# EXHIBIT C



## CHANCERY COURT SHELBY COUNTY, TENNESSEE
## WESTERN DISTRICT OF TENNESSEE

CAMERON BURRELL

Plaintiff

V.

                CASE NO:      CH-19-1677-1

INDIGO AG INC.

Defendant

---

## PETITION FOR INJUNCTIVE RELIEF

---

Come Now the Plaintiff herein by and through counsel of record pursuant to T.R.C.P. 65 and move this Honorable court for a Temporary Injunction restraining and enjoining Defendant Indigo Ag from making penalty deductions from the account of Cameron Burrell regarding certain cancellation costs and additional transportation costs as the initial monies in the account are encumbered by a Landlord's lien held by the State of Mississippi pursuant to Mississippi Code Annotated 89-7-51. See Mississippi Statute attached hereto as Exhibit A.

1

1  Mr. Burrell has farmed certain lands in Sunflower County (Parchman Prison
   Ground) Mississippi pursuant to contract with the State of Mississippi
   containing approximately 838 acres for a period of **EIGHT YEARS**.  Said
   rental payment is due by December 1st of each crop year. Said contract is
   attached hereto as Exhibit B. See Cam Burrell Affidavit Attached.

2. On or about September 26, 2019 Petitioner Burrell entered into a crop
   marketing contract with a Tennessee corporation name **Indigo Ag** located at
   50 South B.B. King Blvd, Memphis, Tennessee 38103. This agreement was
   for the delivery of 5 (10,000 bushel) contracts of # 2 yellow soybeans. The
   contracts with Indigo Ag are attached hereto as collective Exhibit C.

3. Moreover, on or about  September 30, 2019 Petitioner received a telephone
   call  from  an Indigo Ag employee named  Amber Blair  who inquired,
   among other things  as to whether there were  any existing liens that
   Petitioner  may have had on the 2019 soybean crop and methods of payment
   to Mr. Burrell   Petitioner Burrell explained to Ms. Blair that he would reach
   out to officials at the State of Mississippi regarding setting up
   communication as to how to facilitate the payments from Indigo to the State
   of Mississippi. Petitioner Burrell did in fact communicate with State of
   Mississippi officials, advising them of his arrangement and informing them
   of his agreement with Indigo and providing Indigo. The requisite

2

information necessary to facilitate payments.  See collective exhibit D below.  Exhibit D contains email communication between Petitioner Burrell, Indigo Ag and the State of Mississippi.  There was also a subsequent E-Mail correspondence between Your Petitioner and Ms. Mary Gammel on October 4, 2019 wherein, they discussed the State of Mississippi's Landlord Lien and paying the rental amount of $ 89,604.00 owning to the state of Mississippi in satisfaction of the Landlord lien and that rent was to be paid to Mississippi State.  The October 4, 2019 email attached hereto as Exhibit D shows that Ms. Gammel spoke to Mississippi officials on October 3, 2019. See attached Exhibit D.

4.  Your Affiant does herein acknowledges that he has not been able to complete the harvesting of his 2019 soybean crop but is now convinced that he will not be able to deliver the total contract amount herein referenced of 50,000 bushels. However, your Affiant still has approximately 250 acres of soybean to be harvested for the remainder of the 2019 crop year.

5.  On or about November 20, 2019, Your Affiant called the Indigo Ag office in Memphis **and indicated** that Your Petitioner wanted to sell the referenced soybean in order to satisfy the rental payment ($89,000) to Mississippi State. However, Petitioner was told by Mr. McClain at the Indigo Company that there was a penalty of approximately $48,000 that would have to be taken

3

out of the rental payment to Mississippi State to satisfy the referenced venalities.

6. Subsequently counsel for Indigo sent a letter detailing Indigo's intention to impose a cancellation penalty and make consequent deductions from funds otherwise owning to the State of Mississippi for their rental.  See Attached Exhibit E  Exhibit E demonstrates the immediacy of Petitioner's need for intervention by this court to prevent the irreparable harm that would certainly ensue to Petitioner from the disregarding of the right of the Landlord.

7.    Your Affiant maintains that his contract with the State of Mississippi will be revoked and cancelled if Indigo Ag does not honor the landlord lien to the State of Mississippi and that his ability to continue his farming career will be lost if Indigo Ag is allowed to withhold any rental funds otherwise owing to satisfy the lien for the 2019 crop year to Mississippi State. Moreover, Your Affiant is certain that he will be able to satisfy any penalties to Indigo Ag with the proceeds from the reaming soybean yet to be harvested from the 2019 crop.

8.    Additionally, Your Affiant is eligible to receive approximate $42,000 from the United Stated Department of Agriculture which is otherwise available to all soybean farmers who are declared at risk from any tariffs

4

involving the United State and China. This payment is expected by January 15, 2020. See Exhibit Mark as F.

## ARGUMENT

Upon the facts of this case, a temporary restraining order and preliminary injunction should be issued.

The four factors to be considered by the court are as follows:

1. A substantial likelihood of success on the merits;

2. Irreparable injury if the injunction is not issued;

3. The threatened injury outweighs whatever harm the issuance of an injunction may cause the opposing party; and

4. The injunction would not be adverse to the public interest. McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998), Shatel Corp. v. Mao Ta Lumber and Yacht Corp., 697 F 2d 1352, 1354-55 (11th Cir. 1983); Canal Authority, 489 F.2d at 572; Simon v. Culverhouse, 609 F. Supp. 1050, 1051 (S.D. Fla 1985).

We consider, in turn, each of the elements of this standard, as applied to the facts of this case

## (1) Substantial Likelihood of Success on the Merits

Petitioner has present a statute (Mississippi Code Annotated 89-7-51) which provided in pertinent parts that:

> **"Every lessor of land shall have a lien on the agricultural products of the lease premises, however, and by whosoever produced, to secure the payment of the rent and of money advanced to the tenant…"**

Therefore, it is clear from the reading of this statute that the State of Mississippi, as the landlord, has a superior interest in the products and the resulting cash proceeds.  The lien of Indigo is subordinate to the State of Mississippi's landlord lien on the agricultural products and the resulting cash proceeds.

## (2) Irreparable Injury if the Injunction is Not Issued

With regard to irreparable harm, Petitioner will suffer the unlawful default and resulting loss of his leasehold interest with the State of Mississippi. As recognized by Congress as a military veteran  eligible for special benefits as codified under 7 CFR  beginning in the Farming industry. , the new and beginning farmers as codified at 7 CFR Farm program and a socially disadvantaged Farmer for whom the loss of a lease would have long ranging detrimental implications. there can be no doubt that Plaintiffs will suffer irreparable injury if Defendant in this action are permitted to continue to engage in their unlawful conduct as Plaintiff will lose the source of his livelihood .it is his sole means of livelihood, this eight year lease and its corresponding 838 acres provides Petitioners means of income since he has been honorably discharged from the military  It is widely

recognized that conduct such as Defendant's inflicts irreparable injury upon

Plaintiffs because Defendant's actions will lead immediately to the loss of an

irreplaceable leasehold interest and substantial economic injury and damage to

Plaintiff. The term "Socially Disadvantaged Farmer" is defined in previous

legislation, Section 2501e (2) of the Food, Agriculture, Conservation and Trade

Act of 1990 (7 USC 2279e (2)

> A socially disadvantaged Farmer or Rancher is a farmer or rancher who has been
> subjected to racial or ethnic prejudices because of their identity as a member of a group
> without regard to their individual qualities  This term means a farmer or rancher who is a
> member of a socially disadvantaged group   Specifically, a group whose members have
> been subjected to racial or ethnic prejudice because of their identity as members of a
> group without regard to their individual qualities  Those groups include African
> Americans, American Indians or Alaskan natives, Hispanics and Asians or Pacific
> Islanders.

## (3) The Threatened Injury Outweighs Whatever Harm the Issuance of an Injunction May Cause the Opposing Party

The next factor to be considered by this court is whether or not the balance

of hardships tips in favor of Plaintiffs. As has been demonstrated above, the harm

to Plaintiff, absent an injunction, would be irreparable. The inconvenience to

Defendant, upon issuance of the Preliminary Injunction, would be merely a 30 to

60 day delay economic, consisting primarily, of a delay in their receipt of funds to

satisfy penalties as Petitioner has sited additional funds available for payment of

funds. , Given the probable outcome of this action, this is a loss that Defendant

may justifiably be called upon to bear  See Corning Glass Works v. Jeannette Glass

Co , 308 F. Supp  1321, 1328, 164 U.S.P.Q. (BNA) 435 (S.D. N.Y. 1970), opinion aff'd, 432 F.2d 784, 167 U.S.P.Q. (BNA) 421 (2d Cir. 1970.  The threatened injury to Plaintiffs far outweighs whatever harm the issuance of an injunction may cause Defendant.

**(4) The Public Interest Will Be Served By Issuance of the Injunction**

When considering whether to grant injunctive relief, the courts examine and consider the public interest  See McDonald's Corp. v. Robertson, 147 F.3d 1301, 47 U.S.P.Q.2d (BNA) 1545, 41 Fed. R. Serv. 3d 455 (11th Cir. 1998), All Care Nursing Service, Inc  v  Bethesda Memorial Hosp., Inc., 887 F.2d 1535, 1537, 15 Fed. R. Serv. 3d 535 (11th Cir. 1989. This precisely one of the benefits congress has granted to socially disadvantaged farmers and military veteran farmers.

## CONCLUSION

Wherefore, Your Partitioned prays this Honorable Court will enjoin Defendant, Indigo Ag from converting, deducting, offsetting and/or otherwise using secured proceeds belonging Practitioner  Burrell and in possession of Respondent Indigo Ag to satisfy its cancellation and transportation cost or penalties.

8

Respectfully Submitted

Paul A. Robinson Jr. #014464
3749 Marty Street
Memphis, TN 38109
Telephone (901) 649-4053
Fax (901) 328-1803

## CERTIFICATE OF CONSULTATION

I have conveyed the above petition, affidavit and exhibits to legal counsel for
Indigo Ag Inc., Attorney Adam Lazarov via email to alazarov@indigo.com this
12th day of December, 2019.  I have informed Attorney Lazarov that this petition to
will be presented to the Chancellor at 1:30 P. M. this afternoon.

Paul A. Robinson Jr.

9

## ACKNOWLEDGEMENT

The statements contained in the foregoing petition are true to the best of my knowledge, information and belief

STATE OF _Tennessee_
COUNTY OF _Shelby_

Cameron 1 Burrell

Cameron Lamar Burrell

On this the _12th_ day of _December_ 2019, before me, the undersigned Notary, personally appeared, _Cameron Burrell_, known to me, or satisfactorily proven, to be the person whose name is subscribed to the within instrument and acknowledged that he executed, signed and delivered the above and foregoing Affidavit for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal

NOTARY PUBLIC

Notary's Signature _____

My Commission Expires: _August 10, 2021_, 20___

PAUL A. ROBINSON JR.
STATE OF TENNESSEE
NOTARY PUBLIC
COUNTY OF SHELBY
My Comm. Expires Aug 10 2021

10



View the 2018 **Mississippi Code** | View Other Versions of the Mississippi Code

# 2010 Mississippi Code
# TITLE 89 - REAL AND PERSONAL PROPERTY
# Chapter 7 - Landlord and Tenant.
# 89-7-51 - Lien of landlord.

§ 89-7-51. Lien of landlord.

(1) Every lessor of land shall have a lien on the agricultural products of the leased premises, however and by whomsoever produced, to secure the payment of the rent and of money advanced to the tenant, and the fair market value of all advances made by him to his tenant for supplies for the tenant and others for whom he may contract, and for his business carried on upon the leased premises. This lien shall be paramount to all other liens, claims, or demands upon such products when perfected in accordance with Uniform Commercial Code Article 9 - Secured Transactions (Section 75-9-101, et seq.). The claim of the lessor for supplies furnished may be enforced in the same manner and under the same circumstances as his claim for rent may be; and all the provisions of law as to attachment for rent and proceedings under it shall be applicable to a claim for supplies furnished, and such attachment may be levied on any goods and chattels liable for rent, as well as on the agricultural products.

(2) All articles of personal property, except a stock of merchandise sold in the normal course of business, owned by the lessee of real property and situated on the leased premises shall be subject to a lien in favor of the lessor to secure the payment of rent for such premises as has been contracted to be paid, whether or not then due. Such lien shall be subject to all prior liens or other security interests perfected according to law. No such articles of personal property may be removed from the leased premises until such rent is paid except with the written consent of the lessor. All of the provisions of law as to attachment for rent and proceedings thereunder shall be applicable with reference to the

**EXHIBIT**

lessor's lien under this subsection.

**Sources:** Codes, 1880, § 1301; 1892, § 2495; 1906, § 2832; Hemingway's 1917, § 2330; 1930, § 2186; 1942, § 908; Laws, 1972, ch. 343, § 1; Laws, 2001, ch. 495, § 34, eff from and after Jan. 1, 2002.

**Disclaimer:** These codes may not be the most recent version. Mississippi may have more current or accurate information. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or the information linked to on the state site. Please check official sources.

# LEASE CONTRACT
# MISSISSIPPI STATE PENITENTIARY LAND

THE DEPARTMENT OF FINANCE AND ADMINISTRATION THROUGH THE BUREAU OF BUILDING, GROUNDS AND REAL PROPERTY MANAGEMENTON BEHALF OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS / MISSISSIPPI STATE PENITENTIARY HEREAFTER KNOWN AS LESSOR, MAKES THIS CONTRACT TO LEASE:

WITH: _Camron L. Burrell___ -Hereafter known as LESSEE

The Department of Finance and Administration through the Bureau of Building, Grounds and Real Property Management, on behalf of the Mississippi Department of Corrections / Mississippi State Penitentiary, hereinafter referred to as LESSOR, 501 North West Street, Suite 1401B, Jackson, Mississippi 39201, hereby Leases to.

Camron L. Burrell
1948 Arummdale Cove
Corduva, TN 38016

hereinafter referred to as LESSEE, the following described lands, hereinafter referred to as TRACT·

**TRACT NUMBER** _27_

**COUNTY:** _Sunflower___ on the following terms and conditions·

## CONDITION NUMBER 1:

This Lease is entered into in accordance with and pursuant to the authority provided in Sections 47 - 5 - 64 and 47 - 5 - 66 of the *Mississippi Code of 1972, Annotated*, as amended. LESSOR and LESSEE acknowledge that said Tract was recommended by the Mississippi Department of Corrections and that the statutory requirements relating to the advertisement for bids and award of Leases have been complied with.

## CONDITION NUMBER 2:

The Tract of land listed above is generally described on Exhibit A hereto attached. This is a Lease by Tract Number and not by the acre. The LESSOR does not warrant the number of acres of land in the respective Tract.

## CONDITION NUMBER 3:

*Eight (8) YEA*

The primary term of this Lease shall be for a period of three (3) years commencing on ___ April 3rd, 2019 and ending on ___ January 14 ___, 202_, in accordance with Mississippi Code Section 47-5-64 . *for not less than three (3) . years ..and no more than eight (8).*

The current period is for Year __1__ on said three (3) year lease beginning ___ April 3rd ___, 2019 and ending on ___ January 14 ___, 2020.

Lease rent, in full, shall be due annually, in accordance with Condition Number 4b through 4d of the original Lease, and in accordance with Mississippi Code Section 47-5-66 . *shall be due on the anniversary date for each following year of the lease* ., including primary and renewal terms.

All other terms and conditions of the Original Lease shall remain the same.

EXHIBIT

## CONDITION NUMBER 4:

If, upon expiration of the primary term of this lease, LESSOR shall decide to re-lease the subject property, LESSEE, at the option of LESSOR, shall have the right to renew the existing lease under the same terms and conditions as set forth herein for additional terms of one year each. In order to exercise said right LESSEE must comply with the following

## Fwd: Congratulations - Your Offer Has Been Accepted

cgtfmllc@outlook.com
Tue 12/10/2019 3 24 PM
To: problaw937@hotmail com <problaw937@hotmail com>

Get Outlook for Android

**From:** no-reply@indigoag com <no-reply@indigoag com>
**Sent:** Friday, September 27, 2019 7.58·05 AM
**To·** cgtfmllc@outlook com <cgtfmllc@outlook com>
**Subject:** Congratulations - Your Offer Has Been Accepted



Go to your account

### Your Offer AC6QG8B Has Been Accepted

## Soybeans

| | |
|---|---|
| Contract | Basis |
| Price | -$0.25 Jan 2020 |
| Freight | Grower Delivered (FOB Destination) |
| Buyer | Louis Dreyfus Company-Rosedale 016523 (Facility) |
| Quantity | 10,000 Bushels |
| Expiration | Good til Cancel |
| Seller | cameron Burrell |
| Entity Account | Cameron Burrell |
| Offer ID | AC6QG8B |

## View Accepted Offers



## Fwd: Congratulations - Your Offer Has Been Accepted

cgtfmllc@outlook.com
Tue 12/10/2019 3:25 PM
To: problaw937@hotmail.com <problaw937@hotmail.com>

Get Outlook for Android

---

**From:** no-reply@indigoag.com <no-reply@indigoag.com>
**Sent:** Friday, September 27, 2019 7:59:13 AM
**To:** cgtfmllc@outlook.com <cgtfmllc@outlook.com>
**Subject:** Congratulations - Your Offer Has Been Accepted

Go to your account

Your Offer AC4AM2T Has Been Accepted

# Soybeans

| | |
|---|---|
| Contract | Basis |
| Price | -$0.25 Jan 2020 |
| Freight | Grower Delivered (FOB Destination) |
| Buyer | Louis Dreyfus Company-Rosedale 016523 (Facility) |
| Quantity | 10,000 Bushels |
| Expiration | Good til Cancel |
| Seller | cameron Burrell |
| Entity Account | Cameron Burrell |
| Offer ID | AC4AM2T |

## View Accepted Offers

Mail - Paul Robinson - Outlook

## Fwd: Congratulations - Your Offer Has Been Accepted

cgtfmllc@outlook.com

Tue 12/10/2019 3 26 PM

To. problaw937@hotmail.com <problaw937@hotmail.com>

Get Outlook for Android

**From:** no-reply@indigoag.com <no-reply@indigoag.com>
**Sent:** Friday, September 27, 2019 7.58 53 AM
**To.** cgtfmllc@outlook.com <cgtfmllc@outlook.com>
**Subject:** Congratulations - Your Offer Has Been Accepted



Go to your account

Your Offer AC60ZET Has Been Accepted

# Soybeans

| | |
|---|---|
| Contract | Basis |
| Price | -$0.25 Jan 2020 |
| Freight | Grower Delivered (FOB Destination) |
| Buyer | Louis Dreyfus Company-Rosedale 016523 (Facility) |
| Quantity | 10,000 Bushels |
| Expiration | Good til Cancel |
| Seller | cameron Burrell |
| Entity Account | Cameron Burrell |
| Offer ID | AC60ZET |

**View Accepted Offers**

Fw: Letter showing 2019 Taxes are paid

Cameron Burrell
Thu 12/12/2019 10 27 AM
To: Cameron Burrell <cgtfmllc@outlook-com>

---

From: cgtfmllc@outlook com
Sent: Monday, September 30, 2019 10 08 AM
To: Aimee Moncure <Aimee Moncure@dfa ms gov>
Subject: Re. Letter showing 2019 Taxes are paid

Greetings Aimee,

Hope all is well  I need to get my new account manager in contact with you in regards to paying the rent on tracts 3 and 27  I will be working with Indigo Ag here in Memphis and they need some information from you to set you up payments to the State of MS/MSDOC when my soybeans are delivered to the grain elevators

Upon you receiving this email and giving the green light, I will email her your contact information

Thanks again.

Regards,

Cameron Burrell
901.490.5270

Get Outlook for Android

---

501 North West Street, Suite 1401 B
Jackson, MS 39201



## Fwd: -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

cgtfmllc@outlook.com
Tue 12/10/2019 3 07 PM
To  problaw937@hotmail com <problaw937@hotmail com>

Get Outlook for Android

**From:** Mary Beth Gammel <mgammel@indigoag com>
**Sent:** Friday, October 4, 2019 9 11:49 AM
**To:** cgtfmllc@outlook com <cgtfmllc@outlook.com>, Amber Blair <ablair@indigoag com>
**Subject:** RE -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

Sounds great!

A logistics coordinator will be reaching out to you today and sending delivery tickets and instructions.

Also- I was able to speak with both Cathy and Wade at the state of Ms yesterday. They stated that there was a balance of $60,615 on Tract 3 and $28,989 on Tract 27. Would you like to handle this as a money split? If so- we can allocate the money over to the Department of Corrections after the grain has been delivered and contract priced

Just let us know

Mary Gammel
50 South B.B King Blvd
Memphis, TN 38103



Boston • Memphis • Brazil • Argentina • Australia

**From:** cgtfmllc@outlook com <cgtfmllc@outlook com>
**Sent:** Friday, October 4, 2019 8.50 AM
**To:** Amber Blair <ablair@indigoag com>
**Cc:** Mary Beth Gammel <mgammel@indigoag com>
**Subject:** Re: -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

Greetings,

Planning on harvest and delivery on the first 10k bushels on Monday of next week, weather permitting.

Regards,

Cameron Burrell
901.490.5270

Get Outlook for Android

**From:** Amber Blair <ablair@indigoag.com>
**Sent:** Monday, September 30, 2019, 5.55 PM
**To:** cgtfmllc@outlook.com
**Cc:** Mary Beth Gammel
**Subject:** -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

Mr Burrell,

Hi. Just a quick follow-up. You have five total contracting equaling 50,000, The following three have been
approved for early delivery with no additional penalties. Are you wanting to start early delivery on just these
bushels or the entire 50,000bushels?

| Transaction | Bid ID | Delivery Window | Buyer |
|---|---|---|---|
| TX-2491 | AC4AM2T | 10/15/19 - 11/14/20 (grower delivered) | Louis Dreyfus Company-Rosedale 016523 (Facility) |
| TX-2486 | ACLZQAI | 10/15/19 - 11/14/20 (grower delivered) | Louis Dreyfus Company-Rosedale 016523 (Facility) |
| TX-2492 | AC60ZET | 10/15/19 - 11/14/20 (grower delivered) | Louis Dreyfus Company-Rosedale 016523 (Facility) |

Thank you,

Amber Blair

about:blank

indigo

VIA US MAIL

Date        December 4, 2019

To          Paul A. Robinson, Jr, 3749 Many St, Memphis, TN 38109

Re          Notice of Cancelation – Cameron Burrell

Dear Mr. Robinson,

Thank you for speaking with us in regard to your representation of Mr. Cameron Burrell. As you know, Mr. Burrell has legally-binding contracts, governed by National Grain and Feed Association (NGFA) Trade Rules, with Indigo Ag, Inc to sell #1 yellow soybeans through the Indigo Marketplace. Before we learned of your representation, Indigo customer relations personnel spoke with Mr. Burrell, who was unable to offer adequate assurances that he could or would comply with his contractual obligations. Instead, Mr. Burrell agreed on a cancelation per the terms of this letter. We sincerely would like to get Mr. Burrell paid for what Indigo owes him, minus necessary cancelation offsets and deductions, and this correspondence allows us to do that per the terms of Mr. Burrell's contract and NGFA rules. Therefore, after the exercise of due diligence and in consideration of the agreed upon terms herein, we hereby declare Mr. Burrell in default of the following obligations.

#1 Yellow Soybeans Sold to

Indigo Ag, Inc.
50 South B B King Blvd
Memphis, TN 38103

| Offer ID | AC6QG8B | AC4AM2T | ACLZQAI | AC60ZET | ACCAJ54 |
|---|---|---|---|---|---|
| Shipment Dates | 11 1 19-11 30 19 | 10 15 19-11 14 19 | 10 15 19-11 14 19 | 10 15 19-11 14 19 | 11 1 19-11 30 19 |
| Price | -$0 25 Jan 2020 | -$0 25 Jan 2020 | $8 96 | -$0 25 Jan 2020 | -$0 25 Jan 2020 |
| Bushels delivered | 0 | 0 | 8,688 58 | 0 | 0 |
| Defaulted Bushels | 10,000 | 10,000 | 1,311 42 | 10,000 | 10,000 |

Failure to Perform Delivery of Contract is a violation of

NGFA Grain Trade Rules Rule 28

"If the Seller fails to notify the Buyer of his inability to complete his contract, as provided above, the liability of the Seller shall continue until the Buyer, by the exercise of due diligence, can determine whether the Seller has defaulted. In such case it shall then be the duty of the Buyer, after giving notice to Seller to complete the contract, at once to

Indigo Ag, Inc   •   500 Rutherford Avenue   •   Boston, MA 02129   •   Tel 1 (844) 828-0240   •   www.indigoag.com



EXHIBIT
E

12/10/2019, 10 31 AM

indigo

(1) agree with the Seller upon an extension of the contract, or
(2) buy-in for the account of the Seller, using due diligence, the defaulted portion of the contract, or
(3) cancel the defaulted portion of the contract at fair market value based on the close of the market the next business day."

At this time Indigo Ag, Inc. declares Mr. Burrell in default.

Per prior conversations with Indigo non-attorney personnel, Mr. Burrell has agreed that 41,311.42 bushels remain undelivered and that Indigo is entitled to cancel Offer IDs AC6QG8B, AC4AM2T, ACLZQAI, AC60ZET, and ACCAJ54 as to those undelivered bushels.

Indigo will issue Mr. Burrell payment for the delivered bushels, minus deductions, as soon as possible. His payment will be accompanied by a settlement statement, which will set forth all payments owed, deductions therefrom, and set-offs, as explicitly agreed to by Mr. Burrell in the Marketplace Seller Agreement. **Indigo will deduct from Mr. Burrell's payment $40,485.19, which fairly and accurately reimburses Indigo for costs incurred by virtue of this cancelation, plus additional deductions for transport costs as to be reflected on the forthcoming settlement statement.**

You have kindly informed us of the lien the State of Mississippi has against your client. As such, the payment to your client will be in both his name and to the State of Mississippi. It is your client's responsibility to ensure that any commitments he has to the State of Mississippi are satisfied.

We greatly appreciate your reviewing this letter with your client. This correspondence is a notice of default and an attempt to resolve our claims against Mr. Burrell without legal action, and we are hopeful that we will be able to do so. The undelivered bushels are hereby canceled per the terms of the NGFA rules, and we reserve the right to seek all available remedies for losses and damages if Mr. Burrell is not agreeable to the resolution put forth.

We hope to hear from you soon and look forward to resolving this matter.

Very truly yours,

Adam Lazarov, Commercial Legal Counsel, Indigo Ag, Inc.
Email: alazarov@indigoag.com
TN Bar # 033158



**USDA** SUNFLOWER FSA OFFICE
210 N MARTIN LUTHER KING
INDIANOLA, MS 38751-0000
Phone: (662)887-9799

# Payment Statement

### Retain for Tax Purposes

FSA will not issue 1099 tax forms to customers receiving
less than $600 in reportable benefits in a calendar year.

Statement Date: 08/21/2019



CAMERON LAMAR BURRELL SR
1948 AUTUMNDALE CV
0010757 CORDOVA TN 38016-4012
T23

## Payment Summary

| | |
|---|---|
| Gross Payment | $42,753.81 |
| Deductions | - $0.00 |
| Net Payment | $42,753.81 |

## Payment Detail

| TMP/MPF 2019 NON SPECIALTY CROPS | FSA Payment ID 062226702 |
|---|---|
| Transaction control number 32060477 | |
| Gross Payment | $42,753.81 |
| Deductions | - $0.00 |
| Net Payment  ACH sent to CAMERON LAMAR BURRELL SR at REGIONS BANK account ending in 3620 on/about 08/23/2019 | $42,753.81 |

**Notes**
Program Year 2019
Program Name/Type Market Facilitation Program - NS Crops
Payment Amount $42,753 81
You may appeal this payment and
how it was calculated by filing a written request to the County Committee within 30 calendar
days after you receive this statement and by explaining why you believe this payment is
erroneous If you appeal to the County Committee, you have the right to an informal hearing
which you or your representative may attend either personally or by telephone If you appeal
to the County Committee, you may later appeal an adverse determination of the County
Committee to the FSA State Committee or the National Appeals Division or request mediation
If you do not timely file a written appeal, this payment is a final administrative
determination with respect to this matter according to the regulations at 7 CFR Part 780



08/21/2019

Page 1 of 1



USDA is an equal opportunity provider, employer, and lender





This statement was printed by the USDA/FSA National Office The Debt Collection Improvement Act of 1996 (DCIA) (31 USC 3716) requires Treasury to reduce federal
payments to satisfy overdue federal debt. Treasury collections will not appear as deductions on this statement If the amount on this statement does not match the amount
you receive, questions may be directed to Treasury at 1-800-304-3107 Receipt of this statement does not guarantee payment. FSA/CCC is not liable for overdrafts or
failure to verify receipt of funds

## AFFIDAVIT

I, Cameron L. Burrell, a resident citizen of Tennessee, of African American decent, and residing at 1948 Autumndale Cove, Cordova, Tennessee 38016, being first duly sworn, upon oath, under penalty of perjury, hereby depose and say:

1. That on or about Your Affiant entered into a contract for the leasing of farmland from the State of Mississippi (Parchman Prison Ground), hereinafter, Mississippi State, containing approximately 838 acres and being situated in Sunflower County, Mississippi for a period of **EIGHT YEARS**. Said rental payment is due by December 1st of each crop year. See Lease Agreement Marked as Exhibit 1

2. That Your Affiant states that this Mississippi State Land was planted with soybeans of which Mississippi State had an implied Landlord Lien. Such landlord lien is customary in the farm community throughout the country.

3. Your Affiant states that on or about September 26, 2019 he entered into a crop marketing contract with a Tennessee corporation name **Indigo Ag** locate at 50 South B. B. King Blvd, Memphis, Tennessee 38103. This contract was for the delivery of approximately 50,000 bushel of # 2 yellow soybeans to be delivered in 5 separate deliveries consisting of 10,000 bushel each. See Attached Exhibit 2.

4. That on or about September 30, 2019 Your Affiant received a telephone call from an Indigo employee named Amber Blair, who inquired about, among other things, existing lien on the referenced 838 acres of soybeans. Lien

5. On Monday, October 1, 2019 Your Affiant spoke with an Indigo Ag employee named Mary Beth Gammel who was following up on the previous conversation with Ms. Blair the past Friday (September 26, 2019)

6. Moreover, there was also a subsequent E-Mail correspondent between Your Affiant and Ms. Gammel on October 4th, 2019   See Attached Exhibit 3.

7. Your Affiant does herein acknowledges that he has not been able to complete the harvesting of his 2019 soybean crop but is now convinced that he will not be able to deliver the herein referenced 50,000 bushel. However, your Affiant still has approximately 250 acres of soybean to be harvested for the remainder of the 2019 crop year

1

8   On or about November 20, 2019, Your Affiant called the Indigo Ag office in Memphis and indicated that Your Affiant want to sell the referenced soybean in order to satisfy the rental payment ($89,000) in Mississippi State  However, I was told by Mr  McClain of Indigo Ag that there was a penalty of approximately $48,000 that would have to be taken out of the rental payment to Mississippi State to satisfy certain penalties resulting from, as he stated, cancellations and transportation cost.

9   Your Affiant maintains that his contract with the State of Mississippi will be revoked and cancelled if Indigo Ag does not honor the landlord lien to the State of Mississippi and that his ability to continue his farming career will be lost if Indigo Ag is allowed to withhold any rental funds otherwise owing to satisfy the lien for the 2019 crop year to Mississippi State

10  Moreover, Your Affiant is certain that he will be able to satisfy any penalties to Indigo Ag with the proceeds from the reaming soybean yet to be harvested from the 2019 crop

11. Additionally, Your Affiant is eligible to receive approximate $42,000 from the United Stated Department of Agriculture which is otherwise available to all soybean farmers who are declared at risk from any tariffs revolving the United State and China otherwise known as the Market Facilitation Program (MFP).  This payment is expected by January 15, 2020.  See Attached Exhibit 4

**End of Affidavit**

STATE OF ___Tennessee___

COUNTY OF ___Shelby___

_Cameron L. Burrell_
Cameron Lamar Burrell

On this the 12th day of December, 2019, before me, the undersigned Notary, personally appeared, _Cameron Burrell_, known to me, or satisfactorily proven, to be the person whose name is subscribed to the within instrument and acknowledged that he executed, signed and delivered the above and foregoing Affidavit for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

NOTARY PUBLIC

Notary's Signature ___Paul A. Robinson___

My Commission Expires: ___August 11___, 20 21

3

# AFFIDAVIT

I, Cameron L Burrell, a resident citizen of Tennessee, of African American decent, and residing at 1948 Autumndale Cove, Cordova, Tennessee 38016, being first duly sworn, upon oath, under penalty of perjury, hereby depose and say

1. That on or about Your Affiant entered into a contract for the leasing of farmland from the State of Mississippi (Parchman Prison Ground), hereinafter, Mississippi State, containing approximately 838 acres and being situated in Sunflower County, Mississippi for a period of **EIGHT YEARS**. Said rental payment is due by December 1st of each crop year. See Lease Agreement Marked as Exhibit 1.

2. That Your Affiant states that this Mississippi State Land was planted with soybeans of which Mississippi State had an implied Landlord Lien  Such landlord lien is customary in the farm community throughout the country

3. Your Affiant states that on or about September 26, 2019 he entered into a crop marketing contract with a Tennessee corporation name **Indigo Ag** locate at 50 South B  B. King Blvd, Memphis, Tennessee 38103. This contract was for the delivery of approximately 50,000 bushel of # 2 yellow soybeans to be delivered in 5 separate deliveries consisting of 10,000 bushel each. See Attached Exhibit 2

4. That on or about September 30, 2019 Your Affiant received a telephone call from an Indigo employee named Amber Blair, who inquired about, among other things, existing lien on the referenced 838 acres of soybeans. Lien.

5. On Monday, October 1, 2019 Your Affiant spoke with an Indigo Ag employee named Mary Beth Gammel who was following up on the previous conversation with Ms. Blair the past Friday (September 26, 2019)

6. Moreover, there was also a subsequent E-Mail correspondent between Your Affiant and Ms. Gammel on October 4th, 2019   See Attached Exhibit 3.

7. Your Affiant does herein acknowledges that he has not been able to complete the harvesting of his 2019 soybean crop but is now convinced that he will not be able to deliver the herein referenced 50,000 bushel  However, your Affiant still has approximately 250 acres of soybean to be harvested for the remainder of the 2019 crop year.

1

8. On or about November 20, 2019, Your Affiant called the Indigo Ag office in Memphis and indicated that Your Affiant want to sell the referenced soybean in order to satisfy the rental payment ($89,000) to Mississippi State. However, I was told by Mr. McClain of Indigo Ag that there was a penalty of approximately $48,000 that would have to be taken out of the rental payment to Mississippi State to satisfy certain penalties resulting from, as he stated, cancellations and transportation cost.

9. Your Affiant maintains that his contract with the State of Mississippi will be revoked and cancelled if Indigo Ag does not honor the landlord lien to the State of Mississippi and that his ability to continue his farming career will be lost if Indigo Ag is allowed to withhold any rental funds otherwise owing to satisfy the lien for the 2019 crop year to Mississippi State.

10. Moreover, Your Affiant is certain that he will be able to satisfy any penalties to Indigo Ag with the proceeds from the reaming soybean yet to be harvested from the 2019 crop.

11. Additionally, Your Affiant is eligible to receive approximate $42,000 from the United Stated Department of Agriculture which is otherwise available to all soybean farmers who are declared at risk from any tariffs revolving the United State and China otherwise known as the Market Facilitation Program (MFP). This payment is expected by January 15, 2020. See Attached Exhibit 4.

**End of Affidavit**

STATE OF ____Tennessee____

COUNTY OF ____Shelby____

*✗ Cameron L. Burrell*

Cameron Lamar Burrell

On this the 12ᵗʰ day of ____December____, 2019, before me, the undersigned Notary, personally appeared, ____Cameron Burrell____, known to me, or satisfactorily proven, to be the person whose name is subscribed to the within instrument and acknowledged that he executed, signed and delivered the above and foregoing Affidavit for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

NOTARY PUBLIC

Notary's Signature____Paul A. R____

My Commission Expires ____August 11____, 20 21

3

# LEASE CONTRACT
# MISSISSIPPI STATE PENITENTIARY LAND

THE DEPARTMENT OF FINANCE AND ADMINISTRATION THROUGH THE BUREAU OF BUILDING, GROUNDS AND REAL PROPERTY MANAGEMENTON BEHALF OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS / MISSISSIPPI STATE PENITENTIARY HEREAFTER KNOWN AS LESSOR, MAKES THIS CONTRACT TO LEASE:

WITH: _Camron L. Burrell___ -Hereafter known as LESSEE

The Department of Finance and Administration through the Bureau of Building, Grounds and Real Property Management, on behalf of the Mississippi Department of Corrections / Mississippi State Penitentiary, hereinafter referred to as LESSOR, 501 North West Street, Suite 1401B, Jackson, Mississippi 39201, hereby Leases to:

| Camron L. Burrell |
| 1948 Autumndale Cove |
| Cordova, TN 38016 |

hereinafter referred to as LESSEE the following described lands, hereinafter referred to as TRACT:

TRACT NUMBER _3_

COUNTY: _Sunflower_ on the following terms and conditions

CONDITION NUMBER 1:

This Lease is entered into in accordance with and pursuant to the authority provided in Sections 47 - 5 - 64 and 47 - 5 - 66 of the *Mississippi Code of 1972, Annotated*, as amended. LESSOR and LESSEE acknowledge that said Tract was recommended by the Mississippi Department of Corrections and that the statutory requirements relating to the advertisement for bids and award of Leases have been complied with

CONDITION NUMBER 2:

The Tract of land listed above is generally described on Exhibit A hereto attached This is a Lease by Tract Number and not by the acre The LESSOR does not warrant the number of acres of land in the respective Tract

CONDITION NUMBER 3:

The primary term of this Lease shall be for a period of ~~three (3)~~ *Eight (8)* years commencing on ___April 3rd, 2019_ and ending on ____January 14_____, 202_ in accordance with Mississippi Code Section 47-5-64 . *for not less than three (3). years and no more than eight (8).*

The current period is for Year __1__ on said three (3) year lease beginning ____April 3rd__, 2019 and ending on ___January 14_____, 2020.

Lease rent, in full, shall be due annually, in accordance with Condition Number 4b through 4d of the original Lease, and in accordance with Mississippi Code Section 47-5-66 *shall be due on the anniversary date for each following year of the lease __ . including primary and renewal terms.*

All other terms and conditions of the Original Lease shall remain the same

EXHIBIT

CONDITION NUMBER 4:

If, upon expiration of the primary term of this lease, LESSOR shall decide to re-lease the subject property, LESSEE, at the option of LESSOR, shall have the right to renew the existing lease under the same terms and conditions as set forth herein for additional terms of one year each In order to exercise said right LESSEE must comply with the following:

B. Rent for the prior term must have been paid in full by October 30th of the primary term or renewal period, as the case may be;

C. Payment of twenty-five percent (25%) of the annual rental for the renewal lease term must be made to LESSOR at signing or prior to the signing of the renewal contract.

D. Payment of nine dollars ($9.00) per acre in lieu of taxes must be made payable by Certified or Cashier's Check to the Tax Collector of the County in which the land is located and delivered to the LESSOR at signing or prior to signing of the primary lease contract.

In no event shall the total term of the Lease, including primary and renewal terms, exceed eight (8) years. (SB2597 '07)

## CONDITION NUMBER 5:

LESSEE shall pay to LESSOR as rent for the use and possession of the Tract the sum of $67,350.00 per year due and payable as follows

Not less than ____10____ % of the yearly amount of bid shall accompany LESSEE's bid and will be deposited into the Prison Industries Fund and credited toward the rent due by the LESSEE upon the date of award of this Lease to the LESSEE from the LESSOR.

The balance of the rent due is to be paid to LESSOR not later than the date the LESSEE shall take possession of the herein described property as awarded by the LESSOR For this Lease, the said date of possession shall be __April 3rd, 2019__ :

## OR; (If Approved By LESSOR):

The balance of the rent due shall be secured to the LESSOR by the assignment of payment of funds to be received by the LESSEE from the Federal Government through the FSA / USDA Office Said assignment shall be in proper form as specified by the FSA / USDA. Said assignment shall be delivered to the LESSOR no later than the date the LESSEE shall take possession of the herein described property.

Furthermore, The LESSEE agrees to pay rent in full or assign to the LESSOR a first lien mentioned above against the crops planted on the property described herein plus any and all crop insurance proceeds in an amount sufficient to cover any shortage of rent plus a 10% to be charged as additional rent and collectable by the LESSOR as rent should the payment secured to the LESSOR by Assignment of Revenue to be received by the LESSEE from the Federal Government be in an amount less than the balance of rent due. The Lessee agrees to provide the Lessor with the name of Lessee's Crop Insurance supplier, along with a signed Assignment of Indemnity Form

Should the LESSEE fail to assign such a lien to the LESSOR, or, should the crop planted on the property described herein fail to produce the revenue pledged by the lien against a said crop, the Lease will at the option of the LESSOR, terminate and the LESSEE herein shall forfeit all payments previously received by the LESSOR as rent for the property described and shall remain liable to the LESSOR for the balance of rent not paid. A 10% late fee will be added to any balance of rent not paid prior to the expiration date of this lease and collected as additional rent

Should the LESSEE fail to pay or secure payment of the balance of the rent due as specified herein then this Lease shall, at the option of the LESSOR, terminate and the ___10%___ payment which accompanied the bid for this Lease will be forfeited by the LESSEE to the LESSOR.

LESSEE shall submit to LESSOR as payment in lieu of taxes on the Tract(s) the sum of $9.00 per acre shown in bid documents per year and payable as follows (HB 431 '07) A certified or cashier's check made payable to the Tax Collector of the County in which the land is located. Said check will be forwarded to the Tax Collector by LESSOR to be applied to the account of LESSEE.

## CONDITION NUMBER 6:

The LESSEE shall not encumber, assign, or otherwise transfer this Lease, any right or interest in this Lease, or any right or interest in the Tract or any of the improvements that may now or hereafter be constructed or installed on the Tract without the express prior written consent of the LESSOR or its legal representative. Neither shall the LESSEE sublet the Tract or any part thereof or allow any other persons, other than the LESSEE's agents, family, and servants, to occupy or use the Tract without the express prior written consent of the LESSOR or its legal representative A consent by the

LESSOR or its legal representative to one assignment, subletting, occupation, or use by another person shall not be deemed to be consent to any subsequent assignment, subletting, occupation, or use by another person. Any encumbrance, assignment, transfer, or subletting without the express prior written consent of the LESSOR or its legal representative, whether it be voluntary or involuntary, by operation of law or otherwise, is void and shall, at the option of the LESSOR or its legal representative, terminate this Lease.

## CONDITION NUMBER 7:

If for any reason the LESSEE shall abandon this Lease and remove from said Tract of land prior to the expiration hereof, this lease shall be terminated at the option of the LESSOR or its legal representative and shall be henceforth null and void, and the LESSOR or its legal representative shall have the right to enter upon and take possession of said land and to again Lease the same as provided by law. LESSOR shall have the right to seek full restitution from the LESSEE for all damage sustained resulting from the breach of the Lease contract referred to in this paragraph, together with any other amount necessary, including court costs, reasonable attorney fees and interest at the legal rate, to compensate the LESSOR and its legal representative for all detriment proximately caused by the LESSEE's failure to perform his obligations under this Lease.

## CONDITION NUMBER 8:

LESSEE shall not cut or remove from said Tract any timber now standing or growing thereon.

## CONDITION NUMBER 9:

The LESSEE agrees to cultivate the Tract in a husbandman like manner, and not to commit waste thereon, and if in the opinion of the LESSOR or its legal representative waste thereon is or has been committed, then LESSOR shall have the immediate right to terminate this Lease contract, and it or its legal representative to re-enter and re-take the subject lands and take such action as the LESSOR or its legal representative may deem necessary to protect its interest in this Lease and in the Tract or Tracts  LESSEE agrees to reimburse the LESSOR or its legal representative on demand for the costs of any actions taken by the LESSOR or its legal representative pursuant to the provisions of this Condition

## CONDITION NUMBER 10:

LESSEE agrees to plant, grow and harvest from those crops that are specified in Exhibit "B" attached hereto. Said crops have been assigned bases by the FSA / USDA to the Tract and LESSEE agrees to plant the necessary acreage of each crop so as not to diminish the base acreage of the Tract unless otherwise agreed to in writing by the LESSOR or its legal representative

## CONDITION NUMBER 11:

LESSEE agrees to notify the LESSOR or its legal representative in writing of his farm plan for each year of this Lease not later than 60 days prior to the date established by the FSA / USDA as their deadline for submitting farm plans to qualify for FSA / USDA crop programs. Should the LESSEE fail to submit such plan by the required date, or should the plan submitted be unacceptable to the LESSOR or its legal representative, or should the LESSEE fail to plant the crops as designated by this Lease in the acreage prescribed by the Lease, then this Lease may be terminated at the option of the LESSOR or its legal representative on a date determined by the LESSOR or its legal representative and the LESSEE will forfeit to the LESSOR all rent paid

## CONDITION NUMBER 12:

LESSEE agrees that should the LESSEE fail to obtain sufficient crop stands to justify continued cultivation, in accordance with FSA / USDA guidelines and regulations, he will fallow said lands and control the growth of weeds and grass, also in accordance with FSA / USDA guidelines and regulations

## CONDITIONS NUMBER 13:

LESSEE agrees that he will not combine the pro-rata FSA / USDA base acres assigned to this Tract other than with other lands of the Mississippi State Penitentiary. The parties hereto agree that U.S. Department of Agriculture FSA / USDA base acres will be assigned and designated by the FSA / USDA Office. LESSEE agrees to farm and cultivate said land so that maximum acres will be maintained. If allowable under FSA / USDA regulations, base acres may be transferred to other lands of the Mississippi State Penitentiary. So long as LESSEE is not in default under this Condition or any other Condition of this Lease contract, all U.S. Government farm benefits running with said lands, during the term of the Lease, shall inure to the benefit of and be the property of the LESSEE; otherwise, any such benefits shall inure to the benefit of the LESSOR or its assigns

## CONDITION NUMBER 14:

A.  In the fall of the year of termination of the primary term of this Lease contract the LESSOR or its assigns shall have the right to enter on said land for the purpose of breaking and cultivating said land, provided in so doing the LESSOR or its assigns or tenant shall not interfere with the farming operation or damage any existing spring-planted growing crops of the LESSEE

B.  So long as LESSEE is not in default under this or any other condition or conditions of this Lease contract, should the LESSEE have existing spring-planted unharvested crops on the land on the expiration of the primary term of this Lease contract, he shall have the right to enter on said land for the sole purpose of harvesting existing spring-planted crops.

C.  LESSEE agrees that in consideration of the right to harvest existing spring-planted crops after the expiration of this Lease contract he will

1.      Be prompt and diligent in the harvest of his crop;

2       That he will not interfere with the preparation of said land for planting by LESSOR or its assigns or tenant, as provided for under Paragraph A, above.

3       That land preparation by LESSOR or its assigns or tenant, as provided for under Paragraph A above, shall take precedence over LESSEE's right of harvest, as provided for under Paragraph B above, and LESSEE will be a tenant at will

## CONDITION NUMBER 15:

In addition to the Tract leased hereby, the LESSEE shall have the right to common use with other lessees of Mississippi State Penitentiary lands to use the agricultural air strips located on Section 20, Township 24 North, Range 3 West, and Sections 33 and 34, Township 24 North, Range 3 West, provided the LESSEE cooperates with other lessees to keep the airstrips clipped and maintained. The LESSEE agrees that he will not park any equipment on or obstruct the use of said airstrips

## CONDITION NUMBER 16:

The LESSEE, and other lessees of Mississippi State Penitentiary Lands, is hereby authorized to take and receive water from designated domestic water wells of the Mississippi State Penitentiary, to mix chemicals, fertilizer, insecticides and for general farm purposes. LESSEE agrees that prior to spraying toxic and weed control chemicals that he will obtain written permission from the LESSOR or its legal representative, and that said chemicals will not be used if growing vegetables, plants, or trees of the Mississippi State Penitentiary will be damaged thereby, which is to be determined by the LESSOR or its legal representative.

## CONDITION NUMBER 17:

The Mississippi State Penitentiary will permit the LESSEE under the supervision of the Maintenance Department at the Mississippi State Penitentiary, and the LESSOR'S legal representative, to connect to existing electric lines for general farm use, at no cost to the LESSOR, its legal representative, or the Mississippi State Penitentiary, provided LESSEE installs and maintains an electric meter to determine the amount of electricity used. The LESSEE agrees to reimburse LESSOR or its legal representative or the Mississippi State Penitentiary for all electricity used by him. Electricity will

not be made available to operate electric irrigation equipment on Sunflower County land  LESSEE of lands in Quitman County, Mississippi, agrees to make his own arrangements for electricity and to be responsible for all electric bills.

**CONDITION NUMBER 18:**

LESSEE agrees to comply with all security measures, rules and regulations issued by the Department of Corrections dealing with security, ingress and egress on lands of Mississippi State Penitentiary and civilian relations with inmates.

**CONDITION NUMBER 19:**

LESSEE agrees to keep all existing drains open and to return the lands to the LESSOR at the conclusion of this contract in as good condition as received.  LESSEE agrees not to obstruct the natural drain of water.

**CONDITION NUMBER 20:**

The irrigation well, gear heads, pumps and motors located on Tract 1 Quitman County, Mississippi, and Tracts 35 and 36 in Sunflower County, Mississippi, are leased, as is, to the LESSEE of said Tract or Tracts  The irrigation wells located on Sunflower County lands are delivered, as is, except the electric motors which are hereby retained  LESSEE of said Tract or Tracts agrees to return said property described in this paragraph on the expiration of this contract in as good condition as received, natural wear and tear excepted.

**CONDITION NUMBER 21:**

LESSOR and/or its legal representative reserves the right to reclaim part or all of the land leased hereby to be used by the Mississippi Department of Corrections for penitentiary purposes.  In the event any land is reclaimed and/or returned to the Mississippi State Penitentiary for penitentiary purposes, the Mississippi Department of Corrections will make reasonable restitution to the LESSEE, so long as LESSEE is not in default under this Condition or any other Condition of this Lease contract, for rent paid in advance.

**CONDITION NUMBER 22:**

This Lease contract is subject and subordinate to all rights of pipeline companies, public utilities, rights of other State Agencies and easements or rights of way of record or by prescription

**CONDITION NUMBER 23:**

The LESSOR and/or its legal representative reserves the right of ingress and egress in and on land for the purpose of repairing, maintaining, installing and operating electric power lines, water lines, sewage lines, roads, bridges, main water canals and for the apprehension of inmates.  In the event the LESSEE sustains damage resulting there from, the LESSOR will make reasonable restitution to the LESSEE

**CONDITION NUMBER 24:**

All covenants and agreements contained in the Lease are declared to be conditions to this Lease and to the term hereby demised to the LESSEE  Should the LESSEE default in the performance of any covenant, condition, or agreement contained in this Lease the LESSOR may terminate this Lease, re-enter and regain possession of the Tract and recover damages as specified herein as well as those allowed by law or in equity.

**CONDITION NUMBER 25:**

It is understood and agreed that this is solely an agricultural Lease and the lands may be used for such purposes only.  LESSEE agrees that there will be no hunting on any lands subject of this Lease  The rights of all minerals, gas oil, coal, sand, and gravel are reserved to LESSOR and/or its legal representative

**CONDITION NUMBER 26:**

The insolvency of the LESSEE as evidenced by a receiver being appointed to take possession of all or substantially all of the property of the LESSEE, the making of a general assignment for the benefit of creditors by the LESSEE, or the adjudication of the LESSEE as a bankrupt under the Federal Bankruptcy Act shall terminate this Lease and entitle the LESSOR or its legal representative to re-enter and regain possession of the Tract hereby leased.

**CONDITION NUMBER 27:**

This Lease shall be binding on and shall inure to the benefit of the heirs, executors, administrators, successors, and assigns of the parties hereto, but nothing in this paragraph shall be construed as consent by the LESSOR to any assignment of this Lease or any interest therein by the LESSEE except as provided in Condition 6 of this Lease.

**CONDITION NUMBER 28:**

The parties hereto agree that although this Lease Contract is to be performed in Sunflower County and/or Quitman County Mississippi, the LESSOR and LESSEE agree that any action brought to enforce the terms or conditions of the Lease shall be brought in the First Judicial District of Hinds County, the seat of Government of the State of Mississippi. The LESSEE waives any right which he has to be sued in the county of his residence.

**CONDITION NUMBER 29:**

LESSEE, by execution of this Lease, waives his right to be sued in the Courts of the State and/or County of his residence and hereby appoints the Secretary of State for the State of Mississippi, as his agent to receive process for him if he is not found in the State of Mississippi and/or county of the State of Mississippi where suit is filed.

**CONDITION NUMBER 30:**

The lands hereby leased shall be liable to be taxed as other lands are taxed during the continuance of this Lease including the year the Lease Begins, and LESSEE hereby agrees to pay the same as when due. In addition to all other remedies now granted by law for collection of delinquent taxes, LESSEE hereby subjects himself to the jurisdiction of the circuit or any justice court of the County in which the leased lands are situate where the taxing authorities of such districts may file suit to obtain judgment against the LESSEE for any unpaid taxes due hereunder together with penalties, interest, court costs, and reasonable attorney fees.

Section 47-5-66 of the Mississippi Code of 1972, Annotated, as amended provides that "Lands leased for agricultural purposes under Section 47-5-64 shall be subject to a fee in lieu of ad valorem taxes, including taxes levied for school purposes. The fee in lieu shall be Nine Dollars ($9 00) per acre, per year. Before the execution of the agricultural leases to private entities as authorized by Section 47-5-64, at the time of bidding or renewal, the Department of Finance and Administration shall collect the in lieu fee and shall forward the fees to the Tax Collector in which the land is located

**CONDITION NUMBER 31:**

LESSOR shall mail a true copy of this Lease to the tax assessor of the taxing districts in which the leased lands are located within thirty (30) days after the execution of this Lease

**CONDITION NUMBER 32:**

LESSEE shall have the right to build and construct buildings and irrigation wells on the land leased herein for general farm use, with the right to remove said improvements prior to the expiration date of this Lease Contract so long as LESSEE is not in default under this Condition or any other Condition of this Lease Contract. Any other improvements made by the LESSEE shall remain on the land on expiration hereof. The right of removal of any improvement whatsoever shall not apply in the event of default of any kind by LESSEE

**CONDITION NUMBER 33:**

LESSEE agrees to pay the LESSOR all costs of enforcing any of the covenants or Conditions of this Lease, including reasonable attorney fees, court and litigation costs, expenses of litigation, and travel expenses related thereto, should the LESSEE breach the Lease Contract or any covenant or Condition hereof.
**CONDITION NUMBER 34:**

LESSEE assumes all risks of loss, damage or injury by fire or otherwise, to person or property by reason of the condition of the leased premises, or by reason of the management, control, or operation thereof and releases the LESSOR, its legal representative, or its successors and/or assigns from all claim for such loss, damage or injury sustained by the LESSEE or by any agent or employee of the LESSEE or by any person whomsoever, whether caused by the negligence of the LESSOR and/or its legal representative, or its agents or employees or otherwise; and the LESSEE agrees to indemnify the LESSOR and/or its legal representative, its successors and assigns against all claims for such loss, damage or injury sustained by the LESSEE, or by any agent or employee of the LESSEE or by any person whomsoever, whether the same be caused by the negligence of the LESSOR or its legal representative, or its officers, agents, employees or otherwise

**CONDITION NUMBER 35:**

LESSEE will be held liable for all rent due for this Lease Contract and subsequent Lease Extensions including any assignments requested by Lessee and approved by LESSOR.

**CONDITION NUMBER 36:**

Any notice required under the provisions of the Lease shall be made in writing and delivered to the parties at their respective addresses as shown herein via United States Mail, certified, return receipt requested

WITNESS our signatures on this the ___15th___ day of ___April___ , 20 __19__

> LESSOR – DEPARTMENT OF FINANCE AND
> ADMINISTRATION through the
> BUREAU OF BUILDING, GROUNDS AND
> REAL PROPERTY MANAGEMENT
>
> BY: _____
>       Calvin R. Sibley, Director, BOBGRPM
>
> LESSEE
>
> BY: _____
>
>
> LESSER(S)
> BY: _Cameron L Burrell_
>
>
> Type or Print: _Cameron L. Burrell_

APPROVED AS TO FORM
DFA ATTORNEY  4|8|19

The above and foregoing Lease Contract is hereby approved, ratified, and confirmed pursuant to the Public Procurement Review Board of the State of Mississippi, approving this Contract upon its Minutes at a meeting duly called and held on the ___2nd___ day of ___April___ , 20 19 in the City of Jackson, Mississippi

Signed this the ___3rd___ day of ___April___ , 20 __19__

_____
Real Property Management Director

(Lessor's acknowledgment)

STATE OF MISSISSIPPI

COUNTY OF HINDS

On this the ___15th___ day of ___April___ , 20__19__ before me, the undersigned Notary.

  
personally appeared, _____Calvin R. Sibley_____ as _____Director_____ of the Bureau of Building, Grounds and Real Property Management for the Department of Finance and Administration, acknowledged that he/she executed, signed and delivered the above and foregoing instrument, being authorized so to do, for the purposes therein contained

In witness whereof, I hereunto set my hand and official seal.

_____
Notary Public

_____
My Commission Expires

---

(Lessee's acknowledgment for one individual)

STATE OF MISSISSIPPI

COUNTY OF *Hinds*

On this the *2nd* day of *April* _____, 200*19*, before me, _____; the undersigned Notary, personally appeared, *Cameron Burrell* (and) _____ known to me, or satisfactorily proven, to be the person(s) whose name(s) is subscribed to the within instrument and acknowledged that he/she/they executed, signed and delivered the above and foregoing Lease Contract for the purposes therein contained

In witness whereof, I hereunto set my hand and official seal

LAURIE W, ADAMS
Commission Expires
Jan. 7, 2023

_____
Notary Public

_____
My Commission Expires

---

(Lessee's acknowledgment for a ☐ corporation or ☐ partnership or ☐ limited-liability company or ☐ Sole Proprietorship)

STATE OF MISSISSIPPI

COUNTY OF

On this the _____ day of _____, 200___, before me, _____, the undersigned Notary, personally appeared, _____ who acknowledged himself to be the _____ of _____ and as such officer, acknowledged that (s)he executed, signed and delivered the above and foregoing instrument, being authorized so to do, for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

_____
Notary Public

_____
My Commission Expires

EXHIBIT A

LANDS OF THE MISSISSIPPI STATE PENITENTIARY
SUNFLOWER COUNTY MISSISSIPPI

All of the lands in Sunflower County, Mississippi are described by referring to maps or plats now on file at the Land Management Office, Mississippi Correctional Industries, or the Mississippi Department of Corrections

TRACT - 1 All of the lands of the Mississippi State Penitentiary lying in Section 27, Township 24 North, Range 3 West, according to the map hereinabove referred to lying North of Highway #32 and East of U.S. Highway #49 West, less and except Camp #1 and the residential houses located adjacent to and in the immediate area thereof containing approximately 181.9 acres more or less

TRACT - 2 All of the lands of the Mississippi State Penitentiary lying in Section 27 and 34, Township 24 North, Range 3 West, according to the map hereinabove referred to lying East of U.S. Highway #49 West and South of Highway #32, less and except the lands designated as housing area on said map, containing approximately 611.3 acres more or less.

TRACT - 3 All of Sections 34 and 33, Township 24 North, Range 3 West, lying West of I.C.R.R., South of Camp 5 Road, and East of Camp 5 Road, less and except the lands designated as Air Strip, Camp 5 housing area and area designated for vocational education purposes, according to the map hereinabove referred to, containing approximately 449.0 acres more or less.

TRACT - 4 All of Sections 27, 33 and 32, Township 24 North , Range 3 West of Front Camp area, east of Black Bayou, South of Highway 32 , and East of Ditch "A", less and except Front Camp area, Maximum Security Unit, Park Area, and Housing Area, according to the map hereinabove referred to, containing 407 9 acres more or less.

TRACT - 5 All of Sections 27 and 28, Township 24 North, Range 3 West lying West of Highway 49 West, East of Black Bayou and North of Highway 32, less and except the areas designated as Camp 2, Women's Camp, Housing Area, Cemetery Lot, according to the map hereinabove referred to, containing 332 4 acres more or less

TRACT - 6 All of the North half of Section 5, Township 23 North, Range 3 West less and except the land lying North of South Drive according to the map hereinabove referred to, containing 289 5 acres more or less

TRACT - 7 All of Sections 33 and 32, Township 24 North, Range 3 West, and Section 5, Township 23 North, Range 3 West, lying North of South Drive, West of Camp 5 Road, South of Black Bayou and South-west of Ditch "A", containing 385.8 acres more or less

TRACT - 8 All of Section 31, Township 24 North, Range 3 West, and Section 36, Township 24 , Range 4 West, lying south of Black Bayou, East of Camp 5 - 6 Road, East of area designated as Camp 3, less the area designated as Housing and Sewage areas, containing 203 acres more or less

TRACT - 9 All of Sections 35 and 36, Township 24 North, Range 4 West, lying South of Black Bayou, East of Lake Road South and East of Lake Road North, and West of 3 - 6 Road except the areas designated as Catfish Lake, Housing Area, Lake and Recreational Area, containing 209.5 acres more or less

TRACT - 10 All of Sections 35 and 36, Township 24 North, Range 4 West lying South of Black Bayou, East of Camp 4 Road extended, West of Lake Road South, and West of Lake Road North, containing 396 3 acres more or less

TRACT - 11 All of the Penitentiary Land located in Sections 34, 35, 27, 23, and 26, Township 24 North, Range 4 West lying North and West of Camp 4 Road extended, East of Dummy Line Road, South and West of Black Bayou, and South of Highway 32. containing 425 0 acres more or less.

TRACT - 12 All of Sections 25, 26, 35, and 36, Township 24 North, Road 4 West lying South of Highway 32, East of Camp 4 Road West and South of Pecan Ditch, North of Black Bayou, and West of 3 - 6 Road, containing 357 9 acres more or less, less housing area

TRACT - 13 All of Sections 26, 23 and 25 Township 24 North, Road 4 West lying South of Highway 32, North and East of Black Bayou, North and West of Camp Road, less Camp 4 area, containing 352.8 acres more or less

TRACT - 14 All of the lands of the Mississippi State Penitentiary Sections 22, 27, 23 and 26 Township 24 North, Range 3 West lying South Highway 32 and West and North of Dummy Line Road, containing 460.1 acres more or less.

TRACT - 15 All of Sections 25 and 26, Township 24 North, range 4 West, and Section 30, Township 24 North, Range 3 West lying North of Highway 32, South of Shop Drive, West of Camp 6 Section Road, less Field #430, Dog Unit Area, and Camp 6 Area, containing 481.1 acres more or less

TRACT - 16 All of Section 20, Township 24 North, Range 3 West lying East of 10 – 11 Road, South of Camp 10 East Road, South of Camp 10 area and East of Air Strip containing 271.0 acres more or less.

TRACT - 17 All of Section 20 and 19, Township 24 North, Range 3 West lying West of 10 - 11 Road, South of Hog Unit Road, South and East of Hog Unit Ditch, South of Black Bayou Branch, and East of Camp 6 Section Road, less Shop Area, containing 382.3 acres more or less.

TRACT - 18 All of Sections 17, 18, 19, and 20, Township 24 North, Range 3 West lying North of Hog Unit Road, East of Hog Unit Ditch, East of Camp 6 Section Road, South of First Offender Drive, and West of 10 – 11 Road, containing 471.8 acres more or less

TRACT - 19 All of Sections 18, 19, Township 24 North, Range 3 West and Sections 13 and 24, Township 24 North, Range 4 West lying West of Camp 6 Section Road, east of Black Bayou Branch, North of Camp 9 Turnrow East, and East of Black Bottom Road and South of First Offender Drive, less and except dwelling houses and new road area containing 536.1 acres more or less.

TRACT - 20 All of Section 19, Township 24 North, Range 3 West and Section 24 North, Township 24 North, Range 4 West lying South of Black Bayou Branch, West of Camp 6 Section Road, South of Camp 9 Turnrow East, and East of Black Bottom Road, less and except new road area, containing 249.5 acres more or less

TRACT - 21 All of Sections 23 and 24, Township 24 North, Road 4 West, lying South of Camp 9 Turnrow East, West of Black Bottom Road, North of Highway 32, East of Camp 7 area, less housing area containing 254.2 acres more or less.

TRACT - 22 All of Sections 13, 14, 23, and 24 Township 24 North, Range 4 West, lying South of First Offender Drive, West Black Bottom Road, North of Camp 9 Turnrow East, North of Camp 11 Housing area and East of Black Bayou containing 314.1 acres more or less

TRACT - 23 All of Sections 14, 15, and 23 Township 24 West, Range 4 West, lying West of Black Bayou, North of Track 5507, West of Tract 5507, North of Camp 11, East of West Air Strip and East of West Air Strip Road, South of First Offender Road containing 269 3 acres more or less, less Camp 8 area and houses.

TRACT - 24 All of Section 15, 22, and 23, Township 24 North, Range 4 West lying North of Highway 32 East of County Black Top Road, South of North Boundary Penitentiary Lands, West of Air Strip Road, and West of West Air Strip and West of Camp 11 containing 699.2 acres more or less

TRACT - 25 All of Sections 13 and 14 Township 24 North, Range 4 West, lying East of West Air Strip Road, North of First Offender Drive, West of Black Bayou and South of West Boundary Line of Penitentiary Land containing 377 4 acres more or less.

TRACT - 26 Sections 13, 14, and 18 Township 24 West, Range 4 West, lying East of Black Bayou, North of First Offender Drive, West of Black Bayou Branch in Section 18, West of Camp 6 Section Road and South of North line of Section 13, less area designated as Camp 4 and dwelling house containing 362.2 acres more or less.

TRACT - 27 Section 18, Township 24 North, Range 3 West lying West of First Offender Drive, East of Black Bayou Branch, East of Camp 6 Section Road, South of Lime Tree Turnrow and West of 10 and 11 Road containing 370.6 acres more or less.

TRACT - 28 All of Sections 17 and 20 Township 24 North, Range 3 West lying South of Section 17 Turnrow, East of 10 and 11 Road, North of Camp 10 East Road, and West of East Boundary Line of Section 17 and 20 containing 344 3 acres more or less

TRACT - 29  All of Sections 8 and 17, Township 24 North, Range 3 West lying East of 10 and 11 Road, North of Section 17 Turnrow, West of East Boundary Lines Section 17, South of Black Bayou and south of old Camp 11 containing 201.0 acres more or less

TRACT - 30  All of Section 7, 8, 17, and 18 Township 24 North, Range 3 West lying North of Line Tree Turnrow, West of 10 and 11 road, South of Black Bayou, East of West Boundary of Section 7 and 18 containing 440.0 acres less and except area designated as Dump

TRACT - 31 All of Penitentiary land lying Section 6, 7, and 8 Township 24 North, Range 3 West lying North of Black Bayou and West of 10 and 11 Road containing 439.2 acres more or less.

TRACT - 32 All of Mississippi State Penitentiary land lying in sections 8 and 17 Township 24 North, Range 3 West lying North of Black Bayou and East of 10 and 11 containing 305.3 acres more or less.

TRACT - 33  Begin at the intersection of Old Dump Road and Camp 10 - 11 gravel road in Section 29, Township 24 North, Range 3 West; run thence in a westward direction to Rifle Range Ditch and the point of beginning, run thence Westward along said Old Dump Road to the intersection of sand pit Turnrow; run thence South along sand pit Turnrow to Highway 32; run thence in a Easterly direction along 32 Highway to a "v" ditch to Rifle Range Ditch; run thence in a Northeasterly direction along and on said Rifle Range Ditch to Old Dump Road, containing 128.2 acres more or less, all located in Section 29, Township 24 North, Range 3 West

TRACT - 34/42 (Description from Mississippi State Penitentiary 2005)  Begin at the intersection of road 10 - 11 and the North Boundary line of Section 29, Township 24 North, Range 3 West, run thence East along the North Boundary line of Sections 29 and 28 to Black Bayou, run thence South along the West band of Black Bayou to a "v" ditch located North of the dwelling house sites; run thence West and Northwest among said "v" ditch to 10 - 11 road; run thence in a Northeasterly direction along the East right-of-way to 10 - 11 road to the point of beginning. Said land being located in Section 28 and 29, Township 24 North, Range 3 West containing 110.8 acres, more or less.

TRACT - 35 All of Sections 28, 29, 32, and 33, Township 24 North, Range 3 West lying South of Highway 32, and South of Security Parking area and South of Old Hospital area, North and West of Black Bayou and East of the West Boundary line of said Section 32 and 29 containing 445 acres more or less, together with the following irrigation equipment.

## WELL NO. 1

ENGINE: Detroit Diesel Model PTA114144 - Serial No  588047, Rated at 175 Brake H.P.

GENERATOR: Serial No. A56436XD - 230/460 Volts

OVERHEAD PIVOT SPRINKLERS:  Valley Electric Drive, 1711 ft  100 ft. end gun = 1811 ft , Covers 230 acres

WELL HEAD.  Model G125 - Serial No. 911432

WELL -  16 inch rated at 1200 gallons per minute

## WELL NO. 3

WELL:  16 inch rated at 2500 gallons per minute

TRACT - 36  All of Sections 30 and 31, Township 24 North, Range 3 West and All of Sections 25, 36, Township 24 North, Range 4 West, lying South of Highway 32, West of the east Boundary lines of Sections 30 and 31, Township 24 North, Range 3 West, North of Black Bayou and East of 3 - 6 Road less and except the MCI Garden Areas and containing 471 acres, more or less

TRACT - 37/44   A tract of land located in Section 29, Township 24 North, Range 3 West, described generally as follows: Begin at the intersection of the center of Highway 32 and West Line of Section 29, Township 24 North, Range 3 West; run thence East to the East Boundary line of Camp 24 road; run thence North along said East lines of and the point of Camp 24 road to a point located 1065 feet North of the centerline of Highway 32, and the point of beginning of the tract of land herein described; run thence North along the East line of Camp 24 road a distance of 1399.2 feet to a ditch; run thence in an east direction along and on said ditch a distance of 1735 feet, run thence in north direction along the east side of the sewage disposal system a distance of 1000 feet; run thence in a west direction distance of 674 feet; run thence north 300 feet; a distance of 649 feet to the center of Shop Drive Road to a point located 1345 feet of the Northwest corner of said Section 29; run thence east along the center of said road 1465.2 feet to center of a North - South Turnrow, run thence south along the center of said Turnrow  a distance of 335 feet; run thence east along a ditch 866 feet to the center of Camp 10 - 11 road; run thence Southwest along said ditch 330 feet to the center of rifle range ditch; run thence West along old garbage road 759 feet to the east line of garbage dump 851 feet to a stake, run thence in a Southwest direction along the North Line of the garbage dump a distance of 542 feet to the garbage dump road and to a stake marking the Southwest corner of the garbage dump, run thence in as Southwest direction along the center of the garbage dump road a distance of 1815 feet to the North - South sandpit Turnrow; run thence South along sandpit Turnrow 613.8 feet; run thence in a Westerly direction 625 feet to the point of beginning   All of said land less and except the waste water treatment area containing (acres by Mississippi State Penitentiary 2005) 53.8 acres more or less excluding the ditches and roads, the lessors reserve the right to use the North - South Turnrow running North from the Northeast corner of the garbage dump.

TRACT - 38 All of Section 30, Township 24 North, Range 3 West, lying East of Camp 6, Section Road and lying South of Shop Drive, and West of Camp 24 road also known as Warden Drive and lying North of Vegetable Turnrow; less and except Camp 24 area containing 21.86 acres and less and except peach orchard containing 22.16 acres and less and except Camp 23 area containing 18.36 acres and less and except Camp 26 area containing 17.57 acres, all of said land described herein, less exceptions containing 316 acres, more or less.

TRACT - 39   A tract of land located in Section 27, Township 24 North, Range 3 West, described as beginning at the intersection of Highway 49 West and Highway 32; run thence east along the center of Highway 32 approximately 1914 feet; run thence South along a Turnrow approximately 178.2 feet to a ditch and the South side of housing area and the point of beginning of the land herein described; run thence in a westerly direction along the South side of said ditch 957 feet; run thence in a southerly direction along a pasture fence 330 feet, run thence in a westerly direction along a fence row 330 feet to a gravel road, run thence in a southerly direction a distance of 462 feet to a Turnrow, run thence in a easterly direction along a Turnrow a distance of 1425.6 feet to a North - South Turnrow, run thence North along said Turnrow for 924 feet and the point of beginning containing 22.5 acres

TRACT - 42 See descriptions under Tract 34

TRACT - 44 See descriptions under Tract 37

## LANDS OF THE MISSISSIPPI STATE PENITENTIARY:
## QUITMAN COUNTY, MISSISSIPPI

All of the lands in Quitman County, Mississippi are described by referring to maps or plats now on file at the Land Management Office, Mississippi Correctional Industries, of the Mississippi Department of Corrections.
Legal Description by Mississippi State Penitentiary 2005 for Quitman County farmland: (replaces the previous four descriptions for Tracts 1, 2, 3, 4 due to legislative authority to convey part of Quitman County to the Department of Wildlife, Fisheries and Parks

North ½ of the NW ¼ of Section 2, Township 26 North, Range 1 West consisting of 80 acres more or less; plus the SW ¼ of the NW ¼ and the NW ¼ of the SW ¼ of Section 2, Township 26N, Range 1 West consisting of 80 acres more or less, plus the NE ¼ of the SE ¼ and the SE ¼ of the NE ¼, Section 3, township 26 North, Range 1 West, consisting of 80 acres more or less, all in Quitman County, Mississippi, consisting of 201.78 cultivatable acres, more or less, and per Quitman County Chancery Clerk's description in 2007

**EXHIBIT B**

|  |  | Sunflower County | Quitman County |
|---|---|---|---|
| Rape | 174 | 67 | 60 |
| Soybeans | 178 | 67 | 60 |
| Rice | 175 | 67 | 60 |
| Cotton | 128 | 67 | 60 |
| Wheat | 193 | 67 | 60 |
| Sorghum Grain | 177 | 67 | 60 |
| Corn | 126 | 67 | 60 |
| Hay | 138 | 67 | 60 |
| Milo | 150 | 67 | 60 |
| Oats | 156 | 67 | 60 |
| Sunflower Seed | 182 | 67 | 60 |

# LEASE CONTRACT
# MISSISSIPPI STATE PENITENTIARY LAND

THE DEPARTMENT OF FINANCE AND ADMINISTRATION THROUGH THE BUREAU OF BUILDING, GROUNDS AND REAL PROPERTY MANAGEMENT ON BEHALF OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS / MISSISSIPPI STATE PENITENTIARY HEREAFTER KNOWN AS LESSOR, MAKES THIS CONTRACT TO LEASE:

WITH: _Camron L. Burrell____ -Hereafter known as LESSEE

The Department of Finance and Administration through the Bureau of Building, Grounds and Real Property Management, on behalf of the Mississippi Department of Corrections / Mississippi State Penitentiary, hereinafter referred to as LESSOR, 501 North West Street, Suite 1401B, Jackson, Mississippi 39201, hereby Leases to:

Camron L Burrell

1948 Autumndale Cove

Cordova, TN 38016

hereinafter referred to as LESSEE the following described lands, hereinafter referred to as TRACT.

TRACT NUMBER __27_

COUNTY: _Sunflower____ on the following terms and conditions:

## CONDITION NUMBER 1:

This Lease is entered into in accordance with and pursuant to the authority provided in Sections 47 - 5 - 64 and 47 - 5 - 66 of the *Mississippi Code of 1972, Annotated*, as amended. LESSOR and LESSEE acknowledge that said Tract was recommended by the Mississippi Department of Corrections and that the statutory requirements relating to the advertisement for bids and award of Leases have been complied with.

## CONDITION NUMBER 2:

The Tract of land listed above is generally described on Exhibit A hereto attached. This is a Lease by Tract Number and not by the acre. The LESSOR does not warrant the number of acres of land in the respective Tract.

## CONDITION NUMBER 3:

*Eight (8)* KSH

The primary term of this Lease shall be for a period of ~~three (3)~~ years commencing on ____ April 3rd, 2019 and ending on ____ January 14 _____, 202~~1~~, in accordance with Mississippi Code Section 47-5-64 . *for not less than three (3) . years ...and no more than eight (8).*

The current period is for Year __1___ on said three (3) year lease beginning ____ April 3rd ___, 2019 and ending on ____ January 14 _____, 2020.

Lease rent, in full, shall be due annually, in accordance with Condition Number 4b through 4d of the original Lease, and in accordance with Mississippi Code Section 47-5-66 . *shall be due on the anniversary date for each following year of the lease* . including primary and renewal terms

All other terms and conditions of the Original Lease shall remain the same.

EXHIBIT
1

## CONDITION NUMBER 4:

If, upon expiration of the primary term of this lease, LESSOR shall decide to re-lease the subject property, LESSEE, at the option of LESSOR, shall have the right to renew the existing lease under the same terms and conditions as set forth herein for additional terms of one year each. In order to exercise said right LESSEE must comply with the following

A.     Obtain from LESSOR written agreement to the right to renew the Lease;

B.     Rent for the prior term must have been paid in full by October 30th of the primary term or renewal period, as the case may be,

C.     Payment of twenty-five percent (25%) of the annual rental for the renewal lease term must be made to LESSOR at signing or prior to the signing of the renewal contract.

D     Payment of nine dollars ($9.00) per acre in lieu of taxes must be made payable by Certified or Cashier's Check to the Tax Collector of the County in which the land is located and delivered to the LESSOR at signing or prior to signing of the primary lease contract.

In no event shall the total term of the Lease, including primary and renewal terms, exceed eight (8) years. (SB2597 '07)

## CONDITION NUMBER 5:

LESSEE shall pay to LESSOR as rent for the use and possession of the Tract the sum of $33,210.00 per year due and payable as follows.

Not less than ___10___ % of the yearly amount of bid shall accompany LESSEE's bid and will be deposited into the Prison Industries Fund and credited toward the rent due by the LESSEE upon the date of award of this Lease to the LESSEE from the LESSOR

The balance of the rent due is to be paid to LESSOR not later than the date the LESSEE shall take possession of the herein described property as awarded by the LESSOR  For this Lease, the said date of possession shall be _April 3rd, 2019 ·_

## OR; (If Approved By LESSOR):

The balance of the rent due shall be secured to the LESSOR by the assignment of payment of funds to be received by the LESSEE from the Federal Government through the FSA / USDA Office  Said assignment shall be in proper form as specified by the FSA / USDA. Said assignment shall be delivered to the LESSOR no later than the date the LESSEE shall take possession of the herein described property.

Furthermore, The LESSEE agrees to pay rent in full or assign to the LESSOR a first lien mentioned above against the crops planted on the property described herein plus any and all crop insurance proceeds in an amount sufficient to cover any shortage of rent plus a 10% to be charged as additional rent and collectable by the LESSOR as rent should the payment secured to the LESSOR by Assignment of Revenue to be received by the LESSEE from the Federal Government be in an amount less than the balance of rent due.  The Lessee agrees to provide the Lessor with the name of Lessee's Crop Insurance supplier, along with a signed Assignment of Indemnity Form

Should the LESSEE fail to assign such a lien to the LESSOR, or, should the crop planted on the property described herein fail to produce the revenue pledged by the lien against a said crop, the Lease will at the option of the LESSOR, terminate and the LESSEE herein shall forfeit all payments previously received by the LESSOR as rent for the property described and shall remain liable to the LESSOR for the balance of rent not paid.  A 10% late fee will be added to any balance of rent not paid prior to the expiration date of this lease and collected as additional rent

Should the LESSEE fail to pay or secure payment of the balance of the rent due as specified herein then this Lease shall, at the option of the LESSOR, terminate and the __10%__ payment which accompanied the bid for this Lease will be forfeited by the LESSEE to the LESSOR.

LESSEE shall submit to LESSOR as payment in lieu of taxes on the Tract(s) the sum of $9.00 per acre shown in bid documents per year and payable as follows (HB 431 '07).  A certified or cashier's check made payable to the Tax Collector of the County in which the land is located.  Said check will be forwarded to the Tax Collector by LESSOR to be applied to the account of LESSEE

## CONDITION NUMBER 6:

The LESSEE shall not encumber, assign, or otherwise transfer this Lease, any right or interest in this Lease, or any right or interest in the Tract or any of the improvements that may now or hereafter be constructed or installed on the Tract without the express prior written consent of the LESSOR or its legal representative  Neither shall the LESSEE sublet this Tract or any part thereof or allow any other persons, other than the LESSEE's agents, family, and servants, to occupy or use the Tract without the express prior written consent of the LESSOR or its legal representative  A consent by the

LESSOR or its legal representative to one assignment, subletting, occupation, or use by another person shall not be deemed to be consent to any subsequent assignment, subletting, occupation, or use by another person. Any encumbrance, assignment, transfer, or subletting without the express prior written consent of the LESSOR or its legal representative, whether it be voluntary or involuntary, by operation of law or otherwise, is void and shall, at the option of the LESSOR or its legal representative, terminate this Lease.

## CONDITION NUMBER 7:

If for any reason the LESSEE shall abandon this Lease and remove from said Tract of land prior to the expiration hereof, this lease shall be terminated at the option of the LESSOR or its legal representative and shall be henceforth null and void, and the LESSOR or its legal representative shall have the right to enter upon and take possession of said land and to again Lease the same as provided by law. LESSOR shall have the right to seek full restitution from the LESSEE for all damage sustained resulting from the breach of the Lease contract referred to in this paragraph, together with any other amount necessary, including court costs, reasonable attorney fees and interest at the legal rate, to compensate the LESSOR and its legal representative for all detriment proximately caused by the LESSEE's failure to perform his obligations under this Lease.

## CONDITION NUMBER 8:

LESSEE shall not cut or remove from said Tract any timber now standing or growing thereon

## CONDITION NUMBER 9:

The LESSEE agrees to cultivate the Tract in a husbandman like manner, and not to commit waste thereon, and if in the opinion of the LESSOR or its legal representative waste thereon is or has been committed, then LESSOR shall have the immediate right to terminate this Lease contract, and it or its legal representative to re-enter and re-take the subject lands and take such action as the LESSOR or its legal representative may deem necessary to protect its interest in this Lease and in the Tract or Tracts  LESSEE agrees to reimburse the LESSOR or its legal representative on demand for the costs of any actions taken by the LESSOR or its legal representative pursuant to the provisions of this Condition

## CONDITION NUMBER 10:

LESSEE agrees to plant, grow and harvest from those crops that are specified in Exhibit "B" attached hereto  Said crops have been assigned bases by the FSA / USDA to the Tract and LESSEE agrees to plant the necessary acreage of each crop so as not to diminish the base acreage of the Tract unless otherwise agreed to in writing by the LESSOR or its legal representative

## CONDITION NUMBER 11:

LESSEE agrees to notify the LESSOR or its legal representative in writing of his farm plan for each year of this Lease not later than 60 days prior to the date established by the FSA / USDA as their deadline for submitting farm plans to qualify for FSA / USDA crop programs  Should the LESSEE fail to submit such plan by the required date, or should the plan submitted be unacceptable to the LESSOR or its legal representative, or should the LESSEE fail to plant the crops as designated by this Lease in the acreage prescribed by the Lease, then this Lease may be terminated at the option of the LESSOR or its legal representative on a date determined by the LESSOR or its legal representative and the LESSEE will forfeit to the LESSOR all rent paid

## CONDITION NUMBER 12:

LESSEE agrees that should the LESSEE fail to obtain sufficient crop stands to justify continued cultivation, in accordance with FSA / USDA guidelines and regulations, he will fallow said lands and control the growth of weeds and grass, also in accordance with FSA / USDA guidelines and regulations

## CONDITIONS NUMBER 13:

LESSEE agrees that he will not combine the pro-rata FSA / USDA base acres assigned to this Tract other than with other lands of the Mississippi State Penitentiary. The parties hereto agree that U.S. Department of Agriculture FSA / USDA base acres will be assigned and designated by the FSA / USDA Office. LESSEE agrees to farm and cultivate said land so that maximum acres will be maintained. If allowable under FSA / USDA regulations, base acres may be transferred to other lands of the Mississippi State Penitentiary. So long as LESSEE is not in default under this Condition or any other Condition of this Lease contract, all U.S. Government farm benefits running with said lands, during the term of the Lease, shall inure to the benefit of and be the property of the LESSEE; otherwise, any such benefits shall inure to the benefit of the LESSOR or its assigns.

## CONDITION NUMBER 14:

A   In the fall of the year of termination of the primary term of this Lease contract the LESSOR or its assigns shall have the right to enter on said land for the purpose of breaking and cultivating said land, provided in so doing the LESSOR or its assigns or tenant shall not interfere with the farming operation or damage any existing spring-planted growing crops of the LESSEE

B   So long as LESSEE is not in default under this or any other condition or conditions of this Lease contract, should the LESSEE have existing spring-planted unharvested crops on the land on the expiration of the primary term of this Lease contract, he shall have the right to enter on said land for the sole purpose of harvesting existing spring-planted crops.

C.  LESSEE agrees that in consideration of the right to harvest existing spring-planted crops after the expiration of this Lease contract he will·

1   Be prompt and diligent in the harvest of his crop,

2   That he will not interfere with the preparation of said land for planting by LESSOR or its assigns or tenant, as provided for under Paragraph A, above.

3   That land preparation by LESSOR or its assigns or tenant, as provided for under Paragraph A above, shall take precedence over LESSEE's right of harvest, as provided for under Paragraph B above, and LESSEE will be a tenant at will

## CONDITION NUMBER 15:

In addition to the Tract leased hereby, the LESSEE shall have the right to common use with other lessees of Mississippi State Penitentiary lands to use the agricultural air strips located on Section 20, Township 24 North, Range 3 West, and Sections 33 and 34, Township 24 North, Range 3 West, provided the LESSEE cooperates with other lessees to keep the airstrips clipped and maintained. The LESSEE agrees that he will not park any equipment on or obstruct the use of said airstrips

## CONDITION NUMBER 16:

The LESSEE, and other lessees of Mississippi State Penitentiary Lands, is hereby authorized to take and receive water from designated domestic water wells of the Mississippi State Penitentiary, to mix chemicals, fertilizer, insecticides and for general farm purposes   LESSEE agrees that prior to spraying toxic and weed control chemicals that he will obtain written permission from the LESSOR or its legal representative, and that said chemicals will not be used if growing vegetables, plants, or trees of the Mississippi State Penitentiary will be damaged thereby, which is to be determined by the LESSOR or its legal representative.

## CONDITION NUMBER 17:

The Mississippi State Penitentiary will permit the LESSEE under the supervision of the Maintenance Department at the Mississippi State Penitentiary, and the LESSOR'S legal representative, to connect to existing electric lines for general farm use, at no cost to the LESSOR, its legal representative, or the Mississippi State Penitentiary, provided LESSEE installs and maintains an electric meter to determine the amount of electricity used. The LESSEE agrees to reimburse LESSOR or its legal representative or the Mississippi State Penitentiary for all electricity used by him   Electricity will

not be made available to operate electric irrigation equipment on Sunflower County land. LESSEE of lands in Quitman County, Mississippi, agrees to make his own arrangements for electricity and to be responsible for all electric bills.

**CONDITION NUMBER 18:**

LESSEE agrees to comply with all security measures, rules and regulations issued by the Department of Corrections dealing with security, ingress and egress on lands of Mississippi State Penitentiary and civilian relations with inmates

**CONDITION NUMBER 19:**

LESSEE agrees to keep all existing drains open and to return the lands to the LESSOR at the conclusion of this contract in as good condition as received. LESSEE agrees not to obstruct the natural drain of water.

**CONDITION NUMBER 20:**

The irrigation well, gear heads, pumps and motors located on Tract 1 Quitman County, Mississippi, and Tracts 35 and 36 in Sunflower County, Mississippi, are leased, as is, to the LESSEE of said Tract or Tracts. The irrigation wells located on Sunflower County lands are delivered, as is, except the electric motors which are hereby retained. LESSEE of said Tract or Tracts agrees to return said property described in this paragraph on the expiration of this contract in as good condition as received, natural wear and tear excepted

**CONDITION NUMBER 21:**

LESSOR and/or its legal representative reserves the right to reclaim part or all of the land leased hereby to be used by the Mississippi Department of Corrections for penitentiary purposes. In the event any land is reclaimed and/or returned to the Mississippi State Penitentiary for penitentiary purposes, the Mississippi Department of Corrections will make reasonable restitution to the LESSEE, so long as LESSEE is not in default under this Condition or any other Condition of this Lease contract, for rent paid in advance.

**CONDITION NUMBER 22:**

This Lease contract is subject and subordinate to all rights of pipeline companies, public utilities, rights of other State Agencies and easements or rights of way of record or by prescription

**CONDITION NUMBER 23:**

The LESSOR and/or its legal representative reserves the right of ingress and egress in and on land for the purpose of repairing, maintaining, installing and operating electric power lines, water lines, sewage lines, roads, bridges, main water canals and for the apprehension of inmates. In the event the LESSEE sustains damage resulting there from, the LESSOR will make reasonable restitution to the LESSEE

**CONDITION NUMBER 24:**

All covenants and agreements contained in the Lease are declared to be conditions to this Lease and to the term hereby demised to the LESSEE. Should the LESSEE default in the performance of any covenant, condition, or agreement contained in this Lease the LESSOR may terminate this Lease, re-enter and regain possession of the Tract and recover damages as specified herein as well as those allowed by law or in equity

**CONDITION NUMBER 25:**

It is understood and agreed that this is solely an agricultural Lease and the lands may be used for such purposes only. LESSEE agrees that there will be no hunting on any lands subject of this Lease. The rights of all minerals, gas oil, coal, sand, and gravel are reserved to LESSOR and/or its legal representative.

**CONDITION NUMBER 26:**

The insolvency of the LESSEE as evidenced by a receiver being appointed to take possession of all or substantially all of the property of the LESSEE, the making of a general assignment for the benefit of creditors by the LESSEE, or the adjudication of the LESSEE as a bankrupt under the Federal Bankruptcy Act shall terminate this Lease and entitle the LESSOR or its legal representative to re-enter and regain possession of the Tract hereby leased

**CONDITION NUMBER 27:**

This Lease shall be binding on and shall inure to the benefit of the heirs, executors, administrators, successors, and assigns of the parties hereto, but nothing in this paragraph shall be construed as consent by the LESSOR to any assignment of this Lease or any interest therein by the LESSEE except as provided in Condition 6 of this Lease.

**CONDITION NUMBER 28:**

The parties hereto agree that although this Lease Contract is to be performed in Sunflower County and/or Quitman County Mississippi, the LESSOR and LESSEE agree that any action brought to enforce the terms or conditions of the Lease shall be brought in the First Judicial District of Hinds County, the seat of Government of the State of Mississippi. The LESSEE waives any right which he has to be sued in the county of his residence.

**CONDITION NUMBER 29:**

LESSEE, by execution of this Lease, waives his right to be sued in the Courts of the State and/or County of his residence and hereby appoints the Secretary of State for the State of Mississippi, as his agent to receive process for him if he is not found in the State of Mississippi and/or county of the State of Mississippi where suit is filed.

**CONDITION NUMBER 30:**

The lands hereby leased shall be liable to be taxed as other lands are taxed during the continuance of this Lease including the year the Lease Begins, and LESSEE hereby agrees to pay the same as when due. In addition to all other remedies now granted by law for collection of delinquent taxes, LESSEE hereby subjects himself to the jurisdiction of the circuit or any justice court of the County in which the leased lands are situate where the taxing authorities of such districts may file suit to obtain judgment against the LESSEE for any unpaid taxes due hereunder together with penalties, interest, court costs, and reasonable attorney fees.

Section 47-5-66 of the Mississippi Code of 1972, Annotated, as amended provides that "Lands leased for agricultural purposes under Section 47-5-64 shall be subject to a fee in lieu of ad valorem taxes, including taxes levied for school purposes The fee in lieu shall be Nine Dollars ($9 00) per acre, per year. Before the execution of the agricultural leases to private entities as authorized by Section 47-5-64, at the time of bidding or renewal, the Department of Finance and Administration shall collect the in lieu fee and shall forward the fees to the Tax Collector in which the land is located.

**CONDITION NUMBER 31:**

LESSOR shall mail a true copy of this Lease to the tax assessor of the taxing districts in which the leased lands are located within thirty (30) days after the execution of this Lease.

**CONDITION NUMBER 32:**

LESSEE shall have the right to build and construct buildings and irrigation wells on the land leased herein for general farm use, with the right to remove said improvements prior to the expiration date of this Lease Contract so long as LESSEE is not in default under this Condition or any other Condition of this Lease Contract. Any other improvements made by the LESSEE shall remain on the land on expiration hereof. The right of removal of any improvement whatsoever shall not apply in the event of default of any kind by LESSEE

**CONDITION NUMBER 33:**

LESSEE agrees to pay the LESSOR all costs of enforcing any of the covenants or Conditions of this Lease, including reasonable attorney fees, court and litigation costs, expenses of litigation, and travel expenses related thereto, should the LESSEE breach the Lease Contract or any covenant or Condition hereof.

**CONDITION NUMBER 34:**

LESSEE assumes all risks of loss, damage or injury by fire or otherwise, to person or property by reason of the condition of the leased premises, or by reason of the management, control, or operation thereof and releases the LESSOR, its legal representative, or its successors and/or assigns from all claim for such loss, damage or injury sustained by the LESSEE or by any agent or employee of the LESSEE or by any person whomsoever, whether caused by the negligence of the LESSOR and/or its legal representative, or its agents or employees or otherwise, and the LESSEE agrees to indemnify the LESSOR and/or its legal representative, its successors and assigns against all claims for such loss, damage or injury sustained by the LESSEE, or by any agent or employee of the LESSEE or by any person whomsoever, whether the same be caused by the negligence of the LESSOR or its legal representative, or its officers, agents, employees or otherwise.

**CONDITION NUMBER 35:**

LESSEE will be held liable for all rent due for this Lease Contract and subsequent Lease Extensions including any assignments requested by Lessee and approved by LESSOR.

**CONDITION NUMBER 36:**

Any notice required under the provisions of the Lease shall be made in writing and delivered to the parties at their respective addresses as shown herein via United States Mail, certified, return receipt requested

WITNESS our signatures on this the 15th day of April , 20 19

> LESSOR - DEPARTMENT OF FINANCE AND ADMINISTRATION through the BUREAU OF BUILDING, GROUNDS AND REAL PROPERTY MANAGEMENT
>
> BY: _____
> Calvin R. Sibley, Director, BOBGRPM
>
> LESSEE
> BY: _____
> CAMERON L. BURRELL

APPROVED AS TO FORM:

DFA ATTORNEY 9/8/19

LESSEE(S)

BY: _____

_____

Type or Print: _____

The above and foregoing Lease Contract is hereby approved, ratified, and confirmed pursuant to the Public Procurement Review Board of the State of Mississippi, approving this Contract upon its Minutes at a meeting duly called and held on the 3rd day of April , 2019, in the City of Jackson, Mississippi

Signed this the 3rd day of April 20 19

_____
Real Property Management Director

(Lessor's acknowledgment)

STATE OF MISSISSIPPI

COUNTY OF HINDS

On this the _____ day of _____ , 20__ before me, the undersigned Notary.

personally appeared, _Calvin R. Sibley_ as _Director_ of the Bureau of Building, Grounds and Real Property Management for the Department of Finance and Administration, acknowledged that he/she executed, signed and delivered the above and foregoing instrument, being authorized so to do, for the purposes therein contained

In witness whereof, I hereunto set my hand and official seal

Notary Public

My Commission Expires:

---

(Lessee's acknowledgment for one individual)

STATE OF MISSISSIPPI

COUNTY OF _Hinds_

On this the _2nd_ day of _April_ , 200 _19_ , before me, _____, the undersigned Notary, personally appeared, _Cameron Burrell_
(and) _____ known to me, or satisfactorily proven, to be the person(s) whose name(s) is subscribed to the within instrument and acknowledged that he/she/they executed, signed and delivered the above and foregoing Lease Contract for the purposes therein contained

In witness whereof, I hereunto set my hand and official seal

LAURIE W. ADAMS
Commission Expires:
Jan. 7, 2023

Notary Public

My Commission Expires:

---

(Lessee's acknowledgment for a ☐ corporation or ☐ partnership or ☐ limited-liability company or ☐ Sole Proprietorship)

STATE OF MISSISSIPPI

COUNTY OF

On this the _____ day of _____, 200___, before me, _____, the undersigned Notary, personally appeared, _____
who acknowledged himself to be the _____ of _____
and as such officer, acknowledged that (s)he executed, signed and delivered the above and foregoing instrument, being authorized so to do, for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal

Notary Public

My Commission Expires:

EXHIBIT A

LANDS OF THE MISSISSIPPI STATE PENITENTIARY
SUNFLOWER COUNTY MISSISSIPPI

All of the lands in Sunflower County, Mississippi are described by referring to maps or plats now on file at the Land Management Office, Mississippi Correctional Industries, or the Mississippi Department of Corrections

TRACT - 1 All of the lands of the Mississippi State Penitentiary lying in Section 27, Township 24 North, Range 3 West, according to the map hereinabove referred to lying North of Highway #32 and East of U.S. Highway #49 West, less and except Camp #1 and the residential houses located adjacent to and in the immediate area thereof containing approximately 181.9 acres more or less

TRACT - 2 All of the lands of the Mississippi State Penitentiary lying in Section 27 and 34, Township 24 North, Range 3 West, according to the map hereinabove referred to lying East of U.S. Highway #49 West and South of Highway #32, less and except the lands designated as housing area on said map, containing approximately 611 3 acres more or less.

TRACT - 3 All of Sections 34 and 33, Township 24 North, Range 3 West, lying West of LC R R., South of Camp 5 Road, and East of Camp 5 Road, less and except the lands designated as Air Strip, Camp 5 housing area and area designated for vocational education purposes, according to the map hereinabove referred to, containing approximately 449.0 acres more or less.

TRACT - 4 All of Sections 27, 33 and 32, Township 24 North , Range 3 West of Front Camp area, east of Black Bayou, South of Highway 32 , and East of Ditch "A", less and except Front Camp area, Maximum Security Unit, Park Area, and Housing Area, according to the map hereinabove referred to, containing 407.9 acres more or less

TRACT - 5 All of Sections 27 and 28, Township 24 North, Range 3 West lying West of Highway 49 West, East of Black Bayou and North of Highway 32, less and except the areas designated as Camp 2, Women's Camp, Housing Area, Cemetery Lot, according to the map hereinabove referred to, containing 332 4 acres more or less.

TRACT - 6 All of the North half of Section 5, Township 23 North, Range 3 West less and except the land lying North of South Drive according to the map hereinabove referred to, containing 289.5 acres more or less

TRACT - 7 All of Sections 33 and 32, Township 24 North, Range 3 West, and Section 5, Township 23 North, Range 3 West, lying North of South Drive, West of Camp 5 Road, South of Black Bayou and South-west of Ditch "A", containing 385.8 acres more or less

TRACT - 8 All of Section 31, Township 24 North, Range 3 West, and Section 36, Township 24 , Range 4 West, lying south of Black Bayou, East of Camp 3 - 6 Road, East of area designated as Camp 3, less the area designated as Housing and Sewage areas, containing 203 acres more or less

TRACT - 9 All of Sections 35 and 36, Township 24 North, Range 4 West, lying South of Black Bayou, East of Lake Road South and East of Lake Road North, and West of 3 - 6 Road except the areas designated as Catfish Lake, Housing Area, Lake and Recreational Area, containing 209.5 acres more or less

TRACT - 10 All of Sections 35 and 36, Township 24 North, Range 4 West lying South of Black Bayou, East of Camp 4 Road extended, West of Lake Road South, and West of Lake Road North, containing 396 3 acres more or less

TRACT - 11 All of the Penitentiary Land located in Sections 34, 35, 27, 23, and 26, Township 24 North, Range 4 West lying North and West of Camp 4 Road extended, East of Dummy Line Road, South and West of Black Bayou, and South of Highway 32, containing 425 0 acres more or less.

TRACT - 12 All of Sections 25, 26, 35, and 36, Township 24 North, Road 4 West lying South of Highway 32, East of Camp 4 Road West and South of Pecan Ditch, North of Black Bayou, and West of 3 - 6 Road, containing 357 9 acres more or less, less housing area

TRACT - 13 All of Sections 26, 23 and 25 Township 24 North, Road 4 West lying South of Highway 32, North and East of Black Bayou, North and West of Camp Road, less Camp 4 area, containing 352 8 acres more or less

**TRACT - 14** All of the lands of the Mississippi State Penitentiary Sections 22, 27, 23 and 26 Township24 North, Range 3 West lying South Highway 32 and West and North of Dummy Line Road, containing 460 1 acres more or less

**TRACT - 15** All of Sections 25 and 26, Township 24 North, range 4 West, and Section 30, Township 24 North, Range 3 West lying North of Highway 32, South of Shop Drive, West of Camp 6 Section Road, less Field #430, Dog Unit Area, and Camp 6 Area, containing 481 1 acres more or less

**TRACT - 16** All of Section 20, Township 24 North, Range 3 West lying East of 10 - 11 Road, South of Camp 10 East Road, South of Camp 10 area and East of Air Strip containing 271.0 acres more or less

**TRACT - 17** All of Section 20 and 19, Township 24 North, Range 3 West lying West of 10 - 11 Road, South of Hog Unit Road, South and East of Hog Unit Ditch, South of Black Bayou Branch, and East of Camp 6 Section Road, less Shop Area, containing 382 3 acres more or less.

**TRACT - 18** All of Sections 17, 18, 19, and 20, Township 24 North, Range 3 West lying North of Hog Unit Road, East of Hog Unit Ditch, East of Camp 6 Section Road, South of First Offender Drive, and West of 10 - 11 Road, containing 471 8 acres more or less

**TRACT - 19** All of Sections 18, 19, Township 24 North, Range 3 West and Sections 13 and 24, Township 24 North, Range 4 West lying West of Camp 6 Section Road, east of Black Bayou Branch, North of Camp 9 Turnrow East, and East of Black Bottom Road and South of First Offender Drive, less and except dwelling houses and new road area containing 536.1 acres more or less.

**TRACT - 20** All of Section 19, Township 24 North, Range 3 West and Section 24 North, Township 24 North, Range 4 West lying South of Black Bayou Branch, West of Camp 6 Section Road, South of Camp 9 Turnrow East, and East of Black Bottom Road, less and except new road area, containing 249.5 acres more or less.

**TRACT - 21** All of Sections 23 and 24, Township 24 North, Road 4 West, lying South of Camp 9 Turnrow East, West of Black Bottom Road, North of Highway 32, East of Camp 7 area, less housing area containing 254 2 acres more or less.

**TRACT - 22** All of Sections 13, 14, 23, and 24 Township 24 North, Range 4 West, lying South of First Offender Drive, West Black Bottom Road, North of Camp 9 Turnrow East, North of Camp 11 Housing area and East of Black Bayou containing 314 1 acres more or less.

**TRACT - 23** All of Sections 14, 15, and 23 Township 24 West, Range 4 West, lying West of Black Bayou, North of Track 5507, West of Tract 5507, North of Camp 11, East of West Air Strip and East of West Air Strip Road, South of First Offender Road containing 269 3 acres more or less, less Camp 8 area and houses

**TRACT - 24** All of Section 15, 22, and 23, Township 24 North, Range 4 West lying North of Highway 32 East of County Black Top Road, South of North Boundary Penitentiary Lands, West of Air Strip Road, and West of West Air Strip and West of Camp 11 containing 699.2 acres more or less.

**TRACT - 25** All of Sections 13 and 14 Township 24 North, Range 4 West, lying East of West Air Strip Road, North of First Offender Drive, West of Black Bayou and South of West Boundary Line of Penitentiary Land containing 377.4 acres more or less.

**TRACT - 26** Sections 13, 14, and 18 Township 24 West, Range 4 West, lying East of Black Bayou, North of First Offender Drive, West of Black Bayou Branch in Section 18, West of Camp 6 Section Road and South of North line of Section 13, less area designated as Camp 4 and dwelling house containing 362 2 acres more or less

**TRACT - 27** Section 18, Township 24 North, Range 3 West lying West of First Offender Drive, East of Black Bayou Branch, East of Camp 6 Section Road, South of Line Tree Turnrow and West of 10 and 11 Road containing 370 6 acres more or less

**TRACT - 28** All of Sections 17 and 20 Township 24 North, Range 3 West lying South of Section 17 Turnrow, East of 10 and 11Road, North of Camp 10 East Road, and West of East Boundary Line of Section 17 and 20 containing 544 3 acres more or less

**TRACT - 29** All of Sections 8 and 17, Township 24 North, Range 3 West lying East of 10 and 11 Road, North of Section 17 Turnrow, West of East Boundary Lines Section 17, South of Black Bayou and south of old Camp 11 containing 201.0 acres more or less

**TRACT - 30** All of Section 7, 8, 17, and 18 Township 24 North, Range 3 West lying North of Line Tree Turnrow, West of 10 and 11 road, South of Black Bayou, East of West Boundary of Section 7 and 18 containing 440.0 acres less and except area designated as Dump.

**TRACT - 31** All of Penitentiary land lying Section 6, 7, and 8 Township 24 North, Range 3 West lying North of Black Bayou and West of 10 and 11 Road containing 439 2 acres more or less.

**TRACT - 32** All of Mississippi State Penitentiary land lying in sections 8 and 17 Township 24 North, Range 3 West lying North of Black Bayou and East of 10 and 11 containing 305.3 acres more or less.

**TRACT - 33** Begin at the intersection of Old Dump Road and Camp 10 - 11 gravel road in Section 29, Township 24 North, Range 3 West; run thence in a westward direction to Rifle Range Ditch and the point of beginning; run thence Westward along said Old Dump Road to the intersection of sand pit Turnrow; run thence South along sand pit Turnrow to Highway 32; run thence in a Easterly direction along 32 Highway to a "v" ditch to Rifle Range Ditch; run thence in a Northeasterly direction along and on said Rifle Range Ditch to Old Dump Road, containing 128.2 acres more or less, all located in Section 29, Township 24 North, Range 3 West

**TRACT - 34/42** (Description from Mississippi State Penitentiary 2005) Begin at the intersection of road 10 - 11 and the North Boundary line of Section 29, Township 24 North, Range 3 West; run thence East along the North Boundary line of Sections 29 and 28 to Black Bayou; run thence South along the West band of Black Bayou to a "v" ditch located North of the dwelling house sites; run thence West and Northwest among said "v" ditch to 10 - 11 road, run thence in a Northeasterly direction along the East right-of-way to 10 - 11 road to the point of beginning. Said land being located in Section 28 and 29, Township 24 North, Range 3 West containing 110.8 acres, more or less.

**TRACT - 35** All of Sections 28, 29, 32, and 33, Township 24 North, Range 3 West lying South of Highway 32, and South of Security Parking area and South of Old Hospital area; North and West of Black Bayou and East of the West Boundary line of said Section 32 and 29 containing 445 acres more or less, together with the following Irrigation equipment.

## WELL NO. 1

ENGINE   Detroit Diesel Model PTA114144 - Serial No 588047, Rated at 175 Brake H.P.

GENERATOR: Serial No. A56436XD - 230/460 Volts

OVERHEAD PIVOT SPRINKLERS: Valley Electric Drive, 1711 ft 100 ft end gjm = 1811 ft, Covers 230 acres

WELL HEAD: Model G125 - Serial No 911452

WELL: 16 inch rated at 1280 gallons per minute

## WELL NO. 3

WELL: 16 inch rated at 2500 gallons per minute

**TRACT - 36** All of Sections 30 and 31, Township 24 North, Range 3 West and All of Sections 25, 36, Township 24 North, Range 4 West, lying South of Highway 32, West of the east Boundary lines of Sections 30 and 31, Township 24 North, Range 3 West, North of Black Bayou and East of 3 - 6 Road less and except the MCI Garden Areas and containing 471 acres, more or less

TRACT - 37/44   A tract of land located in Section 29, Township 24 North, Range 3 West, described generally as follows: Begin at the intersection of the center of Highway 32 and West Line of Section 29, Township 24 North, Range 3 West; run thence East to the East Boundary line of Camp 24 road; run thence North along said East lines of and the point of Camp 24 road to a point located 1065 feet North of the centerline of Highway 32, and the point of beginning of the tract of land herein described; run thence North along the East line of Camp 24 road a distance of 1399.2 feet to a ditch; run thence in an east direction along and on said ditch a distance of 1735 feet; run thence in north direction along the east side of the sewage disposal system a distance of 1000 feet; run thence in a west direction distance of 674 feet; run thence north 300 feet; a distance of 649 feet to the center of Shop Drive Road to a point located 1345 feet of the Northwest corner of said Section 29; run thence east along the center of said road 1465.2 feet to center of a North - South Turnrow; run thence south along the center of said Turnrow a distance of 335 feet; run thence east along a ditch 866 feet to the center of Camp 10 - 11 road, run thence Southwest along said ditch 330 feet to the center of rifle range ditch; run thence West along old garbage road 759 feet to the east line of garbage dump 851 feet to a stake; run thence in a Southwest direction along the North Line of the garbage dump a distance of 542 feet to the garbage dump road and to a stake marking the Southwest corner of the garbage dump, run thence in as Southwest direction along the center of the garbage dump road a distance of 1815 feet to the North - South sandpit Turnrow; run thence South along sandpit Turnrow 613.8 feet; run thence in a Westerly direction 625 feet to the point of beginning. All of said land less and except the waste water treatment area containing (acres by Mississippi State Penitentiary 2005) 53.8 acres more or less, excluding the ditches and roads, the lessors reserve the right to use the North - South Turnrow running North from the Northeast corner of the garbage dump.

TRACT - 38 All of Section 30, Township 24 North, Range 3 West, lying East of Camp 6, Section Road and lying South of Shop Drive, and West of Camp 24 road also known as Warden Drive and lying North of Vegetable Turnrow; less and except Camp 24 area containing 21.86 acres and less and except peach orchard containing 22 16 acres and less and except Camp 23 area containing 18.36 acres and less and except Camp 26 area containing 17.57 acres, all of said land described herein; less exceptions containing 316 acres, more or less.

TRACT - 39   A tract of land located in Section 27, Township 24 North, Range 3 West, described as beginning at the intersection of Highway 49 West and Highway 32, run thence east along the center of Highway 32 approximately 1914 feet; run thence South along a Turnrow approximately 178 2 feet to a ditch and the South side of housing area and the point of beginning of the land herein described; run thence in a westerly direction along the South side of said ditch 957 feet, run thence in a southerly direction along a pasture fence 330 feet, run thence in a westerly direction along a fence row 330 feet to a gravel road, run thence in a southerly direction a distance of 462 feet to a Turnrow; run thence in a easterly direction along a Turnrow a distance of 1425 6 feet to a North - South Turnrow, run thence North along said Turnrow for 924 feet and the point of beginning containing 22 5 acres.

TRACT - 42 See descriptions under Tract 34.

TRACT - 44 See descriptions under Tract 37.

## LANDS OF THE MISSISSIPPI STATE PENITENTIARY:
## QUITMAN COUNTY, MISSISSIPPI

All of the lands in Quitman County, Mississippi are described by referring to maps or plats now on file at the Land Management Office, Mississippi Correctional Industries, of the Mississippi Department of Corrections.
Legal Description by Mississippi State Penitentiary 2005 for Quitman County farmland: (replaces the previous four descriptions for Tracts 1, 2, 3, 4 due to legislative authority to convey part of Quitman County to the Department of Wildlife, Fisheries and Parks.

North ½ of the NW ¼ of Section 2, Township 26 North, Range 1 West consisting of 80 acres more or less; plus the SW ¼ of the NW ½ and the NW ¼ of the SW ½ of Section 2, Township 26N, Range 1 West consisting of 80 acres more or less, plus the NE ¼ of the SE ¼ and the SE ¼ of the NE ¼, Section 3, township 26 North, Range 1 West, consisting of 80 acres more or less; all in Quitman County, Mississippi; consisting of 201.78 cultivatable acres, more or less, and per Quitman County Chancery Clerk's description in 2007

EXHIBIT B

|  |  | Sunflower County | Quitman County |
|---|---|---|---|
| Rape | 174 | 67 | 60 |
| Soybeans | 178 | 67 | 60 |
| Rice | 175 | 67 | 60 |
| Cotton | 128 | 67 | 60 |
| Wheat | 193 | 67 | 60 |
| Sorghum Grain | 177 | 67 | 60 |
| Corn | 126 | 67 | 60 |
| Hay | 138 | 67 | 60 |
| Milo | 150 | 67 | 60 |
| Oats | 156 | 67 | 60 |
| Sunflower Seed | 182 | 67 | 60 |

## Fwd: Congratulations - Your Offer Has Been Accepted

cgtfmllc@outlook.com
Tue 12/10/2019 3:24 PM
To  problaw937@hotmail.com <problaw937@hotmail.com>

Get Outlook for Android

**From:** no-reply@indigoag.com <no-reply@indigoag.com>
**Sent:** Friday, September 27, 2019 7:58:05 AM
**To:** cgtfmllc@outlook.com <cgtfmllc@outlook.com>
**Subject:** Congratulations - Your Offer Has Been Accepted



Go to your account

Your Offer AC6QG8B Has Been Accepted

# Soybeans

| | |
|---|---|
| Contract | Basis |
| Price | -$0.25 Jan 2020 |
| Freight | Grower Delivered (FOB Destination) |
| Buyer | Louis Dreyfus Company-Rosedale 016523 (Facility) |
| Quantity | 10,000 Bushels |
| Expiration | Good til Cancel |
| Seller | cameron Burrell |
| Entity Account | Cameron Burrell |
| Offer ID | AC6QG8B |

View Accepted Offers



**Fw: Letter showing 2019 Taxes are paid**

Cameron Burrell

Thu 12/12/2019 10 27 AM

To  Cameron Burrell <cgtfmllc@outlook.com>

---

**From** cgtfmllc@outlook com
**Sent:** Monday, September 30, 2019 10 08 AM
**To:** Aimee Moncure <Aimee Moncure@dfa ms gov>
**Subject:** Re  Letter showing 2019 Taxes are paid

Greetings Aimee,

Hope all is well. I need to get my new account manager in contact with you in regards to paying the rent on tracts 3 and 27  I will be working with Indigo Ag here in Memphis and they need some information from you to set you up payments to the State of MS/MSDOC when my soybeans are delivered to the grain elevators.

Upon you receiving this email and giving the green light, I will email her your contact information

Thanks again.

Regards,

Cameron Burrell
901 490 5270

Get Outlook for Android

---

501 North West Street, Suite 1401 B
Jackson, MS 39201



## Fwd: -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

cgtfmllc@outlook.com
Tue 12/10/2019 3 07 PM
To  problaw937@hotmail com <problaw937@hotmail com>

Get Outlook for Android

**From:** Mary Beth Gammel <mgammel@indigoag com>
**Sent:** Friday, October 4, 2019 9 11·49 AM
**To:** cgtfmllc@outlook com <cgtfmllc@outlook com>; Amber Blair <ablair@indigoag com>
**Subject:** RE: -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

Sounds great!

A logistics coordinator will be reaching out to you today and sending delivery tickets and instructions.

Also– I was able to speak with both Cathy and Wade at the state of Ms. yesterday. They stated that there was a balance of $60,615 on Tract 3 and $28,989 on Tract 27  Would you like to handle this as a money split? If so– we can allocate the money over to the Department of Corrections after the grain has been delivered and contract priced

Just let us know

Mary Gammel
50 South B B  King Blvd
Memphis, TN 38103



Boston · Memphis · Brazil · Argentina · Australia

**From:** cgtfmllc@outlook com <cgtfmllc@outlook com>
**Sent:** Friday, October 4, 2019 8.50 AM
**To:** Amber Blair <ablair@indigoag com>
**Cc:** Mary Beth Gammel <mgammel@indigoag com>
**Subject:** Re -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

Greetings,

Planning on harvest and delivery on the first 10k bushels on Monday of next week, weather permitting.

Regards,

Cameron Burrell
901.490.5270

Get Outlook for Android

**From:** Amber Blair <ablair@indigoag.com>
**Sent:** Monday, September 30, 2019, 5.55 PM
**To:** cgtfmllc@outlook.com
**Cc:** Mary Beth Gammel
**Subject:** -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

Mr. Burrell,

Hi. Just a quick follow-up  You have five total contracting equaling 50,000  The following three have been approved for early delivery with no additional penalties. Are you wanting to start early delivery on just these bushels or the entire 50,000bushels?

| Transaction | Bid ID | Delivery Window | Buyer |
|---|---|---|---|
| TX-2491 | AC4AM2T | 10/15/19 - 11/14/20 (grower delivered) | Louis Dreyfus Company-Rosedale 016523 (Facility) |
| TX-2486 | ACLZQAI | 10/15/19 - 11/14/20 (grower delivered) | Louis Dreyfus Company-Rosedale 016523 (Facility) |
| TX-2492 | AC6OZET | 10/15/19 - 11/14/20 (grower delivered) | Louis Dreyfus Company-Rosedale 016523 (Facility) |

Thank you,

Amber Blair

 **USDA**  SUNFLOWER FSA OFFICE
210 N MARTIN LUTHER KING
INDIANOLA, MS 38751-0000
Phone: (662)887-9799

# Payment Statement

### Retain for Tax Purposes

FSA will not issue 1099 tax forms to customers receiving
less than $600 in reportable benefits in a calendar year

Statement Date: 08/21/2019



CAMERON LAMAR BURRELL SR
1948 AUTUMNDALE CV
CORDOVA TN 38016-4012

0010757
T23

## Payment Summary

| | |
|---|---|
| Gross Payment | $42,753 81 |
| Deductions | – $0.00 |
| Net Payment | $42,753 81 |

## Payment Detail

| TMP/MPF 2019 NON SPECIALTY CROPS | FSA Payment ID: 062226702 |
|---|---|
| Transaction control number  32060477 | |
| Gross Payment | $42,753.81 |
| Deductions | – $0 00 |
| Net Payment    ACH sent to CAMERON LAMAR BURRELL SR at REGIONS BANK account ending in 3620 on/about 08/23/2019 | $42,753 81 |

Notes
Program Year  2019
Program Name/Type  Market Facilitation Program - NS Crops
Payment Amount  $42,753 81
You may appeal this payment and
how it was calculated by filing a written request to the County Committee within 30 calendar
days after you receive this statement and by explaining why you believe this payment is
erroneous  If you appeal to the County Committee, you have the right to an informal hearing,
which you or your representative may attend either personally or by telephone  If you appeal
to the County Committee, you may later appeal an adverse determination of the County
Committee to the FSA State Committee or the National Appeals Division or request mediation
If you do not timely file a written appeal, this payment is a final administrative
determination with respect to this matter according to the regulations at 7 CFR Part 780



 USDA is an equal opportunity provider, employer, and lender



 This statement was printed by the USDA/FSA National Office  The Debt Collection Improvement Act of 1996 (DCIA) (31 USC 3716) requires Treasury to reduce federal
payments to satisfy overdue federal debt. Treasury collections will not appear as deductions on this statement. If the amount on this statement does not match the amount
you receive, questions may be directed to Treasury at 1-800-304-3107  Receipt of this statement does not guarantee payment. FSA/CCC is not liable for overdrafts or
failure to verify receipt of funds

ELECTRONICALLY FILED
2019 Dec 13 9:01 AM
CLERK OF COURT

## IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

CAMERON BURRELL,                              )
                                             )
     Plaintiff,                            )
                                             )
vs.                                          )
                                             )   NO. CH-19-1677
INDIGO AG INC.,                              )   Part I
                                             )
     Defendant.                            )
                                             )

### NOTICE OF APPEARANCE

PLEASE TAKE NOTICE that Kathryn K. Van Namen of Butler Snow LLP, hereby

enters her appearance as counsel of record for Defendant Indigo Ag Inc.

DATED this 13th day of December, 2019.

                    Respectfully submitted,

                    BUTLER SNOW, LLP

                    By: _____
                         Kathryn K. Van Namen, #31322
                         6075 Poplar Avenue, Suite 500
                         Memphis, TN 38119
                         Telephone: (901) 680-7200
                         kate.vannamen@butlersnow.com

### CERTIFICATE OF SERVICE

The undersigned certifies that on December 13, 2019, a copy of the foregoing was served
via email and U.S. Mail, postage prepaid, upon the following:

Paul A. Robinson Jr.
3749 Marty Street
Memphis, TN 38109

                         _____
                         Kathryn K. Van Namen

50527151.v1

# IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

*Cameron Borrell*
Plaintiff

vs.

*Indig, Ag. Inc.*
Defendant

Docket No. *CH-19-1677-1*

SHELBY COUNTY
CHANCERY COURT

DEC 16 2019

W. AARON HALL, C & M
TIME: *15:30*   BY: _____

**FIAT**

## TO THE CLERK OF THIS COURT:

Based upon the record in this matter, issue one or more of the following:

☒ **NOTICE OF HEARING**

Issue Notice and set this matter for hearing on *Friday*, the *16th* day of *January*, *2020* at *1:30* o'clock *p.* m.

☐ **WRIT OF CERTIORARI**

Issue a Writ of Certiorari as prayed for in this matter.

☐ **WRIT OF SCIRE FACIAS (CONTEMPT)**

Issue a Writ of Scire Facias as prayed for in this matter and set this matter for hearing on _____, the _____ day of _____, _____ at _____ o'clock ___. m.

☐ **INJUNCTION**

Issue the injunction as prayed for in this matter upon bond being given in the amount of $_____.

☒ **TEMPORARY RESTRAINING ORDER (TRO)**

Issue the Temporary Restraining Order as prayed for in this matter upon bond being given in the amount of $ *500.* and issue Notice setting this matter for hearing on *Friday*, the *10th* day of *January*, _____ at *1:30* o'clock *P.* m. for Defendant to show cause why Plaintiff is not entitled to have the relief prayed for in this matter.

_____
Chancellor

*12-16-19*
Date

**BY INTERCHANGE**

ELECTRONICALLY FILED
2019 Dec 27 6:08 PM
CLERK OF COURT

### WESTERN DISTRICT OF TENNESSEE
### CHANCERY COURT

**CAMERON BURRELL**


**Plaintiff**


**V.**
                              **CASE NO:   CH- 19-1677**

**INDIGO AG INC.**


**Defendant**

---

## MEMORANDUM IN SUPPORT OF PERMANENT INJUNCTION

---

<u>STATEMENT OF THE CASE</u>

A petition for injunctive relief herein was filed on December 12, 2019 in the

Chancery Court of Shelby County, Tennessee. A hearing on the TRO was held on

Monday December 16, 2019 and a Fiat granting the TRO was executed and entered

on December 16, 2019. A hearing on the Permanent Injunction was set for January

10, 2020. Your petitioner is seeking a permanent injunction of Respondent Indigo

Ag Inc. as Indigo has in its possession 8, 688.58 bushels delivered at an agreed price

of $8.96 per bushel. See Exhibit E attached hereto, letter from Indigo corporate

counsel Adam Lazarov. In Exhibit E, Indigo expresses its intention to deduct from Mr. Burrell's payment $40,485.19 for reimbursement of Indigo for cancellation costs plus an additional deduction for transport costs.

## MISSISSIPPI CODE LANDLORD'S LIEN 89-7-51

Your Petitioner asserts that all the monies in the account are encumbered by a first priority Landlord's Lien held by the State of Mississippi pursuant to Mississippi Code Annotated 89-7-51 which states:

**Every lessor of land shall have a lien on the agricultural products of the leased premises……to secure the payment of the rent and of money advanced to the tenant.**

See Mississippi Statute 89-7-51 attached hereto as Exhibit A.

## TENNESSEE CODE ANNOTATED 66-12-101

Tennessee also has such a statute located at Tennessee Code Annotated 66-12-101 Exhibit B stating:

**That A landlord and one controlling land by lease or otherwise shall have a lien on all crops grown on the land during the year for the payment of the rent for the year, whether the contract of rental be verbal or in writing, and this lien shall inure to the benefit of the assignee of the lienor.**

## ARKANSAS CODE ANNOTATED 18-41-103

**Arkansas Code Annotated 18-41-103 provides In addition to the lien given by law to landlords, if any landlord, to enable his or her tenant or employee to make and gather the crop, shall advance the tenant or employee any necessary supplies, either of money, provisions, clothing, stock, or other necessary articles, the landlord shall have a lien upon the crop raised upon the premises for the value of the advances.**
## ALABAMA CODE ANNOTATED 35-9-30

**A landlord has a lien, which is paramount to, and has preference over, all other liens, on the crop grown on rented lands for rent for the current year, and for advances made in money, or other thing of value, either by him directly, or by another at his instance or request for which he became legally bound or liable at or before the time such advances were made, for the sustenance or well-being of the tenant or his family, or for preparing the ground for cultivation, or for cultivating, gathering, saving, handling, or preparing the crop for market; and also on all articles advanced, and on all property purchased with money advanced or obtained by barter in exchange for articles advanced, for the aggregate price or value of such articles and property.**

## GEORGIA CODE ANNOTATED 44-14-341

**Landlords shall have a special lien for rent on crops grown on land rented from them, which lien shall be superior to all other liens except liens for taxes, and shall also have a general lien on the property of the debtor which is subject to levy and sale, which general lien shall date from the time of the levy of a distress warrant to enforce the general lien.**

It is the policy of most agricultural states including Mississippi and Tennessee that the Landlord has a priority lien on the agricultural product taking priority over other liens of whatsoever kind.

## ARGUMENT

**Upon the facts of this case, a permanent injunction should be issued because the four factors for extraordinary relief are met herein: Specifically:**

**The legal standard for extraordinary injunctive relief**

The four factors to be considered by the court are as follows:

1.    A substantial likelihood of success on the merits;

2.    Irreparable injury if the injunction is not issued;

3.    The threatened injury outweighs whatever harm the issuance of an injunction may cause the opposing party; and

4.    The Public Interest Will Be Served By Issuance of the Injunction

The standard for a **preliminary injunction** is essentially the same as for a **permanent injunction**," except that a plaintiff must show actual success for a **permanent injunction**, rather than simply a likelihood of success on the merits. *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 546 n.12, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987); *see Am. Civil Liberties Union of Ky. v. McCreary Cnty.,* 607 F.3d 439, 445 (6th Cir. 2010). In addition, when a plaintiff seeks a **permanent injunction**, "[a]n evidentiary hearing typically is required before an **injunction** may be granted, but a hearing is not necessary where no triable issues of fact are involved." *United States v. Miami Univ.,* 294 F.3d 797, 815 (6th Cir. 2002) (citing *United States v. McGee,* 714 F.2d 607, 613 (6th Cir. 1983)). Backpage.com, LLC v. Cooper, 2013 U.S. Dist. LEXIS 43852, *2-3, 2013 WL 1249063

Pursuant to Tennessee case law, there are four factors to be considered by a trial court in deciding whether to issue a temporary **injunction**:

a. the threat of irreparable harm,

b. the balance between the harm to be prevented and the injury to be inflicted if the **injunction** issues,

c. the probability that the applicant will succeed on the merits, and

d. the public interest.

With respect to **permanent** injunctive relief, the analysis differs somewhat as, in the typical situation; the court has ruled in favor of the applicant on the

10

merits and must determine whether **permanent** injunctive relief is an appropriate

remedy. Curb Records, Inc. v. McGraw, 2012 Tenn. App. LEXIS 670, *1, 2012

WL 4377817

   We consider, in turn, each of the elements of this standard, as applied to the

facts of this case.

### (1) Substantial Likelihood of Success on the Merits

Petitioner has presented a statute (Mississippi Code Annotated 89-7-51)

which provided in pertinent parts that:

> **"Every lessor of land shall have a lien on the agricultural products of the lease premises, however, and by whosoever produced, to secure the payment of the rent and of money advanced to the tenant…"**

As noted above, Tennessee also has such a statute located at Tennessee Code

Annotated 66-12-101 Exhibit B stating:

> **That A landlord and one controlling land by lease or otherwise shall have a lien on all crops grown on the land during the year for the payment of the rent for the year, whether the contract of rental be verbal or in writing, and this lien shall inure to the benefit of the assignee of the lienor.**

Therefore, it is clear from the reading of this statute that the State of

Mississippi, as the landlord, has a superior interest in the agricultural product and

it's resulting cash proceeds.   The proof presented at this hearing demonstrates the

actual success on the merits of Petitioner Burrell in that the landlord's lien of both Mississippi and Tennessee are well established regarding the priority of the landlord's lien.  Both the Mississippi and the Tennessee statutes clearly indicate the priority of the landlord lien.

### (2) Irreparable Injury if the Injunction is Not Issued

With regard to irreparable harm, Petitioner will suffer the unlawful default and resulting loss of his leasehold interest with the State of Mississippi. As recognized by Congress as a military veteran  eligible for special benefits as codified under 7 CFR   beginning in the Farming industry , the new and beginning farmers as codified at 7 CFR Farm program and a socially disadvantaged Farmer for whom the loss of a lease would have long ranging detrimental implications. there can be no doubt that Plaintiffs will suffer irreparable injury if Defendant in this action are permitted to continue to engage in their sanctions and charges Plaintiff will lose the source of his livelihood .It is his sole means of livelihood, this eight year lease and its corresponding 838 acres provides Petitioners means of income since he has been honorably discharged from the military.  It is widely recognized that conduct such as Defendant's inflicts irreparable injury upon Plaintiffs because Defendant's actions will lead immediately to the loss of an irreplaceable leasehold interest and substantial economic injury and damage to

Plaintiff . The letter from the State of Mississippi attached hereto as Exhibit C

demonstrates the economic impact at issue for Petitioner Burrell.

### (3) The Threatened Injury Outweighs Whatever Harm the Issuance of an Injunction May Cause the Opposing Party

The next factor to be considered by this court is whether or not the balance

of hardships tips in favor of Plaintiffs.  As has been demonstrated above, the harm

to Plaintiffs, absent an injunction, would be irreparable. The inconvenience to

Respondent Indigo , upon issuance of the permanent  Injunction, would be merely

economic, consisting primarily, if not entirely, of a reamortization of Petitioner's

indebtedness. Given the probable outcome of this action; this is a loss that

Defendant may justifiably be called upon to bear. See Corning Glass Works v.

Jeannette Glass Co., 308 F. Supp. 1321, 1328, 164 U.S.P.Q. (BNA) 435 (S.D. N.Y.

1970), opinion aff'd, 432 F.2d 784, 167 U.S.P.Q. (BNA) 421 (2d Cir. 1970.  A

viable economic alternative for Indigo could exist in the form of an opportunity for

Mr. Burrell to re-amortize the outstanding debt.  Re-amortization of Mr. Burrell's

indebtedness creates a delay to Indigo, however, a delay to Ingio is nowhere near

the extent of the damage Indigo as to the grievous losses stemming from a total

default in his leasehold interest (868 acres) with the State of Mississippi that would

be incurred by the Petitioner Burrell. .   Moreover, the letter to Mr. Burrell from

the state of Mississippi makes it abundantly clear that Mr. Burrell will indeed be

10

ousted from the only farmland for which his livelihood depends upon. The threatened injury to Plaintiffs far outweighs whatever harm the issuance of an injunction may cause Defendant.

To be sure, Mr. Burrell, as being (a) a member of a minority class and (b) a person who has served this country (veteran) is considered by Congress as someone being eligible to certain provision of the special remedies that congress instructed the Department of Agriculture (FSA-Farm Service Agency) to safeguard under & U.S.C Section 2501e (2) of the Food, Agriculture, Conservation and Trade Act of 1990, as amended, as follows:

The term "Socially Disadvantaged Farmer" is defined in previous legislation, Section 2501e (2) of the Food, Agriculture, Conservation and Trade Act of 1990 (7 USC 2279e (2).

> A socially disadvantaged Farmer or Rancher is a farmer or rancher who has been subjected to racial or ethnic prejudices because of their identity as a member of a group without regard to their individual qualities. This term means a farmer or rancher who is a member of a socially disadvantaged group.  Specifically, a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities. Those groups include African Americans, American Indians or Alaskan natives, Hispanics and Asians or Pacific Islanders.

Likewise:

> While FSA is fully committed to all farmers and ranchers, there is a special focus on the particular credit needs of farmers and ranchers who are in their first 10 years of operation. Each year, FSA targets a portion of its lending by setting aside a portion of all loan funds for financing beginning farmer and rancher operations. With the single exception of the Direct Farm Ownership Down Payment Loan, the Beginning Farmer classification is not related to a type of loan program; it references a specific

Practitioner Burrell was granted an EIGHT YEAR lease agreement from the State of Mississippi and has a remaining SEVEN YEARS on his contract with the State of Mississippi.  Moreover, he has no other leases for which he can continue his farming career and therefore will suffer grievous losses if this requested permanent injunction is not granted.

It is widely recognized that conduct such as Defendant's inflicts irreparable injury upon Plaintiffs because Defendant's actions will lead immediately to the loss of an irreplaceable leasehold interest and substantial economic injury and damage to Plaintiff.  The equities also weigh in this direction as Respondent Indigo had prior knowledge in October of 2019  of the Mississippi crop and landlord lien. See attached Exhibit D (Emails from Indigo indicating knowledge of the Mississippi landlord  and contact with the Mississippi landlord)

**(4) The Public Interest Will Be Served By Issuance of the Injunction**

When considering whether to grant injunctive relief, the courts examine and consider the public interest.  See McDonald's Corp. v. Robertson, 147 F.3d 1301, 47 U.S.P.Q.2d (BNA) 1545, 41 Fed. R. Serv. 3d 455 (11th Cir. 1998); All Care Nursing Service, Inc. v. Bethesda Memorial Hosp., Inc., 887 F.2d 1535, 1537, 15 Fed. R. Serv. 3d 535 (11th Cir. 1989).  Congress has expressed the public interest in the socially disadvantaged farmer legislation and rulemaking

codified at   Section 2501e (2) of the Food, Agriculture, Conservation and Trade Act of 1990 (7 USC 2279e (2).

> A socially disadvantaged Farmer or Rancher is a farmer or rancher who has been subjected to racial or ethnic prejudices because of their identity as a member of a group without regard to their individual qualities. This term means a farmer or rancher who is a member of a socially disadvantaged group.  Specifically, a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities. Those groups include African Americans, American Indians or Alaskan natives, Hispanics and Asians or Pacific Islanders.

It is without doubt that congress considered the need for new and beginning farmers and ranchers—such as Petitioner Burrell—and their corresponding livelihood and viability when it's enacted the special remedies favoring  beginning and veteran farmers when it authorized the Department of Agriculture (FSA) to extend credit and loan benefits to these individuals.  Accordingly, the interest of the nation—inherent in these congressional provisions—and public will be served if this court grants Practitioner Burrell this Permanent Injunction.

## CONCLUSION

The relief sought by this Motion for injunctive relief, Permanent Injunction, serves the public interest , the goals of Congress enacted in the socially disadvantaged farmer legislation and the Landlord lien  statutes of Mississippi and Tennessee.

Respectfully Submitted

Paul A. Robinson Jr. #014464
3749 Marty Street
Memphis, TN 38109
Telephone (901) 649-4053
Fax (901) 328-1803



Exhibit A

ELECTRONICALLY FILED
2019 Dec 27 6:08 PM
CLERK OF COURT



View the 2018 Mississippi Code | View Other Versions of the Mississippi Code

# 2010 Mississippi Code
# TITLE 89 - REAL AND PERSONAL PROPERTY
# Chapter 7 - Landlord and Tenant.
# 89-7-51 - Lien of landlord.

§ 89-7-51. Lien of landlord.

(1) Every lessor of land shall have a lien on the agricultural products of the leased premises, however and by whomsoever produced, to secure the payment of the rent and of money advanced to the tenant, and the fair market value of all advances made by him to his tenant for supplies for the tenant and others for whom he may contract, and for his business carried on upon the leased premises. This lien shall be paramount to all other liens, claims, or demands upon such products when perfected in accordance with Uniform Commercial Code Article 9 - Secured Transactions (Section 75-9-101, et seq.). The claim of the lessor for supplies furnished may be enforced in the same manner and under the same circumstances as his claim for rent may be; and all the provisions of law as to attachment for rent and proceedings under it shall be applicable to a claim for supplies furnished, and such attachment may be levied on any goods and chattels liable for rent, as well as on the agricultural products.

(2) All articles of personal property, except a stock of merchandise sold in the normal course of business, owned by the lessee of real property and situated on the leased premises shall be subject to a lien in favor of the lessor to secure the payment of rent for such premises as has been contracted to be paid, whether or not then due. Such lien shall be subject to all prior liens or other security interests perfected according to law. No such articles of personal property may be removed from the leased premises until such rent is paid except with the written consent of the lessor. All of the provisions of law as to attachment for rent and proceedings thereunder shall be applicable with reference to the

*lessor's lien under this subsection.

**Sources:** Codes, 1880, § 1301; 1892, § 2495; 1906, § 2832; Hemingway's 1917, § 2330; 1930, § 2186; 1942, § 908; Laws, 1972, ch. 343, § 1; Laws, 2001, ch. 495, § 34, eff from and after Jan. 1, 2002.

**Disclaimer:** These codes may not be the most recent version. Mississippi may have more current or accurate information. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or the information linked to on the state site. Please check official sources.

Exhibit B

Current through the 2019 Regular Session

*TN - Tennessee Code Annotated > Title 66 Property > Chapter 12 Crop Liens*

## 66-12-101. *Landlord's lien* for *rent.*

A *landlord* and one controlling land by lease or otherwise shall have a *lien* on all crops grown on the land during the year for the payment of the *rent* for the year, whether the contract of rental be verbal or in writing, and this *lien* shall inure to the benefit of the assignee of the lienor.

## History

Acts 1923, ch. 71, § 1; Shan. Supp., § 5299a1; mod. Code 1932, § 8017; T.C.A. (orig. ed.), § 64-1201.

Annotations

## Case Notes

1. Effect of Statute.
2. Scope of *lien*.
3. Election of Remedies.
4. Assignee — Rights against Purchaser of Crop.

**NOTES TO DECISIONS**

**1. Effect of Statute.**

Sections 66-12-101 — 66-12-107 did not repeal § 66-12-108.

**2. Scope of *lien*.**

*Landlord's lien* is not a continuing one, but relates to a current year and crop only. The *lien* extends only for supplies going into the given crop.

These *lien* provisions are not limited to leases for crop *rent* as opposed to cash *rent.*

**3. Election of Remedies.**

Exhibit B

Tenn. Code Ann. § 66-12-101

*Landlord* having right of action against tenant under conditional sales law, and also under *landlord's lien* law may not pursue both remedies.

### 4. Assignee — Rights against Purchaser of Crop.

A purchaser from the tenant of a crop subject to the *lien* for *rents* is liable to the assignee of the *rent* note for amount due thereon to the extent of the value of the crop.

## Research References & Practice Aids

**Cross-References.**

Leases, §§ 66-7-101, 66-7-102.

**Textbooks.**

Gibson's Suits in Chancery (7th ed., Inman), § 471.

Tennessee Jurisprudence, 1 Tenn. Juris., Agriculture, § 6; 17 Tenn. Juris., *Landlord* and Tenant, §§ 13, 14.

**Law Reviews.**

The Constitutionality of Prejudgment Seizure of Property Under Tennessee Law (Roger W. Dickson),

The New Article 9: Its Impact on Tennessee Law (Part II).

**Collateral References.**

*Landlord's liens* on goods of subtenant or assignee for *rent.* 9 A.L.R. 317, 96 A.L.R. 249.

*Liens* on crops for *rent.* 9 A.L.R. 305, 96 A.L.R. 249.

TENNESSEE CODE ANNOTATED
Copyright © 2019 by The State of Tennessee All rights reserved

End of Document

Exhibit C



**STATE OF MISSISSIPPI**
GOVERNOR PHIL BRYANT

**DEPARTMENT OF FINANCE AND ADMINISTRATION**
LAURA D. JACKSON
EXECUTIVE DIRECTOR

December 11th, 2019

Camron Burrell
1948 Autumndale Cove
Cordova, TN 38016

Mr. Burrell,

The terms of your farming contract with the The Department of Finance and
Administration through the Bureau of Building, Grounds and Real Property
Management, on behalf of the Mississippi Department of Corrections / Mississippi
State Penitentiary, states that leases for the prior term must be paid by October 30 or
before the renewal period in order to be eligible for a renewal. The contract renewal
date for your contracts is January 15th. Your contracts for both Tract 3 and 27 expire
on January 14th at midnight.

I understand that you may be having some difficulties with the Indigo Ag Inc.
receiving payment. In as much as the Department of Finance & Administration and the
Mississippi Department of Corrections would like to work with you in order to keep
you as one of our contracted farmer, we must set a date for final payment in order to
have the time to re-bid tracts 3 & 27 if necessary. Therefore, we must have payment in
hand by the closing of business on January 14, 2020. We must also have the required
25% reserve payment for the 2020 growing season. Taxes are also due at that time.

Amount due for the 2019 growing season:
Tract 3    $60,615.00
Tract 27  $28,989.00
Total      $89,604.00

Required for contract renewal (25% of contracted amount)
Tract 3    $17,612.25
Tract 27  $ 8,154.74
Taxes on all contracted land (842.96 acres @$9.00 per acre) $7,586.64

Exhibit C

Taxes should be made payable by certified check to the Sunflower County Tax Collector. Again, in order to renew your contracts for the 2020 growing season payment must be made prior to closing on January 14th, 2020.

We value our working relationship with you and hope you can work things out with Indigo.

Please call if you have questions.

Kent E. Adams, Director
Real Property Management
Department of Finance & Administration
601-359-2896

cc: Dell Lemley
    Roger Davis

Scanned by CamScanner

Mail - Cameron Burrell - Outlook
Exhibit D

**Fw: Letter showing 2019 Taxes are paid**

Cameron Burrell
Thu 12/12/2019 10:27 AM
To: Cameron Burrell <cgtfmllc@outlook.com>

From: cgtfmllc@outlook.com
Sent: Monday, September 30, 2019 10:08 AM
To: Aimee Moncure <Aimee.Moncure@dfa.ms.gov>
Subject: Re: Letter showing 2019 Taxes are paid

Greetings Aimee,

Hope all is well. I need to get my new account manager in contact with you in regards to paying the rent on tracts 3 and 27. I will be working with Indigo Ag here in Memphis and they need some information from you to set you up payments to the State of MS/MSDOC when my soybeans are delivered to the grain elevators.

Upon you receiving this email and giving the green light, I will email her your contact information.

Thanks again.

Regards,

Cameron Burrell
901.490.5270

Get Outlook for Android

501 North West Street, Suite 1401 B
Jackson, MS 39201



Exhibit D

## Fwd: -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

cgtfmllc@outlook.com
Tue 12/10/2019 3:07 PM
To: problaw937@hotmail.com <problaw937@hotmail.com>

Get Outlook for Android

From: Mary Beth Gammel <mgammel@indigoag.com>
Sent: Friday, October 4, 2019 9:11:49 AM
To: cgtfmllc@outlook.com <cgtfmllc@outlook.com>; Amber Blair <ablair@indigoag.com>
Subject: RE: -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

Sounds great!

A logistics coordinator will be reaching out to you today and sending delivery tickets and instructions.

Also- I was able to speak with both Cathy and Wade at the state of Ms. yesterday. They stated that there was a balance of $60,615 on Tract 3 and $28,989 on Tract 27. Would you like to handle this as a money split? If so- we can allocate the money over to the Department of Corrections after the grain has been delivered and contract priced.

Just let us know.

Mary Gammel
50 South B.B. King Blvd
Memphis, TN 38103

# indigo

Boston • Memphis • Brazil • Argentina • Australia

From: cgtfmllc@outlook.com <cgtfmllc@outlook.com>
Sent: Friday, October 4, 2019 8:50 AM
To: Amber Blair <ablair@indigoag.com>
Cc: Mary Beth Gammel <mgammel@indigoag.com>
Subject: Re: -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

Greetings,

Planning on harvest and delivery on the first 10k bushels on Monday of next week, weather permitting.

Regards,

Cameron Burrell
901.490.5270

Get Outlook for Android

From: Amber Blair <ablair@indigoag.com>
Sent: Monday, September 30, 2019, 5:55 PM
To: cgtfmllc@outlook.com
Cc: Mary Beth Gammel
Subject: -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

Mr. Burrell,

Hi. Just a quick follow-up. You have five total contracting equaling 50,000. The following three have been approved for early delivery with no additional penalties. Are you wanting to start early delivery on just these bushels or the entire 50,000bushels?

| Transaction | Bid ID | Delivery Window | Buyer |
|---|---|---|---|
| TX-2491 | AC4AM2T | 10/15/19 - 11/14/20 (grower delivered) | Louis Dreyfus Company-Rosedale 016523 (Facility) |
| TX-2486 | ACLZQAI | 10/15/19 - 11/14/20 (grower delivered) | Louis Dreyfus Company-Rosedale 016523 (Facility) |
| TX-2492 | AC6OZET | 10/15/19 - 11/14/20 (grower delivered) | Louis Dreyfus Company-Rosedale 016523 (Facility) |

Thank you,

Amber Blair

about:blan

Exhibit E

indigo

**VIA US MAIL**

Date:      December 4, 2019

To:        Paul A. Robinson, Jr., 3749 Marty St., Memphis, TN 38109

Re:        Notice of Cancelation – Cameron Burrell

Dear Mr. Robinson,

Thank you for speaking with us in regard to your representation of Mr. Cameron Burrell. As you know, Mr. Burrell has legally-binding contracts, governed by National Grain and Feed Association (NGFA) Trade Rules, with Indigo Ag, Inc. to sell #1 yellow soybeans through the Indigo Marketplace. Before we learned of your representation, Indigo customer relations personnel spoke with Mr. Burrell, who was unable to offer adequate assurances that he could or would comply with his contractual obligations. Instead, Mr. Burrell agreed on a cancelation per the terms of this letter. We sincerely would like to get Mr. Burrell paid for what Indigo owes him, minus necessary cancelation offsets and deductions, and this correspondence allows us to do that per the terms of Mr. Burrell's contract and NGFA rules. Therefore, after the exercise of due diligence and in consideration of the agreed upon terms herein, we hereby declare Mr. Burrell in default of the following obligations:

#1 Yellow Soybeans Sold to

Indigo Ag, Inc.
50 South B.B. King Blvd.
Memphis, TN 38103

| Offer ID | AC6QG8B | AC4AM2T | ACLZQAI | AC60ZET | ACCAJ54 |
|---|---|---|---|---|---|
| Shipment Dates | 11.1.19-11.30.19 | 10.15.19-11.14.19 | 10.15.19-11.14.19 | 10.15.19-11.14.19 | 11.1.19-11.30.19 |
| Price | -$0.25 Jan 2020 | -$0.25 Jan 2020 | $8.96 | -$0.25 Jan 2020 | -$0.25 Jan 2020 |
| Bushels delivered | 0 | 0 | 8,688.58 | 0 | 0 |
| Defaulted Bushels | 10,000 | 10,000 | 1,311.42 | 10,000 | 10,000 |

Failure to Perform Delivery of Contract is a violation of

NGFA Grain Trade Rules Rule 28.

"If the Seller fails to notify the Buyer of his inability to complete his contract, as provided above, the liability of the Seller shall continue until the Buyer, by the exercise of due diligence, can determine whether the Seller has defaulted. In such case it shall then be the duty of the Buyer, after giving notice to Seller to complete the contract, at once to:

Indigo Ag, Inc.   •   500 Rutherford Avenue   •   Boston, MA 02129   •   Tel: 1 (844) 828-0240   •   www.indigoag.com



12/10/2019, 10:31 AI

Exhibit E

indigo

(1) agree with the Seller upon an extension of the contract; or
(2) buy-in for the account of the Seller, using due diligence, the defaulted portion of the contract; or
(3) cancel the defaulted portion of the contract at fair market value based on the close of the market the next business day."

At this time Indigo Ag, Inc. declares Mr. Burrell in default.

Per prior conversations with Indigo non-attorney personnel, Mr. Burrell has agreed that 41,311.42 bushels remain undelivered and that Indigo is entitled to cancel Offer IDs AC6QG8B, AC4AM2T, ACLZQAI, AC60ZET, and ACCAJ54 as to those undelivered bushels.

Indigo will issue Mr. Burrell payment for the delivered bushels, minus deductions, as soon as possible. His payment will be accompanied by a settlement statement, which will set forth all payments owed, deductions therefrom, and set-offs, as explicitly agreed to by Mr. Burrell in the Marketplace Seller Agreement. **Indigo will deduct from Mr. Burrell's payment $40,485.19, which fairly and accurately reimburses Indigo for costs incurred by virtue of this cancelation, plus additional deductions for transport costs as to be reflected on the forthcoming settlement statement.**

You have kindly informed us of the lien the State of Mississippi has against your client. As such, the payment to your client will be in both his name and to the State of Mississippi. It is your client's responsibility to ensure that any commitments he has to the State of Mississippi are satisfied.

We greatly appreciate your reviewing this letter with your client. This correspondence is a notice of default and an attempt to resolve our claims against Mr. Burrell without legal action, and we are hopeful that we will be able to do so. The undelivered bushels are hereby canceled per the terms of the NGFA rules, and we reserve the right to seek all available remedies for losses and damages if Mr. Burrell is not agreeable to the resolution put forth.

We hope to hear from you soon and look forward to resolving this matter.

Very truly yours,

Adam Lazarov, Commercial Legal Counsel, Indigo Ag, Inc.
Email: alazarov@indigoag.com
TN Bar #: 033158

12/10/2019, 10:31 AM

ELECTRONICALLY FILED
2020 Jan 06 11:21 AM
CLERK OF COURT

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

CAMERON BURRELL,                    )
                                    )
          Plaintiff,                )
                                    )
vs.                                 )
                                    )        NO. CH-19-1677
INDIGO AG INC.,                     )        Part I
                                    )
          Defendant.                )

---

**MOTION TO DISMISS FOR FAILURE TO JOIN INDISPENSABLE PARTY UNDER
TENNESSEE RULE OF CIVIL PROCEDURE 12.02(7)**

---

Defendant Indigo Ag Inc. ("Indigo") asks this Court to dismiss Plaintiff's Petition for

Injunctive Relief pursuant to Rule 12.02(7) of the Tennessee Rules of Civil Procedure for failure

to join an indispensable party.

## I.      INTRODUCTION

Petitioner Cameron Burrell ("Burrell" or "Plaintiff") bases the majority of his argument

for injunctive relief on the fact that the State of Mississippi has an alleged landlord lien on the

crops produced on the land Burrell leases from the State of Mississippi. However, Burrell filed

suit in the Chancery Court of Shelby County, Tennessee knowing that the State of Mississippi is

a sovereign entity immune from suit in another state. Instead, Burrell attempts to assert

arguments on behalf of the State of Mississippi without its involvement.

## II.      FACTS

Burrell is a farmer who leases approximately 838 acres of land in Sunflower County,

Mississippi from the State of Mississippi. *See* Petition for Injunctive Relief ("Petition"), ¶ 1.

Indigo is an agricultural technology company based out of Memphis, Tennessee, which provides

numerous services to farmers, including coordinating connections between growers and buyers

through its Indigo Marketplace™ digital platform. In September 2019, Burrell entered into a

1

Marketplace Seller Agreement with Indigo, pursuant to the terms of which he contracted to sell Indigo 50,000 bushels of soybeans in five separate deliveries of 10,000 bushels each (the Marketplace Seller Agreement and the referenced soybean contracts, collectively the "Agreement")[1]. *Id.* at ¶ 2.

Of the 50,000 bushels of soybeans promised, Burrell only delivered 8,688.58 bushels. *See* Ex. E to Petition. The price per delivered bushel was $8.96. *Id.* Burrell then informed Indigo that he was unable to perform his obligations under the Agreement and could not complete the remainder of the first delivery of 10,000 bushels or deliver the remaining 41,311.42 bushels under the Agreement. *Id.* Burrell and Indigo verbally agreed to cancel the Agreement in exchange for Mr. Burrell paying a cancelation fee of $40,485.19 to be deducted from the total payment owed for the 8,688.58 bushels delivered, all per the terms of the Agreement and NGFA trade rules. *Id.* However, when Indigo sent Mr. Burrell's attorney written correspondence for the purpose of confirming this verbal agreement, Burrell initiated this action claiming that such deductions prevented him from meeting his rent obligations on land he leases from the State of Mississippi. But the State of Mississippi is an indispensable party to this action, and because Burrell failed to join it, this action should be dismissed.

## III.   ARGUMENT

### A. The case should be dismissed because the State of Mississippi is an indispensable party that Plaintiff failed to properly join.

Few Tennessee cases have addressed dismissal under Tennessee Rule of Civil Procedure 12.02(7). *See In re Josiah T.,* No. E201900043COAR3PT, 2019 WL 4862197, at \*4 (Tenn. Ct. App. Oct. 2, 2019). In interpreting the Tennessee Rules of Civil Procedure, Tennessee courts "consult and are guided by the interpretation that has been applied to comparable federal

---

[1] The terms of the Agreement specifically state that the Agreement and transactions under the Agreement will be subject to National Grain & Feed Association ("NGFA") trade rules, and any dispute will be referred to NGFA arbitration in accordance with the NGFA trade rules. Indigo reserves all rights and remedies under the Agreement.

rules of procedure." *Id.* (quoting *Turner v. Turner*, 473 S.W.3d 257, 268 (Tenn. 2015)). Under the federal rules, a motion to dismiss for failure to join a party requires a three-part inquiry. *E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005). Despite the differences between the State of Tennessee's rule and the federal rule governing joinder, a three-part inquiry is also appropriate under Tennessee Rule of Civil Procedure 12.02(7). *In re Josiah T*, 2019 WL 4862197 at *4. First, the Court must determine whether the nonparty falls within a category of persons described in Rule 19.01 that "shall be joined as a party." Tenn. R. Civ. P. 19.01; *see also Peabody W. Coal Co.*, 400 F.3d at 779 (describing the first step of the three-party inquiry). Second, if the nonparty should be joined under Rule 19.01, the Court must determine whether joinder is feasible. *Peabody W. Coal Co.*, 400 F.3d at 779. Third and "[f]inally, if joinder is not feasible, the court must determine . . . whether the case can proceed without the absentee, or whether the absentee is an 'indispensable party' such that the action must be dismissed." *Peabody W. Coal Co.*, 400 F.3d at 779.

1.  The State of Mississippi is an indispensable party.

Rule 19.01 of the Tennessee Rules of Civil Procedure describes two distinct categories of people that are necessary for a just adjudication. First, a person who is subject to service of process *shall be joined as a party* if that person's absence would preclude the court from granting "complete relief . . . among those already parties." *See* Tenn. R. Civ. P. 19.01. Second, a person claiming an interest relating to the subject of the action must also be joined where such absence "may impair or impede the person's ability to protect that interest" or "leave any of the persons already parties subject to a substantial risk . . . ." The party moving to dismiss bears the burden of showing that there is a nonparty that falls within one or both of the categories. *In re Josiah T.*, 2019 WL 4862197, at *5 (citing *Disabled in Action of Penn. v. Se. Penn. Transp. Auth.*, 635 F.3d 87, 97 (3d Cir. 2011)).

3

In this instance, Indigo can meet the burden of showing that the State of Mississippi satisfies both of these categories. First, the State of Mississippi's presence is necessary to afford complete relief among the parties as it relates to the proceeds from the sale of Burrell's bushels of soybeans to Indigo. Burrell specifically relies on Mississippi Code Annotated § 89-7-51, which states, "Every lessor of land shall have a lien on the agricultural products of the leased premises . . . to secure the payment of the rent . . . ." *See* Miss. Code Ann. § 89-7-51. If the State of Mississippi is entitled to a landlord lien on the crops from the land it leases to Burrell, then only the State of Mississippi has authority to assert its right to such lien, and the State of Mississippi's presence is necessary in order to effect complete relief.

Second, the State of Mississippi's involvement is necessary such that it would leave Indigo exposed to additional risk in the event the Court concluded this matter without the State's involvement. Specifically, if the Court granted Burrell's requested relief and enjoined Indigo from making any deductions for cancellation costs from the amounts owed to Burrell under the terms of the contract with Indigo, then Indigo would be enjoined from issuing a check with such deductions. However, the requested injunctive relief does not ask the Court to affirmatively require Indigo to produce a check for any other amount (nor would such a request be a proper use of an injunctive relief petition unattached to a Complaint). Thus, Indigo would be in the untenable position of not being able to make a payment that it desires to make to Mr. Burrell in accordance with the terms of the Agreement and the verbal agreement between the parties, but also without any instruction as to what to do next in light of the fact that the State of Mississippi has not asserted its alleged lien right in these proceedings and thus has not indicated in any way what it believes it may be owed by Indigo. Such a ruling would necessarily affect the rights of the State of Mississippi as landlord and would leave Indigo subject to a substantial risk as it relates to the State of Mississippi's lien rights. Thus, the State of Mississippi is a necessary party.

4

2. Joinder is not feasible.

Although the State of Mississippi is a necessary party, joinder is not feasible if the nonparty is not subject to the Court's personal jurisdiction. *See* Tenn. R. Civ. P. 19.01 ("A person who is subject to service of process shall be joined as a party . . . ."). The State of Mississippi has state sovereign immunity and is thus immune from suit at law or in equity in federal or state court without its consent. Further, counsel for Indigo has conferred with the Mississippi Attorney General's office, who advised, "As a matter of sovereign right and jurisdiction, the State of Mississippi does not appear before the courts of a sister-state when Mississippi's courts are capable of providing complete relief, if necessary, at a later date." *See* Correspondence from Assistant Attorney General dated December 31, 2019, attached hereto as Exhibit A.[2]

3. The action must be dismissed.

Because joinder of the State of Mississippi is not feasible, the Court must determine whether the case can proceed without it, or whether the State of Mississippi is an 'indispensable party' such that the action must be dismissed." *Peabody W. Coal Co.*, 400 F.3d at 779. Rule 19.02 provides factors to be considered in making the determination of whether a nonparty is indispensable. Tenn. R. Civ. P. 19.02. Specifically, the Court can consider (1) to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief or other measures, the prejudice can be lessened or avoided; (3) whether or not a judgment rendered in the person's absence will be adequate; and (4) whether or not the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

---

[2]     The correspondence from the Assistant Attorney General from the State of Mississippi further reiterates the connections Mississippi has to this matter. The farmland at issue is located in Mississippi, and the landlord is the State of Mississippi. The purported agricultural lien is governed by Mississippi statutes. Thus, it appears by selecting this forum, Burrell has ensured that the State of Mississippi cannot participate.

Here, all factors indicate that the action must be dismissed because the State of Mississippi is an indispensable party who cannot be joined. First, the injunctive relief Burrell seeks necessarily prejudices Indigo and the State of Mississippi's rights with respect to the proceeds of the little crop Burrell's farming operations actually yielded. Second, the Court cannot shape appropriate and just relief because any actions would necessarily affect the State of Mississippi's lien rights pursuant to Mississippi statutes. Third, a judgment for permanent injunction in the State of Mississippi's absence will not be adequate because it will simply prevent Indigo from making cancellation deductions from the contracted amount owed Burrell. Fourth, and finally, Burrell may have alternative forms of relief by working directly with the State of Mississippi and/or Indigo in alternative venues. In sum, allowing Burrell to assert a lien right that is not his to assert, in a forum where the true lienholder rightfully refuses to participate and assert its interests, can only serve to confuse these issues and will not result in a final resolution.

As such, dismissal is not only necessary, but also appropriate, because Burrell failed to join the State of Mississippi as an indispensable party to this action.

### IV. CONCLUSION

Burrell knowingly filed this action without involving the State of Mississippi, an indispensable party to this action who cannot feasibly be joined. As such, the action should be dismissed pursuant to Tennessee Rule of Civil Procedure 12.02(7).

DATED this 6th day of January, 2020.

Respectfully submitted,

BUTLER SNOW, LLP

By: _____

R. Campbell Hillyer (TN # 22124)
Kathryn K. Van Namen (TN #31322)

6

6075 Poplar Avenue, Suite 500
Memphis, TN 38119
Telephone: (901) 680-7200
cam.hillyer@butlersnow.com
kate.vannamen@butlersnow.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 6, 2020, a copy of the foregoing was served via email and U.S. Mail, postage prepaid, upon the following:

Paul A. Robinson Jr.
3749 Marty Street
Memphis, TN  38109

Kathryn K. Van Namen

# EXHIBIT A

**Kate Van Namen**

| | |
|---|---|
| **From:** | Romaine Richards <Romaine.Richards@dfa.ms.gov> |
| **Sent:** | Tuesday, December 31, 2019 10:49 AM |
| **To:** | Kate Van Namen |
| **Cc:** | Edward Wiggins |
| **Subject:** | RE: <EXTERNAL>: RE: Indigo/Cameron Burrell |

Good morning Kate,

  While we cannot vouch for the factual accuracy of the pleadings filed by Mr. Burrell, Mr.  Burrell does appear to accurately quote Mississippi Code Section  89-7-51.  The code section provides that:

> "Every lessor of land shall have a lien on the agricultural products of the leased premises, however and by whomsoever produced, to secure the payment of the rent and of money advanced to the tenant. This lien shall be paramount to all other liens, claims, or demands upon such products."

Miss. Code Ann. § 89-7-51(1).

  The State of Mississippi does not intend to intervene in the lawsuit between your client and Mr. Burrell pending in Tennessee state court.  As a matter of sovereign right and jurisdiction, the State of Mississippi does not appear before the courts of a sister-state when Mississippi's courts are capable of providing complete relief, if necessary, at a later date.  According to the Mississippi Supreme Court's decisions in *Planters Bank & Trust Co. v. Sklar*, 555 So.2d 1024 (Miss. 1990) and *Eason v. Johnson*, 69 Miss. 371, 12 So. 446 (1891), the State of Mississippi, as the landlord, would be able to recover funds in the possession of a third party which are subject to the statutory lien.  While Mr. Burrell does not speak for the State of Mississippi, the State of Mississippi does not waive any lien or other legal right it may have in the funds subject to the litigation between your client and Mr. Burrell in Tennessee.

Please feel free to contact me should you have any additional questions or concerns.

## Romaine L. Richards
*Assistant Attorney General*
Mississippi Attorney General's Office
Assigned to:
Department of Finance and Administration
Romaine.Richards@dfa.ms.gov
Telephone: 601-359-3826
Facsimile:  601-576-2538
-----------------------------------------------
P.O. Box 267, Jackson, MS  39205
501 North West Street, Suite 1406A
Jackson, MS  39201

This message is being sent by the Office of the Attorney General for the State of Mississippi and is intended only for the use of the individual to whom it is addressed and may contain information that is legally privileged or confidential.  If you are not the intended recipient, you are hereby notified that any distribution or copying of this message is strictly prohibited.  If you have received this message in error, please notify the original sender or the Office of the Attorney

ELECTRONICALLY FILED
2020 Jan 06 11:21 AM
CLERK OF COURT

## IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

CAMERON BURRELL,                    )
                                    )
         Plaintiff,                 )
                                    )
vs.                                 )
                                    )          NO. CH-19-1677
INDIGO AG INC.,                     )          Part I
                                    )
         Defendant.                 )

---

### RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTION

---

Defendant Indigo Ag Inc. ("Indigo") submits this Response in Opposition to Plaintiff's Memorandum in Support of Permanent Injunction.[1]

### I.       INTRODUCTION

Petitioner Cameron Burrell ("Burrell" or "Plaintiff") attempts to obtain the extraordinary remedy of a permanent injunction. Based on his Petition for Injunctive Relief, Burrell essentially asks the Court to enjoin Indigo from making cancelation deductions from a payment to Burrell for delivery of 8,688.58 bushels of soybeans where Burrell knowingly cancelled the remainder of his contract with Indigo based on his own failure to perform. The majority of his argument for injunctive relief centers on the fact that the State of Mississippi has an alleged landlord lien on the crops produced on the land Burrell leases from the State of Mississippi, and he attempts to assert arguments on behalf of the State of Mississippi without its involvement in this action. Plaintiff bears a heavy burden to prevail, and because he has failed to establish a substantial likelihood of success on the merits, Plaintiff's Motion for Permanent Injunction should be denied.

---

[1]      Note that Plaintiff has only filed the Memorandum in Support Permanent Injunction and not an actual Motion.

## II.   FACTS

Burrell is a farmer who leases approximately 838 acres of land in Sunflower County, Mississippi from the State of Mississippi. *See* Petition for Injunctive Relief ("Petition"), ¶ 1. Indigo is an agricultural technology company based out of Memphis, Tennessee, which provides numerous services to farmers, including coordinating connections between growers and buyers through its Indigo Marketplace™ digital platform. In September 2019, Burrell entered into a Marketplace Seller Agreement with Indigo, pursuant to the terms of which he contracted to sell Indigo 50,000 bushels of soybeans in five separate deliveries of 10,000 bushels each (the Marketplace Seller Agreement and the referenced soybean contracts, collectively the "Agreement")[2]. *Id.* at ¶ 2.

Of the 50,000 bushels of soybeans promised, Burrell only delivered 8,688.58 bushels. *See* Ex. E to Petition. The price per delivered bushel was $8.96. *Id.* Burrell then informed Indigo that he was unable to perform his obligations under the Agreement and could not complete the remainder of the first delivery of 10,000 bushels or deliver the remaining 41,311.42 bushels under the Agreement. *Id.* Burrell and Indigo verbally agreed to cancel the Agreement in exchange for Mr. Burrell paying a cancelation fee of $40,485.19 to be deducted from the total payment owed for the 8,688.58 bushels delivered, all per the terms of the Agreement and NGFA trade rules. *Id.* However, when Indigo sent Mr. Burrell's attorney written correspondence for the purpose of confirming this verbal agreement, Burrell initiated this action claiming that such deductions were an attempt to supersede Mississippi's landlord lien rights and prevented him from meeting his rent obligations on land he leases from the State of Mississippi. Following a

---

[2] The terms of the Agreement specifically state that the Agreement and transactions under the Agreement will be subject to National Grain & Feed Association ("NGFA") trade rules, and any dispute will be referred to NGFA arbitration in accordance with the NGFA trade rules. Indigo reserves all rights and remedies under the Agreement.

2

hearing, the Court granted Plaintiff's request for a temporary restraining order on December 16, 2019 ordering Indigo to maintain the status quo and hold the payment owed Plaintiff related to the 8,688.58 bushels of soybeans until an injunction hearing.

## III.    ARGUMENT

Under Tennessee Rule of Civil Procedure 65.04(2), Burrell must show that *his* "rights *are being or will be* violated by an adverse party and that *the movant will suffer immediate and irreparable injury, loss or damage* pending a final judgment in the action, or that the acts or omissions of the adverse party will tend to render such final judgment ineffectual." *See* Tenn. R. Civ. P. 65.04(2) (emphasis added).

Tennessee courts consider the following four factors in evaluating the need for an injunction:

1.  The threat of irreparable harm to the applicant if the injunction is not granted;

2.  The balance between the harm the applicant is seeking to prevent and the injury the injunction would inflict on the party the applicant is proposing to enjoin;

3.  The probability that the applicant will succeed on the merits; and

4.  The public interest.

*Hughes v. Tenn. Dept. of Correction*, No. M2016–02212–COA–R3–CV, 2017 WL 4125378, at \*4 (Tenn. Ct. App. Sept. 18, 2017). With respect to permanent injunctive relief, the analysis differs somewhat as, in the typical situation, the court has ruled in favor of the applicant on the merits and must determine whether permanent injunctive relief is an appropriate remedy. *Curb Records, Inc. v. McGraw*, No. M2011-02762-COA-R3CV, 2012 WL 4377817, at \*4 (Tenn. Ct. App. Sept. 25, 2012). Further, "[a] court is to use its equitable power to grant injunctive relief sparingly." *Curb Records*, 2012 WL 4377817, at \*5; *see also Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743, 2761 (2010) ("An injunction is a drastic and extraordinary remedy,

3

which should not be granted as a matter of course"). In this instance, the Court should deny Burrell's request because he has not shown that *his* rights are being or will be violated. Instead, he only contends that the State of Mississippi's lien rights could potentially be violated, and he could suffer indirect harm. To illustrate, Burrell asks this Court to enjoin Indigo from making deductions from a check *to him* because *his creditor may* assert a lien right. As such, Burrell cannot make a showing of irreparable harm or a likelihood of success on the merits.

## A. **Plaintiff's Motion for Injunction should be denied because Plaintiff has not satisfied his burden.**

Indigo responds to the factors as set forth in the order of Plaintiff's brief. First, Burrell is not likely to succeed on the merits because the State of Mississippi is a necessary party who cannot be joined to this action.

1. Burrell does not have a substantial likelihood of success on the merits.

Plaintiff recites five different state statutes regarding various agricultural liens in his brief, but the only potentially applicable statute is Mississippi Code Annotated § 89-7-51 because the State of Mississippi leases the land, located in Mississippi, to Burrell. Tennessee, Arkansas, Alabama, and Georgia's statutes are irrelevant. Plaintiff's primary argument is that Mississippi has a priority lien on the agricultural product taking priority over other liens. *See* Plaintiff's Memorandum, p. 10. Yet Burrell fails to cite any authority whatsoever to assert that this Court has authority to enforce a lien on behalf of the State of Mississippi when there is no evidence the State has asserted its lien rights and in fact, is not even a party to this action. As set forth in Indigo's Motion to Dismiss filed contemporaneously herewith, the State of Mississippi is an indispensable party who cannot feasibly be joined. Thus, Burrell is not likely to succeed.

The State of Mississippi has state sovereign immunity and is thus immune from suit at law or in equity in federal or state court without its consent. Further, counsel for Indigo has conferred with Mississippi's Attorney General's office, who advised, "As a matter of sovereign

4

right and jurisdiction, the State of Mississippi does not appear before the courts of a sister-state when Mississippi's courts are capable of providing complete relief, if necessary, at a later date." *See* Correspondence from Assistant Attorney General dated December 31, 2019, attached hereto as Exhibit A.[3]

The State of Mississippi's presence is necessary to afford complete relief among the parties as it relates to the proceeds from the sale of Burrell's 8,688.58 bushels of soybeans to Indigo. If the State of Mississippi is entitled to a landlord lien on the crops from the land it leases to Burrell, then only the State of Mississippi has authority to assert its right to such lien, and the State of Mississippi's presence is necessary in order to effect complete relief. Because Plaintiff has failed to join the State of Mississippi, he is not likely to succeed.

Further, Plaintiff has failed to prove the existence of a valid lien. Burrell only recites the portion of Mississippi Code Annotated § 89-7-51 in his favor which states, "Every lessor of land shall have a lien on the agricultural products of the leased premises . . . to secure the payment of the rent . . . ." *See* Miss. Code Ann. § 89-7-51. However, Burrell neglects to mention the next sentence which states, "The lien shall be paramount to all other liens, claims, or demands upon such products *when perfected in accordance with Uniform Commercial Code Article 9 . . . .*" *See* Miss. Code Ann. § 89-7-51. Despite his burden, Plaintiff has failed to present any proof of the State of Mississippi's lien to support his argument, much less, a perfected lien to establish priority. Without more, Plaintiff has not made a showing of a substantial likelihood of success.

2. Burrell has not shown an irreparable injury if the injunction is not issued.

Plaintiff's only argument that he will be irreparably harmed is that he will "suffer the unlawful default and resulting loss of his leasehold interest with the State of Mississippi . . . if

---

[3]    The correspondence from the Assistant Attorney General from the State of Mississippi further reiterates the connections Mississippi has to this matter. The farmland at issue is located in Mississippi, and the landlord is the State of Mississippi. The purported agricultural lien is governed by Mississippi statutes. Thus, it appears by selecting this forum, Burrell has ensured that the State of Mississippi cannot participate.

Defendant are [sic] permitted to continue to engage in their [sic] sanctions and charges[.]" *See* Memorandum, p. 10. He does not make any further description or allegations concerning Indigo's actions and purported "sanctions and charges." Instead, Plaintiff reiterates his military service, his status as a socially disadvantaged farmer, and the unfortunate circumstances surrounding his current farming operation. But there is no proof to support actionable conduct by Indigo sufficient to warrant an injunction. To the contrary, what Plaintiff refers to as "sanctions and charges" are in reality the verbally agreed upon cancelation fees, which are proper pursuant to both the Agreement and the NGFA trade rules.

Plaintiff contends that he will be unable to fulfil his rent obligations to the State of Mississippi if Indigo makes cancelation deductions pursuant to the Agreement Burrell could not perform. However, Plaintiff fails to provide any explanation for his inability to perform under the Agreement or any rationale for failing to secure any other forms of payment for rent. Other than a general argument that "Defendant's conduct" inflicts irreparable harm, Burrell provides no specific action by Indigo that will cause irreparable injury and completely overlooks how his own action or inaction contributed to his predicament.

Moreover, the requested injunctive relief does not ask the Court to affirmatively require Indigo to do anything more than refrain from making deductions, and any further relief would be inappropriate. Plaintiff's requested injunction would not alleviate his alleged imminent injury because even a full payment for the 8,688.58 bushels delivered at a price of \$8.96 per bushel would still be insufficient for Burrell to fulfill his rent obligations to the State of Mississippi.

3.  The threatened injury to Burrell is not outweighed.

As set forth above, Indigo's rights are also affected, especially if the Court determines an outcome without involving the State of Mississippi. The injunctive relief Burrell seeks necessarily prejudices Indigo and the State of Mississippi's rights with respect to the proceeds of

6

the little crop Burrell's farming operations actually yielded. The Court cannot shape appropriate and just relief because any actions would necessarily affect the State of Mississippi's purported lien rights pursuant to Mississippi statutes, and Plaintiff has not offered any authority to support his assertion that this Court has authority to enforce a lien on behalf of the State of Mississippi where the State of Mississippi is not a party. Further, a permanent injunction in the State of Mississippi's absence will not be adequate because it will simply prevent Indigo from making cancellation deductions from the contracted amount owed Burrell – and nothing more. Thus, Indigo would be in the untenable position of not being able to make a payment that it desires to make to Mr. Burrell in accordance with the terms of the Agreement and the verbal agreement between the parties, but also without any instruction as to what to do next in light of the fact that the State of Mississippi has not asserted its alleged lien right in these proceedings and thus has not indicated in any way what it believes it may be owed by Indigo. Finally, Burrell may have alternative forms of relief by working directly with the State of Mississippi and/or Indigo in alternative venues.

4. The public interest will not be served by issuance of an injunction.

Burrell has not established that the public interest favors issuance of an injunction. Instead, Burrell simply relies on legislative intent surrounding remedies for socially disadvantaged farmers without establishing how it relates to the proposed injunction. Conversely, the public interest favors a denial of Plaintiff's request for injunctive relief, since Plaintiff has failed to meet his burden. The public interest also favors acknowledging the State of Mississippi's sovereign rights and preventing irreparable harm to a non-party. The public is entitled to court adjudications that resolve asserted rights and provide clarity to parties in dispute; whereas granting the requested injunction here based on the State of Mississippi's unasserted right would only confuse the issues without leading to ultimate relief for any party.

7

## IV.   CONCLUSION

Burrell has failed to meet his burden of proof with respect to showing a likelihood of success on the merits. As such, Plaintiff's Petition for Injunctive Relief should be denied.


DATED this 6th day of January, 2020.

Respectfully submitted,

BUTLER SNOW, LLP

By:    R. Campbell Hillyer, # 22124
       Kathryn K. Van Namen, #31322
       6075 Poplar Avenue, Suite 500
       Memphis, TN 38119
       Telephone: (901) 680-7200
       cam.hillyer@butlersnow.com
       kate.vannamen@butlersnow.com


## CERTIFICATE OF SERVICE

The undersigned certifies that on January 6, 2020, a copy of the foregoing was served via email and U.S. Mail, postage prepaid, upon the following:

Paul A. Robinson Jr.
3749 Marty Street
Memphis, TN  38109


Kathryn K. Van Namen

50699207.v2

8

# EXHIBIT A

**Kate Van Namen**

| | |
|---|---|
| **From:** | Romaine Richards <Romaine.Richards@dfa.ms.gov> |
| **Sent:** | Tuesday, December 31, 2019 10:49 AM |
| **To:** | Kate Van Namen |
| **Cc:** | Edward Wiggins |
| **Subject:** | RE: <EXTERNAL>: RE: Indigo/Cameron Burrell |

Good morning Kate,

  While we cannot vouch for the factual accuracy of the pleadings filed by Mr. Burret, Mr.  Burrell does appear to accurately quote Mississippi Code Section  89-7-51.  The code section provides that:

> "Every lessor of land shall have a lien on the agricultural products of the leased premises, however and by whomsoever produced, to secure the payment of the rent and of money advanced to the tenant. This lien shall be paramount to all other liens, claims, or demands upon such products."

Miss. Code Ann. § 89-7-51(1).

  The State of Mississippi does not intend to intervene in the lawsuit between your client and Mr. Burrell pending in Tennessee state court.  As a matter of sovereign right and jurisdiction, the State of Mississippi does not appear before the courts of a sister-state when Mississippi's courts are capable of providing complete relief, if necessary, at a later date.  According to the Mississippi Supreme Court's decisions in *Planters Bank & Trust Co. v. Sklar*, 555 So.2d 1024 (Miss. 1990) and *Eason v. Johnson*, 69 Miss. 371, 12 So. 446 (1891), the State of Mississippi, as the landlord, would be able to recover funds in the possession of a third party which are subject to the statutory lien.  While Mr. Burrell does not speak for the State of Mississippi, the State of Mississippi does not waive any lien or other legal right it may have in the funds subject to the litigation between your client and Mr. Burrell in Tennessee.

Please feel free to contact me should you have any additional questions or concerns.

**Romaine L. Richards**
*Assistant Attorney General*
Mississippi Attorney General's Office
Assigned to:
Department of Finance and Administration
Romaine.Richards@dfa.ms.gov
Telephone: 601-359-3826
Facsimile:  601-576-2538
----------------------------------------------
P.O. Box 267, Jackson, MS  39205
501 North West Street, Suite 1406A
Jackson, MS  39201

This message is being sent by the Office of the Attorney General for the State of Mississippi and is intended only for the use of the individual to whom it is addressed and may contain information that is legally privileged or confidential.  If you are not the intended recipient, you are hereby notified that any distribution or copying of this message is strictly prohibited.  If you have received this message in error, please notify the original sender or the Office of the Attorney

ELECTRONICALLY FILED
2020 Jan 10 8:11 AM
CLERK OF COURT

## IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

CAMERON BURRELL,                          )
                                          )
    Plaintiff,                        )
                                          )
vs.                                       )
                                          )         NO. CH-19-1677
INDIGO AG INC.,                           )         Part I
                                          )
    Defendant.                        )
                                          )

### NOTICE OF APPEARANCE

PLEASE TAKE NOTICE that R. Campbell Hillyer of Butler Snow LLP. hereby enters his

appearance as counsel of record for Defendant Indigo Ag Inc.

DATED this 10th day of January 2020.

                                Respectfully submitted,

                                BUTLER SNOW LLP

By: _____
                                R. Campbell Hillyer (22124)
                                6075 Poplar Avenue, Suite 500
                                Memphis, TN 38119
                                Telephone: (901) 680-7326
                                cam.hillyer@butlersnow.com

### CERTIFICATE OF SERVICE

The undersigned certifies that on January 10, 2020, a copy of the foregoing was served via hand delivery, upon the following:

    Paul A. Robinson Jr.
    3749 Marty Street
    Memphis, TN  38109
    *Counsel for Plaintiff*

                              _____
                                R. Campbell Hillyer

CHANCERY COURT SHELBY COUNTY, TENNESSEE
WESTERN DISTRICT OF TENNESSEE

CAMERON BURRELL


Plaintiff


V.

CASE NO: 19-1967

INDIGO AG INC.


Defendant

---

AMENDED PETITION FOR INJUNCTIVE RELIEF AND MONEY DAMAGES

---


Come Now the Plaintiff herein by and through counsel  record pursuant to

T.R.C.P. 65 and move this Honorable court for a Permanent Injunction restraining

and enjoining Defendant Indigo Ag from making penalty deductions from the

account of Cameron Burrell regarding certain cancellation costs and additional

transportation  costs  as the initial monies in the account are encumbered by a

1

Landlord's lien held by the State of Mississippi pursuant to  Mississippi Code Annotated 87-1-55. Attached hereto as Exhibit A.

1. Mr. Burrell has farmed certain lands in Sunflower  County ( Parchman  Prison Ground ) Mississippi pursuant to contract with the State of Mississippi containing approximately 838 acres for a period of **EIGHT YEARS**.  Said rental payment is due by December 1st of each crop year. Said contract is attached hereto as Exhibit B.

2. On or about September 26, 2019 Petitioner Burrell entered into a crop marketing contract with a Tennessee corporation name **Indigo Ag** located at 50 South B.B. King Blvd, Memphis, Tennessee 38103. This agreement was for the delivery of 5 (10,000 bushel) contracts of # 2 yellow soybeans. The contracts with Indigo Ag are attached hereto as collective Exhibit C.

3. Moreover,  on or about  September 30, 2019 Petitioner received a telephone call  from  an Indigo Ag employee named  Amber Blair who inquired, among other things  as to whether there were  any existing liens that Petitioner  may have had on the 2019 soybean crop and methods of payment to Mr. Burrell.  Petitioner Burrell explained to Ms. Blair that he would reach out to officials at the State of

2

Mississippi regarding setting up communication as to how to facilitate the payments from Indigo to the State of Mississippi. Petitioner Burrell did in fact communicate with State of Mississippi officials, advising them of his arrangement and informing them of his agreement with Indigo and providing Indigo. The requisite information necessary to facilitate payments.  There was also a subsequent E-Mail correspondence between Your Petitioner and Ms. Mary Gammel on October 4, 2019 wherein, they  discussed the State of Mississippi's  Landlord  Lien and paying the rental amount of $ 89,604.00 owning to the state of Mississippi  in satisfaction of the Landlord  lien and that rent was to be paid to Mississippi State. The October 4, 2019 email attached hereto as Exhibit D shows that Ms. Gammel spoke to Mississippi officials on October 3, 2019. See attached Exhibit D.

4.  Your Affiant does herein acknowledges that he has not been able to complete the harvesting of his 2019 soybean crop but is now convinced that he will not be able to deliver the total contract amount herein referenced of 50,000 bushels.

5.  On or about November 20, 2019, Your Affiant called the Indigo Ag office in Memphis **and indicated** that Your Petitioner wanted to sell

the referenced soybean in order to satisfy the rental payment ($89,000) to Mississippi State. However, Petitioner was told by Mr. Mcclain at the Indigo Company that there was a penalty of approximately $48,000 that would have to be taken out of the rental payment to Mississippi State to satisfy the referenced venalities.

6. Subsequently counsel for Indigo sent a letter detailing Indigo's intention to impose a cancellation penalty and make consequent deductions from funds otherwise owning to the State of Mississippi for their rental. See Attached Exhibit E. Exhibit E demonstrates the immediacy of Petitioner's need for intervention by this court to prevent the irreparable harm that would certainly ensue to Petitioner from the disregarding of the right of the Landlord.

7.    Your Affiant maintains that his contract with the State of Mississippi will be revoked and canceled if Indigo Ag does not honor the landlord lien to the State of Mississippi and that his ability to continue his farming career will be lost if Indigo Ag is allowed to withhold any rental funds otherwise owing to satisfy the lien for the 2019 crop year to Mississippi State. Moreover,

8. Additionally, Your Affiant is eligible to receive approximate $42,000 from the United Stated Department of Agriculture which is otherwise available to

4

all soybean farmers who are declared at risk from any tariffs involving the United State and China. This payment is expected by January 15, 2020.  See Exhibit Marked as F.

9. Your Petitioner avers that attached hereto is the recorded priority landlord lien of the State of Mississippi as Exhibit G.


## ARGUMENT

Upon the facts of this case, a permanent  injunction should be issued.

The four factors to be considered by the court are as follows:

1. A substantial likelihood of success on the merits;

2. Irreparable injury if the injunction is not issued;

3. The threatened injury outweighs whatever harm the issuance of an injunction may cause the opposing party; and

4. The injunction would not be adverse to the public interest. McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998); Shatel Corp. v. Mao Ta Lumber and Yacht Corp., 697 F.2d 1352, 1354-55 (11th Cir. 1983); Canal Authority, 489 F.2d at 572; Simon v. Culverhouse, 609 F. Supp. 1050, 1051 (S.D. Fla. 1985).

We consider, in turn, each of the elements of this standard, as applied to the

5

facts of this case.

.       The Public Interest Will Be Served By Issuance of the Injunction

The standard for a **preliminary injunction** is essentially      the same as for a **permanent injunction**," except that a plaintiff must show actual success for a **permanent injunction**, rather than simply a likelihood of success on the merits. *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 546 n.12, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987); *see Am. Civil Liberties Union of Ky. v. McCreary Cnty.,* 607 F.3d 439, 445 (6th Cir. 2010).  In addition, when a plaintiff seeks a **permanent injunction**, "[a]n evidentiary hearing typically is required before an **injunction** may be granted, but a hearing is not necessary where no triable issues of fact are involved." *United States v. Miami Univ.,* 294 F.3d 797, 815 (6th Cir. 2002) (citing *United States v. McGee,* 714 F.2d 607, 613 (6th Cir. 1983)).  Backpage.com, LLC v. Cooper, 2013 U.S. Dist. LEXIS 43852, *2-3, 2013 WL 1249063

Pursuant to Tennessee case law, there are four factors to be considered by a trial court in deciding whether to issue a temporary **injunction**:

a. the threat of irreparable harm,

b. the balance between the harm to be prevented and the injury to be inflicted if the **injunction** issues,

c. the probability that the applicant will succeed on the merits, and

d. the public interest.

6

With respect to **permanent** injunctive relief, the analysis differs somewhat as, in the typical situation; the court has ruled in favor of the applicant on the merits and must determine whether **permanent** injunctive relief is an appropriate remedy. <u>Curb Records, Inc. v. McGraw, 2012 Tenn. App. LEXIS 670, *1, 2012 WL 4377817</u>

We consider, in turn, each of the elements of this standard, as applied to the facts of this case.

**(1.)   Substantial Likelihood of Success on the Merits**

Petitioner has presented a statute (Mississippi Code Annotated 89-7-51) which provided in pertinent parts that:

**"Every lessor of land shall have a lien on the agricultural products of the lease premises, however, and by whosoever produced, to secure the payment of the rent and of money advanced to the tenant…"**

As noted above, Tennessee also has such a statute located at Tennessee Code Annotated 66-12-101 Exhibit B stating:

**That A landlord and one controlling land by lease or otherwise shall have a lien on all crops grown on the land during the year for the payment of the rent for the year, whether the contract of rental be verbal or in writing, and this lien shall inure to the benefit of the assignee of the lienor.**

Therefore, it is clear from the reading of this statute that the State of

Mississippi, as the landlord, has a superior interest in the agricultural product and

it's resulting cash proceeds.   The proof presented at this hearing demonstrates the

actual success on the merits of Petitioner Burrell in that the landlord's lien of both

Mississippi and Tennessee are well established regarding the priority of the

landlord's lien.  Both the Mississippi and the Tennessee statutes clearly indicate

the priority of the landlord lien.

### (2) Irreparable Injury if the Injunction is Not Issued

With regard to irreparable harm, Petitioner will suffer the unlawful default

and resulting loss of his leasehold interest with the State of Mississippi. As

recognized by Congress as a military veteran  eligible for special benefits as

codified under 7 CFR   beginning in the Farming industry , the new and beginning

farmers as codified at 7 CFR Farm program and a socially disadvantaged Farmer

for whom the loss of a lease would have long ranging detrimental implications.

there can be no doubt that Plaintiffs will suffer irreparable injury if Defendant in

this action are permitted to continue to engage in their sanctions and charges

Plaintiff will lose the source of his livelihood .It is his sole means of livelihood,

this eight year lease and its corresponding 838 acres provides Petitioners means of

income since he has been honorably discharged from the military.  It is widely

recognized that conduct such as Defendant's inflicts irreparable injury upon

8

Plaintiffs because Defendant's actions will lead immediately to the loss of an irreplaceable leasehold interest and substantial economic injury and damage to Plaintiff . The letter from the State of Mississippi attached hereto as Exhibit C demonstrates the economic impact at issue for Petitioner Burrell.

**(3) The Threatened Injury Outweighs Whatever Harm the Issuance of an Injunction May Cause the Opposing Party**

The next factor to be considered by this court is whether or not the balance of hardships tips in favor of Plaintiffs.  As has been demonstrated above, the harm to Plaintiffs, absent an injunction, would be irreparable. The inconvenience to Respondent Indigo , upon issuance of the permanent  Injunction, would be merely economic, consisting primarily, if not entirely, of a reamortization of Petitioner's indebtedness. Given the probable outcome of this action; this is a loss that Defendant may justifiably be called upon to bear. See Corning Glass Works v. Jeannette Glass Co., 308 F. Supp. 1321, 1328, 164 U.S.P.Q. (BNA) 435 (S.D. N.Y. 1970), opinion aff'd, 432 F.2d 784, 167 U.S.P.Q. (BNA) 421 (2d Cir. 1970.  A viable economic alternative for Indigo could exist in the form of an opportunity for Mr. Burrell to re-amortize the outstanding debt.  Re-amortization of Mr. Burrell's indebtedness creates a delay to Indigo, however, a delay to Indigo is nowhere near the extent of the damage Indigo as to the grievous losses stemming from a total default in his leasehold interest (868 acres) with the State of Mississippi that would

9

be incurred by the Petitioner Burrell. .   Moreover, the letter to Mr. Burrell from the state of Mississippi makes it abundantly clear that Mr. Burrell will indeed be ousted from the only farmland for which his livelihood depends upon.  The threatened injury to Plaintiffs far outweighs whatever harm the issuance of an injunction may cause Defendant.

To be sure, Mr. Burrell, as being (a) a member of a minority class and (b) a person who has served this country (veteran) is considered by Congress as someone being eligible to certain provision of the special remedies that congress instructed the Department of Agriculture (FSA-Farm Service Agency) to safeguard under & U.S.C Section 2501e (2) of the Food, Agriculture, Conservation and Trade Act of 1990, as amended, as follows:

The term "Socially Disadvantaged Farmer" is defined in previous legislation, Section 2501e (2) of the Food, Agriculture, Conservation and Trade Act of 1990 (7 USC 2279e (2).

A socially disadvantaged Farmer or Rancher is a farmer or rancher who has been subjected to racial or ethnic prejudices because of their identity as a member of a group without regard to their individual qualities. This term means a farmer or rancher who is a member of a socially disadvantaged group.  Specifically, a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities. Those groups include African Americans, American Indians or Alaskan natives, Hispanics and Asians or Pacific Islanders.

Likewise:

While FSA is fully committed to all farmers and ranchers, there is a special focus on the particular credit needs of farmers and ranchers who are in their first 10 years of operation. Each year, FSA targets a portion of its lending by setting aside a portion of all loan funds

10

for financing beginning farmer and rancher operations. With the single exception of the Direct Farm Ownership Down Payment Loan, the Beginning Farmer classification is not related to a type of loan program; it references a specific

Practitioner Burrell was granted an EIGHT YEAR lease agreement from the State of Mississippi and has a remaining SEVEN YEARS on his contract with the State of Mississippi.  Moreover, he has no other leases for which he can continue his farming career and therefore will suffer grievous losses if this requested permanent injunction is not granted.

It is widely recognized that conduct such as Defendant's inflicts irreparable injury upon Plaintiffs because Defendant's actions will lead immediately to the loss of an irreplaceable leasehold interest and substantial economic injury and damage to Plaintiff.  The equities also weigh in this direction as Respondent Indigo had prior knowledge in October of 2019  of the Mississippi crop and landlord lien. See attached Exhibit D (Emails from Indigo indicating knowledge of the Mississippi landlord  and contact with the Mississippi landlord)

### (4) The Public Interest Will Be Served By Issuance of the Injunction

When considering whether to grant injunctive relief, the courts examine and consider the public interest.  See McDonald's Corp. v. Robertson, 147 F.3d 1301, 47 U.S.P.Q.2d (BNA) 1545, 41 Fed. R. Serv. 3d 455 (11th Cir. 1998); All Care Nursing Service, Inc. v. Bethesda Memorial Hosp., Inc., 887 F.2d 1535, 1537, 15 Fed. R. Serv. 3d 535 (11th Cir. 1989).  Congress has expressed the public interest

in the socially disadvantaged farmer legislation and rulemaking codified at

Section 2501e (2) of the Food, Agriculture, Conservation and Trade Act of 1990 (7

USC 2279e (2).

> A socially disadvantaged Farmer or Rancher is a farmer or rancher who has been subjected to racial or ethnic prejudices because of their identity as a member of a group without regard to their individual qualities. This term means a farmer or rancher who is a member of a socially disadvantaged group.  Specifically, a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities. Those groups include African Americans, American Indians or Alaskan natives, Hispanics and Asians or Pacific Islanders.

It is without doubt that congress considered the need for new and beginning

farmers and ranchers—such as Petitioner Burrell—and their corresponding

livelihood and viability when it's enacted the special remedies favoring  beginning

and veteran farmers when it authorized the Department of Agriculture (FSA) to

extend credit and loan benefits to these individuals.  Accordingly, the interest of

the nation—inherent in these congressional provisions—and public will be served

if this court grants Practitioner Burrell this Permanent Injunction.

## CONCLUSION

The relief sought by this Motion for injunctive relief, Permanent Injunction,

serves the public interest , the goals of Congress enacted in the socially

disadvantaged farmer legislation and the Landlord lien  statutes of Mississippi and

Tennessee.

12

## CAUSES OF ACTION

Petitioner Burrell realleges and incorporates all of the foregoing above as though fully set forth verbatim herein. The claims herein are alleged in the alternative and in addition to each other.

Comes now Petitioner Burrell and brings suit against Indigo Ag for Breach of Contract and for Intentional and Negligent Interference with Business Relationship.

## Count I

## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIP

Indigo has intentionally interfered with the business relationship between the State of Mississippi and Cameron Burrell.

One who intentionally and *improperly* interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the **interference** consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
(b) preventing the other from acquiring or continuing the prospective relation.

13

(emphasis added).

Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 700, 2002 Tenn. LEXIS 154, *18

      Specifically, the elements of the tort and burden-of-proof requirements, as originally adopted by several jurisdictions, included: (1) the existence of a business relationship or expectancy (not necessarily contractual); (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional act of **interference**; (4) proof that the **interference** caused the harm sustained; and (5) damage to the plaintiff. Id. at 645 n.3 (quoting Quality Auto Parts Co., 876 S.W.2d at 823).

Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 699, 2002 Tenn. LEXIS 154, *16

      Indigo, Inc has improperlyintentionally  interfered with the business relationship between the State of Mississippi and Cameron Burrell preventing Cameron burrell from continuing the business relationship with the State of Mississippi thereby causing substantial and severe pecuniary loss and harm to Cameron Burrell whereby Cameron Burrell has suffered the loss of the benefit of the relationship.

## COUNT II

## NEGLIGENT INTERFERENCE WITH BUSINESS RELATIONSHIP

      Indigo has  improperly negligently interfered with  the business relationship between the State of Mississippi and Cameron Burrell preventing Cameron burrell from continuing the business relationship with the State of Mississippi thereby causing substantial and severe pecuniary loss and harm to Cameron Burrell whereby Cameron Burrell has suffered the loss of the benefit of the relationship.c

14

## COUNT III

## BREACH OF CONTRACT

Indigo was fully advised that the State of Mississippi had a Landlord's lien on Cameron Burrell's crop. Indigo employees and agents discussed the payment of the Landlord's lien with Mr. Burrell When Indigo did receive the proceeds of the crop yield, Indigo refused and failed to pay the Landlord's lien thereby causing substantial and severe economic injury to Cameron Burrell. There existed a contract between Cameron Burrell and Indigo for Indigo to pay the Landlord's lien. Indigo breached that contract. As a result of Indigo's breach, Cameron Burrell has suffered grievous  substantial economic injury and losses

Respectfully Submitted

Paul A. Robinson Jr. #014464
3749 Marty Street
Memphis, TN 38109
Telephone (901) 649-4053
Fax (901) 328-1803

15

16

Case 2:20-cv-02035-SMV-LRR Document 1-3 Filed 01/13/20 Page 121 of 267 PageID.164

12/4/2019                                                          FILED
                                                          2020 Jan 13 12:48 AM
                                                          CLERK OF COURT
                                                          ELECTRONICALLY FILED

Ex A



View the 2018 Mississippi Code | View Other Versions of the Mississippi Code

# 2010 Mississippi Code
# TITLE 89 - REAL AND PERSONAL PROPERTY
# Chapter 7 - Landlord and Tenant.
# 89-7-51 - Lien of landlord.

**§ 89-7-51. Lien of landlord.**

(1) Every lessor of land shall have a lien on the agricultural products of the leased premises, however and by whomsoever produced, to secure the payment of the rent and of money advanced to the tenant, and the fair market value of all advances made by him to his tenant for supplies for the tenant and others for whom he may contract, and for his business carried on upon the leased premises. This lien shall be paramount to all other liens, claims, or demands upon such products when perfected in accordance with Uniform Commercial Code Article 9 - Secured Transactions (Section 75-9-101, et seq.). The claim of the lessor for supplies furnished may be enforced in the same manner and under the same circumstances as his claim for rent may be; and all the provisions of law as to attachment for rent and proceedings under it shall be applicable to a claim for supplies furnished, and such attachment may be levied on any goods and chattels liable for rent, as well as on the agricultural products.

(2) All articles of personal property, except a stock of merchandise sold in the normal course of business, owned by the lessee of real property and situated on the leased premises shall be subject to a lien in favor of the lessor to secure the payment of rent for such premises as has been contracted to be paid, whether or not then due. Such lien shall be subject to all prior liens or other security interests perfected according to law. No such articles of personal property may be removed from the leased premises until such rent is paid except with the written consent of the lessor. All of the provisions of law as to attachment for rent and proceedings thereunder shall be applicable with reference to the

EXHIBIT
A

Case 2:20-cv-02035-MSN-dkv   Document 1-5   Filed 01/16/20   Page 122 of 267   PageID 165

ELECTRONICALLY FILED
2020 Jan 13 12:48 AM
CLERK OF COURT

Ex A (cont)

lessor's lien under this subsection.

**Sources:** Codes, 1880, § 1301; 1892, § 2495; 1906, § 2832; Hemingway's 1917, § 2330; 1930, § 2186; 1942, § 908; Laws, 1972, ch. 343, § 1; Laws, 2001, ch. 495, § 34, eff from and after Jan. 1, 2002.

**Disclaimer:** These codes may not be the most recent version. Mississippi may have more current or accurate information. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or the information linked to on the state site. Please check official sources.

ELECTRONICALLY FILED
2020 Jan 16 12:48 AM
CLERK OF COURT



# LEASE CONTRACT
# MISSISSIPPI STATE PENITENTIARY LAND

THE DEPARTMENT OF FINANCE AND ADMINISTRATION THROUGH THE BUREAU OF BUILDING, GROUNDS AND REAL PROPERTY MANAGEMENT ON BEHALF OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS / MISSISSIPPI STATE PENITENTIARY HEREAFTER KNOWN AS LESSOR, MAKES THIS CONTRACT TO LEASE:

WITH: _Camron L. Burrell____ -Hereafter known as LESSEE

The Department of Finance and Administration through the Bureau of Building, Grounds and Real Property Management, on behalf of the Mississippi Department of Corrections / Mississippi State Penitentiary, hereinafter referred to as LESSOR, 501 North West Street, Suite 1401B, Jackson, Mississippi 39201, hereby Leases to:

Camron L. Burrell
1948 Autumndale Cove
Cordova, TN 38016

hereinafter referred to as LESSEE, the following described lands, hereinafter referred to as TRACT:

TRACT NUMBER: _3_

COUNTY: _Sunflower_____ on the following terms and conditions:

## CONDITION NUMBER 1:

This Lease is entered into in accordance with and pursuant to the authority provided in Sections 47 - 5 - 64 and 47 - 5 - 66 of the *Mississippi Code of 1972, Annotated,* as amended. LESSOR and LESSEE acknowledge that said Tract was recommended by the Mississippi Department of Corrections and that the statutory requirements relating to the advertisement for bids and award of Leases have been complied with.

## CONDITION NUMBER 2:

The Tract of land listed above is generally described on Exhibit A hereto attached. This is a Lease by Tract Number and not by the acre. The LESSOR does not warrant the number of acres of land in the respective Tract.

## CONDITION NUMBER 3:

The primary term of this Lease shall be for a period of ~~three (3)~~ *Eight (8) year term* years commencing on ____April 3rd, 2019 and ending on ____January 14_____, 2027 in accordance with Mississippi Code Section 47-5-64 . . . *for not less than three (3)....years....and no more than eight (8).*

The current period is for Year __1__ on said three (3) year lease beginning ____April 3rd___, 2019 and ending on ____January 14_____, 2020.

Lease rent, in full, shall be due annually, in accordance with Condition Number 4b through 4d of the original Lease, and in accordance with Mississippi Code Section 47-5-66 . . . *shall be due on the anniversary date for each following year of the lease. . . .* including primary and renewal terms.

All other terms and conditions of the Original Lease shall remain the same.

## CONDITION NUMBER 4:

If, upon expiration of the primary term of this lease, LESSOR shall decide to re-lease the subject property, LESSEE, at the option of LESSOR, shall have the right to renew the existing lease under the same terms and conditions as set forth herein for additional terms of one year each. In order to exercise said right LESSEE must comply with the following:

B.      Rent for the prior term must have been paid in full by October 30th of the primary term or renewal period, as the case may be;

C.      Payment of twenty-five percent (25%) of the annual rental for the renewal lease term must be made to LESSOR at signing or prior to the signing of the renewal contract.

D.      Payment of nine dollars ($9.00) per acre in lieu of taxes must be made payable by Certified or Cashier's Check to the Tax Collector of the County in which the land is located and delivered to the LESSOR at signing or prior to signing of the primary lease contract.

In no event shall the total term of the Lease, including primary and renewal terms, exceed eight (8) years. (SB2597 '07)

**CONDITION NUMBER 5:**

LESSEE shall pay to LESSOR as rent for the use and possession of the Tract the sum of $67,350.00 per year due and payable as follows:

Not less than ___10___% of the yearly amount of bid shall accompany LESSEE's bid and will be deposited into the Prison Industries Fund and credited toward the rent due by the LESSEE upon the date of award of this Lease to the LESSEE from the LESSOR.

The balance of the rent due is to be paid to LESSOR not later than the date the LESSEE shall take possession of the herein described property as awarded by the LESSOR.  For this Lease, the said date of possession shall be April 3rd, 2019 :

**OR; (If Approved By LESSOR):**

The balance of the rent due shall be secured to the LESSOR by the assignment of payment of funds to be received by the LESSEE from the Federal Government through the FSA / USDA Office.  Said assignment shall be in proper form as specified by the FSA / USDA. Said assignment shall be delivered to the LESSOR no later than the date the LESSEE shall take possession of the herein described property.

Furthermore, The LESSEE agrees to pay rent in full or assign to the LESSOR a first lien mentioned above against the crops planted on the property described herein plus any and all crop insurance proceeds in an amount sufficient to cover any shortage of rent plus a 10% to be charged as additional rent and collectable by the LESSOR as rent should the payment secured to the LESSOR by Assignment of Revenue to be received by the LESSEE from the Federal Government be in an amount less than the balance of rent due.  The Lessee agrees to provide the Lessor with the name of Lessee's Crop Insurance supplier, along with a signed Assignment of Indemnity Form.

Should the LESSEE fail to assign such a lien to the LESSOR, or, should the crop planted on the property described herein fail to produce the revenue pledged by the lien against a said crop, the Lease will at the option of the LESSOR, terminate and the LESSEE herein shall forfeit all payments previously received by the LESSOR as rent for the property described and shall remain liable to the LESSOR for the balance of rent not paid.  A 10% late fee will be added to any balance of rent not paid prior to the expiration date of this lease and collected as additional rent.

Should the LESSEE fail to pay or secure payment of the balance of the rent due as specified herein then this Lease shall, at the option of the LESSOR, terminate and the ___10%___ payment which accompanied the bid for this Lease will be forfeited by the LESSEE to the LESSOR.

LESSEE shall submit to LESSOR as payment in lieu of taxes on the Tract(s) the sum of $9.00 per acre shown in bid documents per year and payable as follows (HB 431 '07):  A certified or cashier's check made payable to the Tax Collector of the County in which the land is located.  Said check will be forwarded to the Tax Collector by LESSOR to be applied to the account of LESSEE.

**CONDITION NUMBER 6:**

The LESSEE shall not encumber, assign, or otherwise transfer this Lease, any right or interest in this Lease, or any right or interest in the Tract or any of the improvements that may now or hereafter be constructed or installed on the Tract without the express prior written consent of the LESSOR or its legal representative.  Neither shall the LESSEE sublet the Tract or any part thereof or allow any other persons, other than the LESSEE's agents, family, and servants, to occupy or use the Tract without the express prior written consent of the LESSOR or its legal representative.  A consent by the

Ex B Cont

ELECTRONICALLY FILED
2020 Jan 13 12:48 AM
CLERK OF COURT

LESSOR or its legal representative to one assignment, subletting, occupation, or use by another person shall not be deemed to be consent to any subsequent assignment, subletting, occupation, or use by another person. Any encumbrance, whether it be voluntary or involuntary, by operation of law or otherwise, is void and shall, at the option of the LESSOR or its legal representative, terminate this Lease.

## CONDITION NUMBER 7:

If for any reason the LESSEE shall abandon this Lease and remove from said Tract of land prior to the expiration hereof, this lease shall be terminated at the option of the LESSOR or its legal representative and shall be henceforth null and void, and the LESSOR or its legal representative shall have the right to enter upon and take possession of said land and to again Lease the same as provided by law. LESSOR shall have the right to seek full restitution from the LESSEE for all damage sustained resulting from the breach of the Lease contract referred to in this paragraph, together with any other amount necessary, including court costs, reasonable attorney fees and interest at the legal rate, to compensate the LESSOR and its legal representative for all detriment proximately caused by the LESSEE's failure to perform his obligations under this Lease.

## CONDITION NUMBER 8:

LESSEE shall not cut or remove from said Tract any timber now standing or growing thereon.

## CONDITION NUMBER 9:

The LESSEE agrees to cultivate the Tract in a husbandman like manner, and not to commit waste thereon, and if in the opinion of the LESSOR or its legal representative waste thereon is or has been committed, then LESSOR shall have the immediate right to terminate this Lease contract, and it or its legal representative to re-enter and re-take the subject lands and take such action as the LESSOR or its legal representative may deem necessary to protect its interest in this Lease and in the Tract or Tracts. LESSEE agrees to reimburse the LESSOR or its legal representative on demand for the costs of any actions taken by the LESSOR or its legal representative pursuant to the provisions of this Condition.

## CONDITION NUMBER 10:

LESSEE agrees to plant, grow and harvest from those crops that are specified in Exhibit "B" attached hereto. Said crops have been assigned bases by the FSA / USDA to the Tract and LESSEE agrees to plant the necessary acreage of each crop so as not to diminish the base acreage of the Tract unless otherwise agreed to in writing by the LESSOR or its legal representative.

## CONDITION NUMBER 11:

LESSEE agrees to notify the LESSOR or its legal representative in writing of his farm plan for each year of this Lease not later than 60 days prior to the date established by the FSA / USDA as their deadline for submitting farm plans to qualify for FSA / USDA crop programs. Should the LESSEE fail to submit such plan by the required date, or should the plan submitted be unacceptable to the LESSOR or its legal representative, or should the LESSEE fail to plant the crops as designated by this Lease in the acreage prescribed by the Lease, then this Lease may be terminated at the option of the LESSOR or its legal representative on a date determined by the LESSOR or its legal representative and the LESSEE will forfeit to the LESSOR all rent paid.

## CONDITION NUMBER 12:

LESSEE agrees that should the LESSEE fail to obtain sufficient crop stands to justify continued cultivation, in accordance with FSA / USDA guidelines and regulations, he will fallow said lands and control the growth of weeds and grass, also in accordance with FSA / USDA guidelines and regulations.

## CONDITIONS NUMBER 13:



ELECTRONICALLY FILED
2020 Jan 13 12:48 AM
CLERK OF COURT

# LEASE CONTRACT
# MISSISSIPPI STATE PENITENTIARY LAND

THE DEPARTMENT OF FINANCE AND ADMINISTRATION THROUGH THE BUREAU OF BUILDING, GROUNDS AND REAL PROPERTY MANAGEMENT ON BEHALF OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS / MISSISSIPPI STATE PENITENTIARY HEREAFTER KNOWN AS LESSOR, MAKES THIS CONTRACT TO LEASE:

WITH: _Camron L. Burrell____ -Hereafter known as LESSEE

The Department of Finance and Administration through the Bureau of Building, Grounds and Real Property Management, on behalf of the Mississippi Department of Corrections / Mississippi State Penitentiary, hereinafter referred to as LESSOR, 501 North West Street, Suite 1401B, Jackson, Mississippi 39201, hereby Leases to:

Camron L. Burrell
1948 Autumndale Cove
Cordova, TN 38016

hereinafter referred to as LESSEE, the following described lands, hereinafter referred to as TRACT:

TRACT NUMBER _27_

COUNTY: _Sunflower____ on the following terms and conditions:

## CONDITION NUMBER 1:

This Lease is entered into in accordance with and pursuant to the authority provided in Sections 47 - 5 - 64 and 47 - 5 - 66 of the *Mississippi Code of 1972, Annotated,* as amended. LESSOR and LESSEE acknowledge that said Tract was recommended by the Mississippi Department of Corrections and that the statutory requirements relating to the advertisement for bids and award of Leases have been complied with.

## CONDITION NUMBER 2:

The Tract of land listed above is generally described on Exhibit A hereto attached. This is a Lease by Tract Number and not by the acre. The LESSOR does not warrant the number of acres of land in the respective Tract.

## CONDITION NUMBER 3:

The primary term of this Lease shall be for a period of three (3) Eight (8) KEA years commencing on _____April 3rd, 2019_ and ending on _____January 14_____, 2027, in accordance with Mississippi Code Section 47-5-64 . . . *for not less than three (3) . . . years . . . and no more than eight (8).*

The current period is for Year __1__ on said three (3) year lease beginning _____April 3rd___, 2019 and ending on _____January 14_____, 2020.

Lease rent, in full, shall be due annually, in accordance with Condition Number 4b through 4d of the original Lease, and in accordance with Mississippi Code Section 47-5-66 . . . *shall be due on the anniversary date for each following year of the lease.* . . . including primary and renewal terms.

All other terms and conditions of the Original Lease shall remain the same.

## CONDITION NUMBER 4:

If, upon expiration of the primary term of this lease, LESSOR shall decide to re-lease the subject property, LESSEE, at the option of LESSOR, shall have the right to renew the existing lease under the same terms and conditions as set forth herein for additional terms of one year each. In order to exercise said right LESSEE must comply with the following:

# Ex C

ELECTRONICALLY FILED
2020 Jan 13 12:48 AM
CLERK OF COURT

## Fwd: Congratulations - Your Offer Has Been Accepted

**cgtfmllc@outlook.com**
Tue 12/10/2019 3:24 PM
**To:** problaw937@hotmail.com <problaw937@hotmail.com>

Get Outlook for Android

---

**From:** no-reply@indigoag.com <no-reply@indigoag.com>
**Sent:** Friday, September 27, 2019 7:58:05 AM
**To:** cgtfmllc@outlook.com <cgtfmllc@outlook.com>
**Subject:** Congratulations - Your Offer Has Been Accepted

Go to your account

### Your Offer AC6QG8B Has Been Accepted

# Soybeans

| | |
|---|---|
| Contract | **Basis** |
| Price | **-$0.25 Jan 2020** |
| Freight | **Grower Delivered (FOB Destination)** |
| Buyer | **Louis Dreyfus Company-Rosedale 016523 (Facility)** |
| Quantity | **10,000 Bushels** |
| Expiration | **Good til Cancel** |
| Seller | **cameron Burrell** |
| Entity Account | **Cameron Burrell** |
| Offer ID | **AC6QG8B** |

## View Accepted Offers



ELECTRONICALLY FILED
2020 Jan 13 12:48 AM
CLERK OF COURT

## Fwd: Congratulations - Your Offer Has Been Accepted

**cgtfmllc@outlook.com**
Tue 12/10/2019 3:25 PM
**To:** problaw937@hotmail.com <problaw937@hotmail.com>

Get **Outlook for Android**

---

**From:** no-reply@indigoag.com <no-reply@indigoag.com>
**Sent:** Friday, September 27, 2019 7:59:13 AM
**To:** cgtfmllc@outlook.com <cgtfmllc@outlook.com>
**Subject:** Congratulations - Your Offer Has Been Accepted

Go to your account

### Your Offer AC4AM2T Has Been Accepted

# Soybeans

| | |
|---|---|
| Contract | Basis |
| Price | -$0.25 Jan 2020 |
| Freight | Grower Delivered (FOB Destination) |
| Buyer | Louis Dreyfus Company-Rosedale 016523 (Facility) |
| Quantity | 10,000 Bushels |
| Expiration | Good til Cancel |
| Seller | cameron Burrell |
| Entity Account | Cameron Burrell |
| Offer ID | AC4AM2T |

View Accepted Offers



### Fwd: Congratulations - Your Offer Has Been Accepted

cgtfmllc@outlook.com
Tue 12/10/2019 3:26 PM
To: problaw937@hotmail.com <problaw937@hotmail.com>

Get Outlook for Android

**From:** no-reply@indigoag.com <no-reply@indigoag.com>
**Sent:** Friday, September 27, 2019 7:58:53 AM
**To:** cgtfmllc@outlook.com <cgtfmllc@outlook.com>
**Subject:** Congratulations - Your Offer Has Been Accepted

## °indigo™

Go to your account

### Your Offer AC60ZET Has Been Accepted
# Soybeans

| | |
|---|---|
| Contract | Basis |
| Price | -$0.25 Jan 2020 |
| Freight | Grower Delivered (FOB Destination) |
| Buyer | Louis Dreyfus Company-Rosedale 016523 (Facility) |
| Quantity | 10,000 Bushels |
| Expiration | Good til Cancel |
| Seller | cameron Burrell |
| Entity Account | Cameron Burrell |
| Offer ID | AC60ZET |

## View Accepted Offers



## Fw: Letter showing 2019 Taxes are paid

**Cameron Burrell**

Thu 12/12/2019 10:27 AM

To: Cameron Burrell <cgtfmllc@outlook.com>

---

**From:** cgtfmllc@outlook.com
**Sent:** Monday, September 30, 2019 10:08 AM
**To:** Aimee Moncure <Aimee.Moncure@dfa.ms.gov>
**Subject:** Re: Letter showing 2019 Taxes are paid

Greetings Aimee,

Hope all is well. I need to get my new account manager in contact with you in regards to paying the rent on tracts 3 and 27. I will be working with Indigo Ag here in Memphis and they need some information from you to set you up payments to the State of MS/MSDOC when my soybeans are delivered to the grain elevators.

Upon you receiving this email and giving the green light, I will email her your contact information.

Thanks again.

Regards,

Cameron Burrell
901.490.5270

---

Get **Outlook for Android**

---

501 North West Street, Suite 1401 B
Jackson, MS 39201



12/11/2019 Case 2:20-cv-02035-MSN-dkv Document 1-3 Filed 01/16/20 Page 131 of 267 PageID 174

Mail - Paul Robinson - Outlook

ELECTRONICALLY FILED
2020 Jan 16 1:49 AM
CLERK OF COURT

Ex D.com

## Fwd: -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

**cgtfmllc@outlook.com**
Tue 12/10/2019 3:07 PM
To: problaw937@hotmail.com <problaw937@hotmail.com>

Get Outlook for Android

---

**From:** Mary Beth Gammel <mgammel@indigoag.com>
**Sent:** Friday, October 4, 2019 9:11:49 AM
**To:** cgtfmllc@outlook.com <cgtfmllc@outlook.com>; Amber Blair <ablair@indigoag.com>
**Subject:** RE: -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

Sounds great!

A logistics coordinator will be reaching out to you today and sending delivery tickets and instructions.

Also- I was able to speak with both Cathy and Wade at the state of Ms. yesterday. They stated that there was a balance of $60,615 on Tract 3 and $28,989 on Tract 27. Would you like to handle this as a money split? If so- we can allocate the money over to the Department of Corrections after the grain has been delivered and contract priced.

Just let us know.

Mary Gammel
50 South B.B. King Blvd
Memphis, TN 38103



Boston • Memphis • Brazil • Argentina • Australia

**From:** cgtfmllc@outlook.com <cgtfmllc@outlook.com>
**Sent:** Friday, October 4, 2019 8:50 AM
**To:** Amber Blair <ablair@indigoag.com>
**Cc:** Mary Beth Gammel <mgammel@indigoag.com>
**Subject:** Re: -Early delivery-LDC Rosedale (TX-2491,TX-2486,TX-2492)

Greetings,

Planning on harvest and delivery on the first 10k bushels on Monday of next week, weather permitting.

Regards,

Cameron Burrell
901.490.5270

Get Outlook for Android

about:blank

ELECTRONICALLY FILED
2020 Jan 13 12:48 AM
CLERK OF COURT

Ex. E.

indigo

**VIA US MAIL**

Date:       December 4, 2019

To:         Paul A. Robinson, Jr., 3749 Marty St., Memphis, TN 38109

Re:         Notice of Cancelation – Cameron Burrell

Dear Mr. Robinson,

Thank you for speaking with us in regard to your representation of Mr. Cameron Burrell. As you know, Mr. Burrell has legally-binding contracts, governed by National Grain and Feed Association (NGFA) Trade Rules, with Indigo Ag, Inc. to sell #1 yellow soybeans through the Indigo Marketplace. Before we learned of your representation, Indigo customer relations personnel spoke with Mr. Burrell, who was unable to offer adequate assurances that he could or would comply with his contractual obligations. Instead, Mr. Burrell agreed on a cancelation per the terms of this letter. We sincerely would like to get Mr. Burrell paid for what Indigo owes him, minus necessary cancelation offsets and deductions, and this correspondence allows us to do that per the terms of Mr. Burrell's contract and NGFA rules. Therefore, after the exercise of due diligence and in consideration of the agreed upon terms herein, we hereby declare Mr. Burrell in default of the following obligations:

#1 Yellow Soybeans Sold to

Indigo Ag, Inc.
50 South B.B. King Blvd.
Memphis, TN 38103

| Offer ID | AC6QG8B | AC4AM2T | ACLZQAI | AC60ZET | ACCAJ54 |
|---|---|---|---|---|---|
| Shipment Dates | 11.1.19-11.30.19 | 10.15.19-11.14.19 | 10.15.19-11.14.19 | 10.15.19-11.14.19 | 11.1.19-11.30.19 |
| Price | -$0.25 Jan 2020 | -$0.25 Jan 2020 | $8.96 | -$0.25 Jan 2020 | -$0.25 Jan 2020 |
| Bushels delivered | 0 | 0 | 8,688.58 | 0 | 0 |
| Defaulted Bushels | 10,000 | 10,000 | 1,311.42 | 10,000 | 10,000 |

Failure to Perform Delivery of Contract is a violation of

NGFA Grain Trade Rules Rule 28.

"If the Seller fails to notify the Buyer of his inability to complete his contract, as provided above, the liability of the Seller shall continue until the Buyer, by the exercise of due diligence, can determine whether the Seller has defaulted. In such case it shall then be the duty of the Buyer, after giving notice to Seller to complete the contract, at once to:

Indigo Ag, Inc.   •   500 Rutherford Avenue   •   Boston, MA 02129   •   Tel: 1 (844) 828-0240   •   www.indigoag.com



1 of 2

12/10/2019, 10:31 AI



(1) agree with the Seller upon an extension of the contract; or
(2) buy-in for the account of the Seller, using due diligence, the defaulted portion of the contract; or
(3) cancel the defaulted portion of the contract at fair market value based on the close of the market the next business day."

At this time Indigo Ag, Inc. declares Mr. Burrell in default.

Per prior conversations with Indigo non-attorney personnel, Mr. Burrell has agreed that 41,311.42 bushels remain undelivered and that Indigo is entitled to cancel Offer IDs AC6QG8B, AC4AM2T, ACLZQAI, AC60ZET, and ACCAJ54 as to those undelivered bushels.

Indigo will issue Mr. Burrell payment for the delivered bushels, minus deductions, as soon as possible. His payment will be accompanied by a settlement statement, which will set forth all payments owed, deductions therefrom, and set-offs, as explicitly agreed to by Mr. Burrell in the Marketplace Seller Agreement. **Indigo will deduct from Mr. Burrell's payment $40,485.19, which fairly and accurately reimburses Indigo for costs incurred by virtue of this cancelation, plus additional deductions for transport costs as to be reflected on the forthcoming settlement statement.**

You have kindly informed us of the lien the State of Mississippi has against your client. As such, the payment to your client will be in both his name and to the State of Mississippi. It is your client's responsibility to ensure that any commitments he has to the State of Mississippi are satisfied.

We greatly appreciate your reviewing this letter with your client. This correspondence is a notice of default and an attempt to resolve our claims against Mr. Burrell without legal action, and we are hopeful that we will be able to do so. The undelivered bushels are hereby canceled per the terms of the NGFA rules, and we reserve the right to seek all available remedies for losses and damages if Mr. Burrell is not agreeable to the resolution put forth.

We hope to hear from you soon and look forward to resolving this matter.


Very truly yours,


Adam Lazarov, Commercial Legal Counsel, Indigo Ag, Inc.
Email: alazarov@indigoag.com
TN Bar #: 033158



**USDA**

SUNFLOWER FSA OFFICE
210 N MARTIN LUTHER KING
INDIANOLA, MS 38751-0000
Phone: (662)887-9799

Ex F

ELECTRONICALLY FILED
2020 Jan 13 12:48 AM
CLERK OF COURT

**Payment Statement**

**Retain for Tax Purposes**
FSA will not issue 1099 tax forms to customers receiving
less than $600 in reportable benefits in a calendar year.

**Statement Date: 08/21/2019**

CAMERON LAMAR BURRELL SR
1948 AUTUMNDALE CV
CORDOVA TN 38016-4012

0010757
T23

## Payment Summary

| | |
|---|---|
| **Gross Payment** | **$42,753.81** |
| **Deductions** | **- $0.00** |
| **Net Payment** | **$42,753.81** |

## Payment Detail

**TMD/MFP 2019 NON SPECIALTY CROPS**      FSA Payment ID: OF 2201-02

Transaction control number: 32060477

| | |
|---|---|
| Gross Payment | $42,753.81 |
| Deductions | - $0.00 |
| Net Payment | ACH sent to CAMERON LAMAR BURRELL SR at REGIONS BANK account ending in 3620 on/about 08/23/2019 | $42,753.81 |

**Notes**
Program Year: 2019
Program Name/Type: Market Facilitation Program - NS Crops
Payment Amount: $42,753.81
You may appeal this payment and
how it was calculated by filing a written request to the County Committee within 30 calendar
days after you receive this statement and by explaining why you believe this payment is
erroneous. If you appeal to the County Committee, you have the right to an informal hearing
which you or your representative may attend either personally or by telephone. If you appeal
to the County Committee, you may later appeal an adverse determination of the County
Committee to the FSA State Committee or the National Appeals Division or request mediation.
If you do not timely file a written appeal, this payment is a final administrative
determination with respect to this matter according to the regulations at 7 CFR Part 780.



08/21/2019



USDA is an equal opportunity provider, employer, and lender.





01/01

This statement was printed by the USDA/FSA National Office. The Debt Collection Improvement Act of 1996 (DCIA) (31 USC 3716) requires Treasury to reduce federal payments to satisfy overdue federal debt. Treasury collections will not appear as deductions on this statement. If the amount on this statement does not match the amount you receive, questions may be directed to Treasury at 1-800-304-3107. Receipt of this statement does not guarantee payment. FSA/CCC is not liable for overdrafts or failure to verify receipt of funds.

ELECTRONICALLY FILED
2020 Jan 13 12:48 AM
CLERK OF COURT
12/3/2019

**Filing Type: UCC1F - Farm Lien**

| File Number | Filing Date | Filing Type | Lapse Date |
|---|---|---|---|
| 2019310715151F | 12/3/2019 | UCC1F - Farm Lien | |

**Debtor**
Burrell, Cameron
1948 AUTUMNDALE CV, CORDOVA, TN, 38016

**SecuredParty**
State of Mississippi/Department of Finance &
Administration/Department of Corrections
501 N. West St., Jackson, MS, 39201

Ex G

ELECTRONICALLY FILED
2020 Jan 13 8:54 AM
CLERK OF COURT

**IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS**

| | | |
|---|---|---|
| CAMERON BURRELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | NO. CH-19-1677 |
| INDIGO AG INC., | ) | Part I |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

### POST-HEARING BRIEF

---

Following a hearing on Plaintiff's Petition for Injunctive Relief on January 10, 2020, Defendant Indigo Ag Inc. ("Indigo") submits this Post-Hearing Brief.

## I.      INTRODUCTION

Plaintiff has not met his burden of proof to warrant injunctive relief, nor has Plaintiff properly asked for any sort of mandatory injunction. Instead, the Court's interpretation of the Plaintiff's request for relief to include a mandatory injunction is improper under the circumstances. Indigo respectfully asks that the Court reconsider its ruling.

## II.      ARGUMENT

### A. Plaintiff has not met the four factors to show he is entitled to injunctive relief.

First, Plaintiff is not likely to succeed on the merits because he has not proven how his own rights are being or will be violated *by Indigo*. Instead, Plaintiff bases his entire argument on the fact that the State of Mississippi *might* have a priority lien on crops from land he farms as part of his eight-year lease with the State of Mississippi. Plaintiff argues that without payment in full for the crops he farmed and actually harvested, he will not be able to fulfill his obligations to the State of Mississippi under his lease by January 14, 2020—a deadline imposed solely by the State, not by Indigo—and the State of Mississippi will not renew the lease for the remaining

seven years. Yet Plaintiff has failed to offer any proof of a properly perfected UCC lien by the State of Mississippi. There has been zero evidence introduced by the Plaintiff to establish the existence of a proper lien; instead, Plaintiff relies on an email from an Indigo representative repeating language from counsel for Plaintiff. Without a properly perfected lien pursuant to Mississippi Code Annotated § 75-9-308, Plaintiff's claim for the State of Mississippi priority right to proceeds to Plaintiff's crop necessarily fails. Further, Plaintiff has failed to offer any authority to show he has proper standing to assert such arguments on behalf of the State of Mississippi without its involvement. To the contrary, the State of Mississippi is the *only* proper entity who can enforce such a lien, and because of state sovereign immunity, it cannot be a party to this action; and Plaintiff's position is improper. As such, he cannot succeed.

Second, Plaintiff has not established how he is irreparably harmed by the agreed-upon cancellation fees being deducted from the approximately $77,000 check from Indigo for the 8,688.58 bushels out of 50,000 bushels of soybeans actually delivered. The proof established that Plaintiff owes the State of Mississippi $89,604 in rent for 2019 (which was due in October), as well as a percentage of rent for 2020 and taxes, totaling almost $123,000 by January 14th to avoid losing the lease. But Plaintiff testified that he still has over 250 acres of soybeans in the field that he has failed to harvest, even though Plaintiff alleges they are worth more than the beans he harvested and delivered in October. This remaining crop could easily be or have been harvested and sold to help satisfy Plaintiff's obligations to the State of Mississippi, and yet it is still sitting in the field. Plaintiff's only explanation was that "we halted everything once we filed this petition." *See* Transcript from January 10, 2020 hearing, attached hereto as Exhibit A, 63:3-4. Moreover, Plaintiff testified that his "investors" have money to help him satisfy his obligations to the State of Mississippi, as needed. *Id.* at 67:16-18. Further, Plaintiff did not establish that he would suffer irreparable harm based on any actions by Indigo. Instead, the proof clearly shows

that the State of Mississippi is the only entity who intends to act against Burrell if he cannot fulfill his payment obligations.[1] Thus, any purported irreparable harm Plaintiff faces could easily be avoided[2], and an injunction against Indigo is unnecessary because the key act that would cause Plaintiff harm is by a non-party.

Third, the potential harm to Plaintiff does not outweigh harm to Indigo, as Plaintiff's harm could be avoided by making alternate arrangements to satisfy his payment obligations to the State of Mississippi. Indigo, on the other hand, would be forced to ignore the priority lien of another local creditor with a properly filed UCC lien against Plaintiff. Without the involvement of all of Plaintiff's creditors, Indigo will be left without any resolution as to how to proceed.

Fourth, the public interest clearly favors acknowledgment of properly filed priority liens and clear and complete resolution of judicial proceedings. Without the necessary parties, this cannot be accomplished, and the action should be dismissed.

### B. The Court's oral ruling for a mandatory injunction is improper and will only cause more confusion for the Parties.

Throughout these proceedings, Plaintiff has only requested a prohibitive injunction. In the conclusion of his Petition for Injunctive Relief, Plaintiff asked that this Court "enjoin Defendant, Indigo Ag from converting, deducting, offsetting and/or otherwise using secured proceeds belonging [to] Practitioner [sic] Burrell and in possession of Respondent Indigo Ag to satisfy its cancellation and transportation cost or penalties." *See* Petition for Injunctive Relief, p. 8.

---

[1] Moreover, it is the State's January 14 deadline, not any action or inaction by Indigo, that imposes a sense of urgency. Yet not only has Plaintiff failed to petition to enjoin the State from enforcing this deadline until these matters can be properly resolved, he has brought his action in a forum that ensures that cannot happen.

[2] If, contrary to Plaintiff's sworn testimony, Plaintiff takes the position that he does not have access to funds to fulfill his payment obligations, then his Petition still must fail because in that case he will have not proven he can make up the difference between the $123,000 owed to the State and the $77,000 alleged to be owed by Indigo.

3

Similarly, in closing arguments, counsel for Plaintiff concluded with his request for relief and specifically stated," "[W]e ask the Court to permanently enjoin Indigo from consuming those $40,000 and allowing Mr. Burrell to apply those funds to the landlord's lien in Mississippi and Indigo be paid subsequent to the landlord's lien." *See* Transcript, 85:16-22.

This request for prohibitive injunction only seeks to enjoin Indigo from engaging in a certain action, i.e., deducting the cancellation costs, during the pendency of the case. At no point in the proceedings has there been any specific request by Plaintiff that Indigo affirmatively act by writing a check to the State of Mississippi to go towards Plaintiff's rent obligations. Nor has Plaintiff established any privity between the State of Mississippi and Indigo to necessitate such action. Plaintiff simply sought a ruling barring Indigo from making the agreed-upon cancellation deductions. Nevertheless, the Court interpreted Plaintiff's request for relief to include more than he actually sought and made the incredibly rare decision to implement a mandatory injunction compelling a party to perform an affirmative act at a preliminary injunction stage.

Under Tennessee law, "[i]t is a general rule that a mandatory injunction will not be granted except in extreme cases and when courts of law are unable to afford adequate redress, or when the injuries complained of cannot be compensated in damages." *Smith v. Rodgers*, 677 S.W.2d 1, 3 (Tenn. Ct. App. 1984) (quoting *Morrison v. Jones,* 58 Tenn. App. 333, 430 S.W.2d 668 (1968)). In this instance, a mandatory injunction is not appropriate because this is not an extreme case where the court is unable to afford adequate redress or where injuries complained of cannot be compensated. *See Franklin Square Towne Homeowners Ass'n Inc. v. Kyles*, No. W201602018COAR3CV, 2017 WL 1952833, at *7 (Tenn. Ct. App. May 10, 2017). This is simply Plaintiff's Petition for Injunctive Relief to enjoin Indigo from making cancellation deductions. Plaintiff has not filed a complaint seeking any monetary damages or other relief.

4

Even if Plaintiff had, this case involves a contract dispute and a lease dispute, both of which have certain monetary amounts at issue. Thus, the alleged injuries could be compensated in damages.

Mandatory injunctions at a preliminary injunction stage may be issued only in extreme circumstances. "**Mandatory injunctions are never granted, unless the injury is irreparable, and unless the complainant used extraordinary diligence in applying for it in cases where delay or acquiescence would be prejudicial to the defendant**." *Morrison*, 430 S.W.2d at 673 (citing Gibson's Suit in Chancery, Fifth Ed., Sec. 870) (emphasis added)). Other states agree. *See Bull Motors, L.L.C. v. Brown*, 152 So. 3d 32 (Fla. Dist. Ct. App. 2014) ("Issuance of mandatory injunctions before final hearing is disfavored and should be granted only in rare cases where the right is clear and free from reasonable doubt."); *Observer v. Patton*, 73 F. Supp. 3d 1318 (W.D. Okla. 2014) ("Where mandatory relief is sought through a preliminary injunction, plaintiffs must satisfy a heightened burden that requires a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."); *Wahba, LLC v. USRP (Don), LLC*, 106 P.3d 1109, 1115 (Haw. 2005) ("Mandatory preliminary relief which goes well beyond the status quo is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.) This is not the case here. By issuing a mandatory injunction during what the Court determined to be a preliminary injunction stage, the Court has effectively rendered a permanent mandatory injunction that goes well beyond maintaining the status quo.

Notwithstanding the rare circumstances under which a mandatory injunction may be issued at a preliminary injunction stage, and without any analysis of the factors necessary for such extreme relief, following the parties' presentation of proof, the Court ruled that it would require that "the [approximately $40,000] cancellation fee estimated by Indigo to be paid to the registry of the Chancery Court until such time as this Court makes a final judgment on the matter

. . . ." *See* Transcript, 92: 3-7. The Court further ordered, "The balance of the funds that are owed by Indigo to the petitioner [$31,000] should be released forthright." *Id.* at 12-15.

When counsel for Indigo asked for clarification of the ruling and confirming the Court actually imposed a mandatory injunction, the Court indicated, "That was my understanding of the situation. So that's how I'm interpreting it." *Id.* at 95:1-2. The Court continued, "I understood it to be requesting that the funds needed to be paid to the State of Mississippi in order to avoid termination of the leasehold. So it is not there specifically, but that's my ruling." *Id.* at 11-15. With regard to the mandatory injunction, the Court specifically stated, "So that we're clear, I ordered that it be done." *Id.* at 97:10-11. "I read that into the petition that was before the Court." *Id.* at 23-24.

However, the Court did not take into consideration that by ordering Indigo to issue a check for the remaining $31,000 directly to the State of Mississippi that it would effectively cause Indigo to ignore a valid and existing UCC lien from another creditor. When counsel for Indigo pointed this out, the Court amended its ruling to have Indigo pay the entire amount into the Court clerk's registry instead. *Id.* at 100:12-13. But this still does not solve the problem, and in fact, creates additional hardships. If the Court treats this as an interpleader action, where Indigo is forced to pay the full amount into the Court and make a claim for the amount it is owed, then the parties still cannot obtain complete relief. This is especially true where only two of four interested parties are legally permitted to make claims to the relevant funds, and the other two have not even been given notice of a judicial proceeding.

While the parties understand the desire for Plaintiff to avoid the loss of his farming operations, the Court's ruling will ultimately cause more harm if this matter proceeds without interested parties. The current ruling simply short-circuits the outcome of this case through a mandatory injunction without proper notice to other interested parties, and such relief does not

achieve the ends of justice. In fact, it will only cause more hardship on the current parties, as Indigo will have no choice but to seek interlocutory appeal, not just for itself, but on behalf of all interested parties.

Accordingly, Indigo asks that this Court reconsider its ruling, including the mandatory injunction. If the Court insists on funds being placed to the registry of the Court, Indigo asks that Plaintiff be required to properly name and join all interested parties so that they have proper notice of such funds and can proceed in this action by making a proper claim for amounts owed.

## III.    CONCLUSION

Plaintiff has not satisfied his burden sufficient to prove the four factors necessary to establish a need for injunctive relief. Further, the Court's oral ruling requiring a mandatory injunction is both improper under the current circumstances and only creates more confusion for the parties. Indigo respectfully requests that the Court reconsider its ruling.

Alternatively, if the Court is inclined to continue proceeding under its current ruling, Indigo respectfully requests permission to file an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. Indigo reserves all rights to make additional and further arguments.

DATED this 13th day of January, 2020.

Respectfully submitted,

BUTLER SNOW, LLP

By:     _____
R. Campbell Hillyer, #22124
Kathryn K. Van Namen, #31322
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
Telephone: (901) 680-7200
kate.vannamen@butlersnow.com

7

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 13, 2020, a copy of the foregoing was served via email and U.S. Mail, postage prepaid, upon the following:

Paul A. Robinson Jr.
3749 Marty Street
Memphis, TN  38109

_____
R. Campbell Hillyer

51190191.v1

ELECTRONICALLY FILED
2020 Jan 13 8:54 AM
CLERK OF COURT

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE

_____

        CAMERON BURRELL,
                Plaintiff,

        VS.                          NO.  CH-19-1677

        INDIGO AG, INC.,
                Defendant.

_____

                BE IT REMEMBERED, that the

        above-captioned cause came to be heard on this

        the **10th Day of January**, **2020**, in the Chancery

        Court, Part III, before the Honorable JoeDae

        L. Jenkins, Chancellor presiding, when and

        where the following proceedings were had, to

        wit:

                LISA C. VAUGHN, RPR, LCR(TN)
                RIVERSIDE REPORTING SERVICE
                      (901) 527-1100
                 lcv.riverside@gmail.com

                RIVERSIDE REPORTING SERVICE

**EXHIBIT A**

```
 1                    A P P E A R A N C E S

 2

 3

 4          On Behalf of the
            Plaintiff:      MR. PAUL A. ROBINSON, JR.
 5                          Attorney at Law
                            3749 Marty Street
 6                          Memphis, Tennessee  38109

 7

 8

 9

10          On Behalf of the
            Defendant:      MR. R. CAMPBELL HILLYER
11                          MS. KATHRYN K. VAN NAMEN
                            Butler, Snow
12                          6075 Poplar Avenue
                            Suite 500
13                          Memphis, Tennessee  38119

14

15

16

17

18

19

20

21

22

23

24
```

1                    **TESTIMONY INDEX**

2                                                    <u>Page</u>

3        <u>THOMAS BURRELL</u>

4        Direct Examination (Mr. Robinson) ----------   12

5        <u>CAMERON BURRELL</u>

6        Direct Examination (Mr. Robinson) ----------   16
         Cross Examination (Ms. Van Namen) ----------   45
7        Redirect Examination (Mr. Robinson) --------   69

8

9                    **EXHIBIT INDEX**

10       Exhibit No. 1 -----------------------------   18
         Exhibit No. 2 -----------------------------   23
11       Exhibit No. 3 -----------------------------   37
         Exhibit No. 4 -----------------------------   38
12       Exhibit No. 5 -----------------------------   40
         Exhibit No. 6 -----------------------------   54
13       Exhibit No. 7 -----------------------------   58

14

15

16

17

18

19

20

21

22

23

24

1                    THE COURT:  All right.  Are we ready to

2         proceed?

3                    MR. ROBINSON:  Yes, Your Honor.

4                    MS. VAN NAMEN:  We are, Your Honor.

5                    THE COURT:  Let's proceed.

6                    MR. ROBINSON:  Good afternoon, Your

7         Honor.

8                    THE COURT:  Good afternoon.

9                    MR. ROBINSON:  This case arises out of a

10        contract between the petitioner, Cameron

11        Burrell --

12                    THE COURT:  Let's keep your opening

13        statement to less than five minutes.

14                    MR. ROBINSON:  -- and Indigo Ag.  Your

15        Honor, that contract was for the delivery of

16        soybeans.  Mr. Burrell delivered 8,896 bushels of

17        soybeans.  That money is on hand at Indigo Ag.

18                    This Court previously, on

19        December 12th, did issue a preliminary

20        injunction.  We are asking today that The

21        Court convert that preliminary injunction to a

22        permanent injunction.

23                    We believe that the factors that The

24        Court previously reviewed, with regard to the

                    RIVERSIDE REPORTING SERVICE

```
1        preliminary injunction, support a permanent

2        injunction in this matter as Indigo has

3        previously indicated that they are going to

4        take a cancellation fee of $40,000,

5        $40,485.19, that they indicated they would

6        deduct from the monies that are on hand at

7        Indigo.

8              These monies are subject to a first

9        lien, a priority lien, landlord's lien, by the

10       lessor, the landlord, the State of

11       Mississippi, and, as such, that lien, the

12       landlord's lien, by statute in both

13       Mississippi and Tennessee, takes precedence

14       over any subsequent agreement.  Any

15       contractual obligation by statute is subject

16       to that landlord's lien.

17             So, for these reasons, Your Honor,

18       we're asking The Court pursuant to the four

19       factors, that there is likelihood of success

20       on the merits, irreparable harm, public policy

21       -- public interest, as this is a socially

22       disadvantaged young farmer, this is the first

23       year of a leasehold interest, the equities of

24       balance -- it comes down in favor of the
```

RIVERSIDE REPORTING SERVICE

```
1        permanent injunction that we're requesting of
2        The Court today.
3                 THE COURT:  All right.
4                 MR. ROBINSON:  Thank you, Your Honor.
5                 THE COURT:  Less than five minutes.
6                 MS. VAN NAMEN:  Good afternoon, Your
7        Honor.
8                 THE COURT:  Good afternoon.
9                 MS. VAN NAMEN:  I'm Kate Van Namen.
10                THE COURT:  Is it Newman or Namen?
11                MS. VAN NAMEN:  Namen, Kate Van Namen,
12       and Cam Hillyer here for Indigo Ag.
13                MR. HILLYER:  Good morning, Your
14       Honor.  I just filed my Notice Of Appearance
15       this morning and gave it to Mr. Robinson.
16                MS. VAN NAMEN:  Your Honor, Indigo has
17       filed a motion to dismiss for failure to include
18       an indispensable party.  I realize that that has
19       not been fully briefed, and that's not --
20                THE COURT:  It's not before The Court.
21                MS. VAN NAMEN:  Okay.  But I did want to
22       point out, Your Honor, that most of the arguments
23       set forth in that brief are also included in our
24       response to the plaintiff's petition.
```

```
 1                  The reason is is because we don't

 2          believe that Mr. Burrell can succeed on the

 3          merits of this case and meet the four factors

 4          necessary for an injunction because the State

 5          of Mississippi is not currently a party to

 6          this action.

 7                  I will point out that -- opposing

 8          counsel indicated that this was a prior

 9          preliminary injunction hearing in December,

10          and that's not accurate.  It was a temporary

11          restraining order that was entered.  And that

12          standard is entirely different than the four

13          standards set before The Court today.

14                  The plaintiff bases his entire

15          argument on the fact that the State of

16          Mississippi might assert a lien on crops

17          produced from the land that he leases from the

18          State of Mississippi down in Parchman.

19                  His argument is that because the

20          State has a purported lien Indigo cannot

21          deduct the agreed-upon cancellation costs from

22          the payment that's owed to him that he

23          actually delivered, but he doesn't have the

24          authority to make these arguments.
```

```
 1                  We've talked with the State of

 2       Mississippi's Attorney General's office.  The

 3       State of Mississippi is not a party to this

 4       action.  It should be, but it's not feasible

 5       to add them because they are a state sovereign

 6       entity immune from suit across state lines.

 7                  Essentially we can't resolve this

 8       matter without the State of Mississippi

 9       because any relief at all will only lead to

10       more confusion.

11                  If -- as we proceed here,

12       Mr. Burrell will have the burden, heavy

13       burden, to show that he's entitled to

14       injunctive relief based on the four factors,

15       but he cannot show that his rights are being

16       violated or will be violated.  He's only

17       arguing that the State of Mississippi's

18       priority lien rights are what will be violated

19       and that would indirectly cause him harm.

20       But, as I said, he's not likely to succeed on

21       the merits because Mississippi is not a party.

22                  The Court can't enforce the lien

23       based on Plaintiff's arguments alone nor has

24       he cited any authority or given any argument
```

RIVERSIDE REPORTING SERVICE

1      to support why this Court can do so.

2             As I said, it's a state of sovereign

3      immunity, but the State is essential to afford

4      complete relief among the parties here.

5             Secondly, he has not been able to

6      show irreparable injury, and we don't think

7      he'll be able to do that today.

8             While the circumstances at issue are

9      incredibly unfortunate, Mr. Burrell can't show

10     actionable conduct by Indigo sufficient to

11     warrant the injunctive relief he requests.

12             He argues, by deducting this

13     agreed-upon cancellation fee, that Indigo will

14     cause him not to be able to make his rent

15     payments and he'll lose the next seven years

16     of the lease with the State of Mississippi,

17     but the rent payments were due to the State in

18     October.

19             We have confirmation, from the

20     Mississippi Department of Finance, that

21     Mr. Burrell does not just owe $89,000 for

22     rent.  He owes the 2019 rent, which is around

23     $89,000, but he also owes the 2020 rent, or

24     25 percent of that amount.  He owes taxes for

1          2020 as a prepayment for the upcoming year,

2          and that was to be due in January.

3                    When you add all of those figures

4          up, it's more like $123,000 that he has to pay

5          the State in order to keep the farm.

6                    And in any event, under any

7          scenario, the requested relief that he seeks,

8          the 70 -- the full 70,000 from Indigo, even

9          without the agreed-upon cancellation costs,

10         still would not be sufficient to cover his

11         obligations with the State of Mississippi.

12         And he's not provided any assurances that

13         he'll be able to cover the difference.

14                    The third factor is a permanent

15         injunction won't do anything to help us here.

16         It won't help Mr. Burrell get the money by

17         January 14th to be able to pay the State and

18         keep the lease.  It won't help Indigo know who

19         to pay and how much.  Because we have since

20         learned that Mr. Burrell has other creditors.

21         There are other liens at issue.

22                    So, aside from the State of

23         Mississippi claiming a right to payment on the

24         proceeds of the crops, there are other

RIVERSIDE REPORTING SERVICE

```
 1      creditors who are claiming payment that they

 2      are owed as well, and, without their

 3      involvement, we'll never be able to work out

 4      the solution necessary for Mr. Burrell to get

 5      the money he needs to be able to keep the

 6      lease.

 7              Lastly, the public interest, while

 8      certainly understanding and being sympathetic

 9      to Mr. Burrell's situation, the public is best

10      served by a clear and complete resolution, and

11      here the injunctive relief requested simply to

12      enjoin Indigo from making the agreed-upon

13      cancellation deductions from the payment will

14      not get him the burden -- get him the

15      resolution that he needs, and it will only

16      lead to more confusion.  So we would ask that

17      the injunctive relief be denied.

18              THE COURT:  All right then.  Call your

19      first witness.

20              MR. ROBINSON:  Your Honor, I call

21      Mr. Thomas Burrell.

22              THOMAS BURRELL,

23      Having been first duly sworn, was examined

24               and testified as follows:
```

RIVERSIDE REPORTING SERVICE

1                    <u>DIRECT EXAMINATION</u>

2       BY MR. ROBINSON:

3       Q    Mr. Burrell, would you state your name

4       for The Court.

5       A    Thomas Burrell.

6       Q    And what -- what business are you

7       involved in?

8       A    Among other things, I am a farmer, and I

9       am the president of the Black Farmers &

10      Agriculturalists Association, which is an

11      advocacy association.

12      Q    And, as president of the Black Farmers

13      Association, are you familiar with the code of

14      federal regulations regarding socially

15      disadvantaged farmers?

16      A    Yes, sir, I am.

17      Q    Would you describe to The Court what this

18      socially disadvantaged farmer regulation is

19      about?

20      A    Yes, sir.  Among other things, that

21      statute is the result of a special remedy that

22      Congress created for what is referred to as

23      socially disadvantaged and/or minority

24      farmers, and since then it has added veteran

1    farmers.

2         The purpose of that regulation is to

3    allow these individuals the opportunity to

4    seek credit and loan benefits from the

5    Department of Agricultural and its lending

6    arm, the Farm Service Agency.

7         And it is also available to youth

8    farmers, particularly in the minority

9    community, of which African-Americans are

10   included in that statute.

11   Q    Now, is -- what is your relationship to

12   the petitioner, Cameron Burrell?

13   A    I am his father.

14   Q    And is Cameron Burrell within the ambit

15   of this socially disadvantaged farmer

16   regulation?

17   A    Yes, sir, he is.

18            MR. HILLYER:  Your Honor, I would

19   object.  I hate to object at this point, but

20   to the extent that -- how he's testifying to

21   Mr. Burrell -- his son's position if his son's

22   here to not testify about his financial

23   condition.  Don't we have to do that first if

24   he's going to qualify him as socially

1      disadvantaged?

2              THE COURT:  I'm not sure where he's --

3      where you're trying to go with this.

4              MR. ROBINSON:  Well, Mr. Thomas Burrell

5      is going to testify only to the parameters of the

6      statute, not as to whether the statute -- whether

7      Cameron Burrell meets the economic specifications

8      of the statute.  So --

9              THE COURT:  What does the statute have

10     to do with what we're talking about today anyway?

11             MR. ROBINSON:  Because one of the

12     elements -- or two of the elements --

13             THE COURT:  Are you going to ask me to

14     apply a statute, that statute?

15             MR. ROBINSON:  Well, the -- to the

16     extent that it affects the public interest, yes,

17     Your Honor.  Yes.  This --

18             THE COURT:  How so?

19             MR. ROBINSON:  This statute -- because

20     the -- the four elements that we're required to

21     prove, this statute impacts directly on two of

22     those four elements, specifically the public

23     interest portion and the balancing test to the --

24     the harm to the respondent --

 1                  THE COURT:  Okay.

 2                  MR. ROBINSON:  -- versus the harm to the

 3      petitioner.

 4                  THE COURT:  All right.

 5      BY MR. ROBINSON:

 6      Q    So, Mr. Burrell, the statute -- the code

 7      regulations provision as it relates to

 8      socially disadvantaged farmers, in your

 9      opinion, would be applicable to Cameron

10      Burrell; is that right?

11      A    Yes, sir.

12                  MR. ROBINSON:  That's all I have, Your

13      Honor, of this witness.

14                  MR. HILLYER:  Your Honor, I don't

15      have -- I would...

16                  THE COURT:  Do you have any questions?

17                  MR. HILLYER:  No, I don't, Your Honor.

18                  THE COURT:  All right.  You can step

19      down.

20                  THE WITNESS:  Thank you, Your Honor.

21                  THE COURT:  Call your next witness.

22                  MR. ROBINSON:  Your Honor, I call

23      Cameron Burrell.

24                  THE BAILIFF:  There's no one out

                 RIVERSIDE REPORTING SERVICE

1      there.

2                    MR. ROBINSON:  May I have one minute,

3      Your Honor?  One minute.

4                    THE COURT:  We'll take a recess.

5                         (Recess.)

6                    MR. ROBINSON:  If The Court will, I'd

7      like to call Mr. Cameron Burrell.

8                    THE COURT:  All right.

9                    CAMERON BURRELL,

10     Having been first duly sworn, was examined

11            and testified as follows:

12                 DIRECT EXAMINATION

13     BY MR. ROBINSON:

14     Q    Mr. Burrell, would you state your name

15     for The Court.

16     A    Cameron Lamar Burrell, Sr.

17     Q    What business -- what line of business

18     are you in, Mr. Burrell?

19     A    Currently I'm in agriculture, farming.

20     Q    And where do you farm?

21     A    Currently down in the State of

22     Mississippi, Parchman, Mississippi, the state

23     penitentiary.

24     Q    Do you own land down there?

                RIVERSIDE REPORTING SERVICE

```
 1    A    No, sir.

 2    Q    Who owns the land that you farm?

 3    A    That would be the State of

 4    Mississippi/Mississippi Department of

 5    Corrections.

 6    Q    I'd like to pass you a document and ask

 7    you if you can identify it.  Can you identify

 8    that, Mr. Burrell?

 9    A    Yes, sir.

10    Q    What is that document?

11    A    This is the lease contract that the State

12    of Mississippi issues out upon bid award to

13    farmers when they bid out land the previous

14    year.

15    Q    That's your lease agreement with the

16    State of Mississippi?

17    A    This would be my actual lease agreement

18    here.

19    Q    Okay.

20         MR. ROBINSON:  Your Honor, I'd like to

21    enter that as an exhibit.

22         THE COURT:  Any objection?

23         MS. VAN NAMEN:  No, Your Honor.

24         THE COURT:  With no objection, it will
```

```
1       be admitted as Exhibit 1.

2              (Whereupon, Exhibit 1 was marked.)

3                  THE COURT:  You may proceed.

4       BY MR. ROBINSON:

5       Q    Would you identify this one as well,

6       Mr. Burrell?

7       A    This first one is pretty much a repeat of

8       the lease contract.

9       Q    Is that --

10                 THE COURT:  Say what, now?

11                 THE WITNESS:  This one here --

12                 THE COURT:  You have to speak up.  This

13      lady is taking down everything --

14                 THE WITNESS:  This one here --

15                 THE COURT:  Just a second, sir.  Listen

16      and we'll -- she's taking down everything that you

17      say, so you have to speak clearly so that she can

18      hear and take it down, and then, when you answer a

19      question yes or no, you have to respond with an

20      audible answer and not nodding of the head yes or

21      no.  Do you understand that?

22                 THE WITNESS:  Yes, sir.

23                 THE COURT:  All right.  You may proceed.

24      BY MR. ROBINSON:
```

1      Q    What is that second document,

2   Mr. Burrell?

3      A    The second document is the offer from

4   Indigo on a part of one of the contracts that

5   we set up for the harvesting of the beans for

6   the marketing.

7      Q    Let me see that document.  Look at that

8   second page again.

9      A    Well, this is --

10     Q    That top page.

11     A    This is still the -- a repeat of the

12   contract of -- with the State of Mississippi,

13   my lease contract, just the front page, Tract

14   27.

15     Q    Tract 27?

16     A    Yes, sir.

17     Q    How many tracts do you farm?

18     A    I've got two, Tracts 3 and 27.

19     Q    So -- and that is the Tract 27?

20     A    Yes, sir.

21     Q    And the first one you had was what tract?

22     A    I think it was still Tract 27.

23     Q    Do you have Exhibit A?

24     A    This is Exhibit B.

RIVERSIDE REPORTING SERVICE

```
1              THE COURT:  Do you mean Exhibit 1?

2    BY MR. ROBINSON:

3    Q    Exhibit 1.  Look at Exhibit 1,

4    Mr. Burrell, and tell me what tract that is.

5    A    It's the same.

6    Q    Both are 27?

7    A    Yeah.  But, if there's any clarification

8    that needs to be made, they both will say the

9    same thing.  So 3 will say the same thing, and

10   Tract 27 will say the same thing.

11   Q    Well, how many tracts do you farm in

12   Mississippi?

13   A    Two.

14   Q    And what are the tract numbers?

15   A    Tract 3 --

16   Q    You have a Tract 3.

17   A    -- and Tract 27.

18   Q    And a Tract 27?

19   A    Correct.

20   Q    I want to pass you this one, Mr. Burrell,

21   and you tell me which tract that is.

22   A    Here you go.  This is Tract 3.

23   Q    That's Tract 3?

24   A    Yes.
```

1      Q    All right.  So now we've got the two

2      tracts.

3                 THE COURT:  Describe the document.

4      BY MR. ROBINSON:

5      Q    What -- what kind of document is that?

6      A    It's still a lease contract, my lease

7      contract for Tract 3 with the State of

8      Mississippi.

9      Q    That's your lease contract for --

10     A    Yes, sir.

11     Q    -- for Tract 3?

12     A    Yes, sir.

13                MR. ROBINSON:  Your Honor, we'd like to

14     enter that as Exhibit 2.

15                THE COURT:  Any objection?

16                MS. VAN NAMEN:  Your Honor, there's no

17     objection except to seek clarification.  The

18     document I was handed as Exhibit 1 was the Tract 3

19     lease, so I don't know what was actually entered

20     as Exhibit 1.

21                THE COURT:  Let me see Exhibit 1.

22                THE WITNESS:  Exhibit 1?

23                THE COURT:  Yes, sir.  No, the one --

24                THE WITNESS:  Oh, okay.

1                THE COURT:  I've not read this document,

2       so pass this to Counsel and ask him to clarify

3       that.

4       BY MR. ROBINSON:

5       Q    Now, the tract number --

6                THE COURT:  We need you to clarify what

7       that document is and which tract does it refer to.

8       The representation earlier was that Exhibit

9       Number 1 referred to Tract 27.

10               MR. ROBINSON:  Yes, sir.

11               THE COURT:  Ms. Namen's position is that

12      what she has as Exhibit 1 actually refers to

13      Tract 3.  So we need some clarification.

14               MR. ROBINSON:  Okay.  Now, I'm not sure

15      where the switch occurred, but Exhibit 1 is

16      Tract 27.  That's 27.

17               MS. VAN NAMEN:  Okay.  Okay, Your Honor.

18               THE COURT:  All right.  Exhibit 1 is

19      Tract 27.

20               MR. ROBINSON:  Yes, sir.

21               THE COURT:  All right.  Let's move on.

22      And you're now asking that this document which was

23      handed to the witness be Exhibit 2, which refers

24      to Tract 3?

```
 1                    MR. ROBINSON:  Exactly, Your Honor.

 2                    THE COURT:  All right.  Mr. Flowers,

 3          let's have that one marked as Exhibit 2.

 4               (Whereupon, Exhibit 2 was marked.)

 5                    MS. VAN NAMEN:  Thank you for that

 6          clarification, Your Honor.

 7                    THE COURT:  Yes, ma'am.  I'll need both

 8          my exhibits.  Where's my other exhibit?  I gave it

 9          to you.  All right.

10          BY MR. ROBINSON:

11          Q    So, Mr. Burrell, you farm Tracts 27

12          and 23 (sic), and what town are they near in

13          Mississippi?

14          A    Well, these are actually on the

15          Mississippi State Penitentiary farmland, so

16          Parchman, Mississippi.

17          Q    Okay.  How long have you farmed these

18          tracts?

19          A    2019, one year.

20          Q    This was your first year?

21          A    That would have been my first year, yes.

22          Q    How many years is your lease?

23          A    These particular leases were set out for

24          eight years.  The first three years were
```

RIVERSIDE REPORTING SERVICE

1       automatic with a five year first year right of

2       refusal.  So, after the third year, the State

3       of Mississippi would contact me to ask me

4       whether or not I want to continue on after

5       year three.  But for right now they're set

6       through 2027.

7               THE COURT:  For when?

8               THE WITNESS:  2027.

9       BY MR. ROBINSON:

10      Q    2027?

11      A    Yes, sir.

12      Q    Have you heard of a company called Indigo

13      Ag?

14      A    Yes, sir.

15      Q    What do you know about Indigo Ag?

16      A    Indigo -- my research was that Indigo is

17      pretty much like a broker.  They set up, you

18      know, arrangements between farmers and buyers

19      of grain to pretty much, in these days, kind

20      of cut out the middleman, go straight from the

21      farm to the buyer acting as a broker through

22      their exchange platform.

23      Q    Have you had any interaction with anybody

24      at Indigo Ag?

RIVERSIDE REPORTING SERVICE

```
1        A     Yes, sir.

2        Q     Describe to The Court your involvement

3   with Indigo Ag.

4        A     My first involvement was prior -- was

5   meeting with their transportation division

6   here in downtown Memphis probably -- probably

7   late August, early September, and then -- I

8   met with their transportation division first.

9              And then, after meeting their

10  transportation division, we moved into

11  assigning -- they assigned me a grower account

12  manager from there.

13                   THE COURT:  What type of manager?

14                   THE WITNESS:  A grower account manager.

15  He was pretty much --

16                   THE COURT:  Broker?

17                   THE WITNESS:  Grower.  He was pretty

18  much --

19                   THE COURT:  Grower?

20                   THE WITNESS:  Yes, sir.  He was pretty

21  much acting as the consultant --

22                   THE COURT:  All right.

23                   THE WITNESS:  -- between me and --

24  trying to get things set up on the exchange
```

```
1       platform, yes, sir.

2       BY MR. ROBINSON:

3       Q    So, when you contacted Indigo initially,

4       what were you talking to them about?

5       A    Well, at first it was, again, the

6       logistics side because -- trying to have the

7       soybeans taken out of the field in which they

8       would -- in the event that my beans were

9       picked up and -- or bought from a buyer on

10      their exchange program, they would cover --

11      they would take care of the logistics of

12      picking up the beans from the field so I don't

13      have to worry about trying to lock down

14      independent contractors.  They would take care

15      of that for me once that was agreed to.

16      Q    So did you subsequently enter into an

17      agreement with Indigo to do that?

18      A    Well, not initially.  So, again, the

19      transportation came first.  Then the account

20      manager called me maybe a week later so we

21      could set up a price point on the market

22      exchange to offer the beans out to buyers

23      within Indigo's buyer network.  And then, once

24      that was completed, that's when, you know, the
```

```
 1    ball got moving.

 2         So it may have been two or three days

 3    after I first spoke with the consultant that

 4    we put -- made a bid offer out on their

 5    marketplace.

 6    Q    So you made an initial conversation with

 7    their buyer or --

 8    A    No, it was through the consultant.  So

 9    the grower manager advised me of what the

10    price points were going for and how to best

11    market my grain on their network so it would

12    get picked up.  Because it was still kind of

13    late in the game as far as the buying season.

14    Q    So when did you initially contact Indigo?

15    A    Well, again, that would have been August.

16    And that was just with their logistics

17    division.  This was -- had nothing to do with

18    setting up the marketplace at that time.

19    Q    So the logistics division talks to you

20    about what?

21    A    Simply picking up the grain.  They had

22    nothing to do with the marketplace.  They are

23    strictly a categorical company.  They --

24    Q    Okay.
```

1        A     One area takes care of this --

2        Q     Okay.

3        A     -- and another area takes care of this.

4        They don't cross lines.

5        Q     Okay.  So the logistics division that you

6        talked to in August, all they do is transport

7        beans from your field to the elevator?

8        A     The elevator.  That's all that

9        conversation was was trying to set that up to

10       see if they could even do it first.  Because

11       Parchman was a little tricky trying to get

12       trucks in and out of there and all they have

13       to do.

14       Q     Getting trucks to -- on the prison

15       property?

16       A     On the prison grounds.  All the trucks

17       have to be vetted, a background check.  So

18       that was a little complex.  They hadn't

19       probably dealt with that before.

20             And so -- at one point I thought the deal

21       had died because they weren't able to do it

22       until I got a phone call maybe, like, a week

23       later saying that, hey, we can move forward

24       with that.

RIVERSIDE REPORTING SERVICE

```
 1    Q    Okay.  So they -- the logistics part of
 2         the business, did you enter into an agreement
 3         with them?
 4    A    Not at that time, no.
 5    Q    Okay.  So what was the next contact with
 6         Indigo?
 7    A    So, as I left the office with Indigo from
 8         the logistics division, they were going to
 9         reach out to an account manager to try to get
10         me to get set up to then move forward on the
11         marketplace.
12              So that was -- about a week later is when
13         I got a call from the consultant from Indigo
14         that takes care of that region.  This
15         gentleman covers that region where we farm at.
16    Q    And who was -- do you recall who he was?
17    A    His name is Mr. Leslie Pennix.
18    Q    P --
19    A    Leslie Pennix.  P-e-n-n-i-x, Pennix.
20    Q    And what was your discussion with
21         Mr. Pennix?
22    A    Just about the market at the time, the
23         volatility, what was going on, things that
24         would hinder a higher price and the best way
```

```
1        to strategize to set up the offer through

2        their exchange platform.

3        Q    Okay.  And did you reach an agreement

4        with Mr. Pennix?

5        A    No, there was no agreement reached.  He

6        was just simply there to help me set up the

7        platform and call in to their office to advise

8        them of what we were going to bid -- bid out.

9        There was still no contractual agreement at

10       that time.

11       Q    Okay.  I want to pass you a document,

12       another document, and ask you to identify this

13       for me.

14              THE COURT:  We're going to have to pick

15       up the pace in this.  I plan to be done not later

16       than 4:30.

17              MR. ROBINSON:  We'll be done, Your

18       Honor.  We'll be done.  We're almost to the meat

19       of Mr. Burrell's testimony.

20              THE COURT:  All right.

21       BY MR. ROBINSON:

22       Q    What is that document?

23       A    So these are the orders that were set up

24       and that were accepted by the buyer through
```

RIVERSIDE REPORTING SERVICE

```
 1        Indigo.  So these orders here --

 2    Q    So you talked with the buyers at Indigo?

 3    A    I did not talk to the buyer.  So it was

 4    set up through Indigo's exchange marketplace

 5    there -- right down on the corner here.  We

 6    offered a price for the soybeans, and that was

 7    then put out to their buyers.

 8    Q    Okay.

 9    A    Their buyer happened to be in Rosedale,

10    Mississippi that accepted the offers that we

11    put out.

12    Q    Okay.  So your offers were accepted?

13    A    They were accepted, yes, sir.

14    Q    Okay.  Now, those documents you have in

15    your hand, what do they talk about?

16    A    Simply just -- you know, we were using a

17    basis contract price to try to incentivize the

18    buyer to go ahead and pick them up.  So

19    this -- all this is is just the orders.

20         There's three here it looks like, and

21    they all correspond to each bushel of grain

22    amount that we were going to set up to

23    deliver.

24    Q    What were you set up to deliver?
```

RIVERSIDE REPORTING SERVICE

```
1      A     I was set up on 10,000 bushels.

2      Q     Ten thousand bushels?

3      A     Yes, sir.

4      Q     Okay.

5             MS. VAN NAMEN:  Your Honor, if I might

6      just interject here.  There were two separate

7      documents that I was handed.  One is -- I don't

8      see a correlation, and I don't know which one he's

9      looking at.  So if you could just identify for

10     me -- they already have an exhibit label on the

11     bottom with 2 and a D.  That might help.

12     BY MR. ROBINSON:

13     Q     Look at the bottom of the document in

14     your left hand, Mr. Burrell, and describe to

15     The Court --

16     A     This?

17     Q     Give -- tell The Court the number at the

18     bottom.

19     A     This is -- in my left hand is Exhibit C.

20     Q     It says Exhibit C?

21     A     Yes, sir.

22     Q     Okay.  And what is that document?

23     A     These are the orders -- or the offers

24     that were accepted by the buyer through
```

RIVERSIDE REPORTING SERVICE

```
 1      Indigo's platform.

 2      Q    Those were the orders that were accepted?

 3      A    Yes, sir.

 4      Q    Okay.

 5           MS. VAN NAMEN:  I don't have a copy of

 6      an Exhibit C.

 7           THE COURT:  Okay.  Then pass that back

 8      to him.  Pass both documents back to him.  Pass it

 9      back to Mr. Robinson.  Mr. Robinson, show them the

10      documents that you're attempting to introduce.

11      BY MR. ROBINSON:

12      Q    Mr. Burrell, I want to pass you this

13      document and ask you to identify it.

14      A    This is still one of the orders -- or the

15      bids, one of the bids that was accepted off of

16      the platform that I offered through Indigo.

17      Q    Okay.  At the very top -- read the first

18      line at the top.

19      A    Where it says congratulations or -- your

20      offer has been accepted?

21      Q    Yes.  Read the first line at the top.

22      A    Your offer Alpha Charlie 4 Alpha Mike 2

23      Tango has been accepted, the soybeans.

24      Q    Your offer has been accepted?
```

RIVERSIDE REPORTING SERVICE

```
 1     A    Yes.

 2     Q    Okay.

 3          MS. VAN NAMEN:  I'm sorry, Your Honor.

 4     I'm trying to speed this up as well, but that's

 5     not the offer number I have on this document that

 6     I was handed.  If you can point me in the right

 7     direction, I'll be glad to follow along.  I just

 8     don't see it.

 9     BY MR. ROBINSON:

10     Q    How many of these offers did you have,

11     Mr. Burrell?

12          THE COURT:  Wait a minute.  She's asked

13     you to point out on her document or your document

14     or his document what you're talking about so she

15     can follow along with you.  So let's get this

16     taken care of so we can move along.

17     BY MR. ROBINSON:

18     Q    How many offers did you have,

19     Mr. Burrell?

20          THE COURT:  No, no, no.  Let's resolve

21     the problem that she has, and then you can move

22     on.  Let me see what you have.

23          MS. VAN NAMEN:  Your Honor, I believe --

24          THE COURT:  Just a second.  I'm looking
```

RIVERSIDE REPORTING SERVICE

```
 1        at a document that's dated December 12th, 2010

 2        (sic) --

 3                MR. ROBINSON:  Yes, sir.

 4                THE COURT:  And it comes to

 5        problaw937@hotmail.com.

 6                MR. ROBINSON:  Yes, sir.

 7                THE COURT:  The subject matter --

 8        there's no subject here.  If you go down a little

 9        bit, it's from Indigo, a non-reply e-mail sent

10        Friday, September 27th to cgtfmllc@outlook.com.

11        So we're looking for an e-mail that originally was

12        dated September 27th.

13                Mr. Robinson, can you turn that off?

14                MR. ROBINSON:  Yes, sir.

15                MS. VAN NAMEN:  Your Honor, if I might

16        simplify, I think there are three e-mails just

17        like that, and the offer ID at the bottom is

18        different on each one.

19                THE COURT:  All right.

20                MS. VAN NAMEN:  I have --

21                THE COURT:  This offer ID is AC4AM2T.

22                MS. VAN NAMEN:  I have my own copy of

23        that one, Your Honor.

24                THE COURT:  All right.  Here you go.
```

```
 1     BY MR. ROBINSON:

 2     Q    So --

 3               THE COURT:  Do you have that one?

 4               MR. ROBINSON:  Yes, sir.  Your Honor, if

 5     we could stipulate -- if Counsel will stipulate

 6     that there are three separate orders that were

 7     entered into by Mr. Burrell and Indigo then

 8     that -- that takes care of that.

 9               MS. VAN NAMEN:  Your Honor, I can't

10     stipulate to that, but I can acknowledge that the

11     three separate orders he's trying to reference are

12     attached as Exhibit C to the affidavit.  And I

13     think that puts us all on the same page.

14               MR. ROBINSON:  They are Exhibit C to the

15     affidavit, and they are three -- the three orders

16     that were entered into between Mr. Burrell and

17     Indigo.

18               THE COURT:  Simply submit the three

19     orders, let him identify them, and then we'll

20     accept them as the next-numbered exhibit.

21               All right.  Mr. Burrell, what I want

22     you to do is identify those documents.  Are

23     those the three orders that were accepted by

24     the buyers?
```

```
 1                    THE WITNESS:  These three -- yes, Your
 2      Honor.
 3                    THE COURT:  All right.  And the first
 4      one in your hand, what is the order number?
 5                    THE WITNESS:  This one now is AC60ZET.
 6                    THE COURT:  What's the second one?
 7                    THE WITNESS:  The second one will be
 8      AC6QGAB.
 9                    THE COURT:  And the third one?
10                    THE WITNESS:  The third is AC4AM2T.
11                    THE COURT:  All right.  Mark them as
12      Number -- Exhibit Number 3.
13          (Whereupon, Exhibit 3 was marked.)
14                    THE COURT:  Now, Mr. Robinson, do you
15      have any questions about that, about these
16      exhibits?
17                    MR. ROBINSON:  No, Your Honor.
18                    THE COURT:  All right.  Do you have any
19      objection?
20                    MS. VAN NAMEN:  No, Your Honor.  Thank
21      you for clarifying that.
22                    THE COURT:  There being no objection,
23      they'll be admitted as Exhibit Number 3.  Your
24      next question.
```

```
 1     BY MR. ROBINSON:

 2     Q    Mr. Burrell, I have another document that

 3     I want to pass to you and ask if you can

 4     identify this.

 5     A    This is I believe -- oh, it's a letter

 6     from, I believe, Indigo's counsel to you in

 7     regards to the subject matter of a notice of

 8     cancellation.

 9     Q    And look on Page -- well, first, Your

10     Honor, I'd like to offer this as Exhibit 4.

11          MS. VAN NAMEN:  No objection, Your

12     Honor.

13          THE COURT:  There being no objection, it

14     will be admitted as Exhibit 4.

15       (Whereupon, Exhibit 4 was marked.)

16     BY MR. ROBINSON:

17     Q    Mr. Burrell, on the second page of

18     Exhibit 4, would you read the underlined

19     portion?

20     A    Indigo will deduct from Mr. Burrell's

21     payment $40,485.19 which fairly and accurately

22     reimburses Indigo for costs incurred by virtue

23     of this cancellation plus additional

24     deductions for transport costs as to be
```

```
 1     reflected on the forthcoming settlement

 2     statement.

 3     Q    Okay.  So what is your interpretation of

 4     that sentence you just read?

 5     A    That they were pretty much going to take

 6     40 grand from the total of the beans to take

 7     -- satisfy their costs for -- in regards to us

 8     not doing business anymore in reference to --

 9     Q    Okay.

10          THE COURT:  Let me see that.

11     BY MR. ROBINSON:

12     Q    Mr. Burrell, I'm going to pass you one

13     more document and ask you if you can identify

14     this.

15     A    This is the letter from the State of

16     Mississippi, Department of Finance &

17     Administration, addressed to me in regards to

18     the rent payment that as of this letter,

19     December 11th, still has not been paid.

20     Q    Okay.

21     A    And them recognizing my relationship and

22     possible -- excuse me, difficulties that I may

23     be having getting a settlement from Indigo Ag

24     and them letting me know that if it is not
```

RIVERSIDE REPORTING SERVICE

```
 1        resolved by January 15th of this month, of

 2        this year, they will proceed to rescind the

 3        contract.

 4        Q    Okay.

 5              MR. ROBINSON:  Your Honor, I'd like to

 6        enter this as Exhibit 5.

 7              THE COURT:  Any objection?

 8              MS. VAN NAMEN:  No.

 9              THE COURT:  With no objection, it will

10        be admitted as Exhibit 5.

11          (Whereupon, Exhibit 5 was marked.)

12              THE COURT:  You may proceed.

13        BY MR. ROBINSON:

14        Q    Mr. Burrell, would you look at the first

15        paragraph of this Exhibit 5?

16        A    Okay.

17        Q    Would you read that last sentence?

18        A    The last sentence of the first paragraph

19        states your contracts for both Tracts 3 and 27

20        expire on January 14th at midnight.

21        Q    Now, skip down to the next paragraph.

22        A    Okay.

23        Q    And the third sentence from the bottom

24        beginning with "therefore", please read that
```

RIVERSIDE REPORTING SERVICE

1       to The Court.

2       A     Therefore, we must have payment in hand

3       by the close of business on January 14th of

4       2020.

5       Q     Okay.  And the third sentence -- in that

6       second paragraph, the third sentence beginning

7       -- well, phrased "in order", read from there,

8       please.  In order to keep --

9       A     Oh.  Would like to work with you in order

10      to keep you as one of our contracted farmers,

11      we must set a date for final payment in order

12      to have the time to re-bid Tracts 3 and 27 if

13      necessary.

14      Q     Okay.  Now, re-bid Tracts 3 and 27 if

15      necessary, what is -- what is that saying to

16      you?

17      A     They're going to rescind.  And, as far as

18      they go, they have to put it back out for the

19      general public to, you know, make an offer on

20      it.  Because this is part of their revenue,

21      and, if this contract is not paid on, they

22      have to put it back out to let somebody else

23      bid on it.

24      Q     So the two contracts that -- the two

                RIVERSIDE REPORTING SERVICE

```
1        leases that are Exhibit 1, Tracts 3 and 27 --
2        A     Correct.
3        Q     -- would be re-bid to someone else?
4        A     Yes.
5        Q     And what impact do you believe that would
6        have on your farming operation?
7        A     Well, long-term that is a substantial
8        amount of investment that would be lost and
9        revenue that would be not attained.  Based off
10       current markets in the soybean market going
11       forward eight years, that's a long time, that
12       would damage me as a veteran/African-American
13       farmer trying to farm under the USDA's new
14       practices and their offers to veteran farmers
15       and minority farmers, and that would
16       financially do damage to my overall business
17       in farming -- in agricultural.
18       Q     Okay.  So do you -- are you familiar with
19       the USDA's socially disadvantaged farmer
20       program?
21       A     I am.
22       Q     All right.  Do you consider yourself part
23       of that program?
24       A     I am.
```

1    Q    Okay.  And if -- if you were not able to

2    meet this Mississippi obligation, you're

3    saying that would have a substantial and

4    severe impact?

5    A    Absolutely.  Because not only would it

6    just damage, you know, the operation

7    currently, but going forward there could be

8    other opportunities with the State of

9    Mississippi there on the same property to make

10   revenue from previous crops to possibly bid

11   for more ground with the State of Mississippi

12   based off of previous revenue generated from

13   the soybean crops going forward.

14        So, again, long-term -- eight years,

15   that's quite -- that's quite a substantial

16   amount of time to not only recoup investment

17   but to actually see a healthy return on

18   investment going forward.  So, from a business

19   standpoint, yes, that would be damaging.

20             MR. ROBINSON:  That's all I have, Your

21   Honor.

22             MS. VAN NAMEN:  Your Honor, may I have a

23   quick moment to confer with my client before we

24   proceed?

```
 1              THE COURT:  All right.

 2                  (Brief recess.)

 3              MS. VAN NAMEN:  Thank you, Your Honor.

 4     I was conferring with my client because -- I also

 5     wanted to ask The Court, as it seems to me -- if

 6     Plaintiff has rested his proof, there has been no

 7     proof as to --

 8              THE COURT:  I don't know if he rested.

 9     I think he tendered the witness to you.

10              MS. VAN NAMEN:  Well --

11              MR. ROBINSON:  I tendered the witness,

12     Your Honor.

13              MS. VAN NAMEN:  Your Honor, in tendering

14     that witness, he's offered no proof of the State

15     of Mississippi's actionable lien much less a

16     perfected lien.

17              THE COURT:  Are you going to

18     cross-examine him?

19              MS. VAN NAMEN:  I -- I'll proceed with

20     cross-examining him.  I was just, in the interest

21     of efficiency, seeing if The Court wanted to

22     proceed that way.

23              THE COURT:  Let's cross-examine him, and

24     let's move on.
```

1          CROSS EXAMINATION

2     BY MS. VAN NAMEN:

3     Q    Mr. Burrell, you've asserted a lien on

4     behalf of the State of Mississippi, correct?

5     A    Yes.

6     Q    And Mississippi is not a party to this

7     action, right?

8     A    No.

9     Q    Is it your understanding that

10    Mississippi's lien is on the proceeds of your

11    2019 crop harvested on the land that you lease

12    from the State of Mississippi?

13    A    Yes.

14    Q    Okay.  Let's talk a little bit about your

15    2019 crop.

16         You testified -- well, I don't think you

17    did actually.  How many bushels of soybeans

18    did you actually deliver to Indigo?

19    A    The number that was referenced to me was

20    I believe, like 8,688, something along that

21    line.

22    Q    And I'll represent to you that's what's

23    contained in Exhibit 4 as well, 8,688.58.

24    A    Okay.

RIVERSIDE REPORTING SERVICE

```
 1      Q    All right.  So, out of that 8,688 bushels

 2      of soybeans that were actually delivered, how

 3      many bushels per acre did your farm yield?

 4      A    When you do the analysis, the breakdown,

 5      based off of that amount of bushels, based off

 6      how much was cut at roughly 500 and -- what

 7      does it say, 580 acres to get to that point,

 8      we are -- you're yielding -- regardless of who

 9      you are, you're yielding about 15 bushels an

10      acre.

11      Q    I'm not sure I'm understanding that.  How

12      many beans -- how many acres did you actually

13      cut?

14      A    To get to that number there, that number

15      represents how many acres we had already cut.

16      So that represents roughly about 580 acres in

17      total between Tract 3 -- excuse me, Tract 27,

18      which was first, and then moving to Tract 3.

19      Q    Okay.  That you had already -- you said

20      that you had already cut.  When did you cut

21      them?

22      A    That's how you get to that -- those

23      bushels.  We cut them.

24      Q    Okay.  Let me see if I can under -- tell
```

```
 1        you how I'm understanding it at least, okay?
 2        A    Okay.
 3        Q    So what I would -- I would ask you is
 4        what is an average yield per acre in a bushel
 5        of soybeans?
 6        A    Well, an average yield would be probably,
 7        you know, anywhere from 45, 55, but you're
 8        asking what -- what that yielded, and I was
 9        giving you what that yielded.
10        Q    What that particular yielded?
11        A    Yes.
12        Q    Okay.  Well, in my head, though, if
13        you're at a 45 yield per acre --
14        A    Correct.
15        Q    -- and we get to 8,600 bushels, I'm
16        looking at around 200 bushels an acre -- I'm
17        sorry, 200 acres, but you're saying that you
18        cut 580 acres?
19        A    Yes, ma'am.
20        Q    And you yielded about 15 bushels an acre?
21        A    So, when you send your tickets in to the
22        elevator, the elevator gives you a status
23        sheet of where you are, and so, when the
24        trucks come back or, you know, you talk to
```

```
 1     your driver or what have you -- in a general

 2     setting, outside of Indigo, but, in a general

 3     sitting, that lets you know kind of where

 4     you're at as far as your yield.

 5     Q    What's --

 6          THE COURT:  I think y'all are going way

 7     off the rack of what the initial question was.

 8     The question -- the initial question was how many

 9     acres did you cut, and you responded with a

10     percentage of the entire acreage as opposed to

11     answering the question.  What are you trying to

12     get at, Counsel?

13          MS. VAN NAMEN:  That specifically, Your

14     Honor.  And I'll see if I can streamline that a

15     little more.

16          THE COURT:  All right.  This is not

17     rocket science.  Let's don't complicate it.

18          MS. VAN NAMEN:  I understand, Your

19     Honor.  I will submit to The Court that I was an

20     English major and not a math major, so I will try

21     my best, okay?

22     BY MS. VAN NAMEN:

23     Q    Mr. Burrell, how many acres did you

24     actually cut?
```

RIVERSIDE REPORTING SERVICE

```
 1    A    We are standing on 580 acres of cut

 2    beans.  That's where that number comes from.

 3    Q    Okay.  And, out of the 838 acres that you

 4    leased from the State of Mississippi, we've

 5    got 300 acres left?

 6    A    Approximately 250.

 7    Q    Okay.  Two-fifty.  What happened to

 8    those?

 9    A    They're -- they're there.

10    Q    What's there?

11    A    The beans.

12    Q    So the beans on 250 acres are still in

13    the field?

14    A    Yes, ma'am.

15    Q    Is that the same 250 acres that you

16    testified in your affidavit submitted with the

17    petition that you would use to pay the penalty

18    that you owe Indigo?

19    A    It would be, yes, ma'am.

20    Q    And what are those beans worth now?

21    A    We'll have to put them out there on the

22    market and see -- we could do a spot market.

23    You cut some, send them to the elevator and

24    see what they will give you right there on the
```

RIVERSIDE REPORTING SERVICE

 1      spot.

 2      Q    What would you estimate them to be?

 3      A    Currently right now, based off of where

 4      the prices are, I'd say about $9.60.

 5                THE COURT:  How much?

 6                THE WITNESS:  Nine dollars and 60 cents.

 7      Beans go up after the harvest season.  I had to

 8      keep up with all of that stuff.

 9      BY MS. VAN NAMEN:

10      Q    Why haven't you cut it?

11      A    The weather has been a big issue, and

12      equipment has been a big issue, so -- weather

13      is going to be the big thing.

14           A farmer's rule, you don't cut wet beans

15      because -- just because of the consistency

16      with the beans and stuff, so that would be a

17      gamble trying to turn those in.

18      Q    So, on the 838 acres, you only planted

19      soybeans?

20      A    Yes.

21      Q    Where did you get the seed?

22      A    Through a company here based out of

23      Memphis called Local Seed.

24      Q    Local Seed.  Did you pay for the seed?

```
 1      A    It's on credit.

 2      Q    It's on credit.  Isn't it true they filed

 3      a lien against you for all the soybeans in the

 4      field from Sunflower, Mississippi?

 5      A    That's not uncommon.

 6      Q    It's not uncommon?

 7      A    Not at all, as the State of Mississippi

 8      goes.

 9      Q    How much is that lien?

10      A    Off the top of my head, I'll probably say

11      about 58,000.

12      Q    Is that how much you paid for the beans?

13      Well, on credit.

14      A    On credit, yeah.  Well, they -- you know,

15      they send you a statement every time they send

16      something out, so that's the last statement I

17      have.

18           MS. VAN NAMEN:  Your Honor, I'd like to

19      hand the witness a document.

20           THE COURT:  All right.

21           MS. VAN NAMEN:  It's a set of documents

22      actually.

23      BY MS. VAN NAMEN:

24      Q    Mr. Burrell, if you'll look at the first
```

RIVERSIDE REPORTING SERVICE

1     page, you'll see it says Uniform Commercial

2     Code Filing Acknowledgment.  At the top, it

3     says Hollandale Agricultural Services.  Is

4     that who you bought the beans from?

5     A     No.

6     Q     Okay.  Look down further.  It says

7     secured party, Local Seed Company.  Does that

8     ring a bell?

9     A     Oh -- yes.

10     Q     I'm sorry?

11     A     Yes.

12     Q     Okay.  Look at the next page, if you

13     will.  Now, at the top you'll see this is a

14     Mississippi UCC-1F, a farm lien.

15     A     Uh-huh.

16     Q     And, in the top paragraph, Number 1, it

17     says the debtor's full legal name, Cameron

18     Lamar Burrell.  Is that you?

19     A     Yes.

20     Q     It also has, in paragraph two, Cameron L.

21     Burrell, Sr.  Who's that?

22     A     Me.

23     Q     So you're Senior and Cameron L. --

24     A     I had a son --

RIVERSIDE REPORTING SERVICE

52

```
 1     Q    Okay.

 2     A    -- so I went to Senior.

 3     Q    Fair.  If you keep going, you'll see it

 4     says Local Seed Company is the secured party

 5     and that the farm product described on which

 6     they have a lien is soybeans.

 7     A    Uh-huh.

 8     Q    Quantity all.

 9     A    Uh-huh.

10     Q    Crop year 2019 in Sunflower, Mississippi.

11     A    Uh-huh.

12     Q    Okay.  The next page.  Mississippi UCC-1F

13     financing statement and an addendum.  It looks

14     like it's the same lien reference number, and

15     it just adds Cameron Lamar Burrell in the name

16     and Cameron Burrell, Sr.; is that correct?

17     A    Yes, ma'am.

18          MS. VAN NAMEN:  Your Honor, I'd ask that

19     we move this into evidence as Exhibit Number 6.

20          THE COURT:  All right.  Any objection?

21          MR. ROBINSON:  No objection.

22          THE COURT:  And, to categorize them,

23     these are UCC filings?

24          MS. VAN NAMEN:  I would call them Local
```

54

```
 1          Seed UCC filings.
 2                    THE COURT:  Say it again.
 3                    MS. VAN NAMEN:  Local Seed Company UCC
 4          filings.
 5              (Whereupon, Exhibit 6 was marked.)
 6          BY MS. VAN NAMEN:
 7          Q    Mr. Burrell, I'm passing you another
 8          document now.  If you will look at the middle
 9          portion of that page, you will see an e-mail
10          from cgtfmllc.  That's your e-mail, right?
11          A    Yes.
12          Q    To Amber Blair at Indigo.  Now, she's
13          your case coordinator, or case manager; is
14          that correct?
15          A    Yeah.
16          Q    I'm not sure what they call it, but
17          basically she's your contact at Indigo for
18          your account?
19          A    Yeah, she was.
20          Q    Okay.  Mr. Burrell, can you please read
21          that third sentence in the first paragraph.
22          A    The third sentence...
23          Q    I'll help you.  We've cut an estimated
24          580 acres and have only averaged roughly 45 to
```

RIVERSIDE REPORTING SERVICE

55

1        50 bushels per acre.  With the remaining

2        250 acres left, based on those yields, we're

3        looking at roughly a projected 12 K bushels.

4        In reality, I do not see 50 K being

5        attainable.  Is that correct?

6        A     Yes.

7        Q     Well, you told me earlier that you were

8        averaging about 15 -- what did you say,

9        15 bushels an acre?

10       A     I did say that.

11       Q     Okay.  And this says 45 to 50 bushels an

12       acre.

13       A     Right.

14       Q     So, based on this e-mail, if I'm looking

15       at 50 bushels an acre and I'm multiplying that

16       by 580 acres -- now, I'm not a math person,

17       but, if we're looking at 50 bushels an acre

18       times 580 acres, that's a quarter million

19       dollars.

20       A     That's absolutely correct.

21       Q     And did you -- were you paid a quarter

22       million dollars?

23       A     No.

24       Q     What did you do with the beans?

```
 1       A    Well, we need to talk to Indigo.  Indigo

 2       picked up the beans.  Indigo picked up these

 3       beans and delivered them to the buyer.  It's

 4       not a question of whether I picked them up.

 5            That's what the contract was for,

 6       Indigo -- they would come out to the field,

 7       pick up the beans, deliver them to the buyer,

 8       and then, from there, all things would be

 9       settled.

10       Q    Well, do you know if the beans were

11       delivered?  Were they picked up from you?

12       A    I'm sorry?

13       Q    Were the beans picked -- the beans were

14       picked up from you, weren't they?

15       A    They were picked up.

16       Q    And you got a receipt that they were

17       delivered to the ultimate buyer, correct?

18       A    In the end I did.

19       Q    Okay.

20       A    Through Indigo.

21       Q    Well, let me ask you this, back to this

22       e-mail, in the second paragraph, the first

23       sentence, even if the weather and custom

24       harvester setbacks were not a factor, this
```

RIVERSIDE REPORTING SERVICE

```
 1        year's yield is 25 percent under what we saw
 2        in 2018.  Mr. Burrell, can you explain to
 3        me -- I thought you said this was your first
 4        year of farming.  What did you see in 2018?
 5        A    So, in 2018, I didn't farm per se at a
 6        contract, but I did serve -- that's what CGT
 7        Farm Management does.  We are a farm
 8        consultant.
 9             So, within my organization, someone did
10        farm those beans, and I was hired to consult
11        with them and manage those beans, so I know
12        about that.
13        Q    Okay.  So you've got experience then.  So
14        you can typically tell how many bushels per
15        acre you would get.  So my question is simple.
16        Out of the 580 acres, did you get 45 to 50 or
17        15?
18        A    Fifteen.
19        Q    Well, why did you represent to Amber
20        Blair, your case -- your account manager at
21        Indigo, that you got 45 to 50?
22        A    That was based on what we saw in the
23        field at the time prior to Indigo contacting
24        the contracted carrier that turned in all
```

RIVERSIDE REPORTING SERVICE

```
 1        tickets to Indigo to get that final number.
 2             So 8,688.58, or whatever number you're
 3        referencing, did not come until Indigo came
 4        and got that number.
 5   Q    Okay.
 6             MS. VAN NAMEN:  Let's go ahead and
 7        introduce this as Exhibit Number 7.
 8             THE COURT:  Any objection?
 9             MR. ROBINSON:  No objection, Your Honor.
10        (Whereupon, Exhibit 7 was marked.)
11   BY MS. VAN NAMEN:
12   Q    Okay.  We talked about --
13             THE COURT:  Just a second.  For the
14        record, this e-mail from cgt -- whose e-mail
15        address is that?
16             MS. VAN NAMEN:  Mr. Burrell testified
17        that was his.
18             THE COURT:  All right.  And who is Amber
19        Blair?
20             THE WITNESS:  Amber Blair was the young
21        lady who pretty much facilitated the --
22             THE COURT:  She was your grower manager?
23             THE WITNESS:  No.  She was a separate --
24        a separate person.  She was the person that
```

RIVERSIDE REPORTING SERVICE

1          facilitated setting up all the contracts and the

2          payments with me through the State of Mississippi,

3          so she took care of -- was taking care of all of

4          that.

5                    THE COURT:  All right.  For the record,

6          this Exhibit Number 7 is dated November 26, 2019,

7          and it has a subject reference Early Delivery-LDC

8          Rosedale, and with numbers TX-2491, TX-2486,

9          TX-2492.  And the string of e-mails dates back

10         from September 26th through September 30th.  That

11         will be Exhibit Number 7.

12   BY MS. VAN NAMEN:

13   Q    Mr. Burrell, we talked about the lien

14         that's been filed against you for soybeans you

15         harvested in Sunflower County in 2019 by the

16         seed company.  What about the rest of your

17         farming operation?  Do you have any equipment

18         that you used?

19   A    Yes.

20   Q    Did you pay for it?

21   A    It was on an investment lease.

22   Q    An investment lease?

23   A    Uh-huh.

24   Q    For how much?

```
 1      A    I can't give you a number right now, but

 2      I used that equipment to put my beans in

 3      through investors that are private.

 4      Q    Okay.  What about a chemical company, a

 5      fertilizer or treatment -- did you have

 6      anything like that?

 7      A    Yes, but that was investor taken care of.

 8      Q    So these investors, they're not

 9      creditors?

10      A    No.

11      Q    Is the investor your dad?

12      A    Within the organization, yeah.

13      Q    All right.  Do you have any other

14      creditors?

15      A    As far as the farming operation?

16      Q    Yes.

17      A    Nothing but -- creditors would be Local

18      Seed.

19               THE COURT:  Is what?

20               THE WITNESS:  Local Seed would be the

21      only creditor that extended credit.

22               THE COURT:  Do you mean Hollandale?

23               THE WITNESS:  Well, I don't know who

24      Hollandale is, Your Honor, but Local Seed is who I
```

```
 1      dealt with here in Memphis, Tennessee, yes, sir.
 2      BY MS. VAN NAMEN:
 3      Q    Did the investors own any percentage of
 4      your crop?
 5      A    Yes.
 6      Q    How much?
 7      A    About 30 percent.
 8      Q    Thirty percent.  And have they been paid?
 9      A    No.
10      Q    Are they asking to be paid?
11      A    Well, of course.
12      Q    How much are they owed?
13      A    We will determine that -- that would be
14      based off of the gross revenue of the beans
15      had they all been harvested.
16      Q    But you still have some sitting in the
17      field you haven't harvested?
18      A    I've still got some sitting in the field.
19      Q    Why haven't you harvested them?
20      A    Again, ma'am, I told you the weather has
21      been a devastating player across the country,
22      not just here in Mississippi.
23      Q    Well, if you can get $9 -- what did you
24      say, $9.60?
```

```
1     A    No.  I said that would be projected what
2     to get now.
3     Q    Okay.
4     A    Three months ago -- two months ago they
5     were at probably $8.75.
6     Q    So it's even better now.
7     A    That's what I said, $8.75 three months
8     ago when you're harvesting.  Now you can
9     probably get about $9.60.
10    Q    Even better.  So you could harvest that
11    and pay off the State of Mississippi, couldn't
12    you?
13    A    The State of Mississippi will come first
14    off of what's already there.
15    Q    Well, why have you not used that to
16    secure the rent payment that was already due
17    in October of 2019?
18    A    One more time, please.
19    Q    If you have that much money still sitting
20    in the field --
21    A    Okay.
22    Q    -- why have you not cut that?  I
23    understand weather has been a factor.  Why
24    have you not cut that and applied that money
```

1       towards the rent that you owe the State of

2       Mississippi?

3       A     Oh, we halted everything once we filed

4       this petition.

5       Q     Why?

6       A     We halted every -- all operations until

7       we get to the bottom of dealing with Indigo

8       first before we move forward.

9       Q     Do you have crop insurance?

10      A     At the time, no.

11      Q     Have you previously had crop insurance?

12      A     No.

13      Q     You've already defaulted under the terms

14      of the contract with the State by failing to

15      harvest, right?

16      A     With the State, we've been granted that

17      extension, so we've got -- you know, we know

18      the folks down there, and they know kind of

19      what's going on, so they granted us that

20      extension.  Hence why they sent this letter.

21      Q     You referenced an extension, but my

22      question was about a default.  Let's look

23      back at --

24      A     We haven't defaulted yet, no.

```
 1      Q     Okay.  Let's look back at Exhibit 1.

 2            THE COURT:  Do you have any exhibits

 3      over there with you?

 4            THE WITNESS:  These are the ones I've

 5      been holding onto.

 6      BY MS. VAN NAMEN:

 7      Q    Mr. Burrell, if you'll flip over to

 8      Condition Number 9, you'll see the first

 9      sentence in that paragraph says the lessee

10      agrees to cultivate the tract in a husbandlike

11      manner and not to commit waste thereon.  Do

12      you see that?

13      A     Yes.

14      Q     And Condition Number 10, Lessee agrees to

15      plant, grow and harvest from the crops

16      identified.

17      A     Yes.

18      Q     Well, you agreed to plant, grow and

19      harvest, and you planted and you grew --

20      A     Correct.

21      Q     -- but you haven't harvested.

22      A     We've harvested 580 acres --

23      Q     But not all of it.

24      A     -- of the soybeans wherever they are,
```

65

```
 1       Rosedale, Mississippi, per Indigo's logistics
 2       contracting -- they contracted, through their
 3       logistics company, to haul those beans there.
 4       Q    I'm with you on the 8,600.
 5       A    All right.
 6       Q    What I'm talking about is the beans still
 7       in the field.
 8       A    Okay.
 9       Q    You haven't harvested those?
10       A    They're still there.
11       Q    Okay.  Is that cultivating in a
12       husbandlike manner?
13       A    That wouldn't be cultivating, no.
14       Q    Okay.  If you'll look at Exhibit 5,
15       please.
16       A    I don't have that.
17       Q    That's the letter from the State of
18       Mississippi you're relying on.
19                 THE COURT:  Here you go.
20                 THE WITNESS:  Thank you.  Okay.
21       BY MS. VAN NAMEN:
22       Q    The first paragraph says that the lease
23       for the prior term must be paid by
24       October 30th or before the renewal period in
```

1        order to be eligible for a renewal, right?

2        A    Yes.

3        Q    And the contract renewal date for your

4        contracts is January 15th, right?  Well,

5        that's what it says right here.

6        A    That's what it says here.

7        Q    Okay.  And your contracts for both Tracts

8        3 and 27 expire on January 14th.  Then it

9        proceeds to say the amounts due for the 2019

10       growing season, so you've got Tract 3 and

11       Tract 27, a total of $89,604?

12       A    Correct.

13       Q    But it also says for the contract

14       renewal -- so, to continue the next seven

15       years of your lease, you have to pay

16       25 percent of the contracted amount; for Tract

17       3, that's $17,612.25, for Tract 27, it's

18       $8,154.74, and then the taxes, $9 an acre.

19       They say it's 842.96 acres, I'm going to take

20       their word for it, and that amount -- that

21       amounts to $7,586.64.

22       A    Uh-huh.

23       Q    When I add that up, the total due to

24       Mississippi by January 14th is $122,957.63.

1       Is that right?

2       A    Without a calculator, I'll take your

3       word, yes, ma'am.

4       Q    So $122,000 -- let's round it up to 123.

5       A    Okay.

6       Q    Do you have that kind of money?

7       A    Do I?

8       Q    Yes.

9       A    Personally, no.

10      Q    Do your investors have that kind of

11      money?

12              MR. ROBINSON:  Objection, Your Honor.

13      Calls for speculation.

14              THE COURT:  If he knows.  Overruled.

15      BY MS. VAN NAMEN:

16      Q    I believe you answered.  Do you know?  Do

17      your investors have that kind of money?

18      A    Yes.

19      Q    So are there other avenues you could

20      pursue to be able to meet your obligations to

21      the State of Mississippi without incurring

22      irreparable harm?

23      A    The fact of the matter is that the State

24      of Mississippi -- when you're farming and

```
1        you're on that land and -- the proceeds from
2        those soybeans are automatically understood --
3        in that contract, in that lease, they have the
4        first lien, and all proceeds from those
5        soybeans go to them first.
6        Q    Well, I understand the legal argument,
7        but I also understand that the State of
8        Mississippi is -- as you filed this lawsuit is
9        not a party here.  So any chance we would have
10       had, with the State of Mississippi, to work it
11       out they're not here to say.  Have you seen a
12       lien from the State of Mississippi?
13       A    Yeah.  I'm surprised you didn't have it
14       in your document with the Hollandale people
15       there because I believe they file one when you
16       sign the contract.  I mean in their legal
17       department.
18            MS. VAN NAMEN:  Your Honor, may I have
19       just one moment?
20            THE COURT:  All right.  Pass me the
21       documents back.
22            THE WITNESS:  Okay.
23            MS. VAN NAMEN:  Your Honor, that's all I
24       have.
```

```
 1                  THE COURT:  All right.  Redirect.
 2                  REDIRECT EXAMINATION
 3      BY MR. ROBINSON:
 4      Q    Mr. Burrell, Counsel asked you about your
 5      conversation with Amber Blair.
 6      A    Uh-huh.
 7      Q    Did you advise Amber Blair of the lien
 8      from the State of Mississippi?
 9      A    Oh, that was early on.  As a matter of
10      fact, Ms. Blair asked me that the week of --
11      that the offers were accepted if we had -- or
12      if I had a landlord, and I proceeded to tell
13      her that my landlord was the State of
14      Mississippi/Mississippi Department of
15      Corrections.
16      Q    So they asked you specifically if you had
17      a landlord?
18      A    Yes.  Because, as part of their setup in
19      the payments and everything, one of their
20      things is they will -- Indigo would take care
21      of those payments to the landlord, the farmer
22      would not have to deal with all of that.
23           So, once the proceeds were -- the
24      contracts were met, the proceeds were
```

RIVERSIDE REPORTING SERVICE

```
 1      accumulated, they would begin to funnel those

 2      funds to whomever you directed them to.  And

 3      so I let them know that the State of

 4      Mississippi was my landlord, and they reached

 5      out to them and had a conversation to get all

 6      that in place.

 7      Q    So they contacted the State of

 8      Mississippi and had conversations with them --

 9      A    Yes, sir.

10      Q    -- about your landlord lien?

11      A    Yes, sir.

12      Q    And they were to funnel the monies to the

13      State of Mississippi when they came in?

14      A    I -- I didn't partake in that program

15      other than just setting it up, but whatever

16      they conversed about they let me know that

17      they knew about Tract 3 and Tract 27 per the

18      Department of Finance & Administration there

19      in Mississippi.

20      Q    The Department of Finance &

21      Administration in Mississippi talking with the

22      people at Indigo?

23      A    Amber Blair and her team, yes, sir.

24      Q    At Indigo?
```

1          A     At Indigo, yes, sir.

2                     MR. ROBINSON:  That's all I have, Your

3          Honor.

4                     THE COURT:  All right.  You may step

5          down.  Is that your final witness?

6                     MR. ROBINSON:  That concludes my proof.

7                     THE COURT:  All right.

8                     MS. VAN NAMEN:  Your Honor, at this

9          point, we would argue that the plaintiff has not

10         met his burden, and there's no other proof to be

11         put on by Indigo to finish this matter.

12                     In the interest of efficiency, we

13         would say that he's failed to meet his burden

14         and we should proceed with closing arguments.

15                     THE COURT:  It's unclear in my mind

16         what's going on here.  Call your witnesses.

17                     MS. VAN NAMEN:  Your Honor -- I'm sorry.

18         I didn't understand what you said.

19                     THE COURT:  It does not -- it's not

20         clear to me exactly what's going on here.  Mr. --

21         well, do you want to respond to her request?

22                     MR. ROBINSON:  Yes, Your Honor.  There's

23         no question that there's a lien.  I mean,

24         that's -- Mr. Burrell has testified that there's a

                        RIVERSIDE REPORTING SERVICE

1        lien from the State of Mississippi.

2                They -- Indigo, in Exhibit 4 that's

3        in evidence, has said we will pay the State of

4        Mississippi.  They recognized Mississippi's

5        lien.

6                Their counsel, in Exhibit 4 on

7        Page 2, says you have kindly informed us of

8        the lien that the State of Mississippi has

9        against your client.  As such, payment to your

10       client will be both in his name and to the

11       State of Mississippi.

12               So Indigo recognizes the lien.  They

13       knew about the lien -- landlord's lien in

14       October.  So there's no question, Your Honor,

15       about the existence of a lien.

16               Now, they say, well, the State of

17       Mississippi is not a party to this proceeding.

18       Well, the State of Mississippi is not an

19       indispensable party to the extent that they've

20       already told us, in their correspondence with

21       the petitioner, what they plan to do on

22       January 14th if they're not paid, their lien

23       is not satisfied.

24               So the State of Mississippi -- one,

```
 1          the lien has been established through Indigo,

 2          through their own correspondence and their

 3          counsel, and, two, they've -- the petitioner

 4          has presented correspondence from the State of

 5          Mississippi evidencing their intent, just --

 6          for purposes of likelihood of success on the

 7          merits.

 8                  So he's established the existence of

 9          the lien through evidence that's in the

10          record, irrefutable evidence in the record

11          that there exists a lien with the State of

12          Mississippi.

13                  So if -- if, by indispensable party,

14          they mean to say that, well, we don't have any

15          idea that he really has an obligation to the

16          State of Mississippi, that would be

17          incomprehensible.

18                  I mean, the -- do they question the

19          existence of the State -- of the lien of the

20          State of Mississippi?  No, Your Honor.  Indigo

21          knew about it, has recognized the lien and has

22          told Mr. Burrell that they're going to take

23          his money, what's left after they get $40,000,

24          and send that to the State of Mississippi.  So
```

```
1    they've recognized the existence of

2    Mississippi's lien.

3              THE COURT:  All right.

4              MR. HILLYER:  Your Honor, if I may, I

5    think we got far afield right there with Ms. Van

6    Namen.  I was going to handle this aspect of it.

7    Would you like me to stand at the podium or can I

8    stand where I am, Your Honor?

9              THE COURT:  That's fine as long as the

10   court reporter can pick you up.

11             MR. HILLYER:  Your Honor, I think the

12   issue where I think we're not connecting with

13   Mr. Robinson is he's -- one, about the burden the

14   plaintiff has, but, two, as The Court's well

15   aware, Mr. Robinson is referring to e-mails and

16   referring to correspondence and referring to

17   discussions and -- this is actually highly

18   technical.  This is exactly why I was involved in

19   this.  Mr. Robinson knows this as well.  That's

20   why we introduced a filed UCC-1 from Local Seed.

21             The actual issue he raises in his

22   petition is the State of Mississippi has a

23   duly perfected superior lien to all others

24   that would somehow bar Indigo from taking its
```

1        contractual proceeds.

2                I think what Ms. Van Namen was going

3        with earlier is there is no lien in the

4        record.  Mr. Robinson filed the petition.  He

5        filed his memorandum.  He had witnesses here

6        today.  The Mississippi lien is not in the

7        record.

8                And it's not like an abstract, like

9        you know there's a lien.  It's kind of like

10       saying you know there's a mortgage.  There's a

11       filed deed of trust.

12               The statute that Mr. Robinson cites

13       and we -- I know Your Honor has read our

14       response is this only becomes an issue if they

15       have duly perfected their Article 9 secured

16       lien in accordance with 75-9-101, et seq., and

17       actually 75-9-308 is the one that governs,

18       when a security interest or agricultural lien

19       is perfected; continuity of perfection.

20       That's Mr. Robinson's burden.

21               Right now this Court has nothing to

22       rely upon that they have a lien.  That's

23       statutory.  They've got to perfect the lien

24       before they come in front of other creditors.

1              That's why we were trying to get the

2      State of Mississippi involved.  That's why

3      they're not involved.  That's why we had the

4      discussion if we're not going to have --

5              THE COURT:  They're not involved

6      because?  Fill in the blank.

7              MR. HILLYER:  Because this is Tennessee,

8      and, Your Honor, without -- if you'll indulge --

9      as far as proof, I was on the call with the State

10     of Mississippi with the Assistant Attorney General

11     and the Department of Agriculture, and I believe

12     the exact quote, and I can ask Ms. Van Namen to

13     verify, said we're not going to step one foot

14     across the state line, and you know that, so y'all

15     do whatever you want to do up there.  That's the

16     Mississippi -- that's what it says in that letter

17     that's in evidence.

18              They're not participating.  They're

19     not talking about their lien.  So that's why

20     this forum -- it's not about getting the

21     ultimate resolution.

22              This forum is just the wrong forum

23     to do this, but, if we have to argue about

24     this to get out of this forum, Your Honor,

                  RIVERSIDE REPORTING SERVICE

```
1        it's fatal that they don't have Mississippi's

2        lien in the record, a perfected lien with the

3        statutory language.  They -- that is element

4        one.  We don't even have to go to two, three

5        and four.

6                And I -- I mean, I appreciate

7        everything that the Burrells have said.  I

8        understand their circumstances.  I understand

9        the finances.  But we can't get off element

10       one.  Unless we have a perfected -- duly

11       perfected Mississippi lien in the record, they

12       can't meet their burden.

13               THE COURT:  Do you want to respond to

14       that?

15               MR. ROBINSON:  Yes, sir.  If the

16       Mississippi lien is not in the record, what are

17       they talking about, by they I mean counsel for

18       Indigo, in Exhibit 4 when they say you have kindly

19       informed us of the lien the State of Mississippi

20       has against your client; as such, the payment to

21       your client will be in both his name and to the

22       State of Mississippi?  What -- what are they

23       talking about?  If there's not a lien in this

24       record, what does this letter have reference to?
```

RIVERSIDE REPORTING SERVICE

```
 1                    So Counsel wants to disregard their
 2          own attorney's letter.  They wrote this
 3          letter.  They wrote this letter.  Indigo said
 4          we recognize the lien, we're going to split
 5          the money -- once we get ours, then we're
 6          going to give the State of Mississippi theirs;
 7          we recognize the lien, it's just going to be
 8          subordinate to our lien.
 9                    Your Honor, it's in the record.
10          This -- did this Court an hour ago admit this
11          letter as Exhibit 4 into this record?  I
12          submit this Court did.  And this letter is now
13          a part of the record of this case.
14                    Did they not write this -- do they
15          deny authorship?  I didn't hear them say, Your
16          Honor, that they didn't write this letter,
17          that their -- Indigo's counsel did not produce
18          this letter recognizing this lien that's so
19          nefarious and disappearing that they don't
20          know it exists.  But, oh, they admitted that
21          they know it exists.
22                    Mr. Burrell testified that they have
23          Amber Blair who talked with the State of
24          Mississippi and the landlord, but they say,
```

```
1        oh, the lien's not in the record.  They've

2        admitted that Mississippi has a lien.

3                 THE COURT:  Okay.  Now, what else do you

4        have?

5                 MR. HILLYER:  Well, Your Honor, first

6        off, that was --

7                 THE COURT:  Do you -- do you have --

8                 MR. HILLYER:  Was that closing?

9                 THE COURT:  Do you have a motion?

10                MR. HILLYER:  Yes.  I -- at this point,

11       before we go to closing, I would make --

12                THE COURT:  Well, I need to be -- do you

13       plan to put on any further proof?

14                MR. ROBINSON:  No.

15                THE COURT:  Wait, wait.  I don't want to

16       hear a whole lot of -- I want to hear one argument

17       at the closing if you all are done with the proof.

18                MR. HILLYER:  Can we step outside and

19       talk for one second?

20                THE COURT:  All right.  We'll take a

21       five minute break.

22                     (Recess.)

23                THE COURT:  All right.  Mr. Robinson

24       rests.  There was a motion apparently that was on
```

RIVERSIDE REPORTING SERVICE

1           the table, I don't recall exactly what the motion

2           was, but I'm not dismissing their case.  I think

3           that's what you were moving for, right?

4                   MS. VAN NAMEN:  Essentially, yes, Your

5           Honor.

6                   THE COURT:  I'm denying that motion.

7           Would you like to put on any proof?

8                   MS. VAN NAMEN:  Your Honor, at this time

9           we don't have any proof to put on.

10                  THE COURT:  All right.  Let me hear your

11          arguments.  I'll keep you to 15 minutes apiece.

12                  There are four elements that I'm

13          considering.  Do I need to repeat them here or

14          do you know what they are as to the issuance

15          of the temporary injunction?

16                  MR. ROBINSON:  Yes, sir, I believe I

17          know what they are.

18                  THE COURT:  All right.  Let's proceed

19          then.

20                  MR. ROBINSON:  The first issue is

21          substantial likelihood of success on the merits,

22          is there a lien, a landlord's lien, not just a

23          lien, but a landlord's lien.

24                  We've seen in the record the

```
 1          leasehold agreements -- the lease agreements

 2          between Petitioner Burrell and the State of

 3          Mississippi.  We've seen in the record the

 4          letter from the State of Mississippi

 5          Department of Finance & Administration setting

 6          forth the deadline of January 15th for payment

 7          on those leasehold agreements.

 8               It's undisputed that both

 9          Mississippi and Tennessee require that every

10          lessor of land shall have a lien on the

11          agricultural products of the leased premises

12          to secure the payment of rent.  That is

13          Mississippi and Tennessee, both of which

14          statutes are in the record as attachments to

15          the original petition, Mississippi and

16          Tennessee noting that Indigo is a Tennessee

17          corporation and has its physical presence in

18          Tennessee but also operates in Mississippi,

19          specifically Rosedale is where the soybeans

20          were delivered.

21               So both Tennessee and Mississippi

22          recognize the classic landlord lien, and so

23          there's no question that, as to the merits,

24          Mr. Burrell has a legitimate claim that his
```

```
1        rent should be priority from the proceeds of

2        the 8,000 bushels of soybeans.

3              The irreparable harm element has

4        been established, especially through that

5        January 15 deadline that's evidenced in the

6        letter from the State of Mississippi where

7        they say, if you don't pay us by January 15th,

8        we're going to re-bid Tracts 3 and 27.

9              And Mr. Burrell testified and the

10       leases, Exhibits 1 and 2, confirm that he has

11       a leasehold interest for eight years, but, as

12       of January 15th of this year, if these folks

13       don't get their lien money, there won't be any

14       Tracts 3 and 27 for Mr. Burrell.  So he will

15       clearly suffer the irreparable harm that the

16       second element requires.

17             The third element is a balancing

18       test with the threatened injury -- whether it

19       outweighs whatever harm the issuance of an

20       injunction may cause the opposing party,

21       Indigo foregoing their $40,000 -- basically

22       re-amortizing their debt over possibly a

23       longer period of time.

24             Now, if -- if we weigh -- The Court
```

1      weighs the harm to Indigo of re-amortizing

2      their debt over a long period of time as

3      opposed to Mr. Burrell, on January 15th, being

4      out of business, it -- it seems that

5      Mr. Burrell being out of business basically on

6      the 15th of January would outweigh the

7      re-amortization of Indigo's $40,000.

8      Mr. Burrell has indicated that he will repay

9      those funds owed to Indigo but subsequent to

10     the landlord's lien in Mississippi.

11             The fourth element is the public

12     interest.  And the U.S. Department of

13     Agriculture has established the socially

14     disadvantaged farmer provisions so that young

15     farmers can get started and maintain in the

16     business.

17             Mr. Cameron Burrell testified that

18     even his father and other investors have

19     helped him, to this point, to survive

20     economically in the demanding business of

21     agriculture.  It takes a lot of money -- a lot

22     of money to farm and produce a crop.  Well,

23     he's -- he's just started.  He's just started.

24             And the Department of Agriculture

RIVERSIDE REPORTING SERVICE

```
 1        has said that we're going to help young

 2        farmers get started and maintain in the

 3        business, and they passed regulations

 4        specifically for that purpose, to keep young

 5        farmers like Mr. Burrell in the business.

 6                 And so we weigh that, the public

 7        interest in keeping young farmers in the

 8        business, against the re-amortization of a

 9        $40,000 cancellation fee.

10                 And so the public interest, in

11        advancing socially disadvantaged farmers, is

12        served by enjoining Indigo from consuming the

13        $40,000 which they would receive anyway from

14        Mr. Burrell over -- he still owes them money.

15                 If Indigo doesn't absorb the half --

16        half of the $80,000, the debt is still there.

17        It's re-amortized.  It has to be paid.  It

18        still has to be paid.  They're still owed the

19        money, but it's not priority to the lien of

20        the State of Mississippi.

21                 And so we're asking The Court, based

22        on these four factors, to not allow Indigo to

23        consume the $40,000 but to allow Mr. Burrell

24        to apply those $40,000 to the debt owed -- the
```

1           landlord's lien owed to the State of

2           Mississippi because the public interest

3           requires it.

4                 If a balancing is done, the

5           re-amortization is, we believe, less injurious

6           and harmful to Indigo than Mr. Burrell being

7           out of business on January the 15th.  And --

8           there's clearly irreparable harm to

9           Mr. Burrell in being out of business.

10                And the landlord's lien is a

11          creation of statute, both here in Tennessee

12          and in the State of Mississippi, where the

13          landlord is statutorily to get his rent before

14          any other creditor.

15                And, for those reasons, we ask The

16          Court to permanently enjoin Indigo from

17          consuming those $40,000 and allow Mr. Burrell

18          to apply those funds to the landlord's lien in

19          Mississippi and Indigo be paid subsequent to

20          the landlord's lien.  Thank you, Your Honor.

21                MS. VAN NAMEN:  Your Honor, the four

22          factors, as The Court is aware, are all required.

23          It's not just proving one.  It's proving all four.

24                It's a heavy burden, and the

```
 1        plaintiff has not met it.  He hasn't even

 2        proven one of the four factors to be able to

 3        establish the injunctive relief that he

 4        requests.

 5               He's not been able to make an

 6        argument to show how the requested equitable

 7        relief of enjoining Indigo from making

 8        cancellation deductions in a check would avoid

 9        irreparable injury or how his own actions

10        haven't directly contributed to his current

11        predicament.

12               Essentially he's asking The Court to

13        handcuff the parties to make his obligations

14        to the State of Mississippi transfer to Indigo

15        when Indigo doesn't have an eight year lease

16        with the State of Mississippi.

17               In essence, he relies on the notion

18        of a lien of the landlord, the State of

19        Mississippi, but there is no evidence in the

20        record of a priority lien.

21               While there have been e-mails

22        introduced and despite separate hearings and

23        multiple pleadings, the plaintiff has not

24        offered a single document to show a UCC
```

1       properly perfected filing of the State of

2       Mississippi's lien interest.

3               We have seen a properly perfected

4       lien from another creditor of Mr. Burrell, but

5       the statute on which the plaintiff relies

6       specifically says, this is Mississippi Code

7       89-7-51, Lien of Landlord, the lien shall be

8       paramount to all other liens, claims or

9       demands when perfected in accordance with

10      Uniform Commercial Code Article 9.  Then

11      Mississippi Code 75-9-308 goes through

12      multiple steps on how to properly perfect an

13      agricultural lien.

14              None of the evidence presented in

15      this matter has shown that the State of

16      Mississippi has a properly perfected lien to

17      establish priority to the proceeds from the

18      8,600 bushels of soybeans Mr. Burrell actually

19      delivered.

20              So he can't meet the first factor.

21      He can't succeed on the merits because there's

22      no lien.  And this is especially in light of

23      the properly perfected lien by Local Seed.

24              It's also because the State of

1        Mississippi is not a party, as we said.

2        They're essential to afford complete relief by

3        the parties.

4               The injunctive relief requested

5        simply asks Indigo not to cut a check and

6        nothing more.  It doesn't help Mr. Burrell

7        keep the farm by January 14th.  And that's why

8        he can't meet the second factor to show an

9        irreparable injury.

10              If anything, the evidence today

11       showed that there's still beans in the field.

12       There's still money that is readily available

13       to go towards the amount owed to the State of

14       Mississippi.  He also testified that his

15       investors would have money to help if needed.

16              But, more importantly, the record --

17       the evidence in the record shows that

18       Mr. Burrell owes more than just $70,000 from

19       Indigo.  He owes $123,000 to be able to keep

20       the seven years remaining on the lease.

21              He's not offered any explanation for

22       failure to pay the State in another form, and

23       he hasn't shown that a check from Indigo is

24       the only way to keep the farm, if that's the

```
 1        irreparable injury he alleges.

 2             The third factor, a permanent

 3        injunction doesn't help anyone.  There's not

 4        one party that's outweighed.  If anything,

 5        Indigo is at a disadvantage.  Regardless of

 6        this re-amortization of a debt or bankruptcy

 7        arguments that were made, Indigo still can't

 8        write the check because even if the State of

 9        Mississippi has a lien, and even if it's

10        properly perfected, Indigo has to work that

11        out with the State of Mississippi before --

12        and now Local Seed before Mr. Burrell can get

13        paid.  And, in any event, that 70,000 is not

14        enough to keep the farm.

15             Lastly, the public interest is best

16        served here by enforcing properly perfected

17        liens.  Simply relying on an e-mail from

18        counsel to counsel, not preventing --

19        presenting any UCC filing in evidence at all

20        does not establish any order of priority of a

21        lien, and without that he cannot prevail.

22             Your Honor, we would ask that The

23        Court deny the plaintiff's request for failure

24        to meet the essential factors for proving
```

1     injunctive relief.

2              THE COURT:  All right.  I will retire to

3     chambers and take a look at that, and I'll come

4     out and let you all know what The Court decides.

5              (Recess.)

6              THE COURT:  All right.  I've considered

7     the exhibits and the testimony, and The Court

8     finds as follows:  With respect to the likelihood

9     of success on the merits, the plaintiff has shown

10    that they may have a chance of substantiating a

11    land lien by the State of Mississippi, although

12    they have not provided today proof that that lien

13    has been perfected.  However, today the ultimate

14    proof of that is not what's required.  It really

15    requires that there is some likelihood of being

16    able to be successful on the merits, and the proof

17    today supports that they may be able to show that

18    subject to further proof.

19              With respect to irreparable harm,

20    The Court views the farm lease in this case a

21    long-term lease, very much like real property,

22    so that the loss of the farm lease in this

23    instance would constitute irreparable harm.

24              With respect to the balancing of the

RIVERSIDE REPORTING SERVICE

```
 1          equities, a delay in this situation in

 2          receiving the proceeds by the defendant,

 3          Indigo, will not create a substantial harm to

 4          them as would -- the loss of the leasehold

 5          would be to the plaintiff, particularly

 6          inasmuch as we're talking about the

 7          cancellation fee that is being requested to be

 8          applied in this instance to a debt which, if

 9          proven, would have priority over the

10          cancellation fee.

11                  With respect to the public interest,

12          the petitioner has shown that the federal

13          government has expressed a high interest in

14          the development of veterans and socially

15          disadvantaged farmers such that this interest

16          would be served by this Court granting some

17          equitable relief in this case.

18                  And, while The Court is inclined to

19          grant some equitable relief, The Court is not

20          inclined to require the defendant to pay the

21          estimated cancellation fee over to the

22          plaintiff for the payment of the rents to the

23          State of Mississippi which has not been proven

24          to be perfected.
```

```
 1                    Therefore, The Court will require
 2         that the cancellation fee estimated by Indigo
 3         be paid to the registry of the Chancery Court
 4         and to be held there until such time as this
 5         Court makes a final judgment on the matter
 6         unless the petitioner can set up a bond for
 7         that amount.  If the petitioner wants to set a
 8         bond for that amount, then The Court will
 9         require that Indigo release the entire amount.
10                    The balance of the funds that are
11         owed by Indigo to the petitioner should be
12         released forthright.  That will be my
13         conclusion and my ruling on the matter.
14                    Do you have any questions,
15         Mr. Robinson?  Are you able to set a bond --
16                    MR. ROBINSON:  Your Honor --
17                    THE COURT:  -- in that amount?
18                    MR. ROBINSON:  Your Honor, could -- Your
19         Honor, could I have a moment to consult with my
20         client?
21                    THE COURT:  Just wait a minute.  Do you
22         have any other questions?
23                    MR. ROBINSON:  No, Your Honor.  Other
24         than the -- the immediate release of the balance
```

```
1         of the funds, is that to the State of Mississippi

2         or to Mr. Burrell?

3                   THE COURT:  To the State of Mississippi.

4                   MR. HILLYER:  Yes, Your Honor, I have a

5         couple.

6                   First, for the record, Mr. Robinson

7         asked for a prohibitive injunction.  And I

8         know The Court's well aware of the difference

9         between a prohibitive and mandatory injunction

10        requiring something affirmative.

11                  There's no affirmative actions

12        sought in the petition or in his memorandum

13        about making Indigo pay anyone.  It's simply

14        to bar them from making the cancellation.

15                  So I guess my first question to The

16        Court is is this ruling about requiring Indigo

17        to pay, this is relief not sought by the

18        petitioner, so I guess how is it before The

19        Court?

20                  MR. ROBINSON:  Well, Your Honor -- well,

21        we move -- we move ore tenus to amend the petition

22        to require an outright payment to the State of

23        Mississippi.

24                  MR. HILLYER:  And I understand that that
```

RIVERSIDE REPORTING SERVICE

```
1       may be something down the road.  I guess what I'm
2       saying is there's -- I mean, just simply for the
3       record, there's nothing in any pleading nor did
4       Mr. Robinson orally make any request for anything
5       to be paid.  It was simply a prohibitive
6       injunction.  And I'm asking The Court -- what I'm
7       hearing is a mandatory injunction --
8               THE COURT:  It was not --
9               MR. HILLYER:  -- and that is totally
10      different elements.
11              THE COURT:  It was my recollection --
12      maybe I need to go back and read the petition, but
13      it was my recollection that they were requesting
14      that.  I could have made a -- it could have been a
15      mistake in that regard, so let me see what they
16      requested.
17              MR. HILLYER:  I believe it's on Page 8
18      in the conclusion, Your Honor.
19              THE COURT:  Well, the whole thing here
20      was on August -- on January 14th they needed these
21      funds to be paid to the State of Mississippi in
22      order to prevent them from losing the lease -- the
23      leasehold.  That was my understanding of the
24      situation.  So that's how I'm interpreting it.
```

1              MR. HILLYER:  Oh -- and I understand.  I

2       wasn't questioning Your Honor.  I'm saying I

3       read --

4              THE COURT:  I understand what you're

5       saying.

6              MR. HILLYER:  We did the petition and

7       the response --

8              THE COURT:  I read into it what -- what

9       I just said.  I understood it to be requesting

10      that the funds needed to be paid to the State of

11      Mississippi in order to avoid the termination of

12      the leasehold.  So it is not there specifically,

13      but that's my ruling.

14             MR. HILLYER:  Okay.  And I guess --

15             THE COURT:  So your objection or comment

16      is noted.

17             MR. HILLYER:  Okay.  And I guess my

18      question would be, in light of Your Honor's

19      ruling, we would like the opportunity -- if this

20      is a mandatory injunction, not a prohibitive

21      injunction, we would like the opportunity to brief

22      that because there's some pretty substantial

23      Tennessee Supreme Court law that the elements are

24      different than prohibitive injunctions, and it's

```
 1        only in extreme cases, no possibility of being

 2        ever compensated for damages.  And I can give Your

 3        Honor the cites.

 4                That's why I'm saying it's a totally

 5        different ball game, and if Your Honor read it

 6        that way and Mr. Robinson meant it that way,

 7        that's not at all the way -- it wasn't written

 8        and we didn't take it, so we didn't brief

 9        that, and I think it would be -- it would be

10        unfair to Indigo, Your Honor --

11                THE COURT:  Send me a brief in by Monday

12        morning.  Do you have anything else?

13                MR. HILLYER:  No, Your Honor.  And you

14        want our brief to be outlining a mandatory

15        injunction?

16                THE COURT:  Whatever issue it is that

17        you're raising at this point.

18                MR. HILLYER:  Okay.  And --

19                THE COURT:  If you want me to consider

20        it, I want you to brief that because I want his

21        Order in first thing Monday morning.

22                Mr. Robinson, I want the Order --

23                MR. ROBINSON:  Yes, Your Honor.

24                THE COURT:  -- first thing Monday
```

1      morning.

2              MR. HILLYER:  Again, just simply for the

3      record, Your Honor, I guess -- is Mr. Robinson

4      orally moving for a mandatory injunction if it's

5      not in there?  I mean, where are we getting the

6      mandatory injunction?

7              MR. ROBINSON:  From me.

8              THE COURT:  So that we're clear, I

9      ordered that it be done.

10             MR. HILLYER:  Okay.

11             THE COURT:  Now he's orally moving for

12     that, and, if you want me to, I can rule on that

13     as well.  It would be granted because that's what

14     I'm doing.

15             MR. HILLYER:  Understood.  I was asking

16     if -- I was asking simply for the record when --

17     for our brief if this was something that

18     Mr. Robinson -- you thought Mr. Robinson was

19     asking for so you are granting it or whether you

20     were trying to remedy that.

21             THE COURT:  No, I read that into the

22     petition that was before The Court.

23             MR. HILLYER:  Okay.

24             THE COURT:  Now, what he's done, by

RIVERSIDE REPORTING SERVICE

```
 1        orally moving it, is he's tried to clean up the --

 2        his failure to plead it specifically.

 3              So I don't think that I'm adding

 4        anything to this particular request for

 5        relief, in my opinion.  I could be wrong.  It

 6        wouldn't be the first time.

 7              MR. ROBINSON:  That's clearly our

 8        understanding, Your Honor, because -- I mean, the

 9        whole -- the entire discussion today was --

10              THE COURT:  We don't need to have a

11        discussion about it.

12              Now, do you want to talk to your

13        clients about whether or not --

14              MR. ROBINSON:  About the bond.

15              THE COURT:  -- they can post the bond?

16              MR. HILLYER:  Okay.  Just so -- so we --

17              THE COURT:  Just a second.  He's stepped

18        away.

19              MR. HILLYER:  Oh, I'm sorry.  I do have

20        one other --

21              THE COURT:  Hold on.

22              MR. ROBINSON:  Yes, Your Honor, they

23        want to post a bond.

24              THE COURT:  Okay.  They'll have to post
```

1      a bond in the amount of the cancellation fee.

2                  MR. ROBINSON:  The entire 40,000?

3                  THE COURT:  Yes, sir.

4                  MR. ROBINSON:  That may shed a different

5      light on it, Your Honor.

6                  Your Honor, at this point they could

7      not post the entire $40,000, so in that case

8      they would ask that it be held in the court's

9      treasury.

10                 THE COURT:  All right.

11                 MR. HILLYER:  As to --

12                 THE COURT:  Did you have another

13     question?

14                 MR. HILLYER:  It's as to the -- so the

15     discrepancy between the 70 and the 30, that 40

16     will go into the court's registry, pursuant to The

17     Court's Order, and the other $31,000 --

18                 THE COURT:  You'll pay it to the State

19     of Mississippi.

20                 MR. HILLYER:  And I would ask for the

21     record -- we -- I would -- we won't be able to do

22     that this weekend, Your Honor, because they won't

23     be there, but the issue basically is we don't have

24     a Mississippi lien, and we have a Local Seed lien,

                    RIVERSIDE REPORTING SERVICE

1      and, under Article 9, I can't advise my client to

2      knowingly write a check to the State of

3      Mississippi when they've got a lien from Local

4      Seed, so the check would come after a UCC search,

5      and then it would go to I presume -- I can talk to

6      my client outside, it would go to all lienholders

7      and let them -- that's normally how it gets worked

8      out.  So if Local Seed has a lien before --

9      Mr. Robinson knows how this works in bankruptcy.

10              THE COURT:  Pay the entire amount into

11      the registry of the clerk.

12              MR. HILLYER:  Okay.  Thank you.  That

13      makes it easier for my client so we're not

14      violating anything.

15              THE COURT:  I understand.  Mr. Robinson,

16      do you understand the quagmire that you're in

17      right now, the legal quagmire that you're in?

18              MR. ROBINSON:  Would you -- would you

19      elucidate on that, Your Honor?

20              THE COURT:  Well -- no, I'm not going to

21      be counsel for you, but, you know, you need to --

22      you only have a very short window to accomplish

23      quite a bit.

24              I'm interested in going ahead and

```
1      having a final trial on this quickly.  I don't
2      think that you all need a lot of time to
3      prepare and get ready for this, and, while
4      it's fresh on my mind, I need to know whether
5      or not to release the funds to the State of
6      Mississippi or to release the funds to Indigo.
7      We need to resolve this quickly.
8              MR. HILLYER:  Okay.  When you say a
9      trial, you mean a trial on what I guess would
10     be -- it's not a Complaint.  It's only a petition
11     for injunctive relief.  He chose not to file a
12     Complaint, only the injunctive relief, so we
13     actually don't even have a case to try.
14             MR. ROBINSON:  Well, he raised the
15     issue, Your Honor, of the lien, and The Court
16     clearly said establish the lien.
17             THE COURT:  We're not done here.  It's
18     not resolved whether or not --
19             MR. HILLYER:  The injunction's resolved,
20     right?
21             THE COURT:  I'm only issuing a temporary
22     injunction.
23             MR. HILLYER:  Oh.
24             THE COURT:  I'm not permanently
```

```
 1        enjoining --
 2                MR. HILLYER:  Oh, okay.  So basically --
 3        but our trial is on whether there's a permanent
 4        injunction, it's not --
 5                THE COURT:  Right.
 6                MR. HILLYER:  I guess that's what I'm --
 7        normally, Your Honor -- and I know Your Honor's
 8        aware of this, normally it's a breach of contract
 9        with injunctive relief.  We have no breach of
10        contract.  They've never filed a Complaint, so
11        there's not actually -- we --
12                THE COURT:  Yeah.
13                MR. HILLYER:  We don't have discovery.
14        We have -- all the rules come into play, and --
15        and I know Your Honor is well aware of it --
16                THE COURT:  Yeah, it's --
17                MR. HILLYER:  -- but -- you know, we
18        can't do this like -- I mean, in all honesty -- I
19        understand what we're filing, but this isn't -- I
20        mean, this is Chancery Court, you know, and
21        Mr. Robinson knows that.  This isn't -- we're not
22        going to do a General Sessions trial with no
23        Complaint and no discovery and do that.  I mean, I
24        know Your Honor likes it done the right way.
```

RIVERSIDE REPORTING SERVICE

```
 1                We need -- if we're going to resolve
 2      it, we need a Complaint.  But then again --
 3                MR. ROBINSON:  Well, Your Honor, that's
 4      overbroad.  That's overbroad.
 5                The Court presented a very simple
 6      issue to be resolved prior to the resolution
 7      of this injunction, and that was the issue
 8      Counsel raised about the lien from the State
 9      of Mississippi.  That's the scope of it.
10      That's the scope of it, Your Honor.  It's just
11      about the lien.
12                He -- he raised the issue.  Counsel
13      raised the issue about the lien.  The Court
14      said, okay, they need to prove, to my
15      satisfaction, that there is a lien from the
16      State of Mississippi.  That's the issue.
17      That's the scope of it.
18                So all this about a full-blown
19      trial, that's beside the point.  That's not
20      the issue at all, Your Honor, I contend.
21                The issue is singular, is there a
22      lien from the State of Mississippi.  That's
23      the issue Counsel raised.  And that's all --
24      that's the only issue.  And --
```

```
 1                    THE COURT:  When you all come back

 2         Monday morning, I will have ferreted this out --

 3                    MR. ROBINSON:  Yes, sir.

 4                    THE COURT:  -- to tell you what it is I

 5         need you to do going forward --

 6                    MR. ROBINSON:  Yes, sir.

 7                    THE COURT:  -- together with a date on

 8         which we can resolve it.

 9                    MR. ROBINSON:  Yes, sir.

10                    THE COURT:  All right.

11                    MR. HILLYER:  And our motion is still --

12         we still have the --

13                    THE COURT:  You still have a right to

14         bring your motion.

15                    MR. HILLYER:  Right.  I don't know if we

16         have a date on that yet.

17                    MS. VAN NAMEN:  We don't, but we'll get

18         it set.

19                    MR. HILLYER:  Can we get a date while

20         we're here?

21                    THE COURT:  You might get a trial date

22         before you get to hear your motion, so -- okay.

23                    MR. ROBINSON:  Your Honor, the last

24         question --
```

```
 1                THE COURT:  Let's hold up on that until
 2      Monday morning when I have a fresh look at what
 3      we're working with.
 4                MR. ROBINSON:  Your Honor, I know The
 5      Court -- since we're dealing with the 15th of
 6      January, and today is the 10th, and Monday being
 7      the 13th, is it possible we could have the hearing
 8      Monday or Tuesday?
 9                It's a singular issue, Your Honor.
10      The singular issue Counsel raised, is there a
11      lien from the State of Mississippi.  That's
12      what he said he needed to know.  And The Court
13      is allowing that proof to be made.  It will
14      take about 30 minutes, Your Honor.  It will
15      take about 30 minutes.
16                MR. HILLYER:  Your Honor, I -- with all
17      due respect to Mr. Robinson, he didn't sue Indigo
18      for $71,000.  It's not a Complaint.  It's a
19      petition for injunctive relief.
20                I think what's happening right now
21      is we've skipped the discovery process.  I
22      mean, you cannot require Indigo to go to a
23      trial for damages without discovery.  Everyone
24      knows that.  And I don't understand -- what
```

RIVERSIDE REPORTING SERVICE

1      we're talking about -- the new procedure, with

2      all due respect, is to file a petition, not a

3      Complaint?

4               THE COURT:  File your brief --

5               MR. HILLYER:  Okay.

6               THE COURT:  -- and let me see it Monday

7      morning.  And I'll see you all Monday morning at

8      10:00.

9               MR. HILLYER:  Thank you, Your Honor.

10              MR. ROBINSON:  Thank you, Your Honor.

11              THE COURT:  I have your exhibits.

12          (Whereupon, the case was adjourned to

13            resume Monday, January 13, 2020

14                  at 10:00 a.m.)

15

16

17

18

19

20

21

22

23

24

RIVERSIDE REPORTING SERVICE

1                    C E R T I F I C A T E

2

3          STATE OF TENNESSEE:

4          COUNTY OF SHELBY:

5          I, LISA C. VAUGHN, Registered Professional Reporter,
    and Notary Public for the State of Tennessee at Large, do
6   hereby certify that I reported in machine shorthand the
    above-captioned proceedings.

7

           I HEREBY CERTIFY that the foregoing pages contain a
8   full, true, and correct transcript of my said Stenotype
    notes then and there taken.

9

           I FURTHER CERTIFY that I am not an attorney or counsel
10  of any of the parties, nor a relative or employee of any of
    the parties, nor am I a relative or employee of any attorney
11  or counsel connected with the action, nor am I financially
    interested in the action.

12

           I FURTHER CERTIFY that in order for this document to be
13  authentic and genuine, it must bear my original signature
    and my embossed notarial seal and that any reproduction in
14  whole or in part of this document is not allowed or condoned
    and that such reproductions should be deemed a forgery.

15

           THEREFORE, witness my hand and my official seal in the
16  State of Tennessee on January 11, 2020.

17

                          _____
18                        LISA C. VAUGHN, RPR, LCR
                          LCR #048 - expires June 30, 2020
19                        Notary Public at Large

20

21

22

23

24

                    RIVERSIDE REPORTING SERVICE

**MR. HILLYER: [42]**
15/13 15/16 74/3 74/10
76/6 79/4 79/7 79/9
79/17 93/3 93/23 94/8
94/16 94/24 95/5 95/13
95/16 96/12 96/17 97/1
97/9 97/14 97/22 98/15
98/18 99/10 99/13
99/19 100/11 101/7
101/18 101/22 102/1
102/5 102/12 102/16
104/10 104/14 104/18
105/15 106/4 106/8

**MR. ROBINSON: [61]**
4/2 4/5 4/8 4/13 6/3
11/19 14/3 14/10 14/14
14/18 15/1 15/11 15/21
16/1 16/5 17/19 21/12
22/9 22/13 22/19 22/24
30/16 35/2 35/5 35/13
36/3 36/13 37/16 40/4
43/19 44/10 53/20 58/8
67/11 71/1 71/5 71/21
77/14 79/13 80/15
80/19 92/15 92/17
92/22 93/19 96/22 97/6
98/6 98/13 98/21 99/1
99/3 100/17 101/13
103/2 104/2 104/5
104/8 104/22 105/3
106/9

**MS. VAN NAMEN: [43]**
4/3 6/5 6/8 6/10 6/15
6/20 17/22 21/15 22/16
23/4 32/4 33/4 34/2
34/22 35/14 35/19
35/21 36/8 37/19 38/10
40/7 43/21 44/2 44/9
44/12 44/18 48/12
48/17 51/17 51/20
53/17 53/23 54/2 58/5
58/15 68/17 68/22 71/7
71/16 80/3 80/7 85/20
104/16

**THE COURT: [158]**
**THE WITNESS: [23]**
15/19 18/10 18/13
18/21 21/21 21/23 24/7
25/13 25/16 25/19
25/22 36/24 37/4 37/6
37/9 50/5 58/19 58/22
60/19 60/22 64/3 65/19
68/21

**$**

**$122,000 [1]** 67/4
**$122,957.63 [1]** 66/24
**$123,000 [2]** 10/4
88/19
**$17,612.25 [1]** 66/17
**$31,000 [1]** 99/17
**$40,000 [10]** 5/4 73/23
82/21 83/7 84/9 84/13
84/23 84/24 85/17 99/7
**$40,485.19 [2]** 5/5

38/21
**$7,586.64 [1]** 66/21
**$70,000 [1]** 88/18
**$71,000 [1]** 105/18
**$8,154.74 [1]** 66/18
**$8.75 [2]** 62/5 62/7
**$80,000 [1]** 84/16
**$89,000 [2]** 9/21 9/23
**$89,604 [1]** 66/11
**$9 [2]** 61/23 66/18
**$9.60 [3]** 50/4 61/24
62/9

**0**

**048 [1]** 107/18

**1**

**10 [1]** 64/14
**10,000 [1]** 32/1
**101 [1]** 75/16
**10:00 [2]** 106/8 106/14
**10th [2]** 1/10 105/6
**11 [1]** 107/16
**1100 [1]** 1/22
**11th [1]** 39/19
**12 [2]** 3/4 55/3
**123 [1]** 67/4
**12th [2]** 4/19 35/1
**13 [1]** 106/13
**13th [1]** 105/7
**14th [8]** 10/17 40/20
41/3 66/8 66/24 72/22
88/7 94/20
**15 [5]** 47/20 55/8 57/17
80/11 82/5
**15 bushels [2]** 46/9
55/9
**15th [9]** 40/1 66/4 81/6
82/7 82/12 83/3 83/6
85/7 105/5
**16 [1]** 3/6
**1677 [1]** 1/4
**18 [1]** 3/10
**1F [2]** 52/14 53/12

**2**

**200 [2]** 47/16 47/17
**2010 [1]** 35/1
**2018 [3]** 57/2 57/4 57/5
**2019 [9]** 9/22 23/19
45/11 45/15 53/10 59/6
59/15 62/17 66/9
**2020 [7]** 1/10 9/23 10/1
41/4 106/13 107/16
107/18
**2027 [3]** 24/6 24/8
24/10
**23 [2]** 3/10 23/12
**2486 [1]** 59/8
**2491 [1]** 59/8
**2492 [1]** 59/9
**25 percent [1]** 9/24
57/1 66/16
**250 [1]** 49/6
**250 acres [3]** 49/12
49/15 55/2

**26 [1]** 59/6
**26th [1]** 59/10
**27 [25]** 19/14 19/15
19/18 19/19 19/22 20/6
20/10 20/17 20/18 22/9
22/16 22/16 22/19
23/11 40/19 41/12
41/14 42/1 46/17 66/8
66/11 66/17 70/17 82/8
82/14
**27th [2]** 35/10 35/12

**3**

**30 [4]** 99/15 105/14
105/15 107/18
**30 percent [1]** 61/7
**300 [1]** 49/5
**308 [2]** 75/17 87/11
**30th [2]** 59/10 65/24
**37 [1]** 3/11
**3749 [1]** 2/5
**38 [1]** 3/11
**38109 [1]** 2/6
**38119 [1]** 2/13

**4**

**40 [3]** 3/12 39/6 99/15
**40,000 [1]** 99/2
**45 [7]** 3/6 47/7 47/13
54/24 55/11 57/16
57/21
**4:30 [1]** 30/16

**5**

**50 [4]** 55/4 55/15 57/16
57/21
**50 bushels [3]** 55/1
55/11 55/17
**500 [2]** 2/12 46/6
**51 [1]** 87/7
**527-1100 [1]** 1/22
**54 [1]** 3/12
**55 [1]** 47/7
**58 [1]** 3/13
**58,000 [1]** 51/11
**580 [5]** 46/7 47/18
54/24 55/16 64/22
**580 acres [4]** 46/16
49/1 55/18 57/16

**6**

**60 [1]** 50/6
**6075 [1]** 2/12
**69 [1]** 3/7

**7**

**70 [2]** 10/8 99/15
**70,000 [2]** 10/8 89/13
**75-9-101 [1]** 75/16
**75-9-308 [2]** 75/17
87/11

**8**

**8,000 [1]** 82/2
**8,600 [2]** 47/15 65/4
**8,600 bushels [1]**

87/18
**8,688 [1]** 45/20
**8,688 bushels [1]** 46/1
**8,688.58 [2]** 45/23 58/2
**8,896 [1]** 4/16
**838 [1]** 49/3
**838 acres [1]** 50/18
**842.96 acres [1]** 66/19
**89-7-51 [1]** 87/7

**9**

**901 [1]** 1/22

**A**

**a.m [1]** 106/14
**able [17]** 9/5 9/7 9/14
10/13 10/17 11/3 11/5
28/21 43/1 67/20 86/2
86/5 88/19 90/16 90/17
92/15 99/21
**about [55]** 12/19 13/22
14/10 24/15 26/4 26/13
27/20 29/12 29/22
31/15 34/14 37/15
37/15 45/14 46/9 46/16
47/20 50/4 51/11 55/8
57/12 58/12 59/13
59/16 60/4 61/7 62/9
63/22 65/6 69/4 70/10
70/16 70/17 72/13
72/15 73/21 74/13
76/19 76/20 76/23
77/17 77/23 91/6 93/13
93/16 98/11 98/13
98/14 103/8 103/11
103/13 103/18 105/14
105/15 106/1
**above [2]** 1/9 107/6
**above-captioned [2]**
1/9 107/6
**absolutely [2]** 43/5
55/20
**absorb [1]** 84/15
**abstract [1]** 75/8
**AC4AM2T [2]** 35/21
37/10
**AC60ZET [1]** 37/5
**AC6QGAB [1]** 37/8
**accept [1]** 36/20
**accepted [12]** 30/24
31/10 31/12 31/13
32/24 33/2 33/15 33/20
33/23 33/24 36/23
69/11
**accomplish [1]** 100/22
**accordance [2]** 75/16
87/9
**account [6]** 25/11
25/14 26/19 29/9 54/18
57/20
**accumulated [1]** 70/1
**accurate [1]** 7/10
**accurately [1]** 38/21
**acknowledge [1]** 36/10
**Acknowledgment [1]**
52/2

**acre [13]** 46/3 46/10
47/4 47/13 47/16 47/20
55/1 55/9 55/12 55/15
55/17 57/15 66/18
**acreage [1]** 48/10
**acres [21]** 46/7 46/12
46/15 46/16 47/17
47/18 48/9 48/23 49/1
49/3 49/5 49/12 49/15
50/18 54/24 55/2 55/16
55/18 57/16 64/22
66/19
**acres left [1]** 49/5
**across [3]** 8/6 61/21
76/14
**acting [2]** 24/21 25/21
**action [5]** 7/6 8/4 45/7
107/11 107/11
**actionable [1]** 9/10
44/15
**actions [2]** 86/9 93/11
**actual [2]** 17/17 74/21
**actually [16]** 7/23
21/19 22/12 23/14
43/17 45/17 45/18 46/2
46/12 48/24 51/22
74/17 75/17 87/18
101/13 102/11
**add [3]** 8/5 10/3 66/23
**added [1]** 12/24
**addendum [1]** 53/13
**adding [1]** 98/3
**additional [1]** 38/23
**address [1]** 58/15
**addressed [1]** 39/17
**adds [1]** 53/15
**adjourned [1]** 106/12
**Administration [4]**
39/17 70/18 70/21 81/5
**admit [1]** 78/10
**admitted [6]** 18/1
37/23 38/14 40/10
78/20 79/2
**advancing [1]** 84/11
**advise [3]** 30/7 69/7
100/1
**advised [1]** 27/9
**advocacy [1]** 12/11
**affects [1]** 14/16
**affidavit [1]** 36/12
36/15 49/16
**affirmative [2]** 93/10
93/11
**afford [2]** 9/3 88/2
**afield [1]** 74/5
**African [2]** 13/9 42/12
**African-Americans [1]**
13/9
**after [7]** 24/2 24/4 25/9
27/3 50/7 73/23 100/4
**afternoon [4]** 4/6 4/8
6/6 6/8
**AG [9]** 1/5 4/14 4/17
6/12 24/13 24/15 24/24
25/3 39/23
**again [9]** 19/8 26/5

**A**

**again... [7]** 26/18 27/15 43/14 54/2 61/20 97/2 103/2

**against [5]** 51/3 59/14 72/9 77/20 84/8

**Agency [1]** 13/6

**ago [4]** 62/4 62/4 62/8 78/10

**agreed [6]** 7/21 9/13 10/9 11/12 26/15 64/18

**agreed-upon [4]** 7/21 9/13 10/9 11/12

**agreement [8]** 5/14 17/15 17/17 26/17 29/2 30/3 30/5 30/9

**agreements [3]** 81/1 81/1 81/7

**agrees [2]** 64/10 64/14

**agricultural [6]** 13/5 42/17 52/3 75/18 81/11 87/13

**Agriculturalists [1]** 12/10

**agriculture [5]** 16/19 76/11 83/13 83/21 83/24

**ahead [3]** 31/18 58/6 100/24

**all [89]** 4/1 6/3 8/9 10/3 11/18 15/4 15/12 15/18 16/8 18/23 21/1 22/18 22/21 23/2 23/9 25/22 28/6 28/8 28/12 28/16 30/20 31/19 31/21 35/19 35/24 36/13 36/21 37/3 37/11 37/18 48/16 50/8 51/3 51/7 51/20 53/8 53/20 56/8 57/24 58/18 59/1 59/3 59/5 60/13 61/15 63/6 64/23 65/5 68/4 68/20 68/23 69/1 69/22 70/5 71/2 71/4 71/7 74/3 74/23 79/17 79/20 79/23 80/10 80/18 85/22 85/23 87/8 89/19 90/2 90/4 90/6 96/7 99/10 100/6 101/2 102/14 102/18 103/18 103/20 103/23 104/1 104/10 105/16 106/2 106/7

**alleges [1]** 89/1

**allow [4]** 13/3 84/22 84/23 85/17

**allowed [1]** 107/14

**allowing [1]** 105/13

**almost [1]** 30/18

**alone [1]** 8/23

**along [4]** 34/7 34/15 34/16 45/20

**Alpha [2]** 33/22 33/22

**already [8]** 32/10 46/15 46/19 46/20 62/14

62/16 63/13 72/20 85/18

**appreciate [1]** 77/6

**Approximately [1]** 49/6

**are [67]** 4/1 4/4 4/20 5/3 5/6 5/8 6/23 8/5 8/15 8/18 9/8 10/21 10/24 11/1 11/2 12/6 12/13 13/9 14/13 16/18 20/6 20/14 23/12 23/14 27/22 30/23 32/23 35/16 36/6 36/11 36/14 36/15 36/22 42/1 42/18 44/17 46/8 46/9 47/23 48/6 48/11 49/1 49/12 49/20 50/4 53/23 57/7 60/3 61/10 61/12 64/4 64/24 67/19 68/2 77/16 77/22 79/17 80/12 80/14 80/17 81/14 85/22 92/10 92/15 95/23 97/5 97/19

**area [2]** 28/1 28/3

**argue [2]** 71/9 76/23

**argues [1]** 9/12

**arguing [1]** 8/17

**argument [6]** 7/15 7/19 8/24 68/6 79/16 86/6

**arguments [6]** 6/22 7/24 8/23 71/14 80/11 89/7

**arises [1]** 4/9

**arm [1]** 13/6

**around [2]** 9/22 47/16

**arrangements [1]** 24/18

**Article [3]** 75/15 87/10 100/1

**as [80]** 5/2 5/11 5/21 8/11 8/20 9/2 10/1 11/2 11/24 12/12 12/22 13/24 14/6 15/7 16/11 17/21 18/1 18/5 21/14 21/18 21/20 22/12 23/3 24/21 25/21 27/13 27/13 29/7 34/4 36/12 36/20 37/11 37/23 38/10 38/14 38/24 39/18 40/6 40/10 41/10 41/17 41/17 42/12 44/5 44/7 45/23 48/4 48/4 48/10 51/7 53/19 58/7 60/15 60/15 68/8 69/9 69/18 72/9 74/9 74/9 74/14 74/19 76/9 76/9 77/20 78/11 80/14 81/14 81/23 82/11 83/2 85/22 88/1 90/8 91/4 91/6 92/4 97/13 99/11 99/14

**aside [1]** 10/22

**ask [18]** 11/16 14/13 17/6 22/2 24/3 30/12 33/13 38/3 39/13 44/5 47/3 53/18 56/21 76/12 85/15 89/22 99/8 99/20

**asked [5]** 34/12 69/4

69/10 69/16 93/7

**asking [11]** 4/20 5/18 22/22 47/8 61/10 84/21 86/12 94/6 97/15 97/16 97/19

**asks [1]** 88/5

**aspect [1]** 74/6

**assert [1]** 7/16

**asserted [1]** 45/3

**assigned [1]** 25/11

**assigning [1]** 25/11

**Assistant [1]** 76/10

**association [3]** 12/10 12/11 12/13

**assurances [1]** 10/12

**attached [1]** 36/12

**attachments [1]** 81/14

**attainable [1]** 55/5

**attained [1]** 42/9

**attempting [1]** 33/10

**attorney [5]** 2/5 8/2 76/10 107/9 107/10

**attorney's [1]** 78/2

**audible [1]** 18/20

**August [4]** 25/7 27/15 28/6 94/20

**authentic [1]** 107/13

**authority [2]** 7/24 8/24

**authorship [1]** 78/15

**automatic [1]** 24/1

**automatically [1]** 68/2

**available [2]** 13/7 88/12

**Avenue [1]** 2/12

**avenues [1]** 67/19

**average [2]** 47/4 47/6

**averaged [1]** 54/24

**averaging [1]** 55/8

**avoid [2]** 86/8 95/11

**award [1]** 17/12

**aware [5]** 74/15 85/22 93/8 102/8 102/15

**away [1]** 98/18

**B**

**back [13]** 33/7 33/8 33/9 41/18 41/22 47/24 56/21 59/9 63/23 64/1 68/21 94/12 104/1

**back at [1]** 63/23

**background [1]** 28/17

**BAILIFF [1]** 15/24

**balance [3]** 5/24 92/10 92/24

**balancing [4]** 14/23 82/17 85/4 90/24

**ball [2]** 27/1 96/5

**bankruptcy [2]** 89/6 100/9

**bar [2]** 74/24 93/14

**based [3]** 8/14 8/23 42/9 43/12 46/5 46/5 50/3 50/22 55/2 55/14 57/22 61/14 84/21

**bases [1]** 7/14

**basically [1]** 54/17

82/21 83/5 99/23 102/2

**basis [1]** 31/17

**be [99]** 1/8 1/9 8/4 8/16 8/18 9/7 9/14 10/2 10/10 10/13 10/17 11/3 11/5 11/17 15/9 17/3 17/17 18/1 20/8 22/23 28/17 30/15 30/17 30/18 31/9 34/7 37/7 37/23 38/14 38/24 39/23 40/10 42/3 42/8 42/9 43/7 43/19 47/6 49/19 50/2 50/13 50/16 56/8 59/11 60/17 60/20 61/10 61/13 62/1 65/13 65/23 66/1 67/20 71/10 72/10 73/16 77/21 78/7 79/12 82/1 82/13 84/17 84/18 85/19 86/2 87/7 88/19 90/16 90/17 91/5 91/7 91/16 91/24 92/3 92/4 92/11 92/12 94/1 94/5 94/21 95/9 95/10 95/18 96/9 96/9 96/14 97/9 97/13 98/5 98/9 99/8 99/21 99/23 100/21 101/10 103/6 105/13 107/12 107/14

**beans [30]** 19/5 26/8 26/12 26/22 28/7 39/6 46/12 49/2 49/11 49/12 49/20 50/7 50/14 50/16 51/12 52/4 55/24 56/2 56/3 56/7 56/10 56/13 56/13 57/10 57/11 60/2 61/14 65/3 65/6 88/11

**beans picked [1]** 56/13

**bear [1]** 107/13

**because [31]** 7/1 7/4 7/19 8/5 8/9 8/21 10/19 14/11 14/19 26/6 27/12 28/10 28/21 41/20 43/5 44/4 50/15 50/15 68/15 69/18 76/6 76/7 85/2 87/21 87/24 89/8 95/22 96/20 97/13 98/8 99/22

**becomes [1]** 75/14

**been [28]** 6/19 9/5 11/23 16/10 23/21 27/2 27/15 33/20 33/23 33/24 39/19 44/6 50/11 50/12 59/14 61/8 61/15 61/21 62/23 63/16 64/5 73/1 82/4 86/5 86/21 90/13 91/23 94/14

**before [16]** 1/11 6/20 7/13 28/19 43/23 63/8 65/24 75/24 79/11 85/13 89/11 89/12 93/18 97/22 100/8 104/22

**begin [1]** 70/1

**beginning [2]** 40/24 41/6

**behalf [3]** 2/4 2/10 45/4

**being [13]** 8/15 11/8

**B**

being... **[11]** 37/22
38/13 55/4 83/3 83/5
85/6 85/9 90/15 91/7
96/1 105/6
believe **[13]** 4/23 7/2
34/23 38/5 38/6 42/5
45/20 67/16 68/15
76/11 80/16 85/5 94/17
bell **[1]** 52/8
benefits **[1]** 13/4
beside **[1]** 103/19
best **[5]** 11/9 27/10
29/24 48/21 89/15
better **[2]** 62/6 62/10
between **[8]** 4/10 24/18
25/23 36/16 46/17 81/2
93/9 99/15
bid **[11]** 17/12 17/13
27/4 30/8 30/8 41/12
41/14 41/23 42/3 43/10
82/8
bids **[2]** 33/15 33/15
big **[3]** 50/11 50/12
50/13
bit **[3]** 35/9 45/14
100/23
Black **[2]** 12/9 12/12
Blair **[9]** 54/12 57/20
58/19 58/20 69/5 69/7
69/10 70/23 78/23
blank **[1]** 76/6
blown **[1]** 103/18
bond **[7]** 92/6 92/8
92/15 98/14 98/15
98/23 99/1
both **[13]** 5/12 20/6
20/8 23/7 33/8 40/19
66/7 72/10 77/21 81/8
81/13 81/21 85/11
bottom **[6]** 32/11 32/13
32/18 35/17 40/23 63/7
bought **[2]** 26/9 52/4
breach **[2]** 102/8 102/9
break **[1]** 79/21
breakdown **[1]** 46/4
brief **[9]** 6/23 44/2
95/21 96/8 96/11 96/14
96/20 97/17 106/4
briefed **[1]** 6/19
bring **[1]** 104/14
broker **[3]** 24/17 24/21
25/16
burden **[9]** 8/12 8/13
11/14 71/10 71/13
74/13 75/20 77/12
85/24
BURRELL **[83]** 1/3 3/3
3/5 4/11 4/16 7/2 8/22
9/9 9/21 10/16 10/20
11/4 11/21 11/22 12/3
12/5 13/12 13/14 13/21
14/4 14/7 15/6 15/10
15/23 16/7 16/9 16/14
16/16 16/18 17/8 18/6
19/2 20/4 20/20 23/11

32/14 33/12 34/11
34/19 36/7 36/16 36/21
38/2 38/17 39/12 40/14
45/3 48/23 51/24 52/18
52/21 53/15 53/16 54/7
54/20 57/2 58/16 59/13
64/7 69/4 71/24 73/22
78/22 81/2 81/24 82/9
82/14 83/3 83/5 83/8
83/17 84/5 84/14 84/23
85/6 85/9 85/17 87/4
87/18 88/6 88/18 89/12
93/2
Burrell's **[3]** 11/9 30/19
38/20
Burrells **[1]** 77/7
bushel **[2]** 31/21 47/4
bushels **[21]** 4/16 32/1
32/2 45/17 46/1 46/3
46/5 46/9 46/23 47/15
47/16 47/20 55/1 55/3
55/9 55/11 55/15 55/17
57/14 82/2 87/18
business **[17]** 12/6
16/17 16/17 29/2 39/8
41/3 42/16 43/18 83/4
83/5 83/16 83/20 84/3
84/5 84/8 85/7 85/9
Butler **[2]** 2/11
buyer **[12]** 24/21 26/9
26/23 27/7 30/24 31/3
31/9 31/18 32/24 56/3
56/7 56/17
buyers **[5]** 24/18 26/22
31/2 31/7 36/24
buying **[1]** 27/13

**C**

calculator **[1]** 67/2
call **[12]** 11/18 11/20
15/21 15/22 16/7 28/22
29/13 30/7 53/24 54/16
71/16 76/9
called **[3]** 24/12 26/20
50/23
Calls **[1]** 67/13
Cam **[1]** 6/12
came **[4]** 1/9 26/19
58/3 70/13
CAMERON **[17]** 1/3 3/5
4/10 13/12 13/14 14/7
15/9 15/23 16/7 16/9
16/16 52/17 52/20
52/23 53/15 53/16
83/17
CAMPBELL **[1]** 2/10
can **[35]** 7/2 9/1 15/18
17/7 17/7 18/17 28/23
34/6 34/15 34/16 34/21
35/13 36/10 38/3 39/13
46/24 48/14 54/20 57/2
57/14 61/23 62/8 74/7
74/10 76/12 79/18
83/15 89/12 92/6 96/2
97/12 98/15 100/5
104/8 104/19

can't **[13]** 8/7 8/22 9/9
36/9 60/1 77/9 77/12
87/20 87/21 88/8 89/7
100/1 102/18
cancellation **[15]** 5/4
7/21 9/13 10/9 11/13
38/8 38/23 84/9 86/8
91/7 91/10 91/21 92/2
93/14 99/1
cannot **[4]** 7/20 8/15
89/21 105/22
captioned **[2]** 1/9
93/2
care **[11]** 26/11 26/14
28/1 28/3 29/14 34/16
36/8 59/3 59/3 60/7
69/20
carrier **[1]** 57/24
case **[12]** 4/9 7/3 54/13
54/13 57/20 78/13 80/2
90/20 91/17 99/7
101/13 106/12
cases **[1]** 96/1
categorical **[1]** 27/23
categorize **[1]** 53/22
cause **[1]** 1/9 8/19 9/14
82/20
cents **[1]** 50/6
certainly **[1]** 11/8
certify **[4]** 107/6 107/7
107/9 107/12
cgt **[2]** 57/6 58/14
cgtfmllc **[2]** 35/10
54/10
CH **[1]** 1/4
CH-19-1677 **[1]** 1/4
chambers **[1]** 90/3
chance **[2]** 68/9 90/10
Chancellor **[1]** 1/12
CHANCERY **[4]** 1/1
1/10 92/3 102/20
Charlie **[1]** 33/22
check **[7]** 28/17 86/8
88/5 88/23 89/8 100/2
100/4
chemical **[1]** 60/4
chose **[1]** 101/11
circumstances **[2]** 9/8
77/8
cited **[1]** 8/24
cites **[2]** 75/12 96/3
claim **[1]** 81/24
claiming **[2]** 10/23 11/1
claims **[1]** 87/8
clarification **[4]** 20/7
21/17 22/13 23/6
clarify **[2]** 22/2 22/6
clarifying **[1]** 37/21
classic **[1]** 81/22
clean **[1]** 98/1
clear **[3]** 11/10 71/20
97/8
clearly **[5]** 18/17 82/15
85/8 98/7 101/16
clerk **[1]** 100/11
client **[10]** 43/23 44/4

72/9 72/10 77/20 77/21
92/20 100/1 100/6
100/13
clients **[1]** 98/13
close **[1]** 41/3
closing **[4]** 71/14 79/8
79/11 79/17
code **[6]** 12/13 15/6
52/2 87/6 87/10 87/11
come **[9]** 47/24 56/6
58/3 62/13 75/24 90/3
100/4 102/14 104/1
comes **[3]** 5/24 35/4
49/2
comment **[1]** 95/15
Commercial **[2]** 52/1
87/10
commit **[1]** 64/11
community **[1]** 13/9
company **[9]** 24/12
27/23 50/22 52/7 53/4
54/3 59/16 60/4 65/3
compensated **[1]** 96/2
Complaint **[7]** 101/10
101/12 102/10 102/23
103/2 105/18 106/3
complete **[3]** 9/4 11/10
88/2
completed **[1]** 26/24
complex **[1]** 28/18
complicate **[1]** 48/17
concludes **[1]** 71/6
conclusion **[2]** 92/13
94/18
condition **[3]** 13/23
64/8 64/14
condoned **[1]** 107/14
conduct **[1]** 9/10
confer **[1]** 43/23
conferring **[1]** 44/4
confirm **[1]** 82/10
confirmation **[1]** 9/19
confusion **[2]** 8/10
11/16
congratulations **[1]**
33/19
Congress **[1]** 12/22
connected **[1]** 107/11
connecting **[1]** 74/12
consider **[2]** 42/22
96/19
considered **[1]** 90/6
considering **[1]** 80/13
consistency **[1]** 50/15
constitute **[1]** 90/23
consult **[2]** 57/10 92/19
consultant **[5]** 25/21
27/3 27/8 29/13 57/8
consume **[1]** 84/23
consuming **[2]** 84/12
85/17
contact **[4]** 24/3 27/14
29/5 54/17
contacted **[2]** 26/3
70/7
contacting **[1]** 57/23

contain **[1]** 107/7
contained **[1]** 45/23
contend **[1]** 103/20
continue **[2]** 24/4
66/14
continuity **[1]** 75/19
contract **[21]** 4/10 4/15
17/11 18/8 19/12 19/13
21/6 21/7 21/9 31/17
40/3 41/21 56/5 57/6
63/14 66/3 66/13 68/3
68/16 102/8 102/10
contracted **[4]** 41/10
57/24 65/2 66/16
contracting **[1]** 65/2
contractors **[1]** 26/14
contracts **[7]** 19/4
40/19 41/24 59/1 66/4
66/7 69/24
contractual **[3]** 5/15
30/9 75/1
contributed **[1]** 86/10
conversation **[4]** 27/6
28/9 69/5 70/5
conversations **[1]** 70/8
conversed **[1]** 70/16
convert **[1]** 4/21
coordinator **[1]** 54/13
copy **[2]** 33/5 35/22
corner **[1]** 31/5
corporation **[1]** 81/17
correct **[12]** 20/19 42/2
45/4 47/14 53/16 54/14
55/5 55/20 56/17 64/20
66/12 107/8
Corrections **[2]** 17/5
69/15
correlation **[1]** 32/8
correspond **[1]** 31/21
correspondence **[4]**
72/20 73/2 73/4 74/16
costs **[5]** 7/21 10/9
38/22 38/24 39/7
could **[15]** 26/21 28/10
32/9 36/5 43/7 49/22
62/10 67/19 92/18
92/19 94/14 94/14 98/5
99/6 105/7
couldn't **[1]** 62/11
counsel **[20]** 7/8 22/2
36/5 38/6 48/12 69/4
72/6 73/3 77/17 78/1
78/17 89/18 89/18
100/21 103/8 103/12
103/23 105/10 107/9
107/11
country **[1]** 61/21
COUNTY **[3]** 1/1 59/15
107/4
couple **[1]** 93/5
course **[1]** 61/4
court **[53]** 1/1 1/11
4/18 4/21 4/24 5/8 6/12
6/20 7/13 8/22 9/1 12/4
12/17 16/6 16/15 25/2
32/15 32/17 41/1 44/5

**C**

**court... [33]** 44/21
48/19 74/10 75/21
78/10 78/12 82/24
84/21 85/16 85/22
86/12 89/23 90/4 90/7
90/20 91/16 91/18
91/19 92/1 92/3 92/5
92/8 93/16 93/19 94/6
95/23 97/22 101/15
102/20 103/5 103/13
105/5 105/12
**court's [5]** 74/14 93/8
99/8 99/16 99/17
**cover [3]** 10/10 10/13
26/10
**covers [1]** 29/15
**create [1]** 91/3
**created [1]** 12/22
**creation [1]** 85/11
**credit [6]** 13/4 51/1
51/2 51/13 51/14 60/21
**creditor [3]** 60/21
85/14 87/4
**creditors [6]** 10/20
11/1 60/9 60/14 60/17
75/24
**crop [7]** 45/11 45/15
53/10 61/4 63/9 63/11
83/22
**crops [5]** 7/16 10/24
43/10 43/13 64/15
**cross [6]** 3/6 28/4
44/18 44/20 44/23 45/1
**cross-examine [2]**
44/18 44/23
**cross-examining [1]**
44/20
**cultivate [1]** 64/10
**cultivating [2]** 65/11
65/13
**current [2]** 42/10 86/10
**currently [5]** 7/5 16/19
16/21 43/7 50/3
**custom [1]** 56/23
**cut [18]** 24/20 46/6
46/13 46/15 46/20
46/20 46/23 47/18 48/9
48/24 49/1 49/23 50/10
50/14 54/23 62/22
62/24 88/5

**D**

**dad [1]** 60/11
**damage [3]** 42/12
42/16 43/6
**damages [2]** 96/2
105/23
**damaging [1]** 43/19
**date [6]** 41/11 66/3
104/7 104/16 104/19
104/21
**dated [3]** 35/1 35/12
59/6
**dates [1]** 59/9
**Day [1]** 1/10

**days [2]** 24/19 27/2
**deadline [2]** 81/6 82/5
**deal [2]** 28/20 69/22
**dealing [2]** 63/7 105/5
**dealt [2]** 28/19 61/1
**debt [6]** 82/22 83/2
84/16 84/24 89/6 91/8
**debtor's [1]** 52/17
**December [4]** 4/19 7/9
35/1 39/19
**December 11th [1]**
39/19
**December 12th [2]**
4/19 35/1
**decides [1]** 90/4
**deduct [3]** 5/6 7/21
38/20
**deducting [1]** 9/12
**deductions [3]** 11/13
38/24 86/8
**deed [1]** 75/11
**deemed [1]** 107/14
**default [1]** 63/22
**defaulted [2]** 63/13
63/24
**defendant [4]** 1/6 2/10
91/2 91/20
**delay [1]** 91/1
**deliver [4]** 31/23 31/24
45/18 56/7
**delivered [8]** 4/16 7/23
46/2 56/3 56/11 56/17
81/20 87/19
**delivery [2]** 4/15 59/7
**Delivery-LDC [1]** 59/7
**demanding [1]** 83/20
**demands [1]** 87/9
**denied [1]** 11/17
**deny [2]** 78/15 89/23
**denying [1]** 80/6
**department [12]** 9/20
13/5 17/4 39/16 68/17
69/14 70/18 70/20
76/11 81/5 83/12 83/24
**describe [4]** 12/17 21/3
25/2 32/14
**described [1]** 53/5
**despite [1]** 86/22
**determine [1]** 61/13
**devastating [1]** 61/21
**development [1]** 91/14
**did [41]** 4/19 6/21
26/16 27/14 29/2 30/3
31/3 34/10 34/18 45/17
45/18 46/3 46/12 46/20
48/9 48/23 50/21 50/24
55/8 55/10 55/21 55/24
56/18 57/4 57/6 57/9
57/16 57/19 58/3 59/20
60/5 61/3 61/23 69/7
78/10 78/12 78/14
78/17 94/3 95/6 99/12
**didn't [9]** 57/5 68/13
70/14 71/18 78/15
78/16 96/8 96/8 105/17
**died [1]** 28/21

**difference [2]** 10/13
93/8
**different [6]** 7/12 35/18
94/10 95/24 96/5 99/4
**difficulties [1]** 39/22
**Direct [4]** 3/4 3/6 12/1
16/12
**directed [1]** 70/2
**direction [1]** 34/7
**directly [2]** 14/21 86/10
**disadvantage [1]** 89/5
**disadvantaged [11]**
5/22 12/15 12/18 12/23
13/15 14/1 15/8 42/19
83/14 84/11 91/5
**disappearing [1]** 78/19
**discovery [4]** 102/13
102/23 105/21 105/23
**discrepancy [1]** 99/15
**discussion [4]** 29/20
76/4 98/9 98/11
**discussions [1]** 74/17
**dismiss [1]** 6/17
**dismissing [1]** 80/2
**disregard [1]** 78/1
**division [7]** 25/5 25/8
25/10 27/17 27/19 28/5
29/8
**do [74]** 9/1 9/7 10/15
13/23 14/10 15/16
16/20 16/24 18/21
19/17 19/23 20/1 20/11
24/15 26/17 27/17
27/22 28/6 28/10 28/13
28/21 29/16 31/15 36/3
36/22 37/14 37/18 42/5
42/16 42/18 42/22 46/4
49/22 55/4 55/24 56/10
59/17 60/13 60/22 63/9
64/2 64/11 67/6 67/7
67/10 67/16 67/16
71/21 72/21 73/18
76/15 76/15 76/23
77/13 78/14 79/3 79/7
79/7 79/9 79/12 80/13
80/14 92/14 92/21
96/12 98/12 98/19
99/21 100/16 102/18
102/22 102/23 104/5
107/5
**document [30]** 17/6
17/10 19/1 19/3 19/7
21/3 21/5 21/18 22/1
22/7 22/22 30/11 30/12
30/22 32/13 32/22
33/13 34/5 34/13 34/13
34/14 35/1 38/2 39/13
51/19 54/8 68/14 86/24
107/12 107/14
**documents [7]** 31/14
32/7 33/8 33/10 36/22
51/21 68/21
**does [9]** 9/21 14/9 22/7
46/7 52/7 57/7 71/19
77/24 89/20
**doesn't [5]** 7/23 84/15

86/15 88/6 89/3
**doing [2]** 39/8 97/14
**dollars [3]** 50/6 55/19
55/22
**don't [36]** 7/1 9/6 13/23
15/14 15/17 21/19
26/12 28/4 32/7 32/8
33/5 34/8 44/8 45/16
48/17 50/14 60/23
65/16 73/14 77/1 77/4
78/19 79/15 80/1 80/9
82/7 82/13 98/3 98/10
99/23 101/1 101/13
102/13 104/15 104/17
105/24
**done [9]** 30/15 30/17
30/18 79/17 85/4 97/9
97/24 101/17 102/24
**down [16]** 5/24 7/18
15/19 16/21 16/24
18/13 18/16 18/18
26/13 31/5 35/8 40/21
52/6 63/18 71/5 94/1
**downtown [1]** 25/6
**driver [1]** 48/1
**due [7]** 9/17 10/2 62/16
66/9 66/23 105/17
106/2
**duly [5]** 11/23 16/10
74/23 75/15 77/10

**E**

**e-mail [9]** 35/9 35/11
54/9 54/10 55/14 56/22
58/14 58/14 89/17
**e-mails [4]** 35/16 59/9
74/15 86/21
**each [2]** 31/21 35/18
**earlier [3]** 22/8 55/7
75/3
**early [2]** 25/7 59/7 69/9
**easier [1]** 100/13
**economic [1]** 14/7
**economically [1]** 83/20
**efficiency [2]** 44/21
71/12
**eight [5]** 23/24 42/11
43/14 82/11 86/15
**element [6]** 77/3 77/9
82/3 82/16 82/17 83/11
**elements [7]** 14/12
14/12 14/20 14/22
80/12 94/10 95/23
**elevator [5]** 28/7 28/8
47/22 47/22 49/23
**eligible [1]** 66/1
**else [4]** 41/22 42/3
79/3 96/12
**elucidate [1]** 100/19
**embossed [1]** 107/13
**employee [2]** 107/10
107/10
**end [1]** 56/18
**enforce [1]** 8/22
**enforcing [1]** 89/16
**English [1]** 48/20

**enjoin [2]** 11/12 85/16
**enjoining [3]** 84/12
86/7 102/1
**enough [1]** 89/14
**enter [5]** 17/21 21/14
26/16 29/2 40/6
**entered [4]** 7/11 21/19
36/7 36/16
**entire [7]** 7/14 48/10
92/9 98/9 99/2 99/7
100/10
**entirely [1]** 7/12
**entitled [1]** 8/13
**entity [1]** 8/6
**equipment [3]** 50/12
59/17 60/2
**equitable [3]** 86/6
91/17 91/19
**equities [2]** 5/23 91/1
**especially [2]** 82/4
87/22
**essence [1]** 86/17
**essential [3]** 9/3 88/2
89/24
**Essentially [3]** 8/7 80/4
86/12
**establish [4]** 86/3
87/17 89/20 101/16
**established [4]** 73/1
73/8 82/4 83/13
**estimate [1]** 50/2
**estimated [3]** 54/23
91/21 92/2
**et [1]** 75/16
**even [11]** 10/8 28/10
56/23 62/6 62/10 77/4
83/18 86/1 89/8 89/9
101/13
**event [3]** 10/6 26/8
89/13
**ever [1]** 96/2
**every [3]** 51/15 63/6
81/9
**Everyone [1]** 105/23
**everything [5]** 18/13
18/16 63/3 69/19 77/7
**evidence [10]** 53/19
72/3 73/9 73/10 76/17
86/19 87/14 88/10
88/17 89/19
**evidenced [1]** 82/5
**evidencing [1]** 73/5
**exact [1]** 76/12
**exactly [4]** 23/1 71/20
74/18 80/1
**Examination [8]** 3/4
3/6 3/6 3/7 12/1 16/12
45/1 69/2
**examine [2]** 44/18
44/23
**examined [2]** 11/23
16/10
**examining [1]** 44/20
**except [1]** 21/17
**exchange [6]** 24/22
25/24 26/10 26/22 30/2

## E

**exchange... [1]** 31/4
**excuse [2]** 39/22 46/17
**exhibit [61]** 3/9 3/10
3/10 3/11 3/11 3/12
3/12 3/13 17/21 18/1
18/2 19/23 19/24 20/1
20/3 20/3 21/14 21/18
21/20 21/21 21/22 22/8
22/23 23/3 23/4 23/8
32/10 32/19 32/20 33/6
36/12 36/14 36/20
37/12 37/13 37/23
38/10 38/14 38/15
38/18 40/6 40/10 40/11
40/15 42/1 45/23 53/19
54/5 58/7 58/10 59/6
59/11 64/1 65/14 72/2
72/6 77/18 78/11
**exhibits [6]** 23/8 37/16
64/2 82/10 90/7 106/11
**existence [4]** 72/15
73/8 73/19 74/1
**exists [3]** 73/11 78/20
78/21
**experience [1]** 57/13
**expire [2]** 40/20 66/8
**expires [1]** 107/18
**explain [1]** 57/2
**explanation [1]** 88/21
**expressed [1]** 91/13
**extended [1]** 60/21
**extension [3]** 63/17
63/20 63/21
**extent [3]** 13/20 14/16
72/19
**extreme [1]** 96/1

## F

**facilitated [2]** 58/21
59/1
**fact [3]** 7/15 67/23
69/10
**factor [6]** 10/14 56/24
62/23 87/20 88/8 89/2
**factors [8]** 4/23 5/19
7/3 8/14 84/22 85/22
86/2 89/24
**failed [1]** 71/13
**failing [1]** 63/14
**failure [4]** 6/17 88/22
89/23 98/2
**Fair [1]** 53/3
**fairly [1]** 38/21
**familiar [2]** 12/13 42/18
**far [6]** 27/13 41/17 48/4
60/15 74/5 76/9
**farm [23]** 10/5 13/6
16/20 17/2 19/17 20/11
23/11 24/21 29/15
42/13 46/3 52/14 53/5
57/5 57/7 57/7 57/10
83/22 88/7 88/24 89/14
90/20 90/22
**farmed [1]** 23/17

**farmer [8]** 5/22 12/8
12/18 13/15 42/13
42/19 69/21 83/14
**farmer's [1]** 50/14
**farmers [18]** 12/9
12/12 12/15 12/24 13/1
13/8 15/8 17/13 24/18
41/10 42/14 42/15
83/15 84/2 84/5 84/7
84/11 91/15
**farming [7]** 16/19 42/6
42/17 57/4 59/17 60/15
67/24
**farmland [1]** 23/15
**fatal [1]** 77/1
**father [2]** 13/13 83/18
**favor [1]** 5/24
**feasible [1]** 8/4
**federal [2]** 12/14 91/12
**fee [8]** 5/4 9/13 84/9
91/7 91/10 91/21 92/2
99/1
**ferreted [1]** 104/2
**fertilizer [1]** 60/5
**field [12]** 26/7 26/12
28/7 49/13 51/4 56/6
57/23 61/17 61/18
62/20 65/7 88/11
**Fifteen [1]** 57/18
**fifty [1]** 49/7
**figures [1]** 10/3
**file [4]** 68/15 101/11
106/2 106/4
**filed [11]** 6/14 6/17
51/2 59/14 63/3 68/8
74/20 75/4 75/5 75/11
102/10
**filing [4]** 52/2 87/1
89/19 102/19
**filings [3]** 53/23 54/1
54/4
**Fill [1]** 76/6
**final [5]** 41/11 58/1
71/5 92/5 101/1
**Finance [5]** 9/20 39/16
70/18 70/20 81/5
**finances [1]** 77/9
**financial [1]** 13/22
**financially [2]** 42/16
107/11
**financing [1]** 53/13
**finds [1]** 90/8
**fine [1]** 74/9
**finish [1]** 71/11
**first [43]** 5/8 5/22 11/19
11/23 13/23 16/10 18/7
19/21 23/20 23/21
23/24 24/1 25/4 25/8
26/5 26/19 27/3 28/10
33/17 33/21 37/3 38/9
40/14 40/18 46/18
51/24 54/21 56/22 57/3
62/13 63/8 64/8 65/22
68/4 68/5 79/5 80/20
87/20 93/6 93/15 96/21
96/24 98/6

**five [4]** 4/13 6/5 24/1
79/21
**flip [1]** 64/7
**Flowers [1]** 23/2
**folks [2]** 63/18 82/12
**follow [2]** 34/7 34/15
**following [1]** 1/13
**follows [3]** 11/24 16/11
90/8
**foot [1]** 76/13
**foregoing [2]** 82/21
107/7
**forgery [1]** 107/14
**form [1]** 88/22
**forth [2]** 6/23 81/6
**forthcoming [1]** 39/1
**forthright [1]** 92/12
**forum [4]** 76/20 76/22
76/22 76/24
**forward [8]** 28/23
29/10 42/11 43/7 43/13
43/18 63/8 104/5
**four [5]** 5/18 7/3 7/12
8/14 14/20 14/22 77/5
80/12 84/22 85/21
85/23 86/2
**fourth [1]** 83/11
**fresh [2]** 101/4 105/2
**Friday [1]** 35/10
**front [2]** 19/13 75/24
**full [4]** 10/8 52/17
103/18 107/8
**full-blown [1]** 103/18
**fully [1]** 6/19
**funds [9]** 70/2 83/9
85/18 92/10 93/1 94/21
95/10 101/5 101/6
**funnel [2]** 70/1 70/12
**further [5]** 52/6 79/13
90/18 107/9 107/12

## G

**gamble [1]** 50/17
**game [2]** 27/13 96/5
**gave [2]** 6/15 23/8
**general [2]** 41/19 48/1
48/2 76/10 102/22
**General's [1]** 8/2
**generated [1]** 43/12
**gentleman [1]** 29/15
**genuine [1]** 107/13
**get [39]** 10/16 11/4
11/14 11/14 25/24
27/12 28/11 29/9 29/10
34/15 46/7 46/14 46/22
47/15 48/12 50/21
57/15 57/16 58/1 61/23
62/2 62/9 63/7 70/5
73/23 76/1 76/24 77/9
78/5 82/13 83/15 84/2
85/13 89/12 101/3
104/17 104/19 104/21
104/22
**gets [1]** 100/7
**getting [4]** 28/14 39/23
76/20 97/5

**give [5]** 32/17 49/24
60/1 78/6 96/2
**given [1]** 8/24
**gives [1]** 47/22
**giving [1]** 47/9
**glad [1]** 34/7
**gmail.com [1]** 1/23
**go [19]** 14/3 20/22
24/20 31/18 35/8 35/24
41/18 50/7 58/6 65/19
68/5 77/4 79/11 88/13
94/12 99/16 100/5
100/6 105/22
**goes [2]** 51/8 87/11
**going [40]** 5/3 13/24
14/5 14/13 27/10 29/8
29/23 30/8 30/14 31/22
39/5 39/12 41/17 42/10
43/7 43/13 43/18 44/17
48/6 50/13 53/3 63/19
66/19 71/16 71/20
73/22 74/6 75/2 76/4
76/13 78/4 78/6 78/7
82/8 84/1 100/20
100/24 102/22 103/1
104/5
**Good [5]** 4/6 4/8 6/6
6/8 6/13
**got [16]** 19/18 21/1
27/1 28/22 29/13 49/5
56/16 57/13 57/21 58/4
61/18 63/17 66/10 74/5
75/23 100/3
**government [1]** 91/13
**governs [1]** 75/17
**grain [4]** 24/19 27/11
27/21 31/21
**grand [1]** 39/6
**grant [1]** 91/19
**granted [3]** 63/16
63/19 97/13
**granting [2]** 91/16
97/19
**grew [1]** 64/19
**gross [1]** 61/14
**ground [1]** 43/11
**grounds [1]** 28/16
**grow [2]** 64/15 64/18
**grower [6]** 25/11 25/14
25/17 25/19 27/9 58/22
**growing [1]** 66/10
**guess [8]** 93/15 93/18
94/1 95/14 95/17 97/3
101/9 102/6

## H

**had [21]** 1/13 19/21
24/23 27/17 27/21
28/21 46/15 46/19
46/20 50/7 52/24 61/15
63/11 68/10 69/11
69/12 69/16 70/5 70/8
75/5 76/3
**hadn't [1]** 28/18
**half [2]** 84/15 84/16
**halted [2]** 63/3 63/6

**hand [9]** 4/17 5/6 31/15
32/14 32/19 37/4 41/2
51/19 107/15
**handcuff [1]** 86/13
**handed [4]** 21/18 22/23
32/7 34/6
**handle [1]** 74/6
**happened [2]** 31/9
49/7
**happening [1]** 105/20
**harm [13]** 5/20 8/19
14/24 15/2 67/22 82/3
82/15 82/19 83/1 85/8
90/19 90/23 91/3
**harmful [1]** 85/6
**harvest [5]** 50/7 62/10
63/15 64/15 64/19
**harvested [8]** 45/11
59/15 61/15 61/17
61/19 64/21 64/22 65/9
**harvester [1]** 56/24
**harvesting [2]** 19/5
62/8
**has [59]** 5/2 6/16 6/18
7/20 8/23 9/5 10/4
10/20 12/24 22/12
33/20 33/23 33/24
34/21 39/19 44/6 44/6
50/11 50/12 52/20 59/7
61/20 62/23 71/9 71/24
72/3 72/8 73/1 73/4
73/15 73/21 73/21
74/14 74/22 75/13
75/21 77/20 79/2 81/17
81/24 82/3 82/10 83/8
83/13 84/1 84/17 84/18
86/1 86/23 87/15 87/16
89/9 89/10 90/9 90/13
91/12 91/13 91/23
100/8
**hasn't [2]** 86/1 88/23
**hate [1]** 13/19
**haul [1]** 65/3
**have [129]**
**haven't [7]** 50/10 61/17
61/19 63/24 64/21 65/9
86/10
**having [4]** 11/23 16/10
39/23 101/1
**he [50]** 7/17 7/22 7/23
8/15 8/24 9/5 9/11 9/12
9/22 9/23 9/24 10/4
10/7 11/5 11/15 13/17
25/15 25/17 25/20
29/16 30/5 44/8 44/9
67/14 73/15 74/21 75/4
75/5 82/10 82/14 83/8
84/14 86/1 86/3 86/17
87/20 87/21 88/8 88/14
88/19 88/23 89/1 89/21
101/11 101/14 103/12
103/12 105/12 105/12
105/17
**he'll [3]** 9/7 9/15 10/13
**he's [23]** 8/13 8/16
8/20 10/12 13/20 13/24

## H

**he's...** [17] 14/2 32/8 36/11 44/14 71/13 73/8 74/13 83/23 83/23 83/23 86/5 86/12 88/21 97/11 97/24 98/1 98/17
**head** [3] 18/20 47/12 51/10
**healthy** [1] 43/17
**hear** [6] 18/18 78/15 79/16 79/16 80/10 104/22
**heard** [2] 1/9 24/12
**hearing** [3] 7/9 94/7 105/7
**hearings** [1] 86/22
**heavy** [2] 92/4 99/8
**held** [2] 92/4 99/8
**help** [10] 10/15 10/16 10/18 30/6 32/11 54/23 84/1 88/6 88/15 89/3
**helped** [1] 83/19
**Hence** [1] 63/20
**her** [4] 34/13 69/13 70/23 71/21
**here** [34] 6/12 8/11 9/4 10/15 11/11 13/22 17/18 18/11 18/14 20/22 25/6 31/1 31/5 31/20 32/6 35/8 35/24 50/22 61/1 61/22 65/19 66/5 66/6 68/9 68/11 71/16 71/20 75/5 80/13 85/11 89/16 94/19 101/17 104/20
**hereby** [2] 107/6 107/7
**hey** [1] 28/23
**high** [1] 91/13
**higher** [1] 29/24
**highly** [1] 74/17
**HILLYER** [4] 2/10 6/12 6/13 13/18
**him** [14] 7/22 8/19 9/14 11/14 11/14 13/24 22/2 33/8 33/8 36/19 44/18 44/20 44/23 83/19
**hinder** [1] 29/24
**hired** [1] 57/10
**his** [30] 7/14 7/19 8/15 9/14 10/10 13/13 13/21 13/21 13/22 29/17 34/14 44/6 58/17 71/10 71/13 72/10 73/23 74/21 75/5 77/21 81/24 83/18 85/13 86/9 86/10 86/13 88/14 93/12 96/20 98/2
**hold** [2] 98/21 105/1
**holding** [1] 64/5
**Hollandale** [4] 52/3 60/22 60/24 68/14
**honesty** [1] 102/18
**Honor** [108]
**Honor's** [2] 95/18 102/7
**Honorable** [1] 1/11

**hotmail.com** [1] 35/5
**hour** [1] 78/10
**how** [34] 10/19 13/20 14/18 19/17 20/11 23/17 23/22 27/10 34/10 34/18 45/17 46/2 46/6 46/11 46/12 46/15 46/22 47/1 48/8 48/23 50/5 51/9 51/12 57/14 59/24 61/6 61/12 86/6 86/9 87/12 93/18 94/24 100/7 100/9
**However** [1] 90/13
**huh** [7] 52/15 53/7 53/9 53/11 59/23 66/22 69/6 husbandlike [2] 64/10 65/12

## I

**I guess** [1] 95/14
**I'd** [8] 16/6 17/6 17/20 38/10 40/5 50/4 51/18 53/18
**I'll** [11] 23/7 34/7 44/19 45/22 48/14 51/10 54/23 67/2 80/11 90/3 106/7
**I'm** [42] 6/9 14/2 16/19 22/14 34/3 34/4 34/24 39/12 46/11 46/11 47/1 47/15 47/16 52/10 54/7 54/16 55/14 55/15 55/16 56/12 65/4 65/6 66/19 68/13 71/17 80/2 80/6 80/12 94/1 94/6 94/6 94/24 95/2 96/4 97/14 98/3 98/19 100/20 100/24 101/21 101/24 102/6
**I've** [5] 19/18 22/1 61/18 64/4 90/6
**ID** [2] 35/17 35/21
**idea** [1] 73/15
**identified** [1] 64/16
**identify** [10] 17/7 17/7 18/5 30/12 32/9 33/13 36/19 36/22 38/4 39/13
**III** [1] 1/11
**immediate** [1] 92/24
**immune** [1] 8/6
**immunity** [1] 9/3
**impact** [2] 42/5 43/4
**impacts** [1] 14/21
**importantly** [1] 88/16
**inasmuch** [1] 91/6
**INC** [1] 1/5
**incentivize** [1] 31/17
**inclined** [2] 91/18 91/20
**include** [1] 6/17
**included** [2] 6/23 13/10
**incomprehensible** [1] 73/17
**incredibly** [1] 9/9
**incurred** [1] 38/22

**incurring** [1] 67/21
**independent** [1] 26/14
**INDEX** [3] 3/1 3/9
**indicated** [4] 5/3 5/5 7/8 83/8
**INDIGO** [91] 1/5 4/14 4/17 5/2 5/7 6/12 6/16 7/20 9/10 9/13 10/8 10/18 11/12 19/4 24/12 24/15 24/16 24/16 24/24 25/3 26/3 26/17 27/14 29/6 29/7 29/13 31/1 31/2 33/16 35/9 36/7 36/17 38/20 38/22 39/23 45/18 48/2 49/6 54/12 54/17 56/1 56/1 56/2 56/6 56/20 57/21 57/23 58/1 58/3 63/7 69/20 70/22 70/24 71/1 71/11 72/2 72/12 73/1 73/20 74/24 77/18 78/3 81/16 82/21 83/1 83/9 84/12 84/15 84/22 85/6 85/16 85/19 86/7 86/14 86/15 88/5 88/19 88/23 89/5 89/7 89/10 91/3 92/2 92/9 92/11 93/13 93/16 96/10 101/6 105/17 105/22
**Indigo's** [7] 26/23 31/4 33/1 38/6 65/1 78/17 83/7
**indirectly** [1] 8/19
**indispensable** [3] 6/18 72/19 73/13
**individuals** [1] 13/3
**indulge** [1] 76/8
**informed** [2] 72/7 77/19
**initial** [1] 27/6 48/7 48/8
**initially** [3] 26/3 26/18 27/14
**injunction** [24] 4/20 4/21 4/22 5/1 5/2 6/1 7/4 7/9 10/15 80/15 82/20 89/3 93/7 93/9 94/6 94/7 95/20 95/21 96/15 97/4 97/6 101/22 102/4 103/7
**injunction's** [1] 101/19
**injunctions** [1] 95/24
**injunctive** [11] 8/14 9/11 11/11 11/17 86/3 88/4 90/1 101/11 101/12 102/9 105/19
**injurious** [1] 85/5
**injury** [5] 9/6 82/18 86/9 88/9 89/1
**instance** [2] 90/23 91/8
**insurance** [2] 63/9 63/11
**intent** [1] 73/5
**interaction** [1] 24/23
**interest** [18] 5/21 5/23 11/7 14/16 14/23 44/20

**71/12 75/18 82/11 83/12 84/7 84/10 85/2 87/2 89/15 91/11 91/13 91/15**
**interested** [2] 100/24 107/11
**interject** [1] 32/6
**interpretation** [1] 39/3
**interpreting** [1] 94/24
**introduce** [2] 33/10 58/7
**introduced** [2] 74/20 86/22
**investment** [5] 42/8 43/16 43/18 59/21 59/22
**investor** [2] 60/7 60/11
**investors** [7] 60/3 60/8 61/3 67/10 67/17 83/18 88/15
**involved** [5] 12/7 74/18 76/2 76/3 76/5
**involvement** [1] 11/3 25/2 25/4
**irrefutable** [1] 73/10
**irreparable** [11] 5/20 9/6 67/22 82/3 82/15 85/8 86/9 88/9 89/1 90/19 90/23
**is** [190]
**isn't** [3] 51/2 102/19 102/21
**issuance** [2] 80/14 82/19
**issue** [23] 4/19 9/8 10/21 50/11 50/12 74/12 74/21 75/14 80/20 96/16 99/23 101/15 103/6 103/7 103/12 103/13 103/16 103/20 103/21 103/23 103/24 105/9 105/10
**issues** [1] 17/12
**issuing** [1] 101/21
**it** [135]
**it's** [50] 6/20 8/4 9/2 10/4 20/5 21/6 35/9 38/5 51/1 51/2 51/6 51/21 53/14 56/3 62/6 66/17 66/19 71/15 71/19 75/8 75/9 76/20 77/1 78/7 78/9 81/8 84/17 84/19 85/23 85/23 85/24 87/24 89/9 93/13 94/17 95/24 96/4 97/4 99/14 101/4 101/10 101/10 101/17 102/4 102/8 102/16 103/10 103/18 105/18 105/18
**its** [3] 13/5 74/24 81/17

## J

**January** [22] 1/10 10/2 10/17 40/1 40/20 41/3 66/4 66/8 66/24 72/22

**71/12 75/18 82/11** ...
**81/6 82/5 82/7 82/12 83/3 83/6 85/7 88/7 94/20 105/6 106/13 107/16**
**January 14th** [8] 10/17 40/20 41/3 66/8 66/24 72/22 88/7 94/20
**January 15** [1] 82/5
**January 15th** [6] 40/1 66/4 81/6 82/7 82/12 83/3
**Jenkins** [1] 1/12
**JoeDae** [1] 1/11
**JR** [1] 2/4
**judgment** [1] 92/5
**June** [1] 107/18
**just** [38] 6/14 9/21 18/15 19/13 27/16 29/22 30/6 31/16 31/19 32/6 32/9 34/7 34/24 35/16 39/4 43/6 44/20 50/15 53/15 58/13 61/22 68/19 70/15 73/5 76/22 78/7 80/22 83/23 83/23 85/23 88/18 92/21 94/2 95/9 97/2 98/16 98/17 103/10

## K

**Kate** [2] 6/9 6/11
**KATHRYN** [1] 2/11
**keep** [14] 4/12 10/5 10/18 11/5 41/8 41/10 50/8 53/3 80/11 84/4 88/7 88/19 88/24 89/14
**keeping** [1] 84/7
**kind** [9] 21/5 24/19 27/12 48/3 63/18 67/6 67/10 67/17 75/9
**kindly** [2] 72/7 77/18
**knew** [3] 70/17 72/13 73/21
**know** [44] 10/18 21/19 24/15 24/18 26/24 31/16 32/8 39/24 41/19 43/6 44/8 47/7 47/24 48/3 51/14 56/10 57/11 60/23 63/17 63/17 63/18 67/16 70/3 70/16 75/9 75/10 75/13 76/14 78/20 78/21 80/14 80/17 90/4 93/8 100/21 101/4 102/7 102/15 102/17 102/20 102/24 104/15 105/4 105/12
**knowingly** [1] 100/2
**knows** [5] 67/14 74/19 100/9 102/21 105/24

## L

**label** [1] 32/10
**lady** [2] 18/13 58/21
**Lamar** [3] 16/16 52/18 53/15
**land** [8] 7/17 16/24 17/2 17/13 45/11 68/1

**L**

**land... [2]** 81/10 90/11
**landlord [12]** 5/10 69/12 69/13 69/17 69/21 70/4 70/10 78/24 81/22 85/13 86/18 87/7
**landlord's [11]** 5/9 5/12 5/16 72/13 80/22 80/23 83/10 85/1 85/10 85/18 85/20
**language [1]** 77/3
**Large [2]** 107/5 107/19
**last [4]** 40/17 40/18 51/16 104/23
**Lastly [2]** 11/7 89/15
**late [2]** 25/7 27/13
**later [4]** 26/20 28/23 29/12 30/15
**law [2]** 2/5 95/23
**lawsuit [1]** 68/8
**LCR [3]** 1/21 107/18 107/18
**lcv.riverside [1]** 1/23
**LDC [1]** 59/7
**lead [2]** 8/9 11/16
**learned [1]** 10/20
**lease [26]** 9/16 10/18 11/6 17/11 17/15 17/17 18/8 19/13 21/6 21/6 21/9 21/19 23/22 45/11 59/21 59/22 65/22 66/15 68/3 81/1 86/15 88/20 90/20 90/21 90/22 94/22
**leased [2]** 49/4 81/11
**leasehold [7]** 5/23 81/1 81/7 82/11 91/4 94/23 95/12
**leases [4]** 7/17 23/23 42/1 82/10
**least [1]** 47/1
**left [6]** 29/7 32/14 32/19 49/5 55/2 73/23
**legal [4]** 52/17 68/6 68/16 100/17
**legitimate [1]** 81/24
**lending [1]** 13/5
**Leslie [2]** 29/17 29/19
**less [4]** 4/13 6/5 44/15 85/5
**lessee [2]** 64/9 64/14
**lessor [2]** 5/10 81/10
**let [15]** 19/7 21/21 34/22 36/19 39/10 41/22 46/24 56/21 70/3 70/16 80/10 90/4 94/15 100/7 106/6
**let's [16]** 4/5 4/12 22/21 23/3 34/15 34/20 44/23 44/24 45/14 48/17 58/6 63/22 64/1 67/4 80/18 105/1
**lets [1]** 48/3
**letter [16]** 38/5 39/15 39/18 63/20 65/17 76/16 77/24 78/2 78/3

78/3 78/11 78/12 78/16 78/18 81/4 82/6
**letting [1]** 39/24
**lien [98]** 5/9 5/9 5/9 5/11 5/12 5/16 7/16 7/20 8/18 8/22 44/15 44/16 45/3 45/10 51/3 51/9 52/14 53/6 53/14 59/13 68/4 68/12 69/7 70/10 71/23 72/1 72/5 72/8 72/12 72/13 72/13 72/15 72/22 73/1 73/9 73/11 73/19 73/21 74/2 74/23 75/3 75/6 75/9 75/16 75/18 75/22 75/23 76/19 77/2 77/2 77/11 77/16 77/19 77/23 78/4 78/7 78/8 78/18 79/2 80/22 80/22 80/23 80/23 81/10 81/22 82/13 83/10 84/19 85/1 85/10 85/18 85/20 86/18 86/20 87/2 87/4 87/7 87/7 87/13 87/16 87/22 87/23 89/9 89/21 90/11 90/12 99/24 99/24 100/3 100/8 101/15 101/16 103/8 103/11 103/13 103/15 103/22 105/11
**lien's [1]** 79/1
**lienholders [1]** 100/6
**liens [3]** 10/21 87/8 89/17
**light [3]** 87/22 95/18 99/5
**like [26]** 10/4 16/7 17/6 17/20 21/13 24/17 28/22 31/20 35/17 38/10 40/5 41/9 45/20 51/18 53/14 60/6 74/7 75/8 75/8 75/9 80/7 84/5 90/21 95/19 95/21 102/18
**likelihood [5]** 5/19 73/6 80/21 90/8 90/15
**likely [1]** 8/20
**likes [1]** 102/24
**line [5]** 16/17 33/18 33/21 45/21 76/14
**lines [2]** 8/6 28/4
**LISA [3]** 1/21 107/5 107/18
**Listen [1]** 18/15
**little [5]** 28/11 28/18 35/8 45/14 48/15
**loan [1]** 13/4
**Local [15]** 50/23 50/24 52/7 53/4 53/24 54/3 60/17 60/20 60/24 74/20 87/23 89/12 99/24 100/3 100/8
**lock [1]** 26/13
**logistics [9]** 26/6 26/11 27/16 27/19 28/5 29/1 29/8 65/1 65/3

**long [7]** 23/17 42/7 42/11 43/14 74/9 83/2 90/21
**long-term [3]** 42/7 43/14 90/21
**longer [1]** 82/23
**look [14]** 19/7 20/3 32/13 38/9 40/14 51/24 52/6 52/12 54/8 63/22 64/1 65/14 90/3 105/2
**looking [7]** 32/9 34/24 35/11 47/16 55/3 55/14 55/17
**looks [2]** 31/20 53/13
**lose [1]** 9/15
**losing [1]** 94/22
**loss [2]** 90/22 91/4
**lost [1]** 42/8
**lot [4]** 79/16 83/21 83/21 101/2

**M**

**ma'am [7]** 23/7 47/19 49/14 49/19 53/17 61/20 67/3
**machine [1]** 107/6
**made [6]** 20/8 27/4 27/6 89/7 94/14 105/15
**mail [5]** 35/9 35/11 54/9 54/10 55/14 56/22 58/14 58/14 89/17
**mails [4]** 35/16 59/9 74/15 86/21
**maintain [2]** 83/15 84/2
**major [2]** 48/20 48/20
**make [8]** 7/24 9/14 41/19 43/9 79/11 86/5 86/13 94/4
**makes [2]** 92/5 100/13
**making [4]** 11/12 86/7 93/13 93/14
**manage [1]** 57/11
**Management [1]** 57/7
**manager [9]** 25/12 25/13 25/14 26/20 27/9 29/9 54/13 57/20 58/22
**mandatory [6]** 93/9 94/7 95/20 96/14 97/4 97/6
**manner [2]** 64/11 65/12
**many [13]** 19/17 20/11 23/22 34/10 34/18 45/17 46/3 46/12 46/12 46/15 48/8 48/23 57/14
**Mark [1]** 37/11
**marked [8]** 18/2 23/3 23/4 37/13 38/15 40/11 54/5 58/10
**market [6]** 26/21 27/11 29/22 42/10 49/22 49/22
**marketing [1]** 19/6
**marketplace [5]** 27/5 27/18 27/22 29/11 31/4 29/8 65/1 65/3
**markets [1]** 42/10

**Marty [1]** 2/5
**math [2]** 48/20 55/16
**matter [10]** 5/2 8/8 35/7 38/7 67/23 69/9 71/11 87/15 92/5 92/13
**may [15]** 16/2 18/3 18/23 27/2 39/22 40/12 43/22 68/18 71/4 74/4 82/20 90/10 90/17 94/1 99/4
**maybe [3]** 26/20 28/22 94/12
**me [44]** 14/13 19/7 20/4 20/21 21/21 24/3 24/3 25/11 25/23 26/15 26/20 27/9 29/10 30/6 30/13 32/10 34/6 34/22 39/10 39/17 39/22 39/24 42/12 44/5 45/19 46/17 46/24 52/22 55/7 56/21 57/3 59/2 68/20 69/10 70/16 71/20 74/7 80/10 94/15 96/11 96/19 97/7 97/12 106/6
**mean [26]** 20/1 60/22 68/16 71/23 73/14 73/18 77/6 77/17 94/2 97/5 98/8 101/9 102/18 102/20 102/23 105/22
**meant [1]** 96/6
**meat [1]** 30/18
**meet [8]** 7/3 43/2 67/20 71/13 77/12 87/20 88/8 89/24
**meeting [2]** 25/5 25/9
**meets [1]** 14/7
**memorandum [2]** 75/5 93/12
**Memphis [5]** 2/6 2/13 25/6 50/23 61/1
**merits [9]** 5/20 7/3 8/21 73/7 80/21 81/23 87/21 90/9 90/16
**met [4]** 25/8 69/24 71/10 86/1
**middle [1]** 54/8
**middleman [1]** 24/20
**midnight [1]** 40/20
**might [5]** 7/16 32/5 32/11 35/15 104/21
**Mike [1]** 33/22
**million [2]** 55/18 55/22
**mind [2]** 71/15 101/4
**minority [3]** 12/23 13/8 42/15
**minute [5]** 16/2 16/3 34/12 79/21 92/21
**minutes [5]** 4/13 6/5 80/11 105/14 105/15
**Mississippi [122]**
**Mississippi's [8]** 8/2 8/17 44/15 45/10 72/4 74/2 77/1 87/2
**Mississippi/Mississippi [2]** 17/4 69/14
**mistake [1]** 94/15

**moment [3]** 43/23 68/19 92/19
**Monday [10]** 96/11 96/21 96/24 104/2 105/2 105/6 105/8 106/6 106/7 106/13
**money [17]** 4/17 10/16 11/5 62/19 62/24 67/6 67/11 67/17 73/23 78/5 82/13 83/21 83/22 84/14 84/19 88/12 88/15
**monies [3]** 5/6 5/8 70/12
**month [1]** 40/1
**months [3]** 62/4 62/4 62/7
**more [10]** 8/10 10/4 11/16 39/13 43/11 48/15 62/18 88/6 88/16 88/18
**morning [9]** 6/13 6/15 96/12 96/21 97/1 104/2 105/2 106/7 106/7
**mortgage [1]** 75/10
**most [1]** 6/22
**motion [8]** 6/17 79/9 79/24 80/1 80/6 104/11 104/14 104/22
**move [10]** 22/21 28/23 29/10 34/16 34/21 44/24 53/19 63/8 93/21 93/21
**moved [1]** 25/10
**moving [6]** 27/1 46/18 80/3 97/4 97/11 98/1
**MR [33]** 2/4 2/10 3/4 3/6 3/7 6/13 12/2 13/18 15/5 16/13 18/4 18/24 20/2 21/4 22/24 23/10 24/9 26/2 30/4 30/21 32/12 33/9 33/11 34/9 34/17 36/1 38/1 38/16 39/11 40/13 69/3 71/20 81/24
**Mr. [93]** 4/16 6/15 7/2 8/12 9/9 9/21 10/16 10/20 11/4 11/9 11/21 12/3 13/21 14/4 15/6 16/7 16/14 16/18 17/8 18/6 19/22 20/4 20/20 23/2 23/11 29/17 29/21 30/19 32/14 33/9 33/12 34/11 34/19 35/13 36/7 36/16 36/21 37/14 38/2 38/17 38/20 39/12 40/14 45/3 48/23 51/24 54/7 54/20 57/2 58/16 59/13 64/7 69/4 71/24 73/22 74/13 74/15 74/19 75/4 75/12 75/20 78/22 79/23 82/9 82/14 83/3 83/5 83/8 83/17 84/5 84/14 84/23 85/6 85/9 85/17 87/4 87/18 88/6 88/18 89/12 92/15

## M

**Mr....** [12] 93/2 93/6 94/4 96/6 96/22 97/3 97/18 97/18 100/9 100/15 102/21 105/17
**Mr. Burrell** [60] 4/16 7/2 8/12 9/9 9/21 10/16 10/20 11/4 12/3 13/21 15/6 16/14 16/18 17/8 18/6 19/2 20/4 20/20 23/11 32/14 33/12 34/11 34/19 36/7 36/16 36/21 38/2 38/17 39/12 40/14 45/3 48/23 51/24 54/7 54/20 57/2 58/16 59/13 64/7 69/4 71/24 73/22 78/22 82/9 82/14 83/3 83/5 83/8 84/5 84/14 84/23 85/6 85/9 85/17 87/4 87/18 88/6 88/18 89/12 93/2
**Mr. Burrell's** [3] 11/9 30/19 38/20
**Mr. Cameron** [2] 16/7 83/17
**Mr. Flowers** [1] 23/2
**Mr. Leslie** [1] 29/17
**Mr. Pennix** [1] 29/21
**Mr. Robinson** [22] 6/15 33/9 35/13 37/14 74/13 74/15 74/19 75/4 75/12 79/23 92/15 93/6 94/4 96/6 96/22 97/3 97/18 97/18 100/9 100/15 102/21 105/17
**Mr. Robinson's** [1] 75/20
**Mr. Thomas** [2] 11/21 14/4
**MS** [18] 2/11 3/6 22/11 45/2 48/22 50/9 51/23 54/6 58/11 59/12 61/2 64/6 65/21 67/15 69/10 74/5 75/2 76/12
**much** [19] 10/19 18/7 24/17 24/19 25/15 25/18 25/21 39/5 44/15 46/6 50/5 51/9 51/12 58/21 59/24 61/6 61/12 62/19 90/21
**multiple** [2] 86/23 87/12
**multiplying** [1] 55/15
**must** [4] 41/2 41/11 65/23 107/13
**my** [48] 6/14 17/17 19/13 21/6 23/8 23/8 23/21 24/16 25/4 26/8 27/11 32/19 35/22 39/21 42/16 43/23 44/4 47/12 48/21 51/10 57/9 57/15 60/2 63/21 69/13 70/4 71/6 71/15 92/12 92/13 92/19 93/15 94/11 94/13 94/23 95/13 95/17 98/5 100/1 100/6 100/13 101/4 103/14 107/8 107/13 107/13 107/15 107/15

## N

**name** [7] 12/3 16/14 29/17 52/17 53/15 72/10 77/21
**NAMEN** [20] 2/11 3/6 6/9 6/10 6/11 16/11 45/2 48/22 50/9 51/23 54/6 58/11 59/12 61/2 64/6 65/21 67/15 74/6 75/2 76/12
**Namen's** [1] 22/11
**near** [1] 23/12
**necessary** [4] 7/4 11/4 41/13 41/15
**need** [16] 22/6 22/13 23/7 56/1 79/12 80/13 94/12 98/10 100/21 101/2 101/4 101/7 103/1 103/2 103/14 104/5
**needed** [4] 88/15 94/20 95/10 105/12
**needs** [3] 11/5 11/15 20/8
**nefarious** [1] 78/19
**network** [2] 26/23 27/11
**never** [2] 11/3 102/10
**new** [2] 42/13 106/1
**Newman** [1] 6/10
**next** [9] 9/15 15/21 29/5 36/20 37/24 40/21 52/12 53/12 66/14
**next-numbered** [1] 36/20
**Nine** [1] 50/6
**no** [67] 1/4 3/10 3/10 3/11 3/11 3/12 3/12 3/13 15/17 15/24 17/1 17/23 17/24 18/19 18/21 21/16 21/23 27/8 29/4 30/5 30/5 30/9 34/20 34/20 34/20 35/8 37/17 37/20 37/22 38/11 38/13 40/8 40/9 44/6 44/14 45/8 52/5 53/21 55/23 58/9 58/23 60/10 61/9 62/1 63/10 63/12 63/24 65/13 67/9 71/10 71/23 72/14 73/20 75/3 79/14 81/23 86/19 87/22 92/23 93/11 96/1 96/13 97/21 100/20 102/9 102/22 102/23
**nodding** [1] 18/20
**non** [1] 35/9
**non-reply** [1] 35/9
**None** [1] 87/14
**normally** [3] 100/7 102/7 102/8
**not** [125]

**notarial** [1] 107/13
**Notary** [1] 107/5 107/19
**noted** [1] 95/16
**notes** [1] 107/8
**nothing** [6] 27/17 27/22 60/17 75/21 88/6 94/3
**notice** [2] 6/14 38/7
**noting** [1] 81/16
**notion** [1] 86/17
**November** [1] 59/6
**November 26** [1] 59/6
**now** [33] 13/11 18/10 21/1 22/5 22/14 22/22 24/5 31/14 37/5 37/14 40/21 41/14 49/20 50/3 52/13 54/8 54/12 55/16 60/1 62/2 62/6 62/8 72/16 75/21 78/12 79/3 82/24 89/12 97/11 97/24 98/12 100/17 105/20
**number** [24] 22/5 22/9 32/17 34/5 37/4 37/12 37/12 37/23 45/19 46/14 46/14 49/2 52/16 53/14 53/19 58/1 58/2 58/4 58/7 59/6 59/11 60/1 64/8 64/14
**numbered** [1] 36/20
**numbers** [2] 20/14 59/8

## O

**object** [2] 13/19 13/19
**objection** [16] 17/22 17/24 21/15 21/17 37/19 37/22 38/11 38/13 40/7 40/9 53/20 53/21 58/8 58/9 67/12 95/15
**obligation** [3] 5/15 43/2 73/15
**obligations** [3] 10/11 67/20 86/13
**occurred** [1] 22/15
**October** [4] 9/18 62/17 65/24 72/14
**October 30th** [1] 65/24
**off** [14] 33/15 35/13 42/9 43/12 46/5 46/5 48/7 50/3 51/10 61/14 62/11 62/14 77/9 79/6
**offer** [12] 19/3 26/22 27/4 30/1 33/20 33/22 33/24 34/5 35/17 35/21 38/10 41/19
**offered** [5] 31/6 33/16 44/14 86/24 88/21
**offers** [7] 31/10 31/12 32/23 34/10 34/18 42/14 69/11
**office** [3] 8/2 29/7 30/7
**official** [1] 107/15
**oh** [12] 21/24 38/5 41/9

52/9 63/3 69/9 78/20 79/1 95/1 98/19 101/23 102/2
**okay** [79] 6/21 15/1 17/19 21/24 22/14 22/17 22/17 23/17 27/24 28/2 28/5 29/1 29/5 30/3 30/11 31/8 31/12 31/14 32/4 32/22 33/4 33/7 33/17 34/2 39/3 39/9 39/20 40/4 40/16 40/22 41/5 41/14 42/18 43/1 45/14 45/24 46/19 46/24 47/1 47/2 47/12 48/21 49/3 49/7 52/6 52/12 53/1 53/12 54/20 55/11 56/19 57/13 58/5 58/12 60/4 62/3 62/21 64/1 65/8 65/11 65/14 65/20 66/7 67/5 68/22 79/3 95/14 95/17 96/18 97/10 97/23 98/16 98/24 100/12 101/8 102/2 103/14 104/22 106/5
**once** [5] 26/15 26/23 63/3 69/23 78/5
**one** [46] 14/11 15/24 16/2 16/3 18/5 18/7 18/11 18/14 19/14 19/21 20/20 21/23 23/3 23/19 28/1 28/20 32/7 32/8 33/14 33/15 35/18 35/23 36/3 37/4 37/5 37/6 37/7 37/9 39/12 41/10 62/18 68/15 68/19 69/19 72/24 74/13 75/17 76/13 77/4 77/10 79/16 79/19 85/23 86/2 89/4 98/20
**ones** [1] 64/4
**only** [17] 8/9 8/16 11/15 14/5 43/5 43/16 50/18 54/24 60/21 75/14 88/24 96/1 100/22 101/10 101/12 101/21 103/24
**opening** [1] 4/12
**operates** [1] 81/18
**operation** [4] 42/6 43/6 59/17 60/15
**operations** [1] 63/6
**opinion** [2] 15/9 98/5
**opportunities** [1] 43/8
**opportunity** [3] 13/3 95/19 95/21
**opposed** [2] 48/10 83/3
**opposing** [2] 7/7 82/20
**orally** [4] 94/4 97/4 97/11 98/1
**order** [15] 7/11 10/5 37/4 41/7 41/8 41/9 41/11 66/1 89/20 94/22 95/11 96/21 96/22 99/17 107/12

52/9 63/3 69/9 78/20
**ordered** [1] 97/9
**orders** [11] 30/23 31/1 31/19 32/23 33/2 33/14 36/6 36/11 36/15 36/19 36/23
**ore** [1] 93/21
**organization** [2] 57/9 60/12
**original** [2] 81/15 107/13
**originally** [1] 35/11
**other** [19] 10/20 10/21 10/24 12/8 12/20 23/8 43/8 60/13 67/19 70/15 71/10 75/24 83/18 85/14 87/8 92/22 92/23 98/20 99/17
**others** [1] 74/23
**our** [9] 6/23 41/10 75/13 78/8 96/14 97/17 98/7 102/3 104/11
**ours** [1] 78/5
**out** [38] 4/9 6/22 7/7 11/3 15/24 17/12 17/13 23/23 24/20 26/7 26/22 27/4 28/12 29/9 30/8 31/7 31/11 34/13 41/18 41/22 46/1 49/3 49/21 50/22 51/16 56/6 57/16 68/11 70/5 76/24 83/4 83/5 85/7 85/9 89/11 90/4 100/8 104/2
**outlining** [1] 96/14
**outlook.com** [1] 35/10
**outright** [1] 93/22
**outside** [3] 48/2 79/18 100/6
**outweigh** [1] 83/6
**outweighed** [1] 89/4
**outweighs** [1] 82/19
**over** [8] 5/14 64/3 64/7 82/22 83/2 84/14 91/9 91/21
**overall** [1] 42/16
**overbroad** [2] 103/4 103/4
**Overruled** [1] 67/14
**owe** [3] 9/21 49/18 63/1
**owed** [9] 7/22 11/2 61/12 83/9 84/18 84/24 85/1 88/13 92/11
**owes** [6] 9/22 9/23 9/24 84/14 88/18 88/19
**own** [6] 16/24 35/22 61/3 73/2 78/2 86/9
**owns** [1] 17/2

## P

**P-e-n-n-i-x** [1] 29/19
**pace** [1] 30/15
**page** [13] 3/2 19/8 19/10 19/13 36/13 38/9 38/17 52/1 52/12 53/12 54/9 72/7 94/17
**pages** [1] 107/7

**P**

**paid [16]** 39/19 41/21 51/12 55/21 61/8 61/10 65/23 72/22 84/17 84/18 85/19 89/13 92/3 94/5 94/21 95/10

**paragraph [10]** 40/15 40/18 40/21 41/6 52/16 52/20 54/21 56/22 64/9 65/22

**parameters [1]** 14/5

**paramount [1]** 87/8

**Parchman [4]** 7/18 16/22 23/16 28/11

**part [8]** 1/11 19/4 29/1 41/20 42/22 69/18 78/13 107/14

**partake [1]** 70/14

**participating [1]** 76/18

**particular [3]** 23/23 47/10 98/4

**particularly [2]** 13/8 91/5

**parties [5]** 9/4 86/13 88/3 107/10 107/10

**party [14]** 6/18 7/5 8/3 8/21 45/6 52/7 53/4 68/9 72/17 72/19 73/13 82/20 88/1 89/4

**pass [11]** 17/6 20/20 22/2 30/11 33/7 33/8 33/8 33/12 38/3 39/12 68/20

**passed [1]** 84/3

**passing [1]** 54/7

**PAUL [1]** 2/4

**pay [16]** 10/4 10/17 10/19 49/17 50/24 59/20 62/11 66/15 72/3 82/7 88/22 91/20 93/13 93/17 99/18 100/10

**payment [15]** 7/22 10/23 11/1 11/13 38/21 39/18 41/2 41/11 62/16 72/9 77/20 81/6 81/12 91/22 93/22

**payments [5]** 9/15 9/17 59/2 69/19 69/21

**penalty [1]** 49/17

**penitentiary [2]** 16/23 23/15

**Pennix [5]** 29/17 29/19 29/19 29/21 30/4

**people [2]** 68/14 70/22

**per [8]** 46/3 47/4 47/13 55/1 57/5 57/14 65/1 70/17

**percent [5]** 9/24 57/1 61/7 61/8 66/16

**percentage [2]** 48/10 61/3

**perfect [2]** 75/23 87/12

**perfected [16]** 44/16 74/23 75/15 75/19 77/2 77/10 77/11 87/1 87/3 87/9 87/16 87/23 89/10

**perfection [1]** 75/19

**period [3]** 65/24 82/23 83/2

**permanent [6]** 4/22 5/1 6/1 10/14 89/2 102/3

**permanently [2]** 85/16 101/24

**person [3]** 55/16 58/24 58/24

**Personally [1]** 67/9

**petition [14]** 6/24 49/17 63/4 74/22 75/4 81/15 93/12 93/21 94/12 95/6 97/22 101/10 105/19 106/2

**petitioner [11]** 4/10 13/12 15/3 72/21 73/3 81/2 91/12 92/6 92/7 92/11 93/18

**phone [1]** 28/22

**phrased [1]** 41/7

**physical [1]** 81/17

**pick [4]** 30/14 31/18 56/7 74/10

**picked [9]** 26/9 27/12 56/2 56/2 56/4 56/11 56/13 56/14 56/15

**picking [2]** 26/12 27/21

**place [1]** 70/6

**plaintiff [12]** 1/3 2/4 7/14 44/6 71/9 74/14 86/1 86/23 87/5 90/9 91/5 91/22

**plaintiff's [3]** 6/24 8/23 89/23

**plan [3]** 30/15 72/21 79/13

**plant [2]** 64/15 64/18

**planted [2]** 52/18 64/19

**platform [6]** 24/22 26/1 30/2 30/7 33/1 33/16

**play [1]** 102/14

**player [1]** 61/21

**plead [1]** 98/2

**pleading [1]** 94/3

**pleadings [1]** 86/23

**please [5]** 40/24 41/8 54/20 62/18 65/15

**plus [1]** 38/23

**podium [1]** 74/7

**point [14]** 6/22 7/7 13/19 26/21 28/20 34/6 34/13 46/7 71/9 79/10 83/19 96/17 99/6 103/19

**points [1]** 27/10

**policy [1]** 5/20

**Poplar [1]** 2/12

**portion [3]** 14/23 38/19 54/9

**position [2]** 13/21 22/11

**possibility [1]** 96/1

**possible [2]** 39/22 105/7

**possibly [2]** 43/10 82/22

**post [4]** 98/15 98/23 98/24 99/7

**practices [1]** 42/14

**precedence [1]** 5/13

**predicament [1]** 86/11

**preliminary [4]** 4/19 4/21 5/1 7/9

**premises [1]** 81/11

**prepare [1]** 101/3

**prepayment [1]** 10/1

**presence [1]** 81/17

**presented [3]** 73/4 87/14 103/5

**presenting [1]** 89/19

**president [2]** 12/9 12/12

**presiding [1]** 1/12

**presume [1]** 100/5

**pretty [9]** 18/7 24/17 24/19 25/15 25/17 25/20 39/5 58/21 95/22

**prevail [1]** 89/21

**prevent [1]** 94/22

**preventing [1]** 89/18

**previous [3]** 17/13 43/10 43/12

**previously [4]** 4/18 4/24 5/3 63/1

**price [5]** 26/21 27/10 29/24 31/6 31/17

**prices [1]** 50/4

**prior [5]** 7/8 25/4 57/23 65/23 103/6

**priority [8]** 5/9 8/18 82/1 84/19 86/20 87/17 89/20 91/9

**prison [2]** 28/14 28/16

**private [1]** 60/3

**probably [7]** 25/6 25/6 28/19 47/6 51/10 62/5 62/9

**problaw937 [1]** 35/5

**problem [1]** 34/21

**procedure [1]** 106/1

**proceed [12]** 4/2 4/5 8/11 18/3 18/23 40/2 40/12 43/24 44/19 44/22 71/14 80/18

**proceeded [1]** 69/12

**proceeding [1]** 72/17

**proceedings [2]** 1/13 107/6

**proceeds [11]** 10/24 45/10 66/9 68/1 68/4 69/23 69/24 75/1 82/1 87/17 91/2

**process [1]** 105/21

**produce [2]** 78/17 83/22

**produced [1]** 7/17

**product [1]** 53/5

**products [1]** 81/11

**Professional [1]** 107/5

**program [4]** 26/10

**possibly [2]** 43/10

**prohibitive [5]** 93/7 93/9 94/5 95/20 95/24

**projected [2]** 55/3 62/1

**proof [15]** 44/6 44/7 44/14 71/6 71/10 76/9 79/13 79/17 80/7 80/9 90/12 90/14 90/16 90/18 105/13

**properly [7]** 87/1 87/3 87/12 87/16 87/23 89/10 89/16

**property [3]** 28/15 43/9 90/21

**prove [2]** 14/21 103/14

**proven [3]** 86/2 91/9 91/23

**provided [2]** 10/12 90/12

**proving [3]** 85/23 85/23 89/24

**provision [1]** 15/7

**provisions [1]** 83/14

**public [15]** 5/20 5/21 11/7 11/9 14/16 14/22 41/19 83/11 84/6 84/10 85/2 89/15 91/11 107/5 107/19

**purported [1]** 7/20

**purpose [2]** 13/2 84/4

**purposes [1]** 73/6

**pursuant [2]** 5/18 99/16

**pursue [1]** 67/20

**put [11]** 27/4 31/7 31/11 41/18 41/22 49/21 60/2 71/11 79/13 80/7 80/9

**puts [1]** 36/13

**Q**

**quagmire [2]** 100/16 100/17

**qualify [1]** 13/24

**Quantity [1]** 53/8

**quarter [2]** 55/18 55/21

**question [17]** 18/19 37/24 48/7 48/8 48/8 48/11 56/4 57/15 63/22 71/23 72/14 73/18 81/23 93/15 95/18 99/13 104/24

**questioning [1]** 95/2

**questions [4]** 15/16 37/15 92/14 92/22

**quick [1]** 43/23

**quickly [2]** 101/1 101/7

**quite [3]** 43/15 43/15 100/23

**quote [1]** 76/12

**R**

**rack [1]** 48/7

**raised [6]** 101/14 103/8 103/12 103/13 103/23 105/10

**raises [1]** 74/21

**raising [1]** 96/17

**re [11]** 41/12 41/14 42/3 82/8 82/22 83/1 83/7 84/8 84/17 85/5 89/6

**re-amortization [4]** 82/4 84/8 85/5 89/6

**re-amortized [1]** 84/17

**re-amortizing [2]** 82/22 83/1

**re-bid [4]** 41/12 41/14 42/3 82/8

**reach [2]** 29/9 30/3

**reached [2]** 30/5 70/4

**read [15]** 22/1 33/17 33/21 38/18 39/4 40/17 40/24 41/7 54/20 75/13 94/12 95/3 95/8 96/5 97/21

**readily [1]** 88/12

**ready [2]** 4/1 101/3

**real [1]** 90/21

**reality [1]** 55/4

**realize [1]** 6/18

**really [2]** 73/15 90/14

**reason [1]** 7/1

**reasons [2]** 5/17 85/15

**recall [2]** 29/16 80/1

**receipt [1]** 56/16

**receive [1]** 84/13

**receiving [1]** 91/2

**recess [5]** 16/4 16/5 44/2 79/22 90/5

**recognize [3]** 78/4 78/7 81/22

**recognized [3]** 72/4 73/21 74/1

**recognizes [1]** 72/12

**recognizing [2]** 39/21 78/18

**recollection [2]** 94/11 94/13

**record [25]** 58/14 59/5 73/10 73/10 75/4 75/7 77/2 77/11 77/16 77/24 78/9 78/11 78/13 79/1 80/24 81/3 81/14 86/20 88/16 88/17 93/6 94/3 97/3 97/16 99/21

**recoup [1]** 43/16

**Redirect [3]** 3/7 69/1 69/2

**refer [1]** 22/7

**reference [5]** 36/11 39/8 53/14 59/7 77/24

**referenced [2]** 45/19 63/21

**referencing [1]** 58/3

**referred [2]** 12/22 22/9

**referring [3]** 74/15 74/16 74/16

**refers [2]** 22/12 22/23

**reflected [1]** 39/1

**refusal [1]** 24/2

**regard [2]** 4/24 94/15

**R**

regarding [1]  12/14
regardless [2]  46/8
89/5
regards [3]  38/7 39/7
39/17
region [2]  29/14 29/15
Registered [1]  107/5
registry [3]  92/3 99/16
100/11
regulation [3]  12/18
13/2 13/16
regulations [3]  12/14
15/7 84/3
reimburses [1]  38/22
relates [1]  15/7
relationship [2]  13/11
39/21
relative [2]  107/10
107/10
release [4]  92/9 92/24
101/5 101/6
released [1]  92/12
relief [20]  8/9 8/14 9/4
9/11 10/7 11/11 11/17
86/3 86/7 88/2 88/4
90/1 91/17 91/19 93/17
98/5 101/11 101/12
102/9 105/19
relies [2]  86/17 87/5
rely [1]  75/22
relying [2]  65/18 89/17
remaining [2]  55/1
88/20
remedy [2]  12/21 97/20
REMEMBERED [1]  1/8
renewal [4]  65/24 66/1
66/3 66/14
rent [11]  9/14 9/17 9/22
9/22 9/23 39/18 62/16
63/1 81/12 82/1 85/13
rents [1]  91/22
repay [1]  83/8
repeat [3]  18/7 19/11
80/13
reply [1]  35/9
reported [1]  107/6
reporter [2]  74/10
107/5
REPORTING [1]  1/22
represent [2]  45/22
57/19
representation [1]
22/8
represents [2]  46/15
46/16
reproduction [1]
107/13
reproductions [1]
107/14
request [4]  71/21
89/23 94/4 98/4
requested [6]  10/7
11/11 86/6 88/4 91/7
94/16
requesting [3]  6/1

94/13 95/9
requests [2]  9/11 86/4
require [6]  81/9 91/20
92/1 92/9 93/22 105/22
required [3]  14/20
85/22 90/14
requires [3]  82/16 85/3
90/15
requiring [2]  93/10
93/16
rescind [2]  40/2 41/17
research [1]  24/16
resolution [4]  11/10
11/15 76/21 103/6
resolve [5]  8/7 34/20
101/7 103/1 104/8
resolved [4]  40/1
101/18 101/19 103/6
respect [6]  90/8 90/19
90/24 91/11 105/17
106/2
respond [3]  18/19
71/21 77/13
responded [1]  48/9
respondent [1]  14/24
response [3]  6/24
75/14 95/7
rest [1]  59/16
rested [2]  44/6 44/8
restraining [1]  7/11
rests [1]  79/24
result [1]  12/21
resume [1]  106/13
retire [1]  90/2
return [1]  43/17
revenue [5]  41/20 42/9
43/10 43/12 61/14
reviewed [1]  4/24
right [70]  4/1 6/3 10/23
11/18 15/4 15/10 15/18
16/8 18/23 21/1 22/18
22/21 23/2 23/9 24/1
24/5 25/22 30/20 31/5
34/6 35/19 35/24 36/21
37/3 37/11 37/18 42/22
44/1 45/7 46/1 48/16
49/24 50/3 51/20 53/20
54/10 55/13 58/18 59/5
60/1 60/13 63/15 65/5
66/1 66/4 66/5 67/1
68/20 69/1 71/4 71/7
74/3 74/5 75/21 79/20
79/23 80/3 80/10 80/18
90/2 90/6 99/10 100/17
101/20 102/5 102/24
104/10 104/13 104/15
105/20
rights [2]  8/15 8/18
ring [1]  52/8
RIVERSIDE [1]  1/22
road [1]  94/1
ROBINSON [49]  2/4
3/4 3/6 3/7 6/15 12/2
15/5 16/13 18/4 18/24
20/2 21/4 22/4 23/10
24/9 26/2 30/21 32/12

33/9 33/9 33/11 34/9
34/17 35/13 36/1 37/14
38/1 38/16 39/11 40/13
69/3 74/13 74/15 74/19
75/4 75/12 79/23 92/15
93/6 94/4 96/6 96/22
97/3 97/18 97/18 100/9
100/15 102/21 105/17
Robinson's [1]  75/20
rocket [1]  48/17
Rosedale [4]  31/9 59/8
65/1 81/19
roughly [4]  46/6 46/16
54/24 55/3
round [1]  67/4
RPR [2]  1/21 107/18
rule [2]  50/14 97/12
rules [1]  102/14
ruling [4]  92/13 93/16
95/13 95/19

**S**

said [18]  8/20 9/2
46/19 57/3 62/1 62/7
71/18 72/3 76/13 77/7
78/3 84/1 88/1 95/9
101/16 103/14 105/12
107/8
same [8]  20/5 20/9
20/9 20/10 36/13 43/9
49/15 53/14
satisfaction [1]  103/15
satisfied [1]  72/23
satisfy [1]  39/7
saw [2]  57/1 57/22
say [23]  18/10 18/17
20/8 20/9 20/10 46/7
50/4 51/10 54/2 55/8
55/10 61/24 66/9 66/19
68/11 71/13 72/16
73/14 77/18 78/15
78/24 82/7 101/8
saying [9]  28/23 41/15
43/3 47/17 75/10 94/2
95/2 95/5 96/4
says [16]  32/20 33/19
52/1 52/3 52/6 52/17
53/4 55/11 64/9 65/22
66/5 66/6 66/13 72/7
76/16 87/6
scenario [1]  10/7
science [1]  48/17
scope [3]  103/9 103/10
103/17
se [1]  57/5
seal [2]  107/13 107/15
search [1]  100/4
season [3]  27/13 50/7
66/10
second [15]  18/15 19/1
19/3 19/8 34/24 37/6
37/7 38/17 41/6 56/22
58/13 79/19 82/16 88/8
98/17
Secondly [1]  9/5
secure [2]  62/16 81/12

secured [3]  52/7 53/4
75/15
security [1]  75/18
see [23]  19/7 21/21
28/10 32/8 34/8 34/22
39/10 43/17 46/24
48/14 49/22 49/24 52/1
52/13 53/3 54/9 55/4
57/4 64/8 64/12 94/15
106/6 106/7
seed [18]  50/21 50/23
50/24 50/24 52/7 53/4
54/1 54/3 59/16 60/18
60/20 60/24 74/20
87/23 89/12 99/24
100/4 100/8
seeing [1]  44/21
seek [2]  13/4 21/17
seeks [1]  10/7
seems [2]  44/5 83/4
seen [4]  68/11 80/24
81/3 87/3
send [6]  47/21 49/23
51/15 51/15 73/24
96/11
Senior [2]  52/23 53/2
sent [2]  35/9 63/20
sentence [10]  39/4
40/17 40/18 40/23 41/5
41/6 54/21 54/22 56/23
64/9
separate [6]  32/6 36/6
36/11 58/23 58/24
86/22
September [5]  25/7
35/10 35/12 59/10
59/10
September 26th [1]
59/10
September 27th [2]
35/10 35/12
September 30th [1]
59/10
seq [1]  75/16
serve [1]  57/6
served [4]  11/10 84/12
89/16 91/16
SERVICE [2]  1/22 13/6
Services [1]  52/3
Sessions [1]  102/22
set [23]  6/23 7/13 19/5
23/23 24/5 24/17 25/24
26/21 28/9 29/10 30/1
30/6 30/23 31/4 31/22
31/24 32/1 41/11 51/21
92/6 92/7 92/15 104/18
setbacks [1]  56/24
setting [5]  27/18 48/2
59/1 70/15 81/5
settled [1]  56/9
settlement [2]  39/1
39/23
setup [1]  69/18
seven [3]  9/15 66/14
88/20
severe [1]  43/4

shall [2]  81/10 87/7
she [9]  18/17 22/12
34/14 34/21 54/19
58/22 58/23 58/24 59/3
she's [4]  18/16 34/12
54/12 54/17
shed [1]  99/4
sheet [1]  47/23
SHELBY [2]  1/1 107/4
short [1]  100/22
shorthand [1]  107/6
should [5]  8/4 71/14
82/1 92/11 107/16
show [9]  8/13 8/15 9/6
9/9 33/9 86/6 86/24
88/8 90/17
showed [1]  88/11
shown [4]  87/15 88/23
90/9 91/12
shows [1]  88/17
sic [2]  23/12 35/2
side [1]  26/6
sign [1]  68/16
signature [1]  107/13
simple [2]  57/15 103/5
simplify [1]  35/16
simply [12]  11/11
27/21 30/6 31/16 36/18
88/5 89/17 93/13 94/2
94/5 97/2 97/16
since [3]  10/19 12/24
105/5
single [1]  86/24
singular [3]  103/21
105/9 105/10
sir [39]  12/16 12/20
13/17 15/11 17/1 17/9
18/15 18/22 19/16
19/20 21/10 21/12
21/23 22/10 22/20
24/11 24/14 25/1 25/20
26/1 31/13 32/3 32/21
33/3 35/3 35/6 35/14
36/4 61/1 70/9 70/11
70/23 71/1 77/15 80/16
99/3 104/3 104/6 104/9
sitting [4]  48/3 61/16
61/18 62/19
situation [3]  11/9 91/1
94/24
skip [1]  40/21
skipped [1]  105/21
Snow [1]  2/11
so [130]
socially [11]  5/21
12/14 12/18 12/23
13/15 13/24 15/8 42/19
83/13 84/11 91/14
solution [1]  11/4
some [8]  22/13 49/23
61/16 61/18 90/15
91/16 91/19 95/22
somebody [1]  41/22
somehow [1]  74/24
someone [2]  42/3 57/9
something [5]  45/20

**S**

**something...** [4] 51/16 93/10 94/1 97/17
**son** [1] 52/24
**son's** [2] 13/21 13/21
**sorry** [6] 34/3 47/17 52/10 56/12 71/17 98/19
**sought** [2] 93/12 93/17
**sovereign** [2] 8/5 9/2
**soybean** [2] 42/10 43/13
**soybeans** [18] 4/16 4/17 26/7 31/6 33/23 45/17 46/2 47/5 50/19 51/3 53/6 59/14 64/24 68/2 68/5 81/19 82/2 87/18
**speak** [2] 18/12 18/17
**special** [1] 12/21
**specifically** [8] 14/22 48/13 69/16 81/19 84/4 87/6 95/12 98/2
**specifications** [1] 14/7
**speculation** [1] 67/13
**speed** [1] 34/4
**split** [1] 78/4
**spoke** [1] 27/3
**spot** [2] 49/22 50/1
**Sr** [3] 16/16 52/21 53/16
**stand** [2] 74/7 74/8
**standard** [1] 7/12
**standards** [1] 7/13
**standing** [1] 49/1
**standpoint** [1] 43/19
**started** [4] 83/15 83/23 83/23 84/2
**state** [109]
**statement** [5] 4/13 39/2 51/15 51/16 53/13
**states** [1] 40/19
**status** [1] 47/22
**statute** [16] 5/12 5/15 12/21 13/10 14/6 14/6 14/8 14/9 14/14 14/14 14/19 14/21 15/6 75/12 85/11 87/5
**statutes** [1] 81/14
**statutorily** [1] 85/13
**statutory** [2] 75/23 77/3
**Stenotype** [1] 107/8
**step** [4] 15/18 71/4 76/13 79/18
**stepped** [1] 98/17
**steps** [1] 87/12
**still** [24] 10/10 19/11 19/22 21/6 27/12 30/9 33/14 39/19 49/12 61/16 61/18 62/19 65/6 65/10 84/14 84/16 84/18 84/18 88/11 88/12 89/7 104/11 104/12 104/13
**stipulate** [3] 36/5 36/5

36/10
**straight** [1] 24/20
**strategize** [1] 30/1
**streamline** [1] 48/14
**Street** [1] 2/5
**strictly** [1] 27/23
**string** [1] 59/9
**stuff** [2] 50/8 50/16
**subject** [7] 5/8 5/15 35/7 35/8 38/7 59/7 90/18
**submit** [3] 36/18 48/19 78/12
**submitted** [1] 49/16
**subordinate** [1] 78/8
**subsequent** [1] 5/14 83/9 85/19
**subsequently** [1] 26/16
**substantial** [6] 42/7 43/3 43/15 80/21 91/3 95/22
**substantiating** [1] 90/10
**succeed** [3] 7/2 8/20 87/21
**success** [4] 5/19 73/6 80/21 90/9
**successful** [1] 90/16
**such** [6] 5/11 72/9 77/20 91/15 92/4 107/14
**sue** [1] 105/17
**suffer** [1] 82/15
**sufficient** [2] 9/10 10/10
**suit** [1] 8/6
**Suite** [1] 2/12
**Sunflower** [3] 51/4 53/10 59/15
**superior** [1] 74/23
**support** [2] 5/1 9/1
**supports** [1] 90/17
**Supreme** [1] 95/23
**sure** [4] 14/2 22/14 46/11 54/16
**surprised** [1] 68/13
**survive** [1] 83/19
**switch** [1] 22/15
**sworn** [2] 11/23 16/10
**sympathetic** [1] 11/8

**T**

**table** [1] 80/1
**take** [16] 5/4 16/4 18/18 26/11 26/14 39/5 39/6 66/19 67/2 69/20 73/22 79/20 90/3 96/8 105/14 105/15
**taken** [4] 26/7 34/16 60/7 107/8
**takes** [6] 5/13 28/1 28/3 29/14 36/8 83/21
**taking** [4] 18/13 18/16 59/3 74/24
**talk** [8] 31/3 31/15

45/14 47/24 56/1 79/19 98/12 100/5
**talked** [6] 8/1 28/6 31/2 58/12 52/19 53/13 78/23
**talking** [10] 14/10 26/4 34/14 65/6 70/21 76/19 77/17 77/23 91/6 106/1
**talks** [1] 27/19
**Tango** [1] 33/23
**taxes** [2] 9/24 66/18
**team** [1] 70/23
**technical** [1] 74/18
**tell** [7] 20/4 20/21 32/17 46/24 57/14 69/12 104/4
**temporary** [7] 7/10 80/15 101/21
**Ten** [1] 32/2
**tendered** [2] 44/9 44/11
**tendering** [1] 44/13
**TENNESSEE** [17] 1/1 2/6 2/13 5/13 61/1 76/7 81/9 81/13 81/16 81/16 81/18 81/21 85/11 95/23 107/3 107/5 107/16
**tenus** [1] 93/21
**term** [4] 42/7 43/14 65/23 90/21
**termination** [1] 95/11
**terms** [1] 63/13
**test** [2] 14/23 82/18
**testified** [10] 11/24 16/11 45/16 49/16 58/16 71/24 78/22 82/9 83/17 88/14
**testify** [2] 13/22 14/5
**testifying** [1] 13/20
**testimony** [3] 3/1 30/19 90/7
**than** [9] 4/13 6/5 7/12 30/16 70/15 85/6 88/18 92/24 95/24
**Thank** [10] 6/4 15/20 23/5 37/20 44/3 65/20 85/20 100/12 106/9 106/10
**that** [401]
**that's** [74] 6/19 7/10 7/22 15/12 17/15 20/23 21/9 22/16 26/24 28/8 34/4 35/1 42/11 43/15 43/15 43/20 45/22 46/22 49/2 51/5 51/16 54/10 55/18 55/20 56/5 57/6 59/14 62/7 65/17 66/5 66/6 66/17 68/23 71/2 71/24 72/2 73/9 76/1 76/2 76/3 76/15 76/16 76/17 76/19 78/18 80/3 82/5 88/7 88/24 89/4 94/24 95/13 96/4 96/7 97/13 98/7 100/7 102/6 103/3

103/4 103/9 103/10 103/16 103/17 103/19 103/19 103/22 103/23 103/24 105/11
**their** [39] 11/2 24/22 25/5 25/8 25/9 26/10 27/4 27/7 27/11 27/16 30/2 30/7 31/7 31/9 39/7 41/20 42/14 65/2 66/20 68/16 69/18 69/19 72/6 72/20 72/22 73/2 73/2 73/5 75/15 76/19 77/8 77/12 78/1 78/17 80/2 82/13 82/21 82/22 83/2
**theirs** [1] 78/6
**them** [35] 8/5 26/4 29/3 30/8 31/18 33/9 36/19 36/20 37/11 39/21 39/24 46/21 46/23 49/21 49/23 50/2 53/22 53/24 56/3 56/4 56/7 57/11 61/19 68/5 70/2 70/3 70/5 70/8 78/15 80/13 84/14 91/4 93/14 94/22 100/7
**then** [25] 11/18 12/24 18/18 25/7 25/9 26/19 26/23 29/10 31/7 33/7 34/21 36/7 36/19 46/18 56/8 57/13 66/8 66/18 78/5 80/19 87/10 92/8 100/5 103/2 107/8
**there** [54] 5/19 10/21 10/24 16/11 16/24 25/12 28/12 30/5 30/6 30/9 31/5 32/6 35/16 36/6 37/22 38/13 41/7 43/7 43/9 44/6 46/14 49/9 49/10 49/21 49/24 56/8 62/14 63/18 64/3 65/3 65/10 67/19 68/15 70/18 73/11 74/5 75/3 76/15 79/24 80/12 80/22 82/13 84/16 86/19 86/21 90/15 92/4 95/12 97/5 99/23 103/15 103/21 105/10 107/8
**there's** [26] 15/24 20/7 21/16 31/20 35/8 71/10 71/22 71/23 71/24 72/14 75/9 75/10 75/10 77/23 81/23 85/8 87/21 88/11 88/12 89/3 93/11 94/2 94/3 95/22 102/3 102/11
**therefore** [4] 40/24 41/2 92/1 107/15
**thereon** [1] 64/11
**these** [21] 5/8 5/17 7/24 13/3 23/14 23/17 23/23 24/19 30/23 31/1 32/23 34/10 37/1 37/15 53/23 56/2 60/8 64/4 82/12 84/22 94/20

**they** [116]
**they'll** [2] 37/23 98/24
**they're** [15] 24/5 41/17 49/9 49/9 60/8 65/10 68/11 72/22 73/22 76/3 76/5 76/18 76/18 84/18 88/2
**they've** [7] 72/19 73/3 74/1 75/23 79/1 100/3 102/10
**thing** [7] 20/9 20/9 20/10 50/13 94/19 96/21 96/24
**things** [6] 12/8 12/20 25/24 29/23 56/8 69/20
**think** [16] 9/6 19/22 35/16 36/13 44/9 45/16 48/6 74/5 74/11 74/12 75/2 80/2 96/9 98/3 101/2 105/20
**third** [11] 10/14 24/2 37/9 37/10 40/23 41/5 41/6 54/21 54/22 82/17 89/2
**Thirty** [1] 61/8
**this** [154]
**THOMAS** [5] 3/3 11/21 11/22 12/5 14/4
**those** [25] 10/3 14/22 31/14 33/2 36/22 36/23 46/22 49/8 49/20 50/17 55/2 57/10 57/11 65/3 65/9 68/2 68/4 69/21 70/1 81/7 83/9 84/24 85/15 85/17 85/18
**though** [1] 47/12
**thought** [3] 28/20 57/3 97/18
**thousand** [1] 32/2
**threatened** [1] 82/18
**three** [15] 23/24 24/5 27/2 31/20 35/16 36/6 36/11 36/15 36/15 36/18 36/23 37/1 62/4 62/7 77/4
**through** [19] 24/6 24/21 27/8 30/1 30/24 31/4 32/24 33/16 50/22 56/20 59/2 59/10 60/3 65/2 73/1 73/2 73/9 82/4 87/11
**tickets** [2] 47/21 58/1
**time** [17] 27/18 29/4 29/22 30/10 41/12 42/11 43/16 51/15 57/23 62/18 63/10 80/8 82/23 83/2 92/4 98/6 101/2
**times** [1] 55/18
**TN** [1] 1/21
**today** [12] 4/20 6/2 7/13 9/7 14/10 75/6 88/10 90/12 90/13 90/17 98/9 105/6
**together** [1] 104/7
**told** [4] 55/7 61/20

**T**

told... [2] 72/20 73/22
took [1] 59/3
top [8] 19/10 33/17
33/18 33/21 51/10 52/2
52/13 52/16
total [4] 39/6 46/17
66/11 66/23
totally [2] 94/9 96/4
towards [2] 63/1 88/13
town [1] 23/12
tract [35] 19/13 19/15
19/19 19/21 19/22 20/4
20/10 20/14 20/15
20/16 20/17 20/18
20/21 20/22 20/23 21/7
21/11 21/18 22/5 22/7
22/9 22/13 22/16 22/19
22/24 46/17 46/17
46/18 64/10 66/10
66/11 66/16 66/17
70/17 70/17
tracts [13] 19/17 19/18
20/11 21/2 23/11 23/18
40/19 41/12 41/14 42/1
66/7 82/8 82/14
transcript [1] 107/8
transfer [1] 86/14
transport [2] 28/6
38/24
transportation [4] 25/5
25/8 25/10 26/19
treasury [1] 99/9
treatment [1] 60/5
trial [8] 101/1 101/9
101/9 102/3 102/22
103/19 104/21 105/23
tricky [1] 28/11
tried [1] 98/1
trucks [4] 28/12 28/14
28/16 47/24
true [2] 51/2 107/8
trust [1] 75/11
try [4] 29/9 31/17 48/20
101/13
trying [13] 14/3 25/24
26/6 26/13 28/9 28/11
34/4 36/11 42/13 48/11
50/17 76/11 97/20
Tuesday [1] 105/8
turn [2] 35/13 50/17
turned [1] 57/24
two [15] 14/12 14/21
19/18 20/13 21/1 27/2
32/6 41/24 41/24 49/7
52/20 62/4 73/3 74/14
77/4
Two-fifty [1] 49/7
TX [3] 59/8 59/8 59/9
TX-2486 [1] 59/8
TX-2491 [1] 59/8
TX-2492 [1] 59/9
type [1] 25/13
typically [1] 57/14

**U**

U.S [1] 83/12
UCC [9] 52/14 53/12
53/23 54/1 54/3 74/20
86/24 89/19 100/4
UCC-1 [1] 74/20
UCC-1F [2] 52/14
53/12
Uh [7] 52/15 53/7 53/9
53/11 59/23 66/22 69/6
Uh-huh [7] 52/15 53/7
53/9 53/11 59/23 66/22
69/6
ultimate [3] 56/17
76/21 90/13
unclear [1] 71/15
uncommon [2] 51/5
51/6
under [6] 10/6 42/13
46/24 57/1 63/13 100/1
underlined [1] 38/18
understand [15] 18/21
48/18 62/23 68/6 68/7
71/18 77/8 77/8 93/24
95/1 95/4 100/15
100/16 102/19 105/24
understanding [6]
11/8 45/9 46/11 47/1
94/23 98/8
understood [3] 68/2
95/9 97/15
undisputed [1] 81/8
unfair [1] 96/10
unfortunate [1] 9/9
Uniform [2] 52/1 87/10
unless [2] 77/10 92/6
until [5] 28/22 58/3
63/6 92/4 105/1
up [41] 10/4 18/12 19/5
24/17 25/24 26/9 26/12
26/21 27/12 27/18
27/21 28/9 29/10 30/1
30/6 30/15 30/23 31/4
31/18 31/22 31/24 32/1
34/4 50/7 50/8 56/2
56/2 56/4 56/7 56/11
56/14 56/15 59/1 66/23
67/4 70/15 74/10 76/15
92/6 98/1 105/1
upcoming [1] 10/1
upon [6] 7/21 9/13
10/9 11/12 17/12 75/22
us [8] 10/15 36/13 39/7
63/19 72/7 72/20 77/19
82/7
USDA's [2] 42/13
42/19
use [1] 49/17
used [3] 59/18 60/2
62/15
using [1] 31/16

**V**

VAN [18] 2/11 3/6 6/9
6/11 45/2 48/22 50/9
51/23 54/6 58/11 59/12

61/2 64/6 65/21 67/15
74/5 75/2 76/12
VAUGHN [3] 1/21
107/5 107/18
verify [1] 76/13
versus [1] 15/2
very [4] 33/17 90/21
100/22 103/5
veteran [3] 12/24 42/12
42/14
veteran/African-Americ
an [1] 42/12
veterans [1] 91/14
vetted [1] 28/17
views [1] 90/20
violated [3] 8/16 8/16
8/18
violating [1] 100/14
virtue [1] 38/22
volatility [1] 29/23

**W**

wait [4] 34/12 79/15
79/15 92/21
want [20] 6/21 20/20
24/4 30/11 33/12 36/21
38/3 71/21 76/15 77/13
79/15 79/16 96/14
96/19 96/20 96/20
96/22 97/12 98/12
98/23
wanted [2] 44/5 44/21
wants [2] 78/1 92/7
warrant [1] 9/11
was [106] 4/15 7/8
7/10 7/11 10/2 11/23
16/10 18/2 19/21 19/22
21/18 21/18 21/19 22/8
22/22 23/4 23/20 24/16
25/4 25/4 25/15 25/17
25/20 26/5 26/15 26/24
27/8 27/12 27/16 27/17
28/9 28/9 28/11 28/18
29/5 29/12 29/16 29/16
29/20 29/23 30/5 30/6
30/9 31/3 31/6 32/1
32/7 33/15 34/6 35/11
37/13 38/15 40/11 44/4
44/20 45/19 45/19 46/6
46/18 47/8 48/7 48/8
48/19 54/5 54/19 56/5
57/3 57/10 57/22 58/10
58/17 58/20 58/22
58/23 58/24 59/3 59/21
60/7 62/16 63/22 69/9
69/13 70/4 74/6 74/18
75/2 76/9 79/6 79/8
79/24 79/24 80/2 94/5
94/8 94/11 94/13 94/20
94/23 97/15 97/16
97/17 97/18 97/22 98/9
103/7 106/12
wasn't [2] 95/2 96/7
waste [1] 64/11
way [8] 29/24 44/22
48/6 88/24 96/6 96/6

96/7 102/24
we [109]
we'd [1] 21/13
we'll [9] 11/3 16/4
18/16 30/17 30/18
36/19 49/21 79/20
104/17
we're [28] 5/18 6/1
14/10 14/20 30/14
30/18 35/11 55/2 55/17
74/12 76/4 76/13 78/4
78/5 82/8 84/1 84/21
91/6 97/8 100/13
101/17 102/19 102/21
103/1 104/20 105/3
105/5 106/1
we've [10] 8/1 21/1
49/4 54/23 63/16 63/17
64/22 80/24 81/3
105/21
weather [5] 50/11
50/12 56/23 61/20
62/23
week [4] 26/20 28/22
29/12 69/10
weekend [1] 99/22
weigh [2] 82/24 84/6
weighs [1] 83/1
well [51] 11/2 14/4
14/15 18/5 19/9 20/11
23/14 26/5 26/18 27/15
34/4 38/9 41/7 42/7
44/10 45/16 45/23 47/6
47/12 51/13 51/14 55/7
56/1 56/10 56/21 57/19
60/23 61/11 61/23
62/15 64/18 66/4 68/6
71/21 72/16 72/18
73/14 74/14 74/19 79/5
79/12 83/22 93/8 93/20
93/20 94/19 97/13
100/20 101/14 102/15
103/3
well aware of [1]
102/15
went [1] 53/2
were [47] 1/13 9/17
23/23 23/24 26/4 26/8
27/10 29/8 30/8 30/23
30/24 31/12 31/13
31/16 31/22 31/24 32/6
32/24 33/2 33/2 36/6
36/16 36/23 39/5 43/1
46/2 55/7 55/21 56/10
56/11 56/13 56/13
56/15 56/16 56/24 62/5
69/11 69/23 69/24
69/24 70/12 76/1 80/3
81/20 89/7 94/13 97/20
weren't [2] 28/21 56/14
wet [1] 50/14
what [103] 8/18 12/6
12/6 12/17 12/22 13/11
14/9 14/10 16/17 16/17
17/10 18/10 19/1 19/21
20/4 20/14 21/5 21/5

21/19 22/6 22/12 23/12
24/15 25/13 26/4 27/9
27/20 29/5 29/20 29/23
30/8 30/22 31/15 31/24
32/22 34/14 34/22
36/21 37/4 39/3 41/15
41/15 42/5 46/6 47/3
47/4 47/8 47/8 47/9
47/10 48/1 48/7 48/11
49/7 49/20 49/24 50/2
54/16 55/8 55/24 56/5
57/1 57/4 57/6 57/22
59/16 60/4 60/19 61/23
62/1 62/7 65/6 66/5
66/6 71/18 72/21 75/2
76/16 77/16 77/22
77/22 77/24 79/3 80/1
80/3 80/14 80/17 90/4
94/1 94/6 94/15 95/4
95/8 95/8 97/13 97/24
101/9 102/6 102/19
104/4 105/2 105/12
105/24
what's [11] 37/6 45/22
48/5 49/10 62/14 63/19
71/16 71/20 73/23
90/14 105/20
whatever [5] 58/2
70/15 76/15 82/19
96/16
when [27] 1/12 10/3
17/13 18/18 24/7 26/3
26/24 27/14 29/12 46/4
46/20 47/21 47/23 62/8
66/23 67/24 68/15
70/13 75/18 77/18
86/15 87/9 97/16 100/3
101/8 104/1 105/2
where [18] 1/13 14/2
14/3 16/20 22/15 29/15
33/19 47/23 48/3 49/2
50/3 50/21 74/8 74/12
81/19 82/6 85/12 97/5
Where's [1] 23/8
Whereupon [8] 18/2
23/4 37/13 38/15 40/11
54/5 58/10 106/12
wherever [1] 64/24
whether [10] 14/6 14/6
24/4 56/4 82/18 97/19
98/13 101/4 101/18
102/3
which [18] 9/22 12/10
13/9 20/21 22/7 22/22
22/23 26/7 32/8 38/21
46/18 53/5 81/13 84/13
87/5 91/9 91/23 104/8
while [6] 9/8 11/7
86/21 91/18 101/3
104/19
who [12] 10/18 11/1
17/2 29/16 29/16 46/8
52/4 58/18 58/21 60/23
60/24 78/23
Who's [1] 52/21
whole [4] 79/16 94/19

**W**

**whole... [2]** 98/9
107/14
**whomever [1]** 70/2
**whose [1]** 58/14
**why [17]** 9/1 50/10
57/19 61/19 62/15
62/22 62/23 63/5 63/20
74/18 74/20 76/1 76/2
76/3 76/19 88/7 96/4
**will [43]** 7/7 8/9 8/12
8/16 8/18 9/13 11/13
11/15 16/6 17/24 20/8
20/9 20/10 36/5 37/7
38/14 38/20 40/2 40/9
48/19 48/20 49/24
52/13 54/8 54/9 59/11
61/13 62/13 69/20 72/3
72/10 77/21 82/14 83/8
90/2 91/3 92/1 92/8
92/12 99/16 104/2
105/13 105/14
**window [1]** 100/22
**wit [1]** 1/14
**within [4]** 13/14 26/23
57/9 60/12
**without [8]** 8/8 10/9
11/2 67/2 67/21 76/8
89/21 105/23
**witness [10]** 11/19
15/13 15/21 22/23 44/9
44/11 44/14 51/19 71/5
107/15
**witnesses [2]** 71/16
75/5
**won't [6]** 10/15 10/16
10/18 82/13 99/21
99/22
**word [2]** 66/20 67/3
**work [4]** 11/3 41/9
68/10 89/10
**worked [1]** 100/7
**working [1]** 105/3
**works [1]** 100/9
**worry [1]** 26/13
**worth [1]** 49/20
**would [86]** 5/5 8/19
10/10 11/16 12/3 12/17
13/18 15/9 15/15 16/14
17/3 17/17 18/5 23/21
24/3 26/8 26/10 26/11
26/14 27/11 27/15
29/24 38/18 40/14
40/17 41/9 42/3 42/5
42/8 42/9 42/12 42/15
43/3 43/5 43/19 47/3
47/3 47/6 49/17 49/19
50/2 50/16 53/24 56/6
56/8 57/15 60/17 60/20
61/13 62/1 68/9 69/20
69/22 70/1 71/9 71/13
73/16 74/7 74/24 79/11
80/7 83/6 84/13 86/8
88/15 89/22 90/23 91/4
91/5 91/9 91/16 95/18
95/19 95/21 96/9 96/9

97/13 99/8 99/20 99/21
100/4 100/5 100/6
100/18 100/18 101/9
**wouldn't [2]** 65/13
98/6
**write [4]** 78/14 78/16
89/8 100/2
**written [1]** 96/7
**wrong [2]** 76/22 98/5
**wrote [2]** 78/2 78/3

**Y**

**y'all [2]** 48/6 76/14
**yeah [8]** 20/7 51/14
54/15 54/19 60/12
68/13 102/12 102/16
**year [15]** 5/23 10/1
17/14 23/19 23/20
23/21 24/1 24/1 24/2
24/5 40/2 53/10 57/4
82/12 86/15
**year's [1]** 57/1
**years [9]** 9/15 23/22
23/24 23/24 42/11
43/14 66/15 82/11
88/20
**yes [80]** 4/3 12/16
12/20 13/17 14/16
14/17 15/11 17/9 18/19
18/20 18/22 19/16
19/20 20/24 21/10
21/12 21/23 22/10
22/20 23/7 23/21 24/11
24/14 25/1 25/20 26/1
31/13 32/3 32/21 33/3
33/21 34/1 35/3 35/6
35/14 36/4 37/1 42/4
43/19 45/5 45/13 47/11
47/19 49/14 49/19
50/20 52/9 52/11 52/19
53/17 54/11 55/6 59/19
60/7 60/16 61/1 61/5
64/13 64/17 66/2 67/3
67/8 67/18 69/18 70/9
70/11 70/23 71/1 71/22
77/15 79/10 80/4 80/16
93/4 96/23 98/22 99/3
104/3 104/6 104/9
**yet [2]** 63/24 104/16
**yield [6]** 46/3 47/4 47/6
47/13 48/4 57/1
**yielded [4]** 47/8 47/9
47/10 47/20
**yielding [2]** 46/8 46/9
**yields [1]** 55/2
**you [292]**
**you'll [9]** 51/24 52/1
52/13 53/3 64/7 64/8
65/14 76/8 99/18
**you're [21]** 14/3 22/22
33/10 34/14 43/2 46/8
46/9 47/7 47/13 47/17
48/4 52/23 58/2 62/8
65/18 67/24 68/1 95/4
96/17 100/16 100/17
**you've [4]** 45/3 57/13

63/13 66/10
**young [6]** 5/22 58/20
83/14 84/1 84/4 84/7
**your [178]**
**yourself [1]** 42/22
**youth [1]** 13/7

| STATE OF TENNESSEE 30th JUDICIAL DISTRICT CHANCERY COURT | **SUMMONS**** | DOCKET NUMBER CH- 19-1677-1 |
|---|---|---|

| Plaintiff *Cameron Burrell* | Defendant *Indigo Ag Inc.* |
|---|---|

| TO    (NAME AND ADDRESS OF DEFENDANT) / *Indigo Ag. Inc. ℅ CT Corporation System 300 Montvue Road Knoxville, TN. 37919-5546* | RECEIVED JAN 10 2020 CHANCERY COURT | Method of Service ☐ Shelby County Sheriff ☐ Private Process Server ☐ Out of County Sheriff* ☐ Secretary of State* ☐ Comm Of Insurance* ☒ Certified Mail ☐ Other     *Attach Required Fees |
|---|---|---|

You are summoned to defend a civil action filed against you in the Chancery Court of Shelby County, Tennessee  Your defense to this action must be made within thirty (30) days from the date this summons is served upon you  You must file your defense with the Clerk of the Court and send a copy to the Plaintiff/Plaintiff's attorney at the address listed below   If you  fail to defend this action within thirty  (30) days of service, judgment by default may be rendered against you for  the relief sought in the complaint  Questions regarding this summons  and the  attached documents should be  addressed to  the  Attorney/Plaintiff listed below

| Attorney for Plaintiff or Plaintiff if filing Pro Se (Name, address & telephone number) *Paul Robinson Jr. 5749 Marty Street Memphis TN. 38109 901-649-4053* | ISSUED *12th* _of_ *December*, 20 *19* W. Aaron Hall, Clerk  and Master By _____ Deputy Clerk & Master 140 Adams, Room 308    Memphis, TN 38___ |
|---|---|
| TO THE SHERIFF | Came to hand _____ day of_____, 20 _____ |
| | Sheriff |

**CERTIFICATION (IF APPLICABLE)**

| I, Donna L Russell, Clerk & Master of the Chancery Court in the State of Tennessee, Shelby County, do certify this to be a true and correct copy of the original summons issued in this case | W. Aaron Hall, Clerk & Master By _____ D C & M |
|---|---|

**Submit one original and one copy for each defendant to be served

 If you need accommodations because of a **disability**, please call the ADA Coordinator at ( 901)222-2357
**For questions regarding scheduling or filing, please contact the court**

Notice of Personal Property Exemption.
   TO THE DEFENDANT(S)
      Tennessee law provides a ten thousand dollar ($10,000 00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court  The list may be filed at any time and may be changed by you thereafter as necessary, however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed, these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books  Should any of these items be seized you would have the right to recover them  If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer  Please state docket number on list.

## RETURN OF SERVICE OF SUMMONS

I hereby certify that I **HAVE** served the within summons

By delivering on the _____ day of _____, 20 _____ at _____ am/pm a copy of the

summons and a copy of the Complaint to the following Defendant : _____

at _____

_____        By _____
Signature of person accepting service                       Sheriff or other authorized person to serve process

## RETURN OF NON-SERVICE OF SUMMONS

I hereby certify that I **HAVE NOT** served the within summons

To the named defendant _____ because _____

is (are) not to be found in this county after diligent search and inquiry for the following reason(s) _____

This _____ day of _____, 20 _____

                                                    By _ Sheriff or other authorized person to serve process

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _6th_ day of _January_, 20 _20_, I sent, postage prepaid, by registered return receipt

mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case CH- _19-1677_ to the

defendant _Indigo G. To ct Corporator_ On the _9 u_ day of _January_, 20 _20_, I

received the return receipt, which had been signed by _Savintla Sutton_ on the _7m_ day of _January_,

20 _20_ The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master

| Sworn to and subscribed before me on this _10 7_ day of | Signature of Plaintiff, Plaintiff's attorney or other person authorized by statute to serve process |
|---|---|
| _January_, 20 _20_. | |
| Signature of ____ Notary Public or ____ Deputy Court Clerk | |
| My Commission Expires | |

ATTACH RETURN

RECEIPT HERE

(IF APPLICABLE)

USPS TRACKING #

9590 9402 5599 9274 9174 67

**United States Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

Atty. Paul Robinson
3749 Marty Street
Memphis, TN. 38109

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _Samantha Sutton_  ☐ Agent  ☐ Addressee<br>B. Received by *(Printed Name)*  JAN 07 2020   C. Date of Delivery |
| 1. Article Addressed to:<br><br>CT Corporation System<br>300 Montvue Road<br>Knoxville, TN. 37919-5546 | D. Is delivery address different from item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No |
| ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖<br>9590 9402 5599 9274 9174 67 | 3. Service Type<br>☐ Adult Signature<br>☐ Adult Signature Restricted Delivery<br>☐ Certified Mail®<br>☐ Certified Mail Restricted Delivery<br>☐ Collect on Delivery<br>☐ Collect on Delivery Restricted Delivery<br>☐ Insured Mail<br>☐ Insured Mail Restricted Delivery (over $500) | ☐ Priority Mail Express®<br>☐ Registered Mail™<br>☐ Registered Mail Restricted Delivery<br>☐ Return Receipt for Merchandise<br>☐ Signature Confirmation™<br>☐ Signature Confirmation Restricted Delivery |
| 2. Article Number *(Transfer from service label)*<br>EE 29 1400 959 US | |
| PS Form 3811, July 2015 PSN 7530-02-000-9053 | Domestic Return Receipt |